## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

**ROBERT JOHNSON, as**    )
**Personal Representative**
**for the ESTATE OF IRENA JOHNSON,)**

     **Plaintiff,**    )    **CIVIL ACTION NO.: 2:07cv1068-MHT**

**v.**    )

**DENITA COLVIN and**    )
**WILLIE EVA BALDWIN, et al.**
    )
     **Defendants.**

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANT WILLIE EVA BALDWIN

COMES NOW Defendant Willie Eva Baldwin ("Defendant Baldwin") in the above-styled cause, and moves this Honorable Court, pursuant to Rule 56 of the *Federal Rules of Civil Procedure*, for entry of summary judgment as to each of the plaintiff's claims asserted against her.

As grounds therefor, Defendant Baldwin submits that there is no genuine issue of material fact and she is entitled to judgment as a matter of law.  This Motion is based upon: (1) the plaintiff's complaint, as amended, and Defendant Baldwin's answer thereto (Exhibit A); (2) the deposition of Defendant Baldwin (Exhibit B) (specific pages and lines of her testimony are designated in her summary judgment brief); and (3) Defendant Baldwin's Summary Judgment Brief, which contains the undisputed material facts and applicable Alabama law.

WHEREFORE, based upon the submissions by Defendant Willie Eva Baldwin, as enumerated above, she respectfully requests that this Honorable Court enter summary judgment in her favor as to all claims set forth in plaintiff's complaint in this cause.

/s/ David W. Henderson
DAVID W. HENDERSON (ASB-4048-D57H)
RANDALL MORGAN (ASB-8650-R70R)
Attorneys for Defendant Willie Eva Baldwin

OF COUNSEL:
HILL, HILL, CARTER, FRANCO,
      COLE & BLACK, P.C.
P.O. Box 116
Montgomery, AL 36101-0116
(334) 834-7600

## CERTIFICATE OF SERVICE

     I hereby certify that I have this date electronically filed the foregoing with the Clerk of the Court using the Ala-File system and served a copy via United States Mail, postage prepaid, properly addressed this the 28th day of July, 2008 to the following:

Zachary T. Collins, Esq.
318 North Decatur Street
Montgomery, AL 36104

J. Lenn Ryals, Esq.
RYALS, PLUMMER, DONALDSON,
      AGRICOLA & SMITH, P.C.
60 Commerce Street, Suite 1400
Montgomery, AL 36104

/s/ David W. Henderson
OF COUNSEL

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

ROBERT JOHNSON, as personal )
representative for the ESTATE OF )
IRENA JOHNSON, )
       )
    Plaintiff, )
       )
v. )
       )
DENITA COLVIN; WILLIE EVA BALDWIN; )
and ACE AMERICAN INSURANCE )
COMPANY, et al. )
       )
    Defendants. )

**CASE NO.: 2:07cv1068-MHT**

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

### PLAINTIFF'S SECOND AMENDED COMPLAINT

**COMES NOW**, the Plaintiff, Robert Johnson, as personal representative of the

Estate of Irena Johnson, deceased, and for his complaint against Defendants and states

the following:

### STATEMENT OF PARTIES

1.    Plaintiff, Robert Johnson, is an individual over the age of nineteen (19) years

and is the legal representative to the Estate of Irena Johnson. At the time of her death,

Irena Johnson, deceased, was a resident citizen of Philadelphia County, in the

Commonwealth of Pennsylvania. The estate of the decedent was established in

Philadelphia County, Pennsylvania. **(See Exhibit A)** Pursuant 28 U.S.C. § 1332 (c)(2),

the Plaintiff is deemed a citizen of Philadelphia County in the Commonwealth of

Pennsylvania.

2.    Defendant, Denita Colvin, (hereafter "COLVIN") is an individual over the age

of nineteen (19) years and a resident citizen of Montgomery County, Alabama.



3. Defendant, Willie Eva Baldwin, (hereafter "BALDWIN") is an individual over the age of nineteen (19) years and resident citizen of Henry County, Georgia.

4. Defendant, ACE American Insurance Company, (hereafter "ACE") is a Pennsylvania corporation doing business by agent in the State of Alabama at large. The principal address for this Defendant is 436 Walnut Street, Philadelphia, PA 19106.

### JURISDICTION AND VENUE

5. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 and § 1337 as the Plaintiff's claims involve an amount in excess of $75,000; are between citizens of different States; and are so related to the claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy, those supplemental claims not being inconsistent with the jurisdictional requirements of § 1332.

6. Venue is proper in the United States District Court for the Middle District of Alabama pursuant to 18 U.S.C. § 1391 in that the conduct, acts, or omissions giving rise to this litigation occurred in Montgomery County, Alabama.

### FACTUAL ALLEGATIONS

7. On July 27, 2007, Defendant Baldwin rented a 2007 Hyundai Sonata from Hertz Rental Car Company (a/k/a Hertz Global Holdings, Inc.) at the Hartsfield-Jackson International Airport in Atlanta, Georgia.

8. At all material times thereto, Plaintiff's mother, Irena Johnson, deceased, was a guest and/or passenger in the vehicle driven by Defendant Baldwin.

2

9.    Defendant Baldwin got lost in the Atlanta area and began traveling on Interstate 85 south and subsequently ended up in Montgomery, Alabama near the Interstate 65 interchange.

10.    According to information and belief, witnesses advised that Defendant Baldwin was traveling west on I-85 South in the right lane when she suddenly started backing up into oncoming traffic on I-85.

11.    Defendant Colvin, also traveling west on I-85, collided into the rear of Defendant Baldwin, the vehicle in which Irena Johnson, deceased, was a guest and/or passenger.

12.    Defendant Colvin, at all times relevant to this cause of action, was in violation of § 32-5A-191 of the Code of Alabama when she drove or otherwise exercised actual physical control of a vehicle while having a blood alcohol content (hereafter BAC) of .11 percent, and she subsequently pled guilty to a charge of DUI in the Municipal Court of Montgomery County, Alabama.

13.    As a proximate result of the collision by and between Defendants Colvin and Baldwin, Plaintiff's mother, Irena Johnson, was killed.

14.    Plaintiff brings this wrongful death action pursuant to§ 6-5-410 of the Code of Alabama.

## COUNT ONE
### [Wrongful Death – Negligence]

15.    Plaintiff hereby incorporates by reference, as is fully set forth herein, each and every allegation contained in paragraphs 1 through 14, inclusive, of this Complaint.

3

16.    Defendant Colvin acted negligently by driving or otherwise exercising actual physical control of a vehicle while having a BAC of .11 percent in violation of § 32-5A-191 of the Code of Alabama.

17.    Defendant Colvin acted negligently by operating her vehicle on a busy public interstate while having a BAC of .11 percent. Such conduct constitutes a failure to exercise ordinary and reasonable care while on the roadways of Alabama. At all material times thereto, Defendant Colvin had the last clear chance to avoid the collision with the vehicle in which Irena Johnson, deceased, was a guest and/or passenger, to wit:  the vehicle driven by Defendant Baldwin, in which Irena Johnson was a passenger and/or guest, was in a perilous position; Defendant Colvin knew or, upon the exercise of due diligence, should have known that the vehicle driven by Defendant Baldwin was in a perilous position; that armed with such knowledge Defendant Colvin failed to use reasonable and ordinary care in avoiding the collision; that with the use of ordinary and reasonable care Defendant Colvin could have avoided the collision; and that Plaintiff's mother, Irena Johnson, was killed as a result of the collision by and between Defendants Colvin and Baldwin.

18.    At all times material thereto, Defendant Colvin had a duty to drive in a reasonably safe manner while traveling upon the roadways of Alabama, to wit: by not driving or otherwise exercising actual physical control of a vehicle with a BAC of .08 percent or more pursuant to § 32-5A-191 of the Code of Alabama.

19.    Defendant Colvin breached that duty when she drove and otherwise exercised actual physical control of a vehicle while having a BAC of .11 percent, such violation constituting negligence *per se*.

4

20.    As a proximate consequence of Defendant Colvin's conduct, Plaintiff's mother, Irena Johnson, was killed.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendant Colvin in an amount of Punitive and Exemplary damages as awarded by a struck jury.

## COUNT TWO
### [Wrongful Death – Gross Negligence]

21.    Plaintiff hereby incorporates by reference, as is fully set forth herein, each and every allegation contained in paragraphs 1 through 20, inclusive, of this Complaint.

22.    Defendant Colvin acted with gross negligence by driving or otherwise exercising actual physical control of a vehicle while having a BAC of .11 percent.

23.    Notwithstanding any allegation of sudden emergency, Defendant Colvin had the last clear chance to avoid the collision with the vehicle in which Irena Johnson, deceased, was a guest and/or passenger, to wit: the vehicle driven by Defendant Baldwin, in which Irena Johnson was a passenger and/or guest, was in a perilous position; Defendant Colvin, knew or, upon the exercise of due diligence, should have known that the car driven by Defendant Baldwin was in a perilous position; that armed with such knowledge Defendant Colvin failed to use reasonable and ordinary care in avoiding the collision; that with the use of ordinary and reasonable care Defendant Colvin could have avoided the collision; and that Plaintiff's mother, Irena Johnson, was killed as a result of the collision by and between Defendants Colvin and Baldwin.

24.    At all times material thereto, Defendant Colvin had a duty to drive in a reasonably safe manner while traveling upon the roadways of Alabama, to wit: by not driving while voluntarily intoxicated such that she was mentally and physically impaired.

25.    Defendant Colvin breached that duty when she operated her vehicle upon a busy interstate with a BAC of .11 percent.

26.    As a proximate consequence of Defendant Colvin's conduct, Plaintiff's mother, Irena Johnson, was killed.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendant Colvin in an amount of Punitive and Exemplary damages as awarded by a struck jury.

### COUNT THREE
### [Wrongful Death – Wantonness]

27.    Plaintiff hereby incorporates by reference as if fully set forth herein each and every allegation in paragraph 1-26, inclusive, of this Complaint.

28.    Defendant Baldwin acted intentionally, with wantonness, and with extreme recklessness and disregard for the safety of others by backing into oncoming traffic upon the interstate highways with reckless indifference to the knowledge that such act would likely or probably result in injury and/or death.

29.    Defendant Colvin acted intentionally, with wantonness, and with extreme recklessness and disregard for the safety of others by driving or otherwise exercising actual physical control of a vehicle while having a BAC of .11 percent with reckless indifference to the knowledge that such act would likely or probably result in injury and/or death.

30.    Notwithstanding any allegation of sudden emergency, Defendant Colvin had the last clear chance to avoid the collision with the vehicle in which Irena Johnson, deceased, was a guest and/or passenger, to wit: the vehicle driven by Defendant Baldwin, in which Irena Johnson was a passenger and/or guest, was in a perilous position;

6

Defendant Colvin, knew or, upon the exercise of due diligence, should have known that the vehicle driven by Defendant Baldwin was in a perilous position; that armed with such knowledge Defendant Colvin failed to use reasonable and ordinary care in avoiding the collision; that with the use of ordinary and reasonable care Defendant Colvin could have avoided the collision; and that Plaintiff's mother, Irena Johnson, was killed as a result of the collision by and between Defendants Colvin and Baldwin.

31.    As a proximate consequence of Defendants' conduct, Plaintiff's mother, Irena Johnson, was killed.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendants in an amount of Punitive and Exemplary damages as awarded by a struck jury.

### COUNT FOUR
**[Breach of Contract - Underinsured Motorist Coverage]**

32.    Plaintiff hereby incorporates by reference as if fully set forth herein each and every allegation in paragraph 1-31, inclusive, of this Complaint.

33.    At all times material thereto, the rental car owned by Hertz and driven by Defendant Baldwin was covered by an excess rental liability policy underwritten by ACE American Insurance Company (hereinafter referred to as "ACE"). (**See Exhibit B – Excess Rental Liability Policy**) Additionally, the acts and/or omissions giving rise to this wrongful death action occurred during the rental period and within the policy territory governed by the excess policy.

34.    Irena Johnson, decedent, was an insured on the excess rental liability policy issued to Hertz Global Holdings, Inc. during the rental period covered by said policy.

7

35.     The excess liability policy defines an "insured" as "...any person **Occupying** the **Automobile** with the permission of the **Authorized Driver** who is entitled to coverage under any applicable Uninsured or Underinsured Motorist Legal Statute..."

36.     At all times material thereto, Defendant, Willie Eva Baldwin was an authorized driver of the rental car owned by Hertz subject to the excess rental liability policy during the rental period.

37.     The excess rental liability policy provides, in part, Underinsured Motorist Coverage limits of the difference between the minimum limits protection required by statute to be provided by the underlying statute and a maximum of $100,000 for each accident. The Plaintiff, on behalf of the estate of Irena Johnson, is legally entitled to recover punitive damages arising out of this underinsured motorist claim.

38.     Under the excess rental liability policy, ACE agreed to pay all sums the insured is legally entitled to recover as compensatory damages from the owner or driver of an underinsured motor vehicle in excess of those payable under the terms of underlying protection. The damages must result from bodily injury and (a) must exceed the amount of the minimum coverage limits required for such coverage in the state the automobile is principally garaged and (b) be sustained by the Insured as a result of an accident involving an automobile that takes place during the term of the rental agreement and within the policy territory.

39.     At the time of the accident, the automobiles being operated by the defendants Baldwin and Colvin were underinsured, in that any insurance in force on their vehicles did not and does not provide adequate coverage for the claims and damages asserted by the Plaintiff on behalf of the estate of the deceased, Irena Johnson.

8

40.    The deceased insured has otherwise complied with the terms of the contract with the Defendant ACE and is entitled to be paid by ACE any and all damages sustained by the deceased resulting form the negligence, gross negligence, or wantonness of the defendants.

41.    The Defendant ACE has breached its contract with the estate of the deceased insured by failing to make any payments to the decedent's estate under the underinsured motorist provision of the policy.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendants in the amount of $100,000 as punitive damages for breach of contract, plus attorney's fees and costs.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff demands a jury trial in this action.

Respectfully Submitted, this the 7th day of February, 2008.

*/s/ Zachary T. Collins*
*/s/ Tonya D. Powell*
_____
Zachary T. Collins
Tonya D. Powell
Attorneys for Plaintiff

**OF COUNSEL:**
ZACHARY T. COLLINS, ATTORNEY AT LAW, LLC.
207 Montgomery Street, Suite 215
Montgomery, AL 36104
(334) 263-5575
(334) 263-5569

<u>**TO BE SERVED BY CERTIFIED MAIL**</u>
<u>**ON ACE AMERICAN INSURANCE COMPANY AT:**</u>

ACE American Insurance Company
436 Walnut Street
Philadelphia, PA 19106-3703

9

## CERTIFICATE OF SERVICE

I, Zachary T. Collins, certify that on the 7th day of February, 2008, the foregoing document was served on counsel/adverse party listed below, properly addressed and pre-paid, in the following manner:

( ) Facsimile;
( ) Facsimile, original to follow by United States mail, first class, properly addressed;
( ) United States mail, first class, properly addressed;
( ) United States mail, Express Mail delivery;
( ) Federal Express, overnight delivery;
( ) United Parcel Service, overnight delivery;
( ) Hand delivery;
(X) CM/ECF

OF COUNSEL:

**DAVID H. HENDERSON (ASB-4048-D57H)**
**RANDALL MORGAN (ASB-8650-R70R)**
Attorneys for Defendant Willie Eva Baldwin
Hill, Hill, Carter, Franco, Cole & Black, P.C.
P.O. Box 116
Montgomery, AL 36101-0116

**W. CHRISTOPHER WALLER, JR. (WAL187)**
**JAMES A. RIVES (RIV005)**
Attorneys for Defendant Denita Colvin
**BALL, BALL, MATTHEWS & NOVAK, P.A.**
2000 Interstate Park Drive, Suite 204
Post Office Box 2148
Montgomery, AL 36102-2148
Telephone (334) 387-7680
Facsimile  (334) 387-3222

/s/ Zachary T. Collins

**OF COUNSEL**

Case 2:07-cv-01068-MHT-WC    Document 27-2    Filed 02/11/2008    Page 1 of 1

File #: A4548-2007

Commonwealth of Pennsylvania } ss.
County of Philadelphia

I, RONALD R. DONATUCCI, Register for the Probate of Wills and Granting Letters of Administration in and for the County of Philadelphia, in the Commonwealth of Pennsylvania.

DO HEREBY CERTIFY AND MAKE KNOWN, That on the ___17th___ day of ___October___ in the year of

our Lord _____2007_____        LETTERS OF ADMINISTRATION

on the Estate of ___Irene Johnson___

(AKA: Irene Johnson)

_____

deceased, were granted unto ___Robert Johnson___

_____

having first been qualified well and truly to administer the same. And I further certify that no revocation of said Letters appears of record.

Given under my hand and seal of office,

Date of Death ___7/27/2007___        this ___17th___ day of ___October___    A.D., 20 07

_____
Deputy Register

NOT VALID WITHOUT ORIGINAL SIGNATURE AND IMPRESSED SEAL

10-14 (Rev.1/00)

PLAINTIFF'S EXHIBIT

Blumberg No. 5113



ACE American Insurance Company
436 Walnut Street
Philadelphia, PA 19106-3703
800-523-8254

# Excess Rental Liability Policy

## DECLARATIONS

Policy Number: CGO G23723463

Broker Name: **Willis of New Jersey**

Address: **25 B Vreeland Road, Florham Park, NJ**

**ITEM 1:** | NAMED INSURED:
**Hertz Global Holdings, Inc.**

**ITEM 2:** | NAMED INSURED ADDRESS:
**225 Brae Boulevard**
**Park Ridge, NJ 07656**

**ITEM 3:** | INSURED:

The following are "Insureds":

1. those persons renting an **Automobile** from the **Named Insured** who have agreed in writing to accept **Liability Insurance Supplement** for an additional daily charge as shown in the **Rental Agreement**,

2. any authorized driver of the **Automobile** described in the **Rental Agreement** during the time period the **Automobile** is rented to the person(s) described in 1 above,

3. any person **Occupying** the **Automobile** with the permission of the **Authorized Driver** who is entitled to coverage under any applicable Uninsured or Underinsured Motorist Legal Statute, and

4. the **Named Insured**.

**ITEM 4:** POLICY PERIOD:

Effective Date: **01/01/2007**     12:01 a.m.

Expiration Date: **01/01/2008**     12:01 a.m.

**ITEM 5:** SCHEDULE OF UNDERLYING PROTECTION

Limits of Protection as shown in the Rental Agreement.

**ITEM 6:** LIMITS OF LIABILITY (EACH ACCIDENT)

1. Bodily Injury and Property Damage Combined Single Limit:

   The difference between the Limits of Protection shown in Rental Agreement in the state in which the accident occurs and a combined single limit of $1,000,000 each occurrence for Bodily Injury (including death) and Property Damage.

2. Uninsured and Underinsured Motorist Coverage (if applicable) Combined Single Limit:

   If this Policy applies to damages which the Insured is entitled to collect under the terms of any uninsured or underinsured motorist law, the Limit of Liability shall be the difference between the minimum limits required by statute to be provided by the Underlying Protection and a maximum of $100,000 each accident.

DA-5Z90s (02/06)

PLAINTIFF'S
EXHIBIT
B

ITEM 7:             **POLICY PREMIUM:**

Advance Premium (Due at Inception):  Subject to Monthly Reports

Premium Computation:

Subject to monthly reports and audits, the Premium shall be computed at a rate of $ 11.95   per insured described in paragraph 1 of item 3 above times the number of days in the "Rental Period".

_____             _____
Date                        Countersigned By Authorized Signature

POLICY NUMBER:  CGO G23723463

# Excess Rental Liability Policy

ACE American Insurance Company
1601 Chestnut Street
Philadelphia, PA  19101-1484

| Policy Number:     CGO  G23723463 |
| --- |

## I.   INSURING AGREEMENTS

In consideration of the payment of the Premium as specified in the Declarations and subject to all the terms of this Policy, the **Company** agrees with the Named Insured as follows:

### A.   Excess Liability Coverage

The **Company** will pay all sums in excess of those payable under the terms of the **Underlying Protection**, up to the limit of liability identified in the Declarations, that the Insured is legally obligated to pay as damages, but only if they are because of Bodily Injury or Property Damage arising out of the operation or use of an Automobile;

(1)  by an **Authorized Driver/User;**

(2)  during the term of a **Rental Agreement;** and

(3)  within the **Policy Territory.**

Who is an Insured?

(a)  The Named Insured described in Item 3 of the Declarations; and

(b)  The Authorized Driver of the Automobile.

### B.   Uninsured/Underinsured Motorists Coverage

If uninsured/underinsured motorists coverage is afforded by **Underlying Protection,** the **Company** will also pay all sums the Insured is legally entitled to recover as compensatory damages from the owner or driver of an Uninsured Motor Vehicle or Underinsured Motor Vehicle in excess of those payable under the terms of **Underlying Protection.**  The damages must result from Bodily Injury or, if required by the law of the state in which the Automobile is principally garaged, **Property Damage,** and they must:

(a)  exceed the amount of the minimum coverage limits required to be provided for such coverage by the law of the state in which the Automobile is principally garaged; and

(b)  be sustained by the Insured as the result of an accident involving an Automobile that takes place during the term of the **Rental Agreement** and within the **Policy Territory.**

The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the Uninsured Motor Vehicle or Underinsured Motor Vehicle.

If uninsured/underinsured motorists coverage is not afforded by **Underlying Protection,** this uninsured/underinsured motorists coverage does not apply.

Who is an Insured?

The following persons are insureds under this coverage:

(a)  The Authorized Driver of the Automobile; and

(b)  Any person occupying the Automobile with the permission of its Authorized Driver.

D. The insurance afforded applies separately to each Insured by or against whom a claim is made or suit is brought except that the inclusion of more than one Insured shall not operate to increase the Company's Limit of Liability described in Item 6 of the Declarations.

E. No one will be entitled to receive duplicate payments for the same elements of loss under this coverage form and any other coverage form.

We will not make a duplicate payment under this coverage form for any element of loss for which payment has been made by or for anyone who is legally responsible. However, this does not include any amounts paid or payable under workers' compensation, medical payments, disability benefits or similar law.

III. COSTS, CHARGES AND EXPENSES LIABILITY

A. When coverage is available to the Insured under any Underlying Protection, the Company, although without obligation to do so, shall have the right and opportunity to associate in the defense and control of any claim or suit reasonably likely to involve the Company under this Policy.

B. In addition to the Limits of Liability, the Company will pay for claims and suits covered under this Policy:

(1) All expenses the Company incurs;

(2) The cost of bonds to release attachments in any suit the Company defends but only for bond amounts within our Limits of Liability;

(3) All costs taxed against the Insured in any suit the Company defends; and

(4) All interest on the full amount of any judgment that accrues after entry of the judgment in any suit the Company defends, but the Company's duty to pay interest ends when the Company has paid, offered to pay or deposited in court the part of the judgment that is within the Limits of Liability.

IV. DEFINITIONS

The following words and phrases have special meaning throughout this Policy:

A. "Automobile" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or equipment attached thereto) that the Named Insured rents pursuant to a Rental Agreement, but does not include Mobile Equipment.

B. "Authorized Driver" means only those persons authorized by the terms of a Rental Agreement to operate the Named Insured's Automobile.

C. "Bodily Injury" means bodily injury, sickness or disease including death resulting from any of these.

D. The "Company" means the insurance Company shown on the Declarations who is providing this insurance.

E. "Insured" means: a person described under the applicable "Who is an Insured" provision of either:

1. Section I., Insuring Agreement, Excess Liability Coverage; or

2. Section I., Insuring Agreement, Uninsured/Underinsured Motorists Coverage.

F. "Liability Insurance Supplement" means the insurance provided by this Policy.

G. "Mobile Equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

1. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

(3) by the Named Insured and an individual;

(4) for the individual's rental or lease of the Named Insured's "Automobile" for a period not exceeding thirty (30) days.

N.    "Rental Period" means the period for which an Automobile is rented. The first day of the Rental Period must occur during the Policy Period for this policy to apply.

O.    "Underlying Protection" means a standard policy of automobile liability insurance or an approved program of self-insurance of substantially similar scope, that meets or exceeds minimum motor vehicle liability requirements for a rental vehicle to which this insurance applies.

P.    "Uninsured Motor Vehicle" means a land motor vehicle or trailer:

    a.    For which no liability bond or policy at the time of an accident provides at least the amounts required by the applicable law where an Automobile is principally garaged;

    b.    For which an insuring or bonding company denies coverage or becomes insolvent; or

    c.    That is a hit-and-run vehicle and neither the driver nor the owner can be identified. The vehicle must either:

        (1)  Hit an insured or the Automobile the insured is occupying; or

        (2)  Cause Bodily Injury to an insured without hitting an insured or the Automobile the insured is occupying. The facts of the accident must be proved. We may request supporting evidence beyond the testimony of a person making a claim under this or any similar coverage to support the validity of such claim.

However, Uninsured Motor Vehicle does not include any vehicle:

        (a)  Owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer who is or becomes insolvent and cannot provide the amounts required by that motor vehicle law;

        (b)  Designed for use mainly off public roads while not on public roads;

        (c)  Owned by a governmental unit or agency;

        (d)  A vehicle operated on rails or crawler treads;

        (e)  Insured under a basic automobile insurance policy issued in accordance with state law; or

        (f)  While located for use as a residence or premises.

Q.    "Underinsured Motor Vehicle" means a land motor vehicle or trailer of any type to which a liability bond or policy applies at the time of an accident but the limit of liability of which is less than the excess limit of liability under this coverage form.

However, an Underinsured Motor Vehicle does not include any vehicle:

        (1)  Owned or operated by a self-insurer under any applicable motor vehicle law;

        (2)  Owned by any government unit or agency;

        (3)  Operated on rails or crawler treads;

        (4)  Designed for use mainly off public roads while not on public roads;

        (5)  While located for use as a residence or premises; or

        (6)  Owned by or furnished or available for the regular use of any Insured.

2. liability arising out of (a) the ownership, maintenance, operation, use, loading or unloading of any vehicle while being used in any prearranged or organized racing speed or demolition contest or activity or (b) the operation or use of any snowmobile or trailer designed for use therewith.

H. ~~Bodily Injury or Property Damage arising out of the transportation, storage, handling, distribution, sale, or disposal of asbestos or goods or products containing asbestos.~~

I. Bodily Injury or Property Damage arising out of the manufacturing, handling, distribution, sale, application, consumption or use of any products known as polychlorinated biphenyl or which contains polychlorinated biphenyl derivative or which is generally known in the chemical trade as having a like formulation, structure or function by whatever name manufactured, sold or distributed.

J. Bodily Injury or Property Damage:

1. With respect to which an Insured under this Policy is also an insured under a Nuclear Energy Liability policy issued by Nuclear Energy Liability Insurance Association, American Nuclear Insurer, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limits of liability;

2. Resulting from the hazardous properties of Nuclear Material and with respect to which:

   a. Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954 or any law amendatory thereof;

   b. The Insured is or, had this Policy not been issued, would be entitled to indemnity from the United States of America, or any agency, thereof, under any agreement entered into the United States of America or any agency, thereof, with any person or organization; or

3. Resulting from the hazardous properties of Nuclear Material if

   a. The Nuclear Material is at any nuclear facility owned by or on behalf of the Insured or has been discharged or disbursed therefrom;

   b. The Nuclear Material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Insured; or

   c. The Bodily Injury or Property Damage arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America its territories or possessions or Canada, this exclusion 3.c. applies only to Property Damage to such nuclear facility and any property threat.

As used in this exclusion,

"Property Damage" includes all forms of radioactive contamination of property.

"Hazardous Properties" include radioactive, toxic or explosive properties.

"Nuclear Material" means source material, special Nuclear Material or by-product material.

"Source Material", "Special Material" and "By-Product Material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

C.   APPEALS:   In  the  event  the  Insured  elects  not  to  appeal a judgment in excess of the **Underlying Protection**, the **Company** may elect to do so at its own expense, and shall be liable for the taxable costs, disbursements and interest incidental thereto, but in no event shall the liability of the **Company** exceed the amount set forth in Insuring Agreement for any one Occurrence plus the taxable costs, disbursement and interest incidental to such appeal.

D.   ASSIGNMENT:   Assignment of interest under this Policy shall not bind the **Company** until its consent is endorsed hereon.

E.   ASSISTANCE AND COOPERATION OF THE INSURED: The Insured shall cooperate with the **Company** in the investigation, settlement or defense of any claim or suit.

F.   BANKRUPTCY OR INSOLVENCY: The insolvency or financial impairment of an Insured does not increase the amounts the **Company** would otherwise have had to pay nor does this Policy become excess of any reduced recoveries available because of the insolvency or financial impairment.

G.   CANCELLATION:

    (1)   The first **Named Insured** may terminate this Policy by mailing or delivering to the **Company** advance written notice of such termination.

    (2)   The **Company** may terminate this Policy by mailing or delivering to the first Named Insured written notice of such termination at least:

        a.   15 days before the effective date of such termination if the Company terminates for nonpayment of Premium; or

        b.   90 days before the effective date of such termination if the Company terminates for any other reason.

    (3)   Termination as set forth in sub-paragraph (1) and (2) above shall not affect the right of any person who became an Insured prior to effective date of such termination but coverage shall terminate at the end of the Rental Period.

    (4)   The Company will mail or deliver their notice to the first Named Insured's last mailing address known to them.

    (5)   Notice of termination will state the effective date of such termination. The Policy Period will end on that date.

    (6)   If notice is mailed by either the Company or the first Named Insured, such notice shall be sent via certified mail. Proof of mailing will be sufficient proof of notice.

H.   CHANGES:   Notice to or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy nor stop the Company from asserting any rights under the terms of this Policy, nor shall the terms of this Policy, nor shall the terms of this Policy be waived or changed except by endorsement issued to form a part of this Policy, signed by an authorized representative of the Company.

I.   CONCEALMENT, MISREPRESENTATION OR FRAUD: This Policy shall be void with respect to any claim where an Insured commits fraud, or intentionally conceals or misrepresents any material fact.

J.   DECLARATIONS:   By acceptance of this Policy, the Insured agrees that the statements made in the Declarations are its agreements and representations, that this Policy is issued in reliance upon the truth of such representations and that this Policy embodies all agreements existing between itself and the Company or any of its representatives relating to this Insurance.

POLICY NUMBER: CGO G23723463

# POLICYHOLDER NOTICE
## EMERGENCY CONTACT INFORMATION

ACE USA

## NOTICE OF LOSS

Notice shall be given to the Company at the following address:

ACE American Insurance Company
1601 Chestnut Street
P.O. Box 41484
Philadelphia, PA 19101-1484

Actionline number: 1-800-523-9254

## David Henderson

| | |
|---|---|
| **From:** | efile_notice@almd.uscourts.gov |
| **Sent:** | Monday, February 11, 2008 4:58 PM |
| **To:** | almd_mailout@almd.uscourts.gov |
| **Subject:** | Activity in Case 2:07-cv-01068-MHT-WC Johnson v. Colvin et al Amended Complaint |

This is an automatic e-mail message generated by the CM/ECF system. Please **DO NOT RESPOND** to this e-mail because the mail box is unattended.
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.

### U.S. District Court

### Alabama Middle District

## Notice of Electronic Filing

The following transaction was entered on 2/11/2008 at 4:58 PM CST and filed on 2/11/2008
**Case Name:**          Johnson v. Colvin et al
**Case Number:**       2:07-cv-1068
**Filer:**                   Robert Johnson
**Document Number:** 27

**Docket Text:**
SECOND AMENDED COMPLAINT (w/jury demand) against all defendants, filed by Robert Johnson.
(Attachments: # (1) Exhibit A# (2) Exhibit B)(vma, )


**2:07-cv-1068 Notice has been electronically mailed to:**

Zachary Timothy Collins    zack@zackcollins.com, firm@zackcollins.com

David Wayne Henderson    dwhenderson@hillhillcarter.com

Randall C. Morgan    rmorgan@hillhillcarter.com, pferrara@hillhillcarter.com

Tonya Denita Powell    powell.tonyad@gmail.com

James A. Rives    jrives@ball-ball.com, firm@ball-ball.com

William Christopher Waller , Jr    CWaller@ball-ball.com, CStrickland@ball-ball.com

**2:07-cv-1068 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document

**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=2/11/2008] [FileNumber=881575-0]
[2ab7be83ba96ea49511592979343342d456bd5ed9e52f3c1672370eb5ce7d6091b9f
1b654316893662ec7c192575e86160349fde73bbcc5e4ec238fdf6304126]]
**Document description:** Exhibit A
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=2/11/2008] [FileNumber=881575-1]
[0ca8f8fb272f5aa1173f9d3d8833c0783ccdbd1b0714b65a1f4ef7889f47096fb347
6e165ea8501dce3bee1f6cba5d4e070d6ce51f4c43342bf8eac2c322072f]]
**Document description:** Exhibit B
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=2/11/2008] [FileNumber=881575-2]
[893f710fd68c7904767c54961ad4293c9efa9bb9ade09b5d34bba3e4966ef98bf173
78e228278b762a493b7824da8202a385a7c51d95eac60aee36127eab6655]]

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| ROBERT JOHNSON, as personal representative for the Estate of IRENA JOHNSON, <br><br> Plaintiff, <br><br> v. <br><br> DENITA COLVIN; WILLIE EVA BALDWIN, et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) CASE NO.: 2:07-CV-1068-MHT <br> ) <br> ) <br> ) <br> ) <br> ) |

### DEFENDANT WILLIE EVA BALDWIN'S ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT

COMES NOW, Defendant Willie Eva Baldwin ("Baldwin") in the above-styled cause, and in answer to the Plaintiff's Second Amended Complaint states as follows:

1.     This Defendant reasserts and incorporates herein by reference her previous responses and affirmative defenses plead in her previous answer to Plaintiff's original complaint and First Amended Complaint.

2.     This Defendant otherwise denies each and every material allegation in the Plaintiff's Second Amended Complaint and demands strict proof thereof.

3.     This Defendant admits the decedent died after the accident made the basis of this lawsuit.

4.     This Defendant avers that the actions of the Co-Defendant are the proximate cause of the accident made the basis of this lawsuit.

5.     To the extent that there are any bills or subrogation claims, this Defendant pleads accord, satisfaction, payment, waiver, *res judicata* and collateral estoppel.

## AFFIRMATIVE DEFENSES

1.    This Defendant pleads that the Second Amended Complaint fails to state a claim upon which relief can be granted as a matter of law.

2.    This Defendant denies each and every material allegation of the Plaintiff's Second Amended Complaint which is not admitted herein and demands strict proof of the same.

3.    This Defendant pleads the general issue.

4.    This Defendant avers she is not guilty of the things and matters alleged in the Plaintiff's Second Amended Complaint.

5.    This Defendant alleges the Plaintiff was guilty of assumption of the risk, and as a result, she is not entitled to recover.

6.    This Defendant alleges her conduct was not the proximate cause of any injuries and damages to the Plaintiff.

7.    Plaintiff's damages, if any, are the result of a superceding independent intervening cause.

8.    This Defendant pleads the doctrine of sudden emergency.

9.    This Defendant pleads the accident was unavoidable.

10.    This Defendant avers the Plaintiff was a guest and thus barred from recovery under Alabama's Guest Statute.

## PUNITIVE DAMAGES

11.    The award of punitive damages, to the extent if any, claimed by Plaintiff violates Article I, Section 10[1] and/or the Fourth, Fifth, Sixth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States and Article I, Section 6, and other

provisions of the Constitution of Alabama on the following separate and several grounds:

      (a)    That civil procedures pursuant to which punitive damages are awarded may result wrongfully in a punishment by a punitive damages award after the fact.

      (b)    That civil procedures pursuant to which punitive damages are awarded may result in the award of joint and several judgments against multiple defendants for different alleged acts of wrongdoing.

      (c)    That civil procedures pursuant to which punitive damages are awarded fail to provide means for awarding separate judgments against alleged joint tortfeasors.

      (d)    That civil procedures pursuant to which punitive damages are awarded fail to provide a limit on the amount of the award against the defendant.

      (e)    That civil procedures pursuant to which punitive damages are awarded fail to provide specific standards for the amount of the award of punitive damages.

      (f)    That civil procedures pursuant to which punitive damages are awarded fail to provide specific standards for the award of punitive damages.

      (g)    That civil procedures pursuant to which punitive damages are awarded permit the award of punitive damages upon satisfaction of the standard of proof less than that applicable to the imposition of criminal sanctions.

      (h)    That civil procedures pursuant to which punitive damages are awarded permit multiple awards of punitive damages for the same alleged act.

      (I)    That civil procedures pursuant to which punitive damages are awarded fail to provide a clear consistent appellate standard of review of an award of punitive damages.

      (j)    That civil procedures pursuant to which punitive damages are awarded

permit the admission of evidence relative to the punitive damages in the same proceeding during which liability and compensatory damages are determined.

(k)    That standards of conduct upon which punitive damages are awarded are vague.

(l)    That civil procedures pursuant to which punitive damages are awarded would permit the imposition of excessive fines.

(m)    That civil procedures pursuant to which punitive damages are awarded permit the award of punitive damages upon satisfaction of a standard of proof which is not heightened in relation to the standard of proof for ordinary civil cases.

(n)    That civil procedures pursuant to which punitive damages are awarded permit the imposition of arbitrary, capricious or oppressive penalties.

(o)    That civil procedures pursuant to which punitive damages are awarded fail to limit the discretion of the jury and the award of punitive damages.

12.    This Defendant avers that the demand for punitive damages in the instant case is subject to those limitations established by the Alabama legislature and set forth at *Alabama Code* § 6-11-21 (Repl. Vol. 1993).

13.    The Alabama Supreme Court's action in abolishing the legislatively-created cap on punitive damages was unconstitutional and without effect.

14.    Under the constitutions of the United States and the state of Alabama, the Alabama Supreme Court cannot abolish the cap created by the legislature on punitive damages through judicial decision. See *Honda Motor Company, Ltd. v. Oberg,* 114 S.Ct. 2331 (1994).

15.    To the extent that Plaintiff's demand for punitive damages may result in

multiple punitive damage awards to be accessed for the same act or omission against this Defendant, this award contravenes the Defendant's right to Due Process under the Fourteenth Amendment of the United States Constitution and the Due Process Clause of Article I, Section 13 of the Alabama Constitution. In addition, such an award would infringe upon the Defendant's right against double jeopardy insured by the Fifth Amendment of the United States Constitution and/or Article I, Section 9 of the Alabama Constitution.

16.     With respect to the Plaintiff's demand for punitive damages, the Defendants specifically incorporate by reference any and all standards or limitations regarding the determination and/or enforce ability of punitive damage awards that may be articulated in the decision of *BMW North American, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

17.     This Defendant contends that this Plaintiff is not entitled to an award of punitive damages, and that an award of punitive damages against this Defendant, on the facts of this case, would be contrary to the Constitution of the State of Alabama and the Constitution of the United States. Further, any award of punitive damages to the Plaintiff is limited to the standards set out in *BMW North American, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

18.     The Alabama system and structure for punitive damage awards, together with the claims for punitive damages sought by Plaintiff in this lawsuit, constitute a violation of the Due Process Clause of the Constitution of the United States, under authority of *BMW North American, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). The allegations made by Plaintiffs in this action, and the Plaintiff's claims for punitive damages generally, and under the Alabama system specifically, constitute inadequate notice to

defendant as to deprive defendant of due process of law.

19.     This Defendant avers that any award of punitive damages in this case would violate the Due Process Clause, equal protection clause, and other provisions of the United State Constitution including, but not limited to, as follows:

a.     <u>Due Process Clause - Fourteenth Amendment to the Constitution of the United States:</u> Punitive damages are vague and not rationally related to legitimate governmental interests.

b.     <u>Sixth Amendment to the Constitution of the United States:</u> Punitive damages are penal in nature and, consequently, the defendant is entitled to the same procedural safeguards accorded to criminal Defendants.

c.     <u>Self-incrimination Clause - Fifth Amendment to the Constitution of the United States:</u> It violates the right against self-incrimination to impose punitive damages against the defendant that are penal in nature, yet compel the defendant to disclose potentially incriminating documents and evidence.

d.     <u>Excessive Fines Clause - Eighth Amendment to the Constitution of the United States:</u> In the event that any portion of a punitive damages award against the defendant were to inure to the benefit of any state or governmental or private entity other than the Plaintiff, such an award would violate the excessive fines clause of the Eighth Amendment to the Constitution.

20.     Plaintiff's Complaint seeks to make this defendant liable for punitive damages.

Page 6

The United States Supreme Court has reversed the Alabama Supreme Court in the case styled *BMW of North America, Inc. v. Gore,* 116 S.Ct. 1589 (1996) on the issues of punitive damages. Defendant adopts by reference whatever defenses, criteria, limitations and standards as mandated by the United States Supreme Court decision in that case.

21.    This Defendant affirmatively pleads that any punitive damages that plaintiffs may recover in this case should be capped in keeping with *Ala. Code* § 6-11-21 and in the spirit of the Alabama Supreme Court's recent decision in *Oliver v. Towns,* 738 So.2d 798 (Ala. 1999).

22..    Plaintiff's demand for punitive damages is due to be struck because, on May 14, 2001, the United States Supreme Court released its decision in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424 (2001), holding that the amount of punitive damages, is not really a fact tried by the jury, and the right to jury trial is therefore not implicated.  The court pointed to a fundamental difference between compensatory and punitive damages.   Whereas compensatory damages are essentially a factual determination, punitive damages are an expression of more condemnation that essentially constitutes a conclusion of law.  The court cited the Eight Amendment in explaining that constitutional excessiveness protections apply to both criminal and civil punishments.

Such punishments should be determined by courts as a matter of law, rather than by a jury as a matter of fact.

23.    This Defendant avers that given Alabama's policy against apportionment of damages among joint tortfeasors, the imposition of punitive damages in the case at hand would punish Defendant for the conduct of others in violation of Defendant's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

24.    This Defendant avers that given Alabama's policy against apportionment of damages among joint tortfeasors, the imposition of punitive damages in the case at hand would subject Defendant to excessive fines in violation of the Eighth Amendment of the United States Constitution and Defendants due process rights.

25.    This Defendant avers that given Alabama's policy against apportionment of damages among joint tortfeasors, the imposition of punitive damages in the case at hand would punish Defendant for the conduct of others in violation of Defendants due process rights and Article I, § § 1 and 13 of the Alabama Constitution.

26.    This Defendant pleads all other affirmative defenses in bar or abatement of the claims asserted against her in the complaint.

/s/ David Henderson
DAVID W. HENDERSON (ASB-4048-D57H)
RANDALL MORGAN (ASB-8650-R70R)
Attorneys for Defendant Willie Eva Baldwin

OF COUNSEL:
HILL, HILL, CARTER, FRANCO,
    COLE & BLACK, P.C.
425 South Perry Street
P.O. Box 116
Montgomery, AL 36101-0116
(334) 834-7600

## CERTIFICATE OF SERVICE

I hereby certify that I have this date electronically filed the foregoing with the Clerk of the Court using the Ala-File system and served a copy via United States Mail, postage prepaid, properly addressed this the 21st day of February, 2008 to the following:

Zachary T. Collins, Esq.
207 Montgomery Street
Suite 213
Montgomery, AL 36104

James A. Rives, Esq.
William Christopher Waller, Jr., Esq.
Ball Ball Matthews & Novak PA
P.O. Box 2148
Montgomery, AL 36102-2148

American Insurance Company
436 Walnut Street
Philadelphia, PA 19106-3703

                            /s/ David Henderson
                            OF COUNSEL

**Answers to Complaints**
2:07-cv-01068-MHT-WC Johnson v. Colvin et al

### U.S. District Court

### Alabama Middle District

**Notice of Electronic Filing**

The following transaction was entered by Henderson, David on 2/21/2008 at 4:57 PM CST and filed on 2/21/2008
**Case Name:**        Johnson v. Colvin et al
**Case Number:**     2:07-cv-1068
**Filer:**                Willie Eva Baldwin
**Document Number:** 31

**Docket Text:**
ANSWER to Amended Complaint by Willie Eva Baldwin.(Henderson, David)

**2:07-cv-1068 Notice has been electronically mailed to:**

Zachary Timothy Collins    zack@zackcollins.com, firm@zackcollins.com

David Wayne Henderson    dwhenderson@hillhillcarter.com

Randall C. Morgan    rmorgan@hillhillcarter.com, pferrara@hillhillcarter.com

Tonya Denita Powell    powell.tonyad@gmail.com

James A. Rives    jrives@ball-ball.com, firm@ball-ball.com

William Christopher Waller , Jr    CWaller@ball-ball.com, CStrickland@ball-ball.com

**2:07-cv-1068 Notice has been delivered by other means to:**

Ace American Insurance Company
436 Walnut Street
Philadelphia, PA 19106-3703

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=2/21/2008] [FileNumber=887865-0]
[4d09ef26f9f94640a11620aacb723e317470b31c85ee603fbbc6b3b338d70ced926a
ee4b721a121107e70cfe5609d9ef9aef90e2fbf07de62319ee770822925b]]

# DEPOSITION OF
# WILLIE EVA BALDWIN

## February 27th and 28th, 2008

## Pages 1 through 185

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

EXHIBIT

B

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3  ROBERT JOHNSON, as Personal
   Representative of THE ESTATE OF
4  IRENA JOHNSON, Deceased,
5      Plaintiff,
6  vs.          CIVIL ACTION NO.
                2:07CV1068-MHT
7
   DENITA COLVIN and
8  WILLIE EVA BALDWIN, et al.,
9      Defendants.
10     * * * * * * * * * * * *
11     DEPOSITION OF WILLIE EVA BALDWIN, taken
12 pursuant to stipulation and agreement before Tracey
13 H. Rives, Certified Shorthand Reporter and
14 Commissioner for the State of Alabama at Large, in
15 the Law Offices of Barrickman, Allred & Young, 5775
16 Glenridge Drive, Atlanta, Georgia, on Wednesday the
17 27th day of February 2008 commencing at
18 approximately 2:15 p.m EST. and the Law Offices of
19 Ball, Ball, Matthews & Novak, 2000 Interstate
20 Drive, Montgomery, Alabama, on Thursday, the 28th
21 day of February 2008 commencing at approximately
22 5:05 p.m. CST.
23     * * * * * * * * * * * *

**Page 2**

1      APPEARANCES
2
3
4  FOR THE PLAINTIFF:
5  ZACHARY T. COLLINS, ESQ.
   TONYA D. POWELL, ESQ.
6  Attorneys at Law
   207 Montgomery Street
7  Suite 215
   Montgomery, Alabama
8
   FOR THE DEFENDANT DENITA COLVIN:
9
   W. Christopher Waller, Jr., Esq.
10 BALL, BALL, MATTHEWS,
     & NOVAK
11 Attorneys at Law
   Suite 204
12 2000 Interstate Park Drive
   Montgomery, Alabama
13
   FOR THE DEFENDANT WILLIE EVA BALDWIN:
14
   David W. Henderson, Esq.
15 HILL, HILL, CARTER, FRANCO,
     COLE & BLACK
16 Attorneys at Law
   425 South Perry Street
17 Montgomery, Alabama
   FOR THE DEFENDANT ACE AMERICAN INSURANCE COMPANY:
18
19 John M. Phillips, Esq.
   DORE, LANIER & PHILLIPS
20 Attorneys at Law
   76 South Laura Street
21 Suite 1701
   Jacksonville, FL 32202
22
23

**Page 3**

1      APPEARANCES (cont'd)
2  ALSO PRESENT: Denita Colvin
            Robert Johnson
3
4      * * * * * * * * * * * *
5
       INDEX
6
   EXAMINATION              PAGE
7
   By Mr. Collins ................................. 5
8
   By Mr. Collins (cont'd on 2/28) ............... 94
9
   By Mr. Waller ................................. 124
10
   By Mr. Phillips ............................... 164
11
   By Mr. Henderson ............................. 167
12
   By Mr. Collins ............................... 170
13
   By Mr. Waller ................................. 181
14
   EXHIBITS
15
16 PX-5 - List of medications .................... 23
17 PX-6 - Ms. Baldwin's driver's license ......... 35
18 PX-7 - AAA itinerary .......................... 45
19 PX-8 - Handwritten itinerary .................. 53
20 PX-9 - Hertz estimate of charges .............. 54
21 PX-10 - Hertz rental agreement ................. 60
22 PX-11 - Accident report (corrected copy) ...... 73
23

**Page 4**

1      INDEX (cont.'d)
2  EXHIBITS                  PAGE
3  PX-12 - Department of Police document .......... 92
4  PX-13 - Ms. Baldwin's statement ................ 93
5  PX-14 - Responses to Plaintiff's
        Interrogatories ..................... 104
6
   PX-15-59 - Photographs of scene ............... 109
7
8      * * * * * * * * * * * *
9
10     It is hereby stipulated and agreed by and
11 between counsel representing the parties that the
12 deposition of WILLIE EVA BALDWIN may be taken
13 before Tracey H. Rives, Certified Shorthand
14 Reporter and Commissioner for the State of Alabama
15 at Large, without the formality of a commission and
16 all formality with respect to other procedural
17 requirements is waived; that objections to
18 questions other than objections as to the form of
19 the question need not be made at this time but may
20 be reserved for a ruling at such time as the said
21 deposition may be offered in evidence or used for
22 any other purpose by either party as provided for
23 by the Federal Rules of Civil Procedure.

Page 5

1    It is further stipulated and agreed by
2    and between the parties hereto and the witness that
3    the signature of the witness to this deposition is
4    hereby waived.
5    * * * * * * * * * * * * *
6         WILLIE EVA BALDWIN
7         The witness, after having first been
8    duly sworn to speak the truth, the whole truth, and
9    nothing but the truth testified as follows:
10         EXAMINATION
11   BY MR. COLLINS:
12   Q.   Ms. Baldwin, my name is Zach Collins.  We
13        have met.  Not just today, but we have met
14        before.  And I, too, have been to the house
15        when you were present.  I represent your
16        nephew Mr. Johnson.
17             And can you just state for the
18        record, I've never talked to you about this
19        case at any time, have I?  You've got to say
20        yes or no.  Do you remember me talking to
21        you about this case?
22   A.   Yes.  Uh-huh (positive response).
23   Q.   Are you sure about that?

Page 6

1    A.   I think so.
2    Q.   Can you tell me when you talked to me about
3         this case?
4    A.   Was that yesterday?
5    Q.   No, ma'am.  I wasn't here yesterday.  I
6         believe you may have talked to your attorney
7         about this case, Mr. David Henderson.  Do
8         you remember talking to him?
9    A.   I think so.
10            MR. COLLINS:  Just for the record,
11        I have not talked to her about
12        the case.
13   Q.   Ms. Baldwin, if I ask you a question -- Have
14        you ever done a deposition before?
15   A.   I don't think so.
16   Q.   This is just an opportunity for us to talk
17        about the case that you are involved in.
18        And, again, I represent your nephew,
19        Mr. Johnson.  I'm going to ask you some
20        questions, and occasionally I may not
21        understand your answer, so I will probably
22        ask you some follow-up questions just for
23        clarification.  When you are prepared to

Page 7

1    answer the question, just make sure you say
2    yes or no or answer it verbally.  But don't
3    shake your head side to side or up and down
4    because she has to take it down.  Okay?
5    A.   Uh-huh (positive response).
6    Q.   I have a tendency of talking loud.  Please
7    know I'm not screaming at you.  I just --
8    They'll tell you, I just kind of talk loud.
9    I think I may be going deaf or something,
10   but I just talk loud.
11   A.   I am, too, sort of.
12   Q.   Okay.  Are you on any medications?  Have you
13        taken any medications today, this morning?
14   A.   Yes.
15   Q.   Can you tell me what medications you've
16        taken?
17             Before you do that, spell your name for
18        us.
19   A.   W-i-l-l-i-e.
20   Q.   And your middle name is...
21   A.   E-v-a.
22   Q.   And last name...
23   A.   B-a-l-d-w-i-n.

Page 8

1    Q.   Thank you.  And tell me what medications
2         that you are currently on that you've taken
3         this morning.
4    A.   This morning, Fexofendadine.
5    Q.   Can you spell that for me?
6    A.   F-e-x-o-f-e-n-d-a-d-i-n-e.
7    Q.   Do you know what that medication is for?
8    A.   It's an antihistamine.
9    Q.   Why are you taking it?  What illness or
10        ailment do you have that causes you to have
11        to take that particular medicine?  Do you
12        know?
13   A.   Uh-uh (negative response).
14   Q.   Was that a yes or a no?
15   A.   No, I don't know.
16   Q.   What other medication have you taken this
17        morning?
18   A.   This morning K-o-l-o-r-c-o-n (sic) 10
19        P-o-t-a-s-s-i-u-m.
20   Q.   Do you know what that's for?
21   A.   It goes with the water pill.
22   Q.   When you say the water pills, what are you
23        referring to?

February 27th and 28th, 2008

Deposition of Willie Eva Baldwin

Page 9

1    A.  I'm going take another -- oh, another one.
2        The water pill is L-e-s-i-x (sic).
3    Q.  Do you know what that's for?  When you say
4        water pill, what does it help you with?
5    A.  It helps me go to the bathroom too much.
6    Q.  So it slows down your urinary tract system
7        or stops you from using the bathroom all the
8        time?
9    A.  It helps send me.
10   Q.  Oh, it helps send you to the bathroom.  All
11       right.
12   A.  F-u-r-o-s-e-m-i-d-e.
13   Q.  Do you know what that medicine is for?
14   A.  That's -- It's in parentheses after the
15       L-a-s-i-x.
16   Q.  Okay.  So that's part of the Lasix?
17   A.  Yeah.
18   Q.  Now, those three medicines, you've taken
19       those this morning; is that correct?
20   A.  Right.
21   Q.  Now, I believe -- Do you also take eye
22       drops?
23   A.  Yes.

Page 10

1    Q.  What's the name of that medicine?
2    A.  A-l-p-h-a-g-a-n.  It is a solution of zero
3       point one.
4          MR. WALLER:  Do y'all want to do
5       this?  Zach, I don't mean to
6       interrupt.
7          Ma'am, could you give us
8       that and we can put that on the
9       record?  We can attach it, so
10      we can all have it.  Would that
11      help you out, Zach?
12   Q.  Ms. Baldwin, all of the medicines that
13       you've taken this morning, do any of those
14       medicines prevent you from being able to
15       testify right now at this deposition?
16   A.  I don't think so.
17   Q.  None of them affect your mental abilities to
18       be able to answer questions that I ask you?
19   A.  I don't think so.
20   Q.  You are not having any side effects from any
21       of those medicines right now, are you?
22   A.  No.
23   Q.  At the appropriate time you can give a list

Page 11

1    to your attorney and I'll get a copy from
2    him.  Okay?
3         MR. WALLER:  Do y'all want to --
4       While we've got it now, Zach,
5       so we can all see it.  Ma'am,
6       do you have another copy of
7       that?
8         MR. COLLINS:  Oh, is she reading
9       from a list?
10      MR. WALLER:  Yes.  Ma'am, is that
11      a copy that we can have?
12      THE WITNESS:  I can copy it.
13      MR. WALLER:  Is that another copy
14      that you are looking at now?
15      THE WITNESS:  Yes.
16      MR. WALLER:  Is that in addition
17      to this other one that
18      Mr. Johnson has?
19      MR. COLLINS:  Help us out, David.
20      THE WITNESS:  I think it's the
21      same thing.
22      MR. HENDERSON:  They are two
23      different ones.  One is

Page 12

1    updated -- this one is dated
2    12/28/2007.  This other one is
3    more recent, February 18th,
4    '08.
5         MR. PHILLIPS:  Let's copy them
6       both, please.
7    Q.  Ms. Baldwin, state your address.  Where do
8       you currently live?
9    A.  My address present now?
10   Q.  Yes, your present address.
11   A.  208 Bella Vista Terrace, McDonough.
12   Q.  Who do you live there with?
13   A.  My nephew, Robert Lavaughn Johnson.
14   Q.  Does his wife live there as well?
15   A.  Yes.
16   Q.  And how long have you lived there?
17   A.  Since July the 27th.
18   Q.  Since the accident that we are here today?
19   A.  Yes.
20   Q.  Where did you live prior to that?
21   A.  1235 North Conestoga Street.  And that's in
22       Philadelphia, Pennsylvania.
23   Q.  Who did you live with?

Page 13

| | |
|---|---|
| 1 | A. My sister. |
| 2 | Q. What is her name? |
| 3 | A. Robert's mother. |
| 4 | Q. Can you give her name, for the record, |
| 5 | please? |
| 6 | A. Irena Johnson. |
| 7 | Q. And did you own that home on Conestoga in |
| 8 | Philadelphia? |
| 9 | A. Once upon time. It's been quite a while. |
| 10 | Q. And what happened? Did you sell it to |
| 11 | Ms. Johnson? |
| 12 | A. Yes. |
| 13 | Q. And do you remember when you told sold it to |
| 14 | her? |
| 15 | A. No. |
| 16 | Q. Was it ten years ago? Twenty years ago? |
| 17 | A. Oh, longer than that. |
| 18 | Q. Maybe thirty years ago? |
| 19 | A. Possibly. |
| 20 | Q. So about thirty years ago you owned that |
| 21 | home, correct? |
| 22 | A. Right. I think we purchased it in -- it |
| 23 | might have been in '42. |

Page 14

| | |
|---|---|
| 1 | Q. 1942. When you say we purchased it, who are |
| 2 | you referring to? |
| 3 | A. My husband. |
| 4 | Q. And at some point after that you sold it to |
| 5 | your sister Irena Johnson? |
| 6 | A. Yes. |
| 7 | Q. When you said it to her, was the home solely |
| 8 | in her name? |
| 9 | A. I would think so. |
| 10 | Q. And when did you begin living with your |
| 11 | sister Irena Johnson? |
| 12 | A. It's not clear to me because I lived in |
| 13 | Willow Grove for a few years. |
| 14 | Q. What's Willow Grove? |
| 15 | A. That's a suburb of Philadelphia. |
| 16 | Q. Who did you live with in Willow Grove? |
| 17 | A. With my husband. |
| 18 | Q. And did you move in with your sister Irena |
| 19 | Johnson after your husband passed away? |
| 20 | A. Yes. |
| 21 | Q. Do you remember when your husband passed |
| 22 | away? |
| 23 | A. No. |

Page 15

| | |
|---|---|
| 1 | Q. Is it fair to say that you -- Take your time |
| 2 | if some of these questions are difficult. |
| 3 | You just let me know and we will stop and |
| 4 | you can take a break. Okay? |
| 5 | But how long did you live with Irena, |
| 6 | just you and Irena? Was it ten years? |
| 7 | Fifteen years? |
| 8 | A. More. |
| 9 | Q. About twenty years? |
| 10 | A. Yeah. |
| 11 | Q. And has it only been you two that just lived |
| 12 | together, you and Irena? |
| 13 | A. Yes. |
| 14 | Q. Now, during the time in which you and Irena |
| 15 | lived together, were you working? |
| 16 | A. No. |
| 17 | Q. Were you retired at that point? |
| 18 | A. Yes. |
| 19 | Q. When did you retire? Do you remember what |
| 20 | year? |
| 21 | A. In seventy -- Let's see. It might have been |
| 22 | '76. I'm not sure. In the '70s. |
| 23 | Q. So in about '76 you retired, and you and |

Page 16

| | |
|---|---|
| 1 | Irena lived together; is that correct? |
| 2 | A. Yes. |
| 3 | Q. And is it fair to say since that point, |
| 4 | sometime around 1976 you and Irena lived |
| 5 | together alone, just you and her? |
| 6 | A. Yes. |
| 7 | Q. Tell me about the house that y'all lived in. |
| 8 | How many bedrooms was it? |
| 9 | A. Three. |
| 10 | Q. Three bedrooms? |
| 11 | A. Yeah. |
| 12 | Q. Now, did you have your own room? |
| 13 | A. Yes. |
| 14 | Q. And she had her own room? |
| 15 | A. Yes. |
| 16 | Q. Now, the house was solely in Irena's name at |
| 17 | that point, correct? |
| 18 | A. Yes. |
| 19 | Q. Was Irena working at that time? |
| 20 | A. Part of the time. |
| 21 | Q. Now, when you say part of the time, would |
| 22 | you say she worked maybe twenty hours a week |
| 23 | or so? |

4 (Pages 13 to 16)

Deposition of Willie Eva Baldwin

---

Page 17

1   A.  Yes.
2   Q.  Was this at the laundry facility that she
3       worked at?
4   A.  Yes.
5   Q.  How did y'all handle the bills in the house?
6       Did y'all put everything together?
7   A.  I bought all foods and she prepared.
8   Q.  Now, did y'all have the same bank accounts?
9   A.  No.
10  Q.  Y'all had separate bank accounts?
11  A.  Yes.
12  Q.  So y'all didn't mix y'all's money together,
13      did you?
14  A.  No.
15  Q.  Is it safe to say that whatever money she
16      brought in, she had her own way of
17      accounting for her money?
18  A.  Right.
19  Q.  And she spent that money however she saw
20      fit?
21  A.  Right.
22  Q.  Would it be safe to say that you did the
23      same?  Whatever money you brought into the

---

Page 18

1       house, you accounted for it and you spent it
2       how you saw fit?
3   A.  Yes.
4   Q.  Did you have any control over -- and I'm
5       talking about when y'all lived together --
6       did you have any control over where Irena
7       went?
8   A.  No.
9   Q.  She pretty much had her own schedule?
10  A.  Right.
11  Q.  And she came and went as she pleased?  Would
12      it be safe to say that?
13  A.  Right.
14  Q.  And you as well, you came and went as you
15      pleased?
16  A.  Yes.
17  Q.  No one told you when and what time you had
18      to come home, did they?
19  A.  No.
20  Q.  Would it be safe to say, Ms. Baldwin, that
21      even though y'all lived together under the
22      same roof that y'all essentially had --
23      y'all owned your own individual type

---

Page 19

1       household that you ran?  Would it be safe to
2       say that?  That y'all had your own affairs
3       that you ran even though y'all lived under
4       the same roof?
5           MR. PHILLIPS:  Object to the form.
6   Q.  Do you understand my question?
7   A.  No.
8   Q.  The fact that y'all lived together under the
9       same roof, that didn't mean that you-all
10      shared each others affairs, did it?
11  A.  Sort of.
12  Q.  Sort of?
13  A.  Yeah.  We bowled together three times a
14      week.
15  Q.  So y'all did social things together, right?
16  A.  Yeah.
17  Q.  But in terms of one person ruling the
18      household or having a domination over the
19      household, that wasn't a fact, was it?
20  A.  No.
21          MR. PHILLIPS:  Object to the form.
22  Q.  In terms of either you or Ms. Johnson being
23      the head of the household, would that have

---

Page 20

1       been either one of y'all?
2   A.  No.
3   Q.  So it would be safe to say that y'all kind
4       of had your separate households?
5           MR. PHILLIPS:  Object to the form.
6   A.  We practically just did the same thing.
7   Q.  With regard to your social activities?
8   A.  Right.
9   Q.  That's what you are referring to?
10  A.  Right.
11  Q.  How old are you, Ms. Baldwin?
12  A.  Ninety-one.
13  Q.  What is your Social Security number?
14  A.  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 A.
15  Q.  Now, before you retired what line of work
16      did you do?
17  A.  Teach.
18  Q.  Now, did you hold some type of certificate
19      to teach?
20  A.  Yes.
21  Q.  Were you licensed with a state agency?
22  A.  Yes, I was licensed.
23  Q.  What state were you licensed in?

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 21

1  A.  Pennsylvania.
2  Q.  And how long did you hold that license?
3  A.  Until I retired.
4  Q.  Until you retired.  Do you remember when you
5      got it?
6  A.  I had it written down someplace.
7  Q.  Maybe you might remember this way.  Do you
8      know how many years you taught before you
9      retired?
10 A.  Not that long because it was under a
11     disability.
12 Q.  When you say it was under disability, is
13     that why you retired?
14 A.  Yes.
15 Q.  And tell me about your disability.  What was
16     the disability that caused you to retire?
17 A.  They thought it was my heart.  And the
18     pacemaker, that didn't help at all.  Later
19     they took it out because they said the
20     pacemaker was the problem.
21 Q.  Do you remember when you got that pacemaker?
22 A.  No.
23 Q.  Do you remember what approximate year that

Page 22

1      was?
2  A.  No, I don't.  In the '70s, though.
3  Q.  When you retired because of your disability,
4      did you get some form of disability income?
5  A.  I guess I collected Social Security.
6  Q.  Are you on Social Security right now?
7  A.  Yes.
8  Q.  Is it SSD?  Is that what you get, Social
9      Security disability?  Or is it SSI?  Do you
10     know?
11 A.  It's the high standard of whatever it is.
12 Q.  And you've been getting that since the '70s?
13 A.  Yes.  I'm about to break them.
14 Q.  While you are looking for that, do you know
15     how much you get in Social Security
16     disability income?
17     While you are looking for that, I'm
18     going to ask you a couple of questions.  If
19     you need me to pause for a second, I will.
20     Okay?
21     Have you ever been to Alabama before?
22 A.  Yes.
23 Q.  Do you know anyone or are you related to

Page 23

1      anyone that lives in Alabama?
2  A.  I don't think so.
3  Q.  As far as you know, you have no relatives in
4      Alabama?
5  A.  I don't think so.
6  Q.  Have you ever been arrested before?
7  A.  No.
8  Q.  Have you ever filed bankruptcy before?
9  A.  No.
10 Q.  Have you ever sued anyone before, been a
11     plaintiff in a case?
12 A.  No.
13 Q.  Have you ever been sued before?
14 A.  No.
15 Q.  And what about being a witness in a case?
16     Have you ever been a witness in any case and
17     had to go to court and testify about it or
18     sit in a deposition like this about it?
19 A.  No.
20 Q.  And that card that you are looking for, you
21     can provide it to your attorney.
22            (Plaintiff's Exhibit Number Five
23            marked for identification.)

Page 24

1  Q.  Let's go back real briefly, Ms. Baldwin, and
2      talk about your medical history.  And I have
3      a -- Let me show you what I'm going to mark
4      as Plaintiff's Exhibit Number Five.  And I
5      believe this is a document that you just
6      provided everybody in the room.  Will you
7      take a look at that?  Is that the document
8      you just gave everyone in the room?
9  A.  Yes.
10 Q.  Why don't you just take a look at it.  Look
11     at that one right there.  Let's talk about
12     the first prescription.  It's called
13     Aricept.
14 A.  Right.
15 Q.  It looks like the purpose is for dementia?
16 A.  Right.
17 Q.  When were you diagnosed with dementia?  Do
18     you remember?
19 A.  It's been a long time.
20 Q.  A long time?
21 A.  Yes.
22 Q.  Were you diagnosed with dementia prior to
23     July 27th of 2007?

6 (Pages 21 to 24)

Deposition of Willie Eva Baldwin

Page 25

1  A.  Yes.
2  Q.  Before the accident?
3  A.  Uh-huh (positive response).
4  Q.  And on the date of the accident, were you
5      taking Aricept or any other medicine for
6      dementia?
7  A.  Yes.  N-a-m-e-n-d-a.
8  Q.  That's listed on Plaintiff's Exhibit Number
9      Five as number six; is that correct?
10 A.  Uh-huh (positive response), number six.
11 Q.  Do you take both Aricept and Namenda?
12 A.  Yes.
13 Q.  You take both of them for dementia?
14 A.  Yes.
15 Q.  I believe you take a ten milligram tablet of
16     Aricept and a five milligram tablet of
17     Namenda; is that correct?
18 A.  Yes.
19         MR. HENDERSON:  Let me just
20             clarify this.  Are you talking
21             about now or before or at the
22             time of the accident?
23         MR. COLLINS:  Actually kind of

Page 26

1             both.
2  Q.  Do you take both of them now?
3  A.  Yes.
4  Q.  Prior to July 27, 20007 were you taking both
5      of those at that time?
6  A.  Beg your pardon?
7  Q.  Were you taking both of those medicines at
8      that time?
9  A.  Yes.
10 Q.  Number two Fexofendadine, that's the
11     antihistamine I think you testified earlier.
12     Are you taking that now?
13 A.  Yes.
14 Q.  And on July 27th, the day of the accident,
15     were you taking that medicine was well?
16 A.  Yes.
17 Q.  And let's for speed's sake, all of the
18     medicines that you have listed there, one
19     through eight, are you currently taking all
20     of those medicines right now?
21 A.  Yes.
22 Q.  And you take them on a daily basis?
23 A.  Yes.

Page 27

1  Q.  And if I believe I understand you correctly,
2      you have taken at least some of those today
3      or will take some of those today; is that
4      correct?
5  A.  I've already taken them.
6  Q.  You've taken all of them?
7  A.  Yes.
8  Q.  Now, on July 27th were you taking those
9      eight medications?
10 A.  Yes.
11         (Brief recess.)
12 Q.  With regards to the eight medications that
13     you were taking on the date of the accident,
14     July 27, 2007, I believe you testified that
15     you are still taking those same eight
16     medications today; is that correct?
17 A.  Yes.
18 Q.  Do you have any side effects from any of
19     those medications?  Do they make you dizzy
20     or slow moving or something to that effect?
21 A.  It seems that Aricept makes me have a lot of
22     dreams.  And it may be that I've been
23     looking at television and all of this stuff

Page 28

1      going on.
2  Q.  Is that -- When you say it makes you have
3      dreams, is that in the daytime, sometimes in
4      the daytime?
5  A.  No.
6  Q.  Just at nighttime?
7  A.  Right.
8  Q.  Does the Aricept make you see things
9      sometimes that are really not there in the
10     daytime?
11 A.  No.
12 Q.  But none of them make you dizzy and things
13     of that nature, do they?
14 A.  (Witness shakes head.)
15 Q.  Is that no?
16 A.  I don't think so.
17         MR. HENDERSON:  Ms. Baldwin, you
18             may want to speak up so
19             everybody can hear you.
20         THE WITNESS:  All right.
21 Q.  These eye drops that you take, are you
22     taking three different types of eye drops?
23 A.  Yes.

Page 29

| | |
|---|---|
| 1 | Q. And you take those on a daily basis? |
| 2 | A. Yes. |
| 3 | Q. Are those for glaucoma? |
| 4 | A. Well, yes. High blood pressure and for |
| 5 | glaucoma. |
| 6 | Q. You've got by the second one, the A-z-o-p-t, |
| 7 | high pressure and glaucoma. Do you mean |
| 8 | that you have high pressure in your eyes? |
| 9 | A. Yes. |
| 10 | Q. How long have you had glaucoma? Do you |
| 11 | remember when you were diagnosed with |
| 12 | glaucoma? |
| 13 | A. A long, long time ago. |
| 14 | Q. A long, time ago? |
| 15 | A. Yes. |
| 16 | Q. Is it safe to say you've been taking these |
| 17 | eye drops or these eye drops for your |
| 18 | glaucoma for several years? |
| 19 | A. Oh, yes. |
| 20 | Q. Do you know approximately how many years? |
| 21 | A. Uh-uh (negative response). |
| 22 | Q. More than ten? |
| 23 | A. More than ten. |

Page 30

| | |
|---|---|
| 1 | Q. And on July 27, 2007 had you taken those eye |
| 2 | drops for your glaucoma? |
| 3 | A. Yes. |
| 4 | Q. Where do you normally get your prescriptions |
| 5 | filled at, Ms. Baldwin, here in Georgia? |
| 6 | A. In Georgia? |
| 7 | Q. Do you get them filled in Georgia? |
| 8 | A. No. My -- I get them mostly in the mail. |
| 9 | It's Prescription Solution. |
| 10 | Q. And are they prescribed by a doctor, by a |
| 11 | physician? |
| 12 | A. Yes. |
| 13 | Q. What physician prescribed these particular |
| 14 | eye drops? Do you know his or her name? |
| 15 | Is that something you think you can get |
| 16 | to us at a later date? |
| 17 | A. Probably. |
| 18 | Q. Who is your general doctor? Do you have one |
| 19 | here in Georgia? |
| 20 | A. Yes. Woods. |
| 21 | Q. Dr. Woods? |
| 22 | A. Yes. |
| 23 | Q. Is Dr. Woods a male or female? |

Page 31

| | |
|---|---|
| 1 | A. Male. |
| 2 | Q. Do you know his first name? |
| 3 | A. That's the general. |
| 4 | Q. That's your general -- |
| 5 | A. Yes. |
| 6 | Q. -- general practitioner? |
| 7 | A. Uh-huh (positive response). |
| 8 | MR. COLLINS: Can you get that to |
| 9 | me? |
| 10 | MR. HENDERSON: Yes, if we can |
| 11 | track it down. |
| 12 | Q. Ms. Baldwin, I'm going to ask your attorney |
| 13 | just to get that to us. I'll send some |
| 14 | questions with him and follow up with that. |
| 15 | Okay? |
| 16 | A. Beg your pardon? |
| 17 | Q. I'll ask your attorney to get that from you |
| 18 | and he can get that to us, the information |
| 19 | for Dr. Woods. |
| 20 | A. I have an appointment with him shortly. |
| 21 | Q. Okay. Are you looking for the appointment |
| 22 | card in your purse? |
| 23 | A. Yes. His name is Bruce A. Woods. |

Page 32

| | |
|---|---|
| 1 | Q. Bruce A. Woods? |
| 2 | A. Yes. |
| 3 | Q. And he's in McDonough, or is he in Atlanta? |
| 4 | A. He's in McDonough. |
| 5 | Q. We can get that information. |
| 6 | A. Address? |
| 7 | Q. Do you want to give it to us? Go ahead. |
| 8 | A. 259 Jonesborough Road, McDowell (sic), |
| 9 | Georgia. |
| 10 | Q. What's that zip code? |
| 11 | A. 30253. |
| 12 | Q. Thank you, Ms. Baldwin. |
| 13 | Are you currently using inhalers as |
| 14 | well? Is that correct? |
| 15 | A. Part of the time. |
| 16 | Q. When you say part of the time, does your |
| 17 | prescription say that you have to use them |
| 18 | every day? |
| 19 | A. No. |
| 20 | Q. How often are you to use your inhalers? |
| 21 | A. When I'm having trouble. |
| 22 | Q. So only when necessary? |
| 23 | A. Yes. |

Page 33

1    Q.  When was the last eye exam you had,
2         Ms. Baldwin?  Do you remember?
3    A.  Yeah.  This week.
4    Q.  This week?
5    A.  (Witness nods head.)
6    Q.  You had one already, or you are about to get
7         one?
8    A.  I just had it.
9    Q.  When was that?  Today is Wednesday.  Was it
10        Monday or Tuesday?
11   A.  Probably it was last week.  Did you say the
12        eye doctor?
13   Q.  Eye doctor, yes.  You say you had an
14        appointment last week, you believe?
15   A.  Yes.  I believe I've taken that out.  One
16        day I had the examination.  And that --
17        Since I've had it, I don't have it with me.
18   Q.  And when you had that eye exam, I assume
19        that you still have glaucoma; is that
20        correct?
21   A.  I guess I have it.
22   Q.  And you are still taking eye drops for that
23        glaucoma?

Page 34

1    A.  Right.
2    Q.  What about your last physical?  Did you have
3         a physical prior to the accident on July
4         27th?
5    A.  No.
6    Q.  You didn't.  Have you had one since then?
7    A.  A total physical?
8    Q.  A total physical, yes, ma'am.
9    A.  I guess I have.
10   Q.  You have?
11   A.  Yes.
12   Q.  Do you remember when?
13   A.  That was with...
14   Q.  That was with Dr. Woods?
15   A.  No.  No.
16        This is the eye physician.  That was
17        last week.  The eye physician is
18        Dr. McDowell.
19   Q.  Dr. McDowell?
20   A.  Yes.
21   Q.  Do you have his address on there?
22   A.  Yes.  His card.  It's in the Peachtree
23        Pavilion, which is 5775 Peachtree Street

Page 35

1         downward road.
2    Q.  We will get that address.  If that's not the
3         right one, we will find it.
4         Ms. Baldwin, let me ask you a couple of
5    other questions.  With regards to your
6    driving history, how long have you held a
7    driver's license?
8    A.  Since early, early '40s.
9    Q.  And is that a Pennsylvania driver's license?
10   A.  It is now.
11   Q.  What was the first state?
12   A.  Georgia.
13   Q.  Georgia.  Okay.  And at some point you moved
14        to Pennsylvania and got a Pennsylvania
15        driver's license?
16   A.  Yes.
17   Q.  And do you still currently have a
18        Pennsylvania driver's license?
19   A.  Good until 2011.
20             (Plaintiff's Exhibit Number Six
21             marked for identification.)
22   Q.  2011.  I'm going to show you what I'm going
23        to mark as Plaintiff's Exhibit Number Six.

Page 36

1         Do you have your driver's license with you
2         right now?  You don't have to pull it out.
3         What I'm going to show you is this document
4         right here and tell me if that looks like a
5         copy of your Pennsylvania driver's license.
6    A.  Yes.
7    Q.  It does?
8    A.  It does.  Yes.  2011.  That's it.
9    Q.  So this is a copy of your actual driver's
10        license; is that correct?
11   A.  Right.
12   Q.  Now, Ms. Baldwin, do you have any type of
13        restrictions on your driver's license that
14        you know of?
15   A.  No.
16   Q.  I notice on the back of your driver's
17        license it says that you are to wear
18        corrective lenses.  Those are the glasses
19        that you have on right now?
20   A.  Right.
21   Q.  And I assume you had those glasses on the
22        day of the accident, right?
23   A.  Yes.

Page 37

| | |
|---|---|
| 1 | Q. Has your driver's license ever been |
| 2 | suspended? |
| 3 | A. No. |
| 4 | Q. No revocations of any sort? |
| 5 | A. No. |
| 6 | Q. Has your license ever lapsed for any reason? |
| 7 | A. No. |
| 8 | Q. Have you ever been involved in any accidents |
| 9 | whatsoever, automobile accidents? |
| 10 | A. I don't think so. |
| 11 | Q. You don't think so? |
| 12 | A. (Witness shakes head.) |
| 13 | Q. Think just a little bit for me. Let's say |
| 14 | within the past ten years have you ever hit |
| 15 | someone with your vehicle, caused an |
| 16 | accident? |
| 17 | A. No. |
| 18 | Q. Has anyone ever hit you and caused you any |
| 19 | injuries in an accident or just caused an |
| 20 | accident in general within the past ten |
| 21 | years? Has anyone ever... |
| 22 | A. Anyone ever hit me? |
| 23 | Q. Yes. |

Page 38

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. How long ago has that been? |
| 3 | A. That was about a year ago. |
| 4 | Q. Someone hit you about a year ago? |
| 5 | A. Yes. |
| 6 | Q. Where was that at? |
| 7 | A. In Atlanta. |
| 8 | Q. In Atlanta. Were you driving your vehicle? |
| 9 | A. Yes, mine. |
| 10 | Q. Is that the New Yorker that you were... |
| 11 | A. Fifth Avenue. |
| 12 | Q. Fifth Avenue? |
| 13 | A. Yes, New Yorker. |
| 14 | Q. Was there a police report done on that? |
| 15 | A. Was there... |
| 16 | Q. A police report done on that? |
| 17 | A. Yes. |
| 18 | Q. Now, whose fault was it in that accident? |
| 19 | MR. HENDERSON: Object to the |
| 20 | form. |
| 21 | A. He came from behind me and hit the left back |
| 22 | door and bent it in. |
| 23 | Q. Who all was in that vehicle? |

Page 39

| | |
|---|---|
| 1 | A. The same. |
| 2 | Q. The same ladies? |
| 3 | A. Yes. |
| 4 | Q. Was anybody injured? |
| 5 | A. Injured? |
| 6 | Q. Yes, hurt. |
| 7 | A. No. |
| 8 | Q. You said that was about a year ago. Was |
| 9 | that before the July 27th accident? |
| 10 | A. It probably was two years ago. |
| 11 | Q. So it was about two years ago when you had |
| 12 | come from Pennsylvania to Atlanta? |
| 13 | A. I was coming from Georgia, Cuthbert going to |
| 14 | Philadelphia. |
| 15 | Q. You were coming from Cuthbert to |
| 16 | Philadelphia. And do you remember where |
| 17 | that accident took place, what city that |
| 18 | accident took place? |
| 19 | A. Atlanta. |
| 20 | Q. It did happen in Atlanta? |
| 21 | A. Yes. |
| 22 | Q. Did your car have any damage to it? |
| 23 | A. Yes. The back left door was bent in. |

Page 40

| | |
|---|---|
| 1 | Q. Did you get it repaired? Did you get your |
| 2 | vehicle repaired after that accident? |
| 3 | A. Yes. |
| 4 | Q. Who paid for those repairs? Did you file an |
| 5 | insurance claim on that? |
| 6 | A. Well, I had to catch up with the person that |
| 7 | was driving this truck that hit the back. |
| 8 | Q. Did he try to leave the scene? |
| 9 | A. He didn't try. He left. But since I was -- |
| 10 | I followed him, he eventually stopped. |
| 11 | Q. Now, when he stopped, did you-all call the |
| 12 | police? |
| 13 | A. Yes. |
| 14 | Q. And did they make a report of that accident? |
| 15 | A. I don't know. They said we could settle it |
| 16 | ourselves. |
| 17 | Q. Now, did you ever file a claim with your |
| 18 | insurance company to have your vehicle fixed |
| 19 | regarding that accident? |
| 20 | A. No. |
| 21 | Q. You didn't? |
| 22 | A. No. |
| 23 | Q. Was your vehicle ever fixed after that |

Deposition of Willie Eva Baldwin

Page 41

1   accident?
2   A.  You know, I think so.  I'm not really sure.
3   Q.  And if you think so, would you have paid for
4       that yourself?
5   A.  Yes, I paid for it.
6   Q.  Who was your insurance company?  Is it
7       Allstate?
8   A.  Allstate.
9   Q.  So you don't know whether or not you
10      actually contacted Allstate and let them
11      know about it?
12  A.  No.
13  Q.  Is it possible that you did, though?
14  A.  No, I didn't.
15  Q.  You didn't.  Okay.
16      Do you remember what part of Atlanta --
17      Atlanta is huge.  There is a lot of suburbs.
18      Do you remember what part of Atlanta that
19      was in?
20  A.  It was the part -- you know, I can
21      describe -- that seemingly you can when you
22      come under this thing up there -- the way I
23      come through Atlanta, I would have to go

Page 42

1   through and keep to my left.
2   Q.  Okay.
3   A.  So I did and kept to my left.  But I was on
4       the right lane and went under this whatever.
5       And that driver seemingly was going to go
6       the same way, but it seemed that he took for
7       granted that I was going to go to that part
8       that was beyond and go on that route.
9   Q.  Do you remember what highway or interstate
10      it was?  Was it I-75?
11  A.  85.  Anyway, it had to be 85 or 75.
12  Q.  So was it through downtown Atlanta --
13  A.  Yes.
14  Q.  -- when downtown splits off 75 and 85 splits
15      off?  Was it through that area?
16  A.  It possibly was.
17  Q.  Do you remember a lot of tall buildings and
18      things of the like in that area,
19      skyscrapers?
20  A.  Yes.
21  Q.  Now, you say that accident may have been two
22      years ago?
23  A.  Yes, it possibly was two years ago.

Page 43

1   Q.  What time of year would that have been?
2       Would that have been around the same time?
3   A.  Yes, in July.
4   Q.  In July.  Have you been in any other
5       accidents?
6   A.  No.
7   Q.  Whether or not you were at fault or someone
8       else was at fault, do you remember any other
9       accidents that you may have been in?
10  A.  No.
11  Q.  Now, I believe you were in the room when
12      your nephew testified that you and your
13      sisters make this trip to Georgia -- from
14      Pennsylvania to Cuthbert every year?
15  A.  Right.
16  Q.  And how long have you been doing that?
17  A.  Ever since probably I'll say the middle '40s
18      maybe.
19  Q.  And is every year the same time?
20  A.  About the same time.
21  Q.  Now, you have another sister Ella Prather;
22      is that correct?
23  A.  Yes.

Page 44

1   Q.  And she lives in Detroit; is that correct?
2   A.  Right.
3   Q.  How does she accompany you-all on that trip?
4   A.  She comes by a bus from Detroit to
5       Philadelphia.
6   Q.  And does she do that every time?
7   A.  Yes.
8   Q.  And then once she arrives in Philadelphia,
9       then you-all travel from Philadelphia to the
10      south; is that correct?
11  A.  Right.
12  Q.  And you-all have always done that by
13      automobile; is that correct?
14  A.  Right.
15  Q.  And the vehicle that you-all traveled in has
16      always been your vehicle?
17  A.  Right.
18  Q.  Have you ever rented a vehicle to make that
19      trip?
20  A.  No.
21  Q.  You always drove your car?
22  A.  Right.
23  Q.  Now, how long a drive is that from

| Page 45 | Page 47 |
|---|---|
| 1      Philadelphia to, let's say, Atlanta? | 1    A.   I just made the plan for the car to go, not |
| 2    A.   Philadelphia to.... | 2      who was going to be. I don't know. |
| 3    Q.   To Atlanta. Do you remember? | 3    Q.   Okay. That's all right. So you just made |
| 4    A.   Thirteen hundred miles, I think. I always | 4      the plans -- Since all of you-all were |
| 5      got AAA to layout the route. | 5      traveling together, you just made the plans |
| 6    Q.   AAA would always map everything out for you? | 6      for everybody? |
| 7    A.   Right. | 7    A.   Yes. |
| 8        (Plaintiff's Exhibit Number Seven | 8    Q.   It's indicated on that document that you-all |
| 9         marked for identification.) | 9      would be leaving on July 26, that was a |
| 10   Q.   And I'm going to show you what I'm going to | 10      Thursday, flying to Atlanta? Do you see |
| 11     mark as Plaintiff's Exhibit Number Seven, | 11      that date on there, July 26? |
| 12     what appears to be a copy of a AAA document. | 12   A.   Oh, yes. |
| 13     It's actually two pages. Let me staple it | 13   Q.   Is that the day you-all were scheduled to |
| 14     together for you. | 14      leave Pennsylvania -- |
| 15      Why don't you take a look at that | 15   A.   Yes. |
| 16     document for me, Ms. Baldwin, and tell me if | 16   Q.   -- to fly to Atlanta? |
| 17     you recognize that document. Does that | 17   A.   Yes. |
| 18     document look familiar to you? | 18   Q.   And is it indicated on there anywhere, |
| 19   A.   Not yet. | 19      Ms. Baldwin, that you-all were going to rent |
| 20   Q.   Let me ask you this question. Is your name | 20      a vehicle from Hertz once you got to |
| 21     on that document, Ms. Baldwin? Do you see | 21      Atlanta? Do you see that on there? |
| 22     your name on there anywhere? | 22   A.   Yes, I see. |
| 23   A.   Yes. | 23   Q.   Now, when you made these reservations at |

| Page 46 | Page 48 |
|---|---|
| 1    Q.   At the top of that document there is an | 1      AAA, did you have to pay for it right then? |
| 2     address, 394 West Lancaster in Haverford, | 2      Did you have to pay for your airline tickets |
| 3     Pennsylvania. Is that the agent that you | 3      and reserve the rental car at that time? |
| 4     used to make your plans for this trip? | 4    A.   Did I have to pay for the tickets? It seems |
| 5    A.   I guess it is. | 5      that we just went in and paid for the |
| 6    Q.   When you make those plans, do you go to a | 6      tickets. And... |
| 7     physical location and sit down with a AAA | 7    Q.   When you say -- I don't mean to cut you off. |
| 8     agent and they mapped everything out for | 8      When you say we just went in, did |
| 9     you? | 9      Ms. Johnson go in with you? |
| 10   A.   Yes. | 10   A.   Yes. |
| 11   Q.   Now, there is two other names on that | 11   Q.   And did she, too, make this same reservation |
| 12     document as well. Would those names be Ella | 12      at the same time? |
| 13     Prather and Irena Johnson? | 13   A.   I just made the reservation for the car to |
| 14   A.   Right. | 14      go. |
| 15   Q.   Now, who made the plans through AAA? | 15   Q.   But when you-all went in to plan this trip, |
| 16   A.   I did. | 16      Ms. Johnson physically went in to AAA with |
| 17   Q.   You made the plans? | 17      you; is that correct? She went to the |
| 18   A.   Yes. | 18      location with you? |
| 19   Q.   When you made those plans, did you make | 19   A.   Oh, yes. |
| 20     those plans for your sister Ella and your | 20   Q.   Did she, too, tell the agent that you-all |
| 21     sister Irena? | 21      spoke with that she, too, wanted to go to |
| 22   A.   I just made the plans for the car to go. | 22      Atlanta, Georgia by way of airplane? Did |
| 23   Q.   Say again. I didn't understand. | 23      she say she wanted to make the same trip |

Page 49

1    that you wanted to make?
2    A.  No.  It just started with the three of us.
3         And they just went with, you know, making it
4         for the three of us.
5    Q.  So this wasn't a trip that you were making
6         by yourself --
7    A.  Uh-uh (negative response).
8    Q.  -- and then you just asked them to tag along
9         with you?  You-all went in to make this same
10        trip together, correct?
11   A.  I'm not sure.
12   Q.  Do you remember how the trip was paid for?
13        Did everybody pay for their own trip?
14   A.  No.
15   Q.  Who paid for it?
16   A.  You mean by the...
17   Q.  To buy the plane tickets.  Who paid for the
18        airline tickets?
19   A.  I think I did.  But Irena paid -- gave me
20        the money, hers.  But I paid for Eloise and
21        mine.  But I paid for all of them as far as
22        they are concerned.
23   Q.  Are you saying you paid for them on your

Page 50

1    credit card, and then they gave you the
2    money back?
3    A.  Who?
4    Q.  Irena.
5    A.  No.  Yeah, she gave it to me before.
6    Q.  Okay.  Before you-all went to AAA to make
7         this reservation, Irena had already given
8         you her money?
9    A.  To make it with AAA -- I'm not sure.
10   Q.  Let me try to see if I can ask the question
11        a little clearer.  Did Irena pay for her own
12        trip?
13   A.  Yes.  By plane, yes.
14   Q.  She paid for her own airline ticket,
15        correct?
16   A.  Uh-huh (positive response).
17   Q.  Did Ella pay for her own airline?
18   A.  No.  I usually paid for hers.
19   Q.  Was there a reason why you usually paid for
20        Ella and not for Irena?
21   A.  Because she had never worked.  She always
22        stayed at home.
23   Q.  So Irena because she had her own income and

Page 51

1    her own checking account and handled her own
2    affairs would pay for her own trip; is that
3    correct?
4    A.  Yes.
5         MR. HENDERSON:  Let's make sure we
6         are talking about the airfare.
7         You said trip.
8    Q.  The airfare; is that correct?
9    A.  Yes.
10   Q.  Let me ask you this.  What was the purpose
11        of the trip?
12   A.  Just a visit to see the other part of the
13        family.
14   Q.  Was that something that Irena wanted to do
15        as well as Ella and as well as you?
16   A.  Sure.
17   Q.  Did you ever tell Irena and Ella that I'm
18        going to Cuthbert, Georgia, will y'all just
19        ride with me?  Or did everybody make the
20        decision that they are all going to
21        Cuthbert, Georgia?
22   A.  I think we just made the decision that the
23        other part of the family is there, and so we

Page 52

1    are all going.
2    Q.  So would it be safe to say that Irena making
3         the trip to Cuthbert benefitted her and also
4         benefitted you?  I mean, you-all were just
5         traveling together?
6    A.  Yeah.
7    Q.  When you got to -- when you got on the
8         plane -- Let's talk about the trip, the day
9         you actually took the trip to Atlanta.  That
10        would be July 26, 2007.  When you got on the
11        plane to Atlanta, was your plane delayed for
12        any reason?
13   A.  Yes.
14   Q.  Can you tell me why?
15   A.  The president was there doing his thing.
16   Q.  What president are you referring to?  George
17        Bush?
18   A.  Yes.
19   Q.  The United States president?
20   A.  Right.
21   Q.  When you say doing his thing, had his plane
22        come into the same airport?
23   A.  Yes, he was there.

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 53

1  Q.  Did you see him?
2  A.  No, I didn't see him.  We sat on the plane
3      and waited until his business was over.
4  Q.  And how long did President Bush hold y'all
5      up?  Do you know?
6  A.  It was quite a little while.  About an hour,
7      I guess.
8  Q.  So y'all had to sit on the plane for about
9      an hour and wait on President Bush?
10 A.  Right.
11 Q.  So that would explain why your plane was
12     delayed coming into Atlanta; is that
13     correct?
14 A.  Yes.
15 Q.  Let's talk about when you got to Atlanta.
16     Did you rent a vehicle?  Did you go to Hertz
17     rental car and rent a vehicle?
18 A.  I guess I did.
19         (Plaintiff's Exhibit Number Eight
20         marked for identification.)
21 Q.  Before we go there, I'm going to mark this
22     as Plaintiff's Exhibit Number Eight.  I'm
23     going to show you this document.  You may

Page 54

1      not have seen it before.  Do you recognize
2      that document there, Ms. Baldwin?
3  A.  Uh-huh (positive response).
4  Q.  You do recognize that?
5  A.  Uh-huh (positive response).
6  Q.  Whose handwriting is that?
7  A.  Mine.
8  Q.  That is your handwriting?
9  A.  Yes.
10 Q.  So you had the itinerary mapped out for this
11     trip; is that correct?
12 A.  Right.
13 Q.  And that itinerary included Ms. Prather,
14     Ms. Johnson, and Ms. Baldwin, that's you; is
15     that correct?
16 A.  Yes.
17 Q.  And according to this itinerary, you-all had
18     planned to once you get to Atlanta was at
19     some point leave and go to Cuthbert, Georgia
20     and remain there until about August 4th.
21     Does that sound about right?
22 A.  That sounds about right, yes.
23         (Plaintiff's Exhibit Number Nine

Page 55

1         marked for identification.)
2  Q.  I'm going to show you, Ms. Baldwin, what
3      I've marked as Plaintiff's Exhibit Number
4      Nine.  I want you to take a look at those
5      documents and tell me if you can identify
6      those documents?  Have you ever seen that
7      before?
8          And you can take a look at the second
9      page and see if your signature is on there
10     as well.  Have you ever seen that document
11     before?  Do you see a name on it,
12     Ms. Baldwin?
13 A.  Yes.
14 Q.  Is that your signature at the bottom of that
15     page, the second page, Plaintiff's Exhibit
16     Number Nine?
17 A.  Yes.
18 Q.  Is there the name of a rental car company on
19     that document?
20 A.  Yes, Hertz.
21 Q.  Hertz rental car?
22 A.  Yes.
23 Q.  Do those look like a copy of the documents

Page 56

1      that you got when you paid for the rental
2      car?
3  A.  I don't know.
4  Q.  Do you remember signing anything when you
5      got the rental car?
6  A.  Yeah.
7  Q.  Do you remember paying for the rental car?
8  A.  Let's see.  Do they say?
9  Q.  Does it say on there how much you paid for
10     that rental car, Ms. Baldwin?
11 A.  Yes.
12 Q.  How much does it say?
13 A.  Total estimate charge eight hundred ten
14     dollars twenty-seven cents.
15 Q.  I want you to turn to the very first page of
16     that document, and I want you to take a look
17     at it.  There is an area on the document
18     that says optional services.  Do you see
19     that on there?
20 A.  Yes.  That would have been eight hundred ten
21     twenty-seven.
22 Q.  Right where it says optional services in
23     that little block, do you see those three

Deposition of Willie Eva Baldwin

**Page 57**

1  lines that says LDW, LIS and PPO?
2  A.  Yes.
3  Q.  Do you remember taking out insurance for
4  this rental car, Ms. Baldwin?
5  A.  Yes.
6  Q.  Did you ask for that insurance to cover the
7  vehicle and cover any losses in the event
8  something happened?
9  A.  Yes.
10  Q.  They told you how much the insurance cost
11  and you agreed to pay that amount for the
12  insurance?
13  A.  Yes.
14  Q.  Where it says LIS accepted, can you tell me
15  how much insurance you paid for under LIS?
16  The little line next to it, what's that
17  amount right next to it?
18  A.  One hundred and sixteen fifty-five.
19  Q.  Now, did you make this payment and accept
20  this insurance at the Atlanta International
21  Airport?
22  A.  Yes, I had accepted insurance there.
23  Q.  Was that in the State of Georgia; Atlanta,

**Page 58**

1  Georgia?
2  A.  I don't know.
3  Q.  Did you do that in Atlanta, Georgia?
4  A.  I guess so.
5  Q.  Was it in the Atlanta airport?
6  A.  I'm not sure.
7  Q.  Where did you rent the vehicle from?
8  A.  Atlanta, I guess.
9  Q.  And, again, on the second page, that is your
10  signature; is that correct?
11  A.  The second page, yes.
12  Q.  Now, let me ask you...
13  A.  Wait a minute.  The second page.  Yes,
14  that's my signature.
15  Q.  Who paid for rental car, Ms. Baldwin?
16  A.  I did.
17  Q.  Now, you paid for it on your credit card.
18  Did you have to use a credit card or debit
19  card to make that payment?
20  A.  I don't use a debit card.
21  Q.  What about a credit card?
22  A.  Possibly with a credit card.
23  Q.  Did you use that to rent the vehicle, or did

**Page 59**

1  you use cash?
2  A.  No.  I didn't use cash.
3  Q.  So you used some form of plastic; is that
4  correct?
5  A.  Yes.
6  Q.  Now, did anyone else help you pay for that
7  rental car?
8  A.  No.
9  Q.  You paid for it by yourself?
10  A.  Yes.
11  Q.  Did anybody reimburse you?  Did Ms. Johnson
12  give you some of the money to help you take
13  care of eight hundred and ten dollars?
14  A.  I'm quite sure she did.
15  Q.  But Ms. Prather, she wouldn't have given you
16  any money; is that correct?
17  A.  No.
18  Q.  Now, you-all were going to Cuthbert, Georgia
19  together as a family, correct?
20  A.  Right.
21  Q.  Three sisters, correct?
22  A.  Right.
23  Q.  Why didn't you-all rent separate cars?

**Page 60**

1  A.  We would have needed three drivers.
2  Q.  I didn't hear you.  What did you say?
3  A.  If we had rented three cars, we would have
4  needed three drivers.
5  Q.  Okay.  So are you saying it was beneficial
6  for you-all to just rent one car?
7  A.  Yes, rent one car and three of us get in it.
8  Q.  So it kind of helped everybody out in the
9  situation, right?
10  A.  Right.
11  Q.  Ms. Johnson, it helped her out a little bit;
12  is that correct?
13  A.  Uh-huh (positive response).
14  Q.  It helped you out a little bit as well,
15  correct?
16  A.  Right.
17  Q.  And it also helped Ms. Prather out because
18  y'all didn't have to rent separate cars; is
19  that right?
20  A.  Right.
21       (Plaintiff's Exhibit Number Ten
22        marked for identification.)
23  Q.  Now, once you rented the vehicle from

Page 61

1  Hertz -- I'm done with that document. Thank
2  you. Let me show you another document
3  before I move forward. Here is another
4  document that I believe you may have
5  received. I'm going to ask you if you
6  remember receiving this document. This is a
7  copy of it. It may have come in a
8  folder-like form. Would you take a look at
9  that and see if you remember seeing a
10  document similar to that that was in some
11  folder-like form?
12      You don't have to read all the way
13  through it, but just kind of flip through
14  the pages and see if you ever remember
15  seeing anything like that.
16      Ms. Baldwin, I'm going to represent to
17  you that that document is a copy of this
18  document. Do you remember receiving any
19  type of document like this from Hertz that
20  was in this little folder exactly like this?
21  Just take a look at it. And they may have
22  stuck these little tickets here inside that
23  folder. Do you remember receiving those

Page 62

1  tickets and then that little jacket as well?
2  A. No.
3  Q. You don't remember receiving that? Okay.
4  That's quite all right.
5  A. This must be charged to VISA.
6  Q. That's correct. Okay.
7      You already talked about the little
8  cards. But I just wanted to know if you
9  remembered receiving a folder equivalent to
10  the one that I've just given to you.
11  A. No, I don't remember.
12  Q. Okay. That's quite all right. Thank you.
13      So looking at that document you can't
14  say you remember seeing any document like
15  that?
16  A. (Witness shakes head.)
17  Q. Ms. Baldwin, we can move on. You can stick
18  that down here.
19  A. Okay.
20  Q. Do you remember what kind of vehicle you
21  rented, what kind of car it was?
22  A. (Witness shakes head.)
23  Q. You don't remember the type? Do you

Page 63

1  remember what color it was?
2  A. Wine, I guess you could say.
3  Q. You say it was wine colored?
4  A. Yes. Sort of reddish.
5  Q. In the reddish...
6  A. Yeah.
7  Q. I'm going to show you this document just to
8  kind of -- maybe we can refresh your memory
9  a little bit. Does that photograph -- Does
10  that photograph look like the type of car
11  that you rented? Is that the vehicle that
12  you rented that day, the green car there?
13  A. (Witness indicates.)
14  Q. Yes.
15  A. I guess it does.
16  Q. Do you remember renting a vehicle like that?
17  A. Oh, that's a...
18  Q. Is that a reddish or a greenish car?
19  A. It was reddish.
20  Q. The one that you rented?
21  A. Right.
22  Q. Who owned that vehicle? Do you know who
23  owned the vehicle that you rented? Was it

Page 64

1  owned by Hertz?
2  A. I would think so.
3  Q. Do you remember the license plate that was
4  on it?
5  A. No.
6  Q. When you rented the vehicle, the vehicle
7  that you remember renting, did you check it
8  to make sure everything worked fine on it,
9  the headlights --
10  A. Uh-huh (positive response).
11  Q. -- the turn signals, the brake lights --
12  A. Uh-huh (positive response).
13  Q. -- the brakes? Did you check and make sure
14  the car was in good repair?
15  A. Yes.
16  Q. Tell me how you did that.
17  A. Until I got to where I was going to get off,
18  I could check it -- you know, until it was
19  time that I didn't want to go any further in
20  Alabama, then I could check it on the
21  highway if I needed those things. But...
22  Q. But before you -- I'm sorry. Go ahead.
23  A. But once I decided, turn around, don't go

Deposition of Willie Eva Baldwin

Page 65

1　any further in Alabama, then this little
2　chute that -- you know, that you could turn
3　around in, it was just -- just one --
4　couldn't but one car go through that -- that
5　door up there at the end of -- that you
6　would make your left to turn around.
7　Q.　We are going to talk about the accident in
8　just a moment. Okay? What I'm referring to
9　is, when you rented the vehicle when you
10　were in Atlanta at the airport, before you
11　had gotten into the car, did you check it
12　and make sure everything worked properly?
13　A.　Yes.
14　Q.　And did everything work properly on it?
15　A.　Yes.
16　Q.　The lights and turn signals and brake lights
17　and everything was working properly?
18　A.　(Witness nods head.)
19　Q.　As you were driving the vehicle, was it
20　driving just fine?
21　A.　Yes.
22　Q.　You didn't have any mechanical problems or
23　no other types of problems with the vehicle?

Page 66

1　A.　No.
2　Q.　Once you left the Atlanta airport, where did
3　you go when you left Atlanta? When you,
4　Irena, and Ella got in the vehicle to leave
5　Atlanta, where did y'all go?
6　A.　It seemed that it was -- it was sort of to
7　the right, and the car was over to a little
8　section to the right.
9　Q.　I'm not talking about the day of the
10　accident. I'm talking about the first day
11　you rented the car on July 26 when your
12　plane got to Atlanta and you went and rented
13　the car, as soon as you left the airport --
14　before you got to Montgomery, as soon as you
15　left the airport, where did y'all go, you
16　and Ella and Irena? Do you remember?
17　A.　(Witness shakes head.) Just to try to pick
18　up the luggage.
19　Q.　I'm talking about once you got the luggage
20　and actually got into the vehicle.
21　A.　Well, we hadn't gotten the luggage until
22　yet.
23　Q.　Did you have to get the vehicle to go get

Page 67

1　your luggage?
2　A.　No. It was this, you know, table that it
3　would be on. But all was on except one
4　piece, which we haven't found yet.
5　Q.　Once you did get most of the luggage...
6　A.　But...
7　Q.　I'm sorry. Go ahead.
8　A.　But that was found. It was really crushed
9　up. But it seemed that maybe everything was
10　in there. Anyway, they finished tearing
11　that up.
12　Q.　And once you got the luggage and loaded it
13　into the vehicle, the rental car, the Hertz
14　rental car, where did you-all go when you
15　left the airport?
16　A.　When we got the luggage?
17　Q.　Yes, after you got the luggage. You don't
18　remember?
19　　When you left Atlanta, did y'all get
20　lost?
21　A.　I guess we were lost because we were going
22　on to Alabama.
23　Q.　Before you had gotten to Alabama, did you

Page 68

1　ever go to Florida?
2　A.　Yes, we went to Florida.
3　Q.　What part of Florida did you go to?
4　A.　I don't know where.
5　Q.　Do you know how you got to Florida?
6　A.　Yeah.
7　Q.　How?
8　A.　Drove there. And once we were in Florida,
9　we knew we didn't want to be in Florida.
10　Q.　Were you driving at the time?
11　A.　Yes.
12　Q.　Did you drive the entire time?
13　A.　Yes.
14　Q.　Now, do you remember what part of Florida
15　you had gotten to?
16　A.　No.
17　Q.　Do you remember what highway or interstate
18　you were on?
19　A.　I thought it was 85, I thought.
20　Q.　So when you got to Florida, did you-all turn
21　around and come back?
22　A.　Right.
23　Q.　That same day?

| Page 69 |
|---|
| 1   A.   That same day. |
| 2   · Q.   How long will y'all been driving?  Do you |
| 3        know? |
| 4   A.   Since that morning, I guess. |
| 5   Q.   Since that morning.  Okay.  So your plane -- |
| 6        Strike that. |
| 7            After that you left Florida when you turned |
| 8        around in Florida, did you end back up in |
| 9        Georgia? |
| 10  A.   Right. |
| 11  Q.   Do you remember what part of Georgia you |
| 12       ended back up in? |
| 13  A.   No. |
| 14  Q.   Does the name Newnan sound familiar? |
| 15       Newnan, Georgia, does it sound familiar? |
| 16  A.   Not connecting this. |
| 17  Q.   Did you-all stay the night in a hotel |
| 18       somewhere? |
| 19  A.   It didn't seem that we did. |
| 20  Q.   So after you got back from Florida, y'all |
| 21       didn't spend the night in a hotel?  Do you |
| 22       remember? |
| 23  A.   Uh-uh (negative response). |

| Page 70 |
|---|
| 1   Q.   Do you remember ever staying in a hotel |
| 2        during this trip?  When you came down last |
| 3        year from Pennsylvania to Atlanta, do you |
| 4        remember staying in a hotel at any time |
| 5        during that trip? |
| 6   A.   No, I don't think so. |
| 7   Q.   So when did you-all end up in Alabama? |
| 8   A.   On the 27th. |
| 9   Q.   On the 27th.  So you came in -- As your |
| 10       airline tickets indicate, you flew in on the |
| 11       26th, correct?  The morning of July 26th, |
| 12       correct, you flew into Atlanta?  Does that |
| 13       sound about right? |
| 14  A.   Yes. |
| 15  Q.   Then you rented a vehicle from Hertz at the |
| 16       airport, correct? |
| 17  A.   Atlanta airport. |
| 18  Q.   Atlanta airport, correct? |
| 19  A.   Uh-huh (positive response). |
| 20  Q.   You left the Atlanta airport and you |
| 21       traveled and you got lost in Florida.  Does |
| 22       that sound about right? |
| 23  A.   Uh-huh (positive response). |

| Page 71 |
|---|
| 1   Q.   And then you ended up back in Georgia? |
| 2   A.   Back. |
| 3   Q.   And then back in Alabama.  Did y'all ever |
| 4        stop and take a rest anywhere? |
| 5   A.   Uh-uh (negative response).  I don't think |
| 6        so. |
| 7   Q.   You drove the entire time from the morning |
| 8        of July 26 until the evening hours of July |
| 9        27th?  Y'all never stopped at all? |
| 10  A.   I don't remember stopping.  But... |
| 11  Q.   Is it possible that you could have? |
| 12  A.   It's possible that we could have. |
| 13  Q.   So it's possible that y'all may have spent |
| 14       the night in Newnan, Georgia; is that |
| 15       correct?  Y'all may have done that? |
| 16           If I represent to you that your sister |
| 17       Ella said that you-all spent the night in |
| 18       Newnan, Georgia, would she be correct? |
| 19  A.   I don't know. |
| 20  Q.   So you don't remember anything about |
| 21       spending the night anywhere, do you? |
| 22  A.   (Witness shakes head.) |
| 23  Q.   That's okay.  Let's talk about the accident |

| Page 72 |
|---|
| 1        that happened on July 27th.  Ms. Baldwin, |
| 2        when I used the word hotel, sometimes I |
| 3        assume that's motel, too.  Did y'all stay at |
| 4        a motel?  Do you remember a motel or |
| 5        anything like a Motel 6 or any type of |
| 6        lodging facility that you stayed at? |
| 7   A.   I'm not sure. |
| 8   Q.   On July 27, 2007 at about seven o five do |
| 9        you remember being involved in an automobile |
| 10       accident? |
| 11  A.   Yes. |
| 12  Q.   Now, I want you to tell me in your own words |
| 13       what happened. |
| 14  A.   Well, to get off of 85 and turn around, you |
| 15       had to go up this little path, and only one |
| 16       car could go through.  And as I was going |
| 17       up, a car came from behind and just |
| 18       spattered the car. |
| 19  Q.   Okay.  So as you were going up the little |
| 20       ramp area, the area that you are referring |
| 21       to, you were hit from behind? |
| 22  A.   Right. |
| 23  Q.   Do you know who it was that hit you from |

Deposition of Willie Eva Baldwin

Page 73

1  behind?
2  A.  No, I didn't know them.
3  Q.  You didn't know at that time?
4  A.  No.
5  Q.  Did you later learn who it was that hit you
6  from behind?
7  A.  Just in reading who it was.
8  Q.  Do you remember what you read that let you
9  know who it was that hit you from behind?
10  A.  Some of your writings.
11  Q.  Were those things that you presented to your
12  attorney?  I don't want you to tell me what
13  your attorney told you.  Were those some of
14  the documents that I presented to your
15  attorney is what you looked at?
16  A.  I guess so.
17  Q.  Did you ever see the police report?
18  A.  No.
19      (Plaintiff's Exhibit Number 11
20      marked for identification.)
21  Q.  Let me show you what I've marked as
22  Plaintiff's Exhibit Number Eleven.  I want
23  you to take a look at that document.  I

Page 74

1  represent to you that this is the corrected
2  copy of the accident report.  Have you ever
3  seen that accident report before?
4  A.  Not that I remember.
5  Q.  Did you ever talk to anyone regarding the
6  accident?
7  A.  No.
8  Q.  Do you remember talking to a Montgomery
9  police officer about the accident?
10  A.  It seemed that we might have eventually got
11  off there, and this is the lady that hit me
12  from behind.
13  Q.  Do you see her name on that report?
14  A.  Denita R. Colvin.
15  Q.  Do you remember what kind of vehicle
16  Ms. Colvin was driving when she hit you from
17  behind?
18  A.  It seemed that it was -- it was a dark
19  color.
20  Q.  When you say dark, was it black?
21  A.  It was black.
22  Q.  Do you remember what kind of vehicle it was?
23  A.  No.  It was sort of an older vehicle because

Page 75

1  it just splattered up -- the Hertz vehicle
2  just splattered up like it was glass.
3  Q.  Ms. Baldwin, I want you to take a look at
4  that police report, that accident report.
5  And if you look at the area where it says
6  unit number one --
7  A.  Yes.
8  Q.  -- over to your left-hand side, I believe
9  your attorney can show you.  Do you see your
10  name on that report?
11  A.  Yes.
12  Q.  And that unit number one would identify that
13  you were driving in vehicle number one
14  according to the police report.  Does that
15  sound about right?
16  A.  Yes.
17  Q.  Now, below that you'll see where by
18  Ms. Colvin's name it will say unit number
19  two.
20  A.  Uh-huh (positive response).
21  Q.  Do you see anywhere on that report that
22  shows that Ms. Colvin was driving in unit
23  number two?

Page 76

1  A.  Yes.
2  Q.  Now, do you know whether or not there were
3  any witnesses to this accident?
4  A.  I wouldn't say it was no more than who was
5  in the car.
6  Q.  Now which car are you referring to?
7  A.  The one that hit.
8  Q.  Now, let me ask you this question.  When you
9  were driving on 85 getting ready to turn
10  around, did you notice any other vehicles on
11  the interstate, any other cars that were
12  driving alongside you, ahead of you?
13  A.  They couldn't drive beside me because I was
14  going up this ramp to where one car could
15  only go through.  And as I was going up that
16  ramp to go through that one door, a car
17  behind came and hit me.
18  Q.  When you say go through that door, what are
19  you referring to?  What door are you
20  referring to?
21  A.  Where you could only go up the ramp, and the
22  door I'm talking about is a door for just
23  one car to go through.

Page 77

1    Q.  Were there any other vehicles on the
2        interstate that you were driving on?
3    A.  I wasn't on the interstate.  I was before.
4        Yeah, it was a lot of cars.
5    Q.  Do you know about how many cars may have
6        been on the road?
7    A.  No.
8    Q.  How fast were you driving?  Do you remember?
9    A.  Probably thirty or forty miles an hour.
10   Q.  Thirty or forty miles an hour?
11   A.  Yeah, looking for some place to get off.
12   Q.  Do you know what the speed limit is on that
13       road?
14   A.  No.
15   Q.  Did you see any signs that indicate what the
16       speed -- the posted speed limit was?
17   A.  I'm quite sure I did, but I don't remember
18       what it would be.
19   Q.  Did you see any signs that would indicate
20       what the minimum speed that you would have
21       to drive?
22   A.  No.  I'm probably sure I did, but I don't
23       remember.

Page 78

1    Q.  And you believe you were driving about
2        thirty or forty miles an hour?
3    A.  Yes.
4    Q.  Why would you have been going that slow?
5    A.  Looking for some place to get off.
6    Q.  You say you were looking for a place to get
7        off?
8    A.  Yes.
9    Q.  Now, when you were looking for this place to
10       get off, did you somehow stop so that you
11       can kind of make a turn?  Did you stop in
12       the road?
13   A.  No.  Probably a little slower to get on this
14       ramp that was going up to that door for
15       turning around.
16   Q.  Did you...
17   A.  I assume, you know, you go up and turn to
18       your left, that that was going to put you
19       somewhere to turn around.
20   Q.  So is it your testimony that you never, ever
21       stopped your vehicle on the road?
22   A.  I never stopped.
23   Q.  Now, I want you to look at page two of that

Page 79

1        accident report, Ms. Baldwin.
2    A.  Page two.
3    Q.  And towards the bottom of the page there is
4        a paragraph that says describe what
5        happened, refer to vehicles by number.  Can
6        you read that for me, Ms. Baldwin?
7    A.  Witness advised that vehicle one was
8        traveling west on -- that's 1085 South in
9        the right lane when suddenly vehicle one
10       started backing up on 1085 in the lane of
11       traffic.  Witness further advised that
12       vehicle two took evasive action, however was
13       unable to avoid the collision.
14           We weren't down on that highway then.
15       The driver of vehicle one advised that she
16       was traveling on 1085 south and vehicle two
17       collided with her vehicle in the rear.
18       Driver of vehicle one advised that she never
19       put her vehicle in reverse.  Driver of
20       vehicle two advised that when she noticed
21       vehicle one, it was backing on the
22       interstate.
23           We weren't down on the interstate.

Page 80

1    Q.  Okay.  Continue.
2    A.  Driver of vehicle two further advised she
3        attempted to avoid the collision by swerving
4        to the right.
5    Q.  Okay.
6    A.  But we weren't on the highway then.  We were
7        on that ramp.
8    Q.  Now, you saw where it said witnesses advised
9        that you were backing up on interstate.
10       Would that be incorrect?
11   A.  That's incorrect.  We went -- well, a long
12       time before that since it seemed that all I
13       saw was going further into Alabama.  But
14       there was that ramp I saw, so I did back up
15       on, you know, the regular highway until I
16       could make the -- it would be a left-hand
17       turn to get on this ramp to go up and go
18       through that little door.
19   Q.  So at some point you did back up on the
20       highway to try to catch the ramp.  Is that
21       what you are testifying to?
22   A.  Yes.
23   Q.  And that was because you -- Was that because

Deposition of Willie Eva Baldwin

Page 81

1  you were too far in Alabama, and you didn't
2  want to go that far?
3  A.  Right.  Had been to Florida.  Didn't want to
4  get further into Alabama.
5  Q.  You were the only person that was driving;
6  is that correct?
7  A.  Right.  See, on the -- That's the way it
8  looked.  And the highway is down here.  But
9  when you go up this ramp here, only one car
10  can go through there at a time.
11  Q.  And let me see that exhibit.  We are going
12  to talk about that for a second.  Just for
13  the record, I believe, Ms. Baldwin, you are
14  referring to page number four on Plaintiff's
15  Exhibit Number Eleven.  Is this the diagram
16  that you were just talking about?
17  A.  Yes.
18  Q.  Now, hang on one second.  Let me allow you
19  to use this ink pen here.  Ms. Baldwin, I'm
20  going to refer to page number four --
21  actually page number five.  It is the same
22  drawing, but it's a little bit bigger and it
23  might help you identify it a little better.

Page 82

1  All right?
2  A.  Okay.
3  Q.  What I want you to do, Ms. Baldwin, I think
4  you testified that you were traveling in the
5  one lane right there, correct?  I want you
6  to take one of these green stars, if you
7  can, and just put it in the area that you
8  were just so we can show that that was your
9  vehicle in that approximate area.  Okay?
10  MR. HENDERSON:  At what time?
11  Q.  At approximately seven o two, seven o three,
12  right before the accident where you believe
13  your vehicle was.
14  MR. HENDERSON:  When you say right
15  before the accident, there is a
16  lot of time there.
17  Q.  Immediately preceding the accident at seven
18  o two or seven o three -- during the time
19  frame when you tried to take the one little
20  road.
21  MR. WALLER:  Can I interject
22  something?
23  Ms. Baldwin, do you need

Page 83

1  orientation on that map from
2  Mr. Henderson, your attorney?
3  Q.  Take a look at that.  Do you understand what
4  all of that means on this particular map?
5  A.  Uh-huh (positive response).  I hadn't been
6  on this little space long to go up and go
7  through that exit and turn to my left.
8  Q.  Now, where you placed the X on this
9  particular diagram on Plaintiff's Exhibit
10  Number Eleven...
11  MR. HENDERSON:  I'm sorry.  That's
12  a star.
13  Q.  Excuse me.  The star.  Is that where you
14  contend your vehicle was?
15  A.  I would say that I hadn't been going up very
16  long.
17  Q.  Where did you back up at and try to...
18  A.  Down in the highway.
19  Q.  You were in the highway when you backed up?
20  A.  Yeah.
21  Q.  And did you actually put your vehicle in
22  reverse and start backing up to try to catch
23  that exit?

Page 84

1  A.  Yes.  I stood there until it was safe for me
2  to back up, you know, and go to my right to
3  get to that.
4  Q.  And that was in the highway that you did
5  that, that you backed up?
6  A.  Right.
7  Q.  Do you remember -- Let me ask you this.
8  Once Ms. Colvin's car hit you from behind,
9  do you remember the car going up in the air?
10  A.  It didn't seem to go up in the air.  It just
11  seemed to sort of turn around as if it was
12  going to go back to the left.
13  Q.  And were you injured in the accident?
14  A.  Injured?
15  Q.  Yes, ma'am.  Were you hurt?
16  A.  (Witness shakes head.)
17  Q.  You weren't hurt?
18  A.  (Witness shakes head.)
19  Q.  How did you get out of the vehicle?
20  A.  I just got out.
21  Q.  You just got out?
22  A.  Yes.
23  Q.  When you got out, what's the first thing you

Page 85

1     did?
2 A.   Well, I looked back at my sister, the one
3     that was killed. And she was, you know,
4     laying over -- from the right side she was
5     laying over to the left side. And when the
6     car hit, she said, oh. And it was a lot of
7     blood coming from -- so much so that the
8     jacket that she had on the seat beside her
9     was so full of blood and the seat of the car
10     that we just left that is was. And the
11     ambulance picked her up.
12 Q.   Did you see anybody else come in and try to
13     help out with the accident?
14 A.   No.
15 Q.   You don't remember any guys coming in and
16     trying to get you out of the car?
17 A.   No.
18 Q.   Did anybody try to get Ms. Prather out of
19     the car?
20 A.   Only the people of the ambulance that was
21     going to take us -- you know, that helped
22     her up.
23 Q.   Prior to them arriving, did anyone...

Page 86

1 A.   Nobody, no. Nobody. We were just the two
2     cars up there.
3 Q.   There were no other cars around?
4 A.   No.
5 Q.   Did anybody try to -- Did you try to help
6     your sister Ms. Johnson get up?
7 A.   No, because the people in the ambulance was
8     helping her.
9 Q.   Okay. That's fair enough. After you had
10     gotten out and you-all waited for the
11     paramedics to come, did you say anything to
12     Ms. Prather about what happened?
13 A.   No, I don't think so.
14 Q.   Did you go to the hospital?
15 A.   They took us to the hospital.
16 Q.   The ambulance took you to the hospital as
17     well?
18 A.   Right.
19 Q.   Was your sister injured -- Ms. Prather, was
20     she hurt?
21 A.   It doesn't seem so. But she doesn't
22     remember it. I guess it just, you know,
23     dulled the brains.

Page 87

1 Q.   Let me ask you this question. In your
2     interrogatories I asked you -- the questions
3     I had asked you, and you were to answer and
4     give them back to us. I had asked you is it
5     customary for you to stop or back up on the
6     roadway. And I believe your answer was very
7     seldom.
8 A.   Very seldom.
9 Q.   Have you ever done that before where you
10     just stopped in the middle of the highway
11     and backed up?
12 A.   I wasn't on the middle of...
13 Q.   Or in the highway?
14 A.   In the highway.
15 Q.   Have you ever done that before?
16 A.   Yes.
17 Q.   You have?
18 A.   Uh-huh (positive response). Pulled to the
19     side -- to, you know, the extreme right.
20 Q.   But when you stopped and backed up, were you
21     in the highway when you did that and then
22     you pulled to the side?
23 A.   Right.

Page 88

1 Q.   Let me ask you this question. Was anybody
2     injured or was there an accident behind that
3     conduct before when you did that? Did
4     anybody ever get hurt?
5 A.   No.
6 Q.   Do you think it's safe to stop in the
7     highway and back up?
8 A.   Yes.
9 Q.   You think it is safe to do that?
10 A.   If you don't see anyplace of pulling off to
11     your right.
12 Q.   Assuming that it's -- Let me ask you this
13     question. If there are other cars coming
14     behind you, would it be safe -- in your
15     opinion would it be safe, then, to stop in
16     the highway?
17 A.   Extremely at the right, but not in the
18     highway. You know, but that space that's
19     not part of the highway where if you broke
20     down you would stop anyway.
21 Q.   That's fine. But if you were in the highway
22     and you -- not in that space you are talking
23     about, but if you were in the highway?

Deposition of Willie Eva Baldwin

Page 89

1  A.  Oh, no.  Never back up there.
2  Q.  Is that dangerous?
3  A.  Sure.
4  Q.  What do you think would happen if you did
5      that?
6  A.  They would kill everybody in that front car.
7  Q.  When you backed up -- you say you were in
8      the highway when you backed up -- did you
9      think about whether or not someone....
10 A.  But I wasn't, you know, out in the traveling
11     lane.  I was beside -- that space that if
12     you had car trouble that you would pull over
13     there.
14 Q.  Is it possible that you may have thought
15     that you were in that space and you were in
16     the highway?
17 A.  No.
18 Q.  I think you testified earlier that you were
19     in the highway when you backed up.  Were you
20     in the highway when you backed up?
21 A.  Possibly.  But you are calling the
22     highway -- it's those lanes that tell you,
23     you know, that you are in one, two, three

Page 90

1      lane, that's the highway.  But not that lane
2      that you don't drive on, the one that's on
3      the right.
4  Q.  So would it be safe to say that if you were
5      in the highway, the lane that you do drive
6      on and you back up, that would be dangerous?
7  A.  Worse than dangerous.
8  Q.  And would it be safe to say if someone
9      backed up in that lane that you drive in
10     with oncoming traffic, that injury or death
11     might very well happen?
12 A.  It sure would.
13     MR. HENDERSON:  Object to the
14     form.
15 Q.  When the accident happened, did you get
16     out -- did you see any debris in the road?
17     From where the vehicles were tore up, did
18     you see anything in the road?
19 A.  No.  It was clear, that little ramp.
20 Q.  What I'm referring to, once the collision
21     happened, once the accident happened, did
22     you see any parts of either Ms. Colvin's car
23     or the Hyundai that you rented...

Page 91

1  A.  No.  It didn't seem that it bothered that
2      car that hit me.  It just splattered it.
3  Q.  It just splattered which one?
4  A.  The one that I was driving.  And it didn't
5      seem that they were hurt.  It seemed that
6      they just sat there.
7  Q.  Who did?
8  A.  The other car.  It did -- When it hit, it --
9      on the other little space there, it had
10     turned to come across that little ramp that
11     we were going up.
12 Q.  At some point, Ms. Baldwin, when you had
13     gone to the hospital and Ms. Prather had
14     gone to the hospital, at some point did you
15     go down to the Montgomery Police Station?
16 A.  It seemed that at some point we did, because
17     it seemed that they didn't -- couldn't keep
18     up with the license.  And it was some
19     walking around down there.
20 Q.  Do you remember giving a statement about
21     your version of the events that took place
22     on July 27, 2007?  Did you give a statement
23     to the police about what happened?

Page 92

1  A.  I would think I did.
2      (Plaintiff's Exhibit Number 12
3      marked for identification.)
4  Q.  Let me show you what I'm going to mark as
5      Plaintiff's Exhibit Number Twelve and ask
6      you if you remember receiving that document,
7      reading it and signing it.  And I'll
8      represent to you that that's a copy of the
9      document.  Is that your signature on there?
10 A.  Yes.
11 Q.  I want you to read for the record the
12     portion of that document that's highlighted
13     in yellow for me.  Tell me if you remember
14     that.
15 A.  I fully understand the foregoing statement
16     and do willingly agree to answer questions.
17     I understand and know what I'm doing.  No
18     promises or threats have been made to me by
19     anyone and no pressure of any kind has been
20     made against me by anyone.
21 Q.  Okay.  So you were asked to make a
22     statement, and you made it on your own free
23     will?

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 93

1   A.  Yes.
2   Q.  Now, do you remember if they recorded that
3       statement; in other words, if they had a
4       little tape recorder device similar to what
5       we have here today when they recorded your
6       statement or not?
7   A.  You mean this is the police --
8   Q.  Yes.
9   A.  -- in Montgomery?
10  Q.  In Montgomery, yes, ma'am.
11  A.  No, I don't.
12          (Plaintiff's Exhibit Number 13
13           marked for identification.)
14  Q.  I'm going to show you what I've marked as
15      Plaintiff's Exhibit Thirteen.  I want you to
16      take a look at that document.  It's about
17      twelve pages long, and I represent to you
18      that it constitutes the statement that you
19      gave to Corporal Caffey following the
20      accident.  I want you to take a few minutes
21      to look at it if you haven't already.  Take
22      a look at that and see if that statement is
23      the statement that you gave on that date

Page 94

1       July 28th, 2007.
2           MR. COLLINS:  For the record,
3           Ms. Baldwin is still under
4           oath.  She is reviewing
5           Plaintiff's Exhibit Number
6           Thirteen.  However, due to
7           scheduling we are going to
8           break for the evening,
9           reconvene tomorrow in
10          Montgomery beginning at about
11          four o'clock.
12              Anything else anybody needs
13          on the record?
14          MR. HENDERSON:  I don't think so.
15      (Deposition adjourned.)
16      (Deposition reconvened on
17          Thursday, the 28th day of
18          February 2008 at approximately
19          5:05 p.m. CST)
20      EXAMINATION (cont.'d)
21  BY MR. COLLINS:
22  Q.  Ms. Baldwin, how are you doing?
23  A.  Struggling.

Page 95

1   Q.  Are you struggling?  We are going to try to
2       make this as painless as possible.  Okay?
3   A.  Thank you.
4   Q.  We are back on the record, and you remember
5       you are still under oath from yesterday.
6       Okay?
7   A.  Yes.
8   Q.  I'm going to finish asking you some
9       questions that I didn't get a chance to talk
10      to you about yesterday.
11          Do you remember I showed you
12      Plaintiff's Exhibit Number Thirteen.  That
13      was a statement that you had given to the
14      Montgomery Police Department and we had
15      asked you to take a copy of it home and read
16      it.  Did you get a chance to do that?
17  A.  No.
18  Q.  Do you remember your attorney giving you a
19      copy yesterday before we left the
20      deposition?  Did you get a chance to look at
21      that document and review it last night?
22  A.  No.
23  Q.  Now, I represent to you that that document

Page 96

1       is the statement that you gave Corporal
2       Caffey, I believe, on July 28th, which is
3       the date after the accident.  Do you
4       remember giving a statement to the police
5       about the accident?  Do you remember talking
6       to the police about the accident?
7   A.  No.
8   Q.  Yesterday we had showed you a document and
9       you said you did remember.
10  A.  Yes, I did, because today seemed to -- it
11      was here, there, and everywhere.
12  Q.  Okay.  Now, does that -- do you need a
13      couple of minutes to read that statement, or
14      are you comfortable testifying to what you
15      believe you said the day of the accident?
16      If you need some time to read it.
17  A.  Yes, sir, I do.
18  Q.  Okay.  Just let us know when you are done.
19      Okay?
20  A.  Uh-huh (positive response).
21  Q.  Ms. Baldwin, do you remember yesterday I
22      showed you what has been marked as
23      Plaintiff's Exhibit Number Twelve.  And it

Deposition of Willie Eva Baldwin

Page 97

1  was a document that contained your statement
2  indicating that you fully understand the
3  statement that you were giving and you were
4  giving that statement voluntarily. Do you
5  remember seeing this document yesterday?
6  A.  Yes.
7  Q.  Is that your signature on the bottom of
8    Plaintiff's Exhibit Number Twelve?
9  A.  Yes, to the right.
10  Q.  Okay.
11        MR. COLLINS:  And, for the record,
12          with agreement of the parties
13          we stipulate that the statement
14          constituted in Plaintiff's
15          Exhibit Number Thirteen is the
16          statement that Ms. Baldwin had
17          given on July 28th, 2007
18          regarding the accident that
19          makes the basis of this case.
20  Q.  Ms. Baldwin, I'm just going to ask you a
21    couple of questions based on your statement
22    and see if you can just help me out a little
23    bit.  Okay?

Page 98

1        Now, I asked you yesterday,
2    Ms. Baldwin, if you remember spending the
3    night somewhere in Newnan, Georgia.  And I
4    believe you told me no, you didn't remember
5    spending the night.
6  A.  I don't.
7  Q.  If you would, turn to page number eight.
8    And if you look at the bottom you'll see the
9    page designations at the bottom of your
10    document.  But turn to the eighth page of
11    that document, and let me know when you get
12    there.
13  A.  Okay.
14  Q.  And I'll read to you, Ms. Baldwin, from the
15    statement about a quarter of the page down
16    it says: question:  Okay.  So y'all go back
17    to Atlanta and this is Thursday evening, and
18    then you get on 85 and you-all stop in
19    Newnan, Georgia to spend the night.  Is that
20    where y'all spent the night?  And your
21    answer is: I...
22        And then the question again is:  Do you
23    remember spending the night?  And your

Page 99

1    answer was:  Yes.  Do you remember saying
2    that on July 28th, 2007?
3  A.  Spending the night?
4  Q.  Does that help you remember whether or not
5    you spent the night in Newnan, Georgia?
6  A.  Spending the night, was that at a motel or
7    the hospital?
8  Q.  At a motel -- a motel or hotel.  And I
9    believe you said that you spent the night at
10    Holiday Inn, I think.  Is that -- If you
11    look down, is that what you told....
12  A.  I don't know.
13  Q.  Do you remember telling Corporal Caffey that
14    you spent the night at the Holiday Inn?
15  A.  No, I don't remember it now.
16  Q.  Okay.  Let's talk about when you got to
17    Alabama.  I believe you testified yesterday
18    that you -- when you left Georgia, you came
19    straight on to Alabama and then you realized
20    that you were too far into Alabama and you
21    wanted to turn around.
22  A.  Right.
23  Q.  Do you remember going to Ramer, Alabama?

Page 100

1  A.  Ramer?
2  Q.  Yes.
3  A.  (Witness shakes head.)
4  Q.  You don't remember?  Do you know where
5    Ramer, Alabama is?
6  A.  No.
7  Q.  Do you remember stopping and purchasing gas
8    in Ramer, Alabama?
9  A.  No.
10  Q.  Do you remember where you stopped and got
11    gas on your way from Georgia to Alabama?
12  A.  No.
13  Q.  You don't really remember?
14  A.  (Witness shakes head.)
15  Q.  When you got into Alabama, did you drive
16    just on Interstate 85 or did you ride all
17    around different portions of Montgomery,
18    Alabama?
19  A.  No.
20  Q.  You were just on the interstate?
21  A.  Right, 85.
22  Q.  85.  You never got off at all and went to
23    another part of --

Page 101

1   A.  No.
2   Q.  -- this area in Montgomery, Alabama?
3   A.  No.
4   Q.  That's enough with this document here.  We
5       are pretty much done with that.
6           Let's talk about Cuthbert, Georgia.
7       Tell me again, Ms. Baldwin, who were you,
8       Irena, and Ella -- who were you-all going to
9       visit in Cuthbert, Georgia?
10  A.  Family.
11  Q.  Can you give me the names of family?
12  A.  Lois Brown.
13  Q.  And how was she related to you?
14  A.  Niece.
15  Q.  And do you know her telephone number?
16      Ms. Baldwin, you don't have to get it out
17      right now.  But if you can get it to your
18      attorney, he can give it to me later.  Okay?
19          And who else were y'all going to see?
20  A.  Ann Johnson.
21  Q.  And how are you related to Ann Johnson?
22  A.  I'm her aunt.
23  Q.  Now, Ann Johnson, is she related to -- how

Page 102

1       was she related to Irena Johnson?
2   A.  She's Irena's niece.
3   Q.  And Lois Brown is also Irena's niece; is
4       that correct?
5   A.  Right.
6   Q.  Now, does Lois Brown and Ann Johnson live
7       together or do they live separately?  Do
8       they live in different houses, or do they
9       live together?
10  A.  Different houses.
11  Q.  Was there anyone else you-all were going to
12      see in Cuthbert?
13  A.  A sister-in-law.
14  Q.  Your sister-in-law?
15  A.  Yeah.
16  Q.  What's her name?
17  A.  Lucille Johnson.
18  Q.  Now, how was she your sister-in-law?
19  A.  She was once married to my brother, oldest
20      brother.
21  Q.  Now, was there anyone else you-all were
22      going to see in Cuthbert, Georgia?
23  A.  Just whoever was in the house with Lucille.

Page 103

1   Q.  Now, when you had planned to get to
2       Cuthbert, did you-all have some type of
3       activity planned like a family dinner or
4       reunion of sorts that you-all had planned?
5   A.  No.
6   Q.  What usually happens when you-all go to
7       Cuthbert and what kind of activities do
8       you-all usually partake in?
9   A.  Just go from house to house, and Lois
10      usually fixes dinner.
11  Q.  And, again, I think you testified
12      yesterday...
13  A.  We may go out to dinner.
14  Q.  Okay.
15  A.  I can't tell you where that is.
16  Q.  I think you testified yesterday that this is
17      something you-all do every single year,
18      correct?
19  A.  Yes.
20  Q.  And it's kind of like a reunion?
21  A.  Well, we don't call it a reunion, not then.
22      But sometime ago it was a reunion.
23  Q.  But now it's just all of the sisters come

Page 104

1       down and everybody just goes to visit
2       everybody?
3   A.  Right.
4   Q.  And that's something that Irena wanted to
5       do; is that correct?
6   A.  Right.
7   Q.  Something that you wanted to do?
8   A.  Uh-huh (positive response).
9   Q.  And something that Ella wanted to do; is
10      that correct?
11  A.  Right.
12          (Plaintiff's Exhibit Number 14
13           marked for identification.)
14  Q.  Ms. Baldwin, I'm going to show you what I've
15      marked as Plaintiff's Exhibit Number
16      Fourteen.  And I'm going to ask you if you
17      can take a look at that document and see if
18      you've seen that document before.  And on
19      the very last page or next to the last page,
20      I believe your signature may be on there,
21      and tell me if you signed that document.
22      And you can flip the pages if you need to,
23      Ms. Baldwin.

Page 105

1　　　　Ms. Baldwin, all I want you to do is
2　take a look at that document. You don't
3　have to read it. Just take a look at the
4　document and see if you've seen it before
5　and if you in fact signed that document on
6　the last page.
7　　　　Is that last page, Ms. Baldwin? Does
8　that appear to be your signature somewhere
9　on that page?
10　A.　Yes.
11　Q.　It looks like you read those
12　interrogatories. I'm just going to ask you
13　a couple of questions with regard to those
14　interrogatories and the other attorneys may
15　ask you some questions about those as well.
16　　　　Ms. Baldwin, was Irena and Ella, were
17　they passengers in the vehicle?
18　A.　Yes.
19　Q.　Now, do you know what a guest is?
20　A.　A guest?
21　Q.　Yes.
22　A.　Yes. Somebody that really doesn't live with
23　you.

Page 106

1　　　　MR. HENDERSON: Object to the
2　　　　form.
3　Q.　Would you characterize Irena as a guest in
4　the automobile with you?
5　　　　MR. HENDERSON: Object to the
6　　　　form.
7　Q.　Or would you characterize her as a
8　passenger?
9　　　　MR. HENDERSON: Object to the
10　　　　form. You are asking about a
11　　　　legal conclusion.
12　　　　MR. COLLINS: I understand the
13　　　　objection.
14　　　　MR. HENDERSON: And she obviously
15　　　　doesn't understand the legal
16　　　　definition of a guest or a
17　　　　passenger. But under the facts
18　　　　that she presented, it would
19　　　　appear that she's a passenger.
20　Q.　With regards to interrogatory number
21　thirteen, you indicated that you also had
22　insurance with Allstate. Did you file a
23　claim with Allstate for this particular

Page 107

1　case? Did you let Allstate know -- your
2　insurance company know about this particular
3　accident?
4　A.　I don't remember.
5　Q.　You don't remember. You may have? You just
6　don't remember?
7　A.　No, I don't remember.
8　Q.　And interrogatory number twenty-two asks is
9　it customary in your driving experience that
10　you stop on the roadways including
11　interstate, highways, and expressways that
12　are traveled by other drivers -- if you look
13　at number twenty-four in that document. And
14　your answer was very seldom. And I believe
15　yesterday you testified that...:
16　A.　Twenty-two?
17　Q.　Yes, ma'am.
18　　　　MR. COLLINS: Do you want to help
19　　　　her out, David?
20　A.　Very, very seldom.
21　Q.　Very, very seldom. And I believe yesterday
22　you said that you have done it before; is
23　that correct?

Page 108

1　　　　MR. HENDERSON: Let me object to
2　　　　the form. I don't think that
3　　　　she said that she stopped in a
4　　　　lane of highway, but she
5　　　　stopped off to the side of the
6　　　　road because obviously she
7　　　　testified yesterday that it
8　　　　would be dangerous to stop in
9　　　　the lane of a highway.
10　　　　MR. COLLINS: Actually I think she
11　　　　testified that she stopped in
12　　　　the highway before.
13　　　　THE WITNESS: No, not in the
14　　　　highway.
15　　　　MR. COLLINS: There was another
16　　　　question I think she -- when I
17　　　　asked her is it customary that
18　　　　she stop on the roadway, I
19　　　　believe she -- we can address
20　　　　that at a later date. I'll
21　　　　withdraw the question for right
22　　　　now.
23　Q.　Just a couple of more things, Ms. Baldwin.

| | Page 109 |
|---|---|
| 1 | We are done with that document there. Let |
| 2 | me ask you one more question about Cuthbert. |
| 3 | Are there any other relatives in Cuthbert |
| 4 | that may be sick or sometimes ill when |
| 5 | you-all travel to see them? |
| 6 | A. Well, my sister-in-law is ill. But she's in |
| 7 | bed at all times. |
| 8 | Q. Is that Lucille Johnson? |
| 9 | A. Right. |
| 10 | Q. Is that one of the reasons why you-all |
| 11 | travel to see her because she's... |
| 12 | A. No. |
| 13 | Q. But when you make it to Cuthbert, you do go |
| 14 | and see her? |
| 15 | A. Definitely. |
| 16 | Q. Anybody else that may be ill or anything to |
| 17 | that effect? |
| 18 | A. No. That's the only ill one there. |
| 19 | (Plaintiff's Exhibit Numbers 15 |
| 20 | through 59 marked for |
| 21 | identification.) |
| 22 | Q. The last thing I want to do, Ms. Baldwin -- |
| 23 | and I'll give the other attorneys an |

| | Page 110 |
|---|---|
| 1 | opportunity to ask you some questions -- I'm |
| 2 | going to show you about forty-six |
| 3 | photographs that were taken of the accident. |
| 4 | Okay? I want you to just kind of flip |
| 5 | through them and look at them and tell me if |
| 6 | the scene looks familiar to you. When you |
| 7 | got out of the car after the accident, if |
| 8 | you remember seeing Ms. Colvin's vehicle and |
| 9 | your vehicle that you had rented in that |
| 10 | same or similar condition. |
| 11 | Just take a look at those photographs. |
| 12 | Just flip through them and tell me if you |
| 13 | remember that scene -- if those photographs |
| 14 | accurately depict the scene as you saw it |
| 15 | that day. And if you could kind of keep |
| 16 | them in order. |
| 17 | Ms. Baldwin, you had an opportunity to |
| 18 | look at those photographs, correct? |
| 19 | A. Yes. |
| 20 | Q. Do the images in those photographs look |
| 21 | familiar to you? The vehicles and the |
| 22 | scenery, does all of that look familiar to |
| 23 | you? |

| | Page 111 |
|---|---|
| 1 | A. This is the closest one to it. |
| 2 | Q. Does that appear to be the car that you had |
| 3 | rented from Hertz? |
| 4 | A. This car seems to be blue. |
| 5 | Q. Okay. What color was the Hertz car? |
| 6 | A. It looks like it was a rust color or wine or |
| 7 | reddish looking. |
| 8 | Q. But take a look at the entire scene and the |
| 9 | car. You said there was a black car that |
| 10 | hit you as well; is that correct? The black |
| 11 | car is the car that hit you from behind? |
| 12 | MR. WALLER: Object to the form. |
| 13 | Q. What color was the car that hit you from |
| 14 | behind? |
| 15 | MR. WALLER: Object to the form. |
| 16 | A. It seems to have been black. But you don't |
| 17 | show that car -- you don't show another car |
| 18 | on this little strip going up. |
| 19 | Q. Can you take a look at the picture where |
| 20 | your hand is right here, this picture right |
| 21 | here, there on the top. And I believe |
| 22 | that's Plaintiff's Exhibit Number -- What's |
| 23 | the number at the bottom there? |

| | Page 112 |
|---|---|
| 1 | A. Fifteen. |
| 2 | Q. Fifteen. What color is the vehicle in that |
| 3 | photograph? |
| 4 | A. It's sitting over here, but it's dark. |
| 5 | Q. Does it appear to be black or blue? |
| 6 | A. It appears to be black. |
| 7 | Q. Do you remember that vehicle being the |
| 8 | vehicle that was involved in the accident |
| 9 | that you were in? |
| 10 | A. It seemingly might have been. |
| 11 | Q. What about the vehicle right here, does that |
| 12 | kind of look like the vehicle that you may |
| 13 | have been in that you were driving? |
| 14 | A. That is a hit from possibly the right side. |
| 15 | Q. And where was the car that you were driving |
| 16 | hit from? |
| 17 | A. Mostly on the right, I guess, that my sister |
| 18 | said, oh, and, you know, fell over to the |
| 19 | left. And it was all of this blood over |
| 20 | there. |
| 21 | Q. If I represent to you that that is the |
| 22 | vehicle that you rented from Hertz -- |
| 23 | A. This is? |

Deposition of Willie Eva Baldwin

Page 113

1  Q. Yes.
2      -- would that sound about right? Could
3  it possibly have been the vehicle that you
4  rented from Hertz?
5      MR. PHILLIPS: Object to the form.
6  A. It could have, but not been a blue one.
7  Q. Do any of those pictures look familiar to
8  you, Ms. Baldwin?
9  A. Not too much.
10 Q. Now, when you got out of the vehicle after
11 the accident, did you take a look at the
12 scene? Did you look and see what was going
13 on?
14 A. No, because it was -- Yeah. Because it
15 wasn't anybody there but the people that
16 were in the car that hit me. They didn't
17 seem to be getting out doing anything. Just
18 sitting in the car.
19 Q. And when you got out -- You testified
20 yesterday that you had got out of the car;
21 is that correct?
22 A. Yes.
23 Q. And that you checked on your sisters and

Page 114

1  then you waited for help; is that correct?
2  A. Right.
3  Q. While you were waiting, did you look around
4  to see what vehicles...
5  A. It seems that nobody was around.
6  Q. Did you see any cars that looked like they
7  had been in a collision?
8  A. No, no.
9  Q. Did you see a black car?
10 A. That was standing facing me. Not facing me,
11 facing the right side of the Hertz car that
12 I was driving.
13 Q. Is that the Hertz car that you were driving?
14 A. This one?
15 Q. Yes.
16 A. The color is wrong.
17 Q. Is that the only thing wrong? Does that
18 look like the type of vehicle you had
19 rented, though? Is that the only thing you
20 represent as being wrong is the color?
21 A. I'm not sure. And I guess that one
22 that's -- with its face torn -- that's going
23 to come back across seemingly. But after it

Page 115

1  hit, it just parked over there.
2  Q. If you would, Ms. Baldwin, slide the
3  photographs over to me and I'm going to go
4  through some of them.
5  A. Okay. This is six.
6  Q. And I'll put them back in order. Don't
7  worry about that. Okay?
8  A. Okay.
9  Q. Ms. Baldwin, I'm going to show you what is
10 Plaintiff's Exhibit Number Twenty-nine.
11 Does that photograph look like the vehicle
12 that you rented from Hertz?
13 A. I'm not sure.
14 Q. Is it similar in type, just the color is
15 different?
16     MR. PHILLIPS: Object. It's been
17         asked and answered. She
18         doesn't seem to recall.
19 A. At this point I'm not sure.
20 Q. Okay. You just can't remember?
21 A. (Witness shakes head.)
22 Q. And you say there was a black car over to
23 the right-hand side. I'm going to show you

Page 116

1  what's been marked as Plaintiff's Exhibit
2  Number Thirty. Does that appear to be the
3  black car that you remember seeing?
4  A. You mean this one?
5  Q. The one in the middle of the page.
6  A. Going in the wrong direction. And it isn't
7  going up that little strip behind me.
8  Q. Okay. Just one second, Ms. Baldwin. Take a
9  look at Plaintiff's Exhibit Number
10 Forty-nine. Does that appear to be the area
11 that you were traveling in Montgomery on
12 July 27th?
13 A. Yes.
14 Q. So that...
15 A. That's that -- yes, the strip that's going
16 up.
17 Q. Okay.
18 A. It's only one door up there to go through.
19 Q. Okay. Now, when you say -- Strike that.
20 Let me ask you this question. So you do
21 recognize the images in Plaintiff's Exhibit
22 Number Forty-nine. You see the signs up
23 there? Do you recognize those?

| Page 117 |
| --- |

1   A.  Maybe.
2   Q.  Okay. I think you just said you did. Do
3       you remember whether or not you were
4       traveling on that road on July 27th of 2007?
5   A.  Yes.
6   Q.  You were?
7   A.  Yes.
8   Q.  So does that picture fairly and accurately
9       depict the scene as you remember on July 27,
10      2007?
11  A.  Yes. See, you drive up here. And to turn
12      around, only one could go through there to
13      turn around.
14          MR. HENDERSON: Ms. Baldwin, just
15          so I'm clear. When you point
16          up there, do you mean there was
17          just one lane that you could go
18          through?
19          THE WITNESS: Just one -- it was
20          just one lane.
21          MR. HENDERSON: And that's what
22          you mean when you say door, it
23          was just -- the lane was the

| Page 118 |
| --- |

1           door, right?
2           THE WITNESS: No.
3           MR. COLLINS: Object to the form.
4           MR. WALLER: Object to the form.
5   Q.  Ms. Baldwin, do this for us. Take this ink
6       pen and draw an X in the lane in which you
7       say you were traveling that you were going
8       through to...
9   A.  Well, it wasn't but one lane.
10  Q.  Can you put an X in the lane looking at that
11      picture where you were traveling?
12  A.  Well, I guess it could be this one.
13          MR. HENDERSON: Ms. Baldwin,
14          that's only if you know. Don't
15          put it down if you don't know.
16  A.  No. And this is all wrong. Nobody was over
17      here. It's just that you could go up this
18      lane to go through this one door to your
19      left to turn around.
20  Q.  And, if you could for us, Ms. Baldwin, I
21      notice you have the pen there. Could you
22      indicate, if you remember, which lane you
23      were traveling in when you got ready to turn

| Page 119 |
| --- |

1       around? Just put a nice big X right there.
2       It doesn't have to be too big.
3   A.  To turn around?
4   Q.  Yes.
5   A.  I wasn't going to turn around in this lane.
6       I didn't want to go on over into Alabama any
7       further. So I was going to get on this
8       thing. Well, you had called -- what -- 85
9       is down here. And going up this lane, just
10      one car could go up and through.
11  Q.  This probably would show up a little bit
12      better than that, Ms. Baldwin, if you can
13      get the top off. Just use that end right
14      there and make a marking where you were
15      indicating you were traveling.
16          MR. HENDERSON: If you know.
17  Q.  If you know.
18  A.  This lane.
19  Q.  And I represent to you that Ms. Baldwin just
20      drew a red line with a red Sharpie marker
21      indicating the lane that she was driving.
22          And I indicate that Ms. Baldwin just
23      drew a second red line. What's the purpose

| Page 120 |
| --- |

1       of the second red line?
2   A.  This is where I was traveling.
3   Q.  Okay. Now, Ms. Baldwin, is that in the
4       middle of the interstate or the highway?
5   A.  That's not the highway.
6   Q.  Is it in the middle of the road?
7   A.  When you say road...
8   Q.  Yes, ma'am. Tell me...
9   A.  That's that place that I had gotten off of
10      85 down here.
11  Q.  Okay.
12  A.  And I was going forward here.
13  Q.  Ms. Baldwin, tell me how many lanes are
14      indicated in that photograph? Do you see
15      how many different lanes? Can you count
16      them?
17  A.  Just one. Is that it?
18  Q.  Okay. And which one were you traveling in?
19      The one where you drew the red lines?
20  A.  Yeah, between this -- just going straight up
21      to go through this one door which only one
22      car could go through.
23  Q.  Okay. Do you see that door on that

Deposition of Willie Eva Baldwin

Page 121

1   photograph right now, Ms. Baldwin?
2   A.  No.
3        MR. HENDERSON:  Let me represent
4        that I don't see it on there
5        either because you can't see
6        past the car.
7        THE WITNESS:  Right.
8   A.  But this is...
9   Q.  Ms. Baldwin, you can hang on to that marker.
10      I'm going to show you a couple of more
11      photographs and then we will be done.  Okay?
12      We will straighten these out here
13      afterwards.
14        I'm going to show you what's been
15      marked as Plaintiff's Exhibit Number Fifty.
16      And it's similar to this photograph on
17      Forty-nine.  And can you look up now and
18      tell me if you see the door?  Can you tell
19      me if you see the door that you are
20      referring to?
21   A.  Why did you get this person standing there
22      because nobody was standing in that little
23      ramp.

Page 122

1   Q.  And I'll represent to you, Ms. Baldwin, that
2      those photographs were taken after the
3      accident.  And so you may see people inside
4      the photographs that may have not been there
5      at the time of the accident.
6   A.  Let's see.
7   Q.  Do you see the door that you were referring
8      to?
9   A.  It should be up here.
10  Q.  If you see it, why don't you circle it for
11     me with the red marker if you see the door
12     that you are referring to.
13  A.  No, these arrows are all wrong.
14  Q.  Can you tell me how?
15  A.  They seem to be pointing go on through.
16  Q.  Okay.
17  A.  And not a left turn.
18        MR. HENDERSON:  Let's wait one
19        second for his question,
20        Ms. Baldwin.
21  Q.  On that document it appears you drew a door;
22     is that correct?
23  A.  Right.

Page 123

1   Q.  Where you say the door should be?
2   A.  Yes.
3   Q.  Are you saying, Ms. Baldwin, the lane that
4      you just drew on this photograph, is that
5      the lane that you were driving in?
6   A.  Yes.
7   Q.  And you drew that in red?
8   A.  There is only one lane.
9   Q.  In red marker, right?
10  A.  Right.
11  Q.  Let me show you this document I'm going to
12     represent to you as Plaintiff's Exhibit
13     Number Fifty-five.  Can you look on that
14     document and tell me if you see any letters
15     written in the straight -- in the roadway.
16  A.  No.
17  Q.  Why don't you take a look at it again, look
18     down on the road and see if you see any
19     letters that are written in what looks like
20     paint, orange paint just in that photograph.
21  A.  It wasn't anybody up there.
22  Q.  What I'm looking for is for you to look at
23     that image right there and see if you see

Page 124

1   where somebody wrote three letters POI in
2   the road.  Do you see it?
3   A.  Yes, I see that.
4   Q.  Can you circle that for me with that red
5      marker?
6   A.  Okay.
7   Q.  And I'm going to represent to you,
8      Ms. Baldwin, that POI means point of impact.
9      Is it possible that you were driving in that
10     lane when the collision occurred?
11  A.  I guess so.  It wasn't but one lane there.
12  Q.  All right, Ms. Baldwin.  I don't think I
13     have anything further at this point.  I'm
14     going to turn you over to Mr. Waller.  He
15     may have some questions for you.
16     Mr. Phillips, who is on the telephone, he
17     may have some questions for you.  And then
18     your attorney, I'm sure he's going to have
19     some questions for you as well.
20        EXAMINATION
21  BY MR. WALLER:
22  Q.  Ms. Baldwin, are you doing okay?  Do you
23     need to take a break?

Page 125

1    A.  I'm doing okay.
2    Q.  I'm going to try to be as fast as I can.
3        Okay?
4    A.  Okay.
5    Q.  Ms. Baldwin, we met yesterday for the first
6        time.  And, as you know, I'm one of the
7        attorneys representing Ms. Colvin.  And I'll
8        represent to you Ms. Colvin was the driver
9        of the black vehicle involved in the
10       collision.  Do you remember Ms. Colvin from
11       yesterday?  I represent to you that I'm
12       representing Ms. Colvin who was the driver
13       of that black vehicle.  Okay?
14   A.  Yes.
15   Q.  If at any time I ask you a question and you
16       don't understand it, please stop me and I'll
17       restate it.  Okay?
18   A.  Yes.
19   Q.  Mr. Collins was showing you Plaintiff's
20       Exhibit Fifty.  This is the one that you
21       wrote on.  Do you mind if I come over there
22       right next to you?
23   A.  Sure.  Come on.

Page 126

1    Q.  Ms. Baldwin, let me ask you this.  Does this
2        diagram in the scene that's depicted right
3        here, does that accurately depict the
4        roadway immediately after the accident?
5            MR. HENDERSON:  If you know,
6            Ms. Baldwin.
7    A.  If I can discard all of that.
8    Q.  So by all of that, you are saying discard
9        the individual who is right here on the
10       right of the picture?  Is that what you are
11       talking about?
12   A.  Unless that person got -- No, nobody got out
13       of the car that hit me.
14   Q.  Let me do this, Ms. Baldwin.  I'll represent
15       to you that this is a police officer.  And
16       this picture was taken after the accident.
17       Okay?
18   A.  Okay.
19   Q.  Here is my question based on that.  Okay.
20       Does this picture -- this scene identified
21       in Plaintiff's Exhibit Fifty with the
22       exception of the police officer and the
23       cars, does this scene of the roadway, does

Page 127

1        that accurately depict the roadway as you
2        remember it --
3    A.  Yes.
4    Q.  -- at the time of the accident?
5    A.  Yes.
6    Q.  Mr. Collins had asked to you identify how
7        many lanes are depicted on this roadway.  It
8        is my understanding you testified there was
9        one lane?
10   A.  Right.
11   Q.  In looking on this picture, you don't have
12       any reason to disagree with that, do you?
13   A.  No.
14   Q.  This individual right here to the right,
15       Ms. Baldwin -- do you see this individual on
16       Plaintiff's Exhibit Fifty?
17   A.  Uh-huh (positive response).
18   Q.  Where do you believe he is standing?  Is he
19       standing in the roadway or on the shoulder?
20   A.  It should be -- well, he was on -- It wasn't
21       any shoulder.  It was just a scoop up.
22   Q.  But based on this picture right here and --
23       and I'm asking you about this picture --

Page 128

1        where do you think this gentleman is
2        standing?  In the lane still?
3    A.  No.  He wouldn't be in the lane.  Oh, from
4        looking at this picture, it looks like he's
5        in the lane because it looks like you have
6        all of this as the lane.
7    Q.  Ms. Baldwin, you'll recall yesterday that
8        you testified that at some time prior to the
9        collision or prior to the accident that you
10       had backed your car up; is that correct?
11   A.  Not on this, not on that ramp.
12   Q.  Where did you back your car up, Ms. Baldwin,
13       in relation to the ramp which is Plaintiff's
14       Exhibit Fifty?
15   A.  It was beside the ramp where, you know, you
16       can stop.  It's no traveling down there.
17   Q.  Let me do this real quick.  I'm going to see
18       if I can have a picture that shows that area
19       so you can tell us about it.  Okay?
20   A.  Okay.
21   Q.  Ms. Baldwin, can you tell us how many
22       seconds went by from the time that you
23       backed the vehicle up until the time that

Deposition of Willie Eva Baldwin

---

Page 129

1     the accident happened?
2          MR. HENDERSON: Object to the
3         form. Only if you know.
4    A. No, I couldn't tell you.
5    Q. Would minutes be a better description, if
6     you know?
7    A. Yeah. And I wouldn't know those.
8    Q. Was it less than an hour from the time...
9    A. Oh, yes.
10   Q. Was it less than five minutes from the time
11     that you backed up until the accident?
12   A. I didn't back up to the accident.
13   Q. Right. And that was the way I phrased, and
14     I'll rephrase it. I'm glad you told me. I
15     want to be sure we both understand. Okay?
16     Was the period of time less than five
17     minutes from the time that you backed up
18     until the time of the accident?
19         MR. HENDERSON: If you know.
20   Q. You can answer, if you know.
21   A. No, I don't know.
22   Q. I'm asking your opinion. You don't know
23     whether or not it was less than five

---

Page 130

1     minutes?
2    A. No, I'm not sure.
3    Q. Ms. Baldwin, isn't it true that you don't
4     know for a fact, do you, that at the time of
5     your backing up the accident happened
6     immediately thereafter?
7    A. Well, as I pulled to my right and got on
8     that ramp going up, it was no time.
9    Q. When you say no time, you mean pretty
10     instantaneous after that?
11   A. Right.
12   Q. And to get on the ramp, would you have had
13     to back up to get on that ramp?
14   A. Yes, I would.
15   Q. Yesterday you had mentioned at some point
16     you were going to turn left. Do you
17     remember saying that?
18   A. Right.
19   Q. Will you show us -- Scratch that. Did you
20     have a chance to turn left before the
21     accident?
22   A. I might have. But it looked like all I
23     could see was that 85 is just going on and

---

Page 131

1     on. So that was the only place I saw that I
2     could turn around.
3    Q. Were you tired by that time?
4         MR. HENDERSON: Object to the
5        form.
6    Q. Ma'am, you can answer.
7    A. No. I wasn't tired.
8    Q. You weren't tired?
9    A. No.
10   Q. That particular day, Ms. Baldwin, do you
11     recall traveling south of Montgomery?
12   A. South of -- No, not south of Montgomery. It
13     seemed that if I had kept going 85, I would
14     have gone on into Montgomery.
15   Q. Let me show you Plaintiff's Exhibit
16     Fifty-five that Mr. Collins just showed you.
17     He represented those letters POI. Would you
18     have any reason to disagree with the police
19     officer's opinion that the point of impact
20     between the vehicles was depicted as shown
21     in Plaintiff's Exhibit Fifty-five?
22   A. No.
23   Q. I'll even rephrase it even though you

---

Page 132

1     answered. Assuming a police officer or the
2     facts established that the point of impact
3     is located on Plaintiff's Exhibit Fifty-five
4     as you are looking at here, would you have
5     any reason whatsoever to disagree with that?
6    A. No.
7    Q. Ma'am?
8    A. No. It's too much in that picture. That --
9     just disregard all of this stuff.
10   Q. When you say stuff, you mean the cars that
11     are in the picture?
12   A. Yes, these.
13   Q. But the scene of the accident, that's a fair
14     depiction, would you agree, with the
15     exception of the cars? Is that right?
16   A. Well, I don't know because I wouldn't know
17     if any cars were down there.
18   Q. Ms. Baldwin, I'm going to turn your
19     attention real quick and go over some
20     questions that I had written down when
21     Mr. Collins was asking you questions. I'm
22     going to try to do my best not to repeat
23     what he asked you yesterday. I just have a

---

Page 133

1    few.
2       Do you have any children?
3  A.  No.
4  Q.  Have you ever been married?
5  A.  Yes.
6  Q.  Who were you married to?
7  A.  Renzie L. Baldwin.
8  Q.  Was that your only marriage?
9  A.  Yes.
10  Q.  Have you ever served in the military?
11  A.  No.
12  Q.  Mr. Collins talked about your medical
13     conditions yesterday, and you provided us
14     with an exhibit showing your medications.
15     Do you remember that?
16  A.  Yes.
17  Q.  I want to ask you something about the drug
18     Namenda.
19  A.  Namenda?
20  Q.  Yes, ma'am.
21  A.  N-a-m-e-n-d-a.
22  Q.  Correct. Do you take that?
23  A.  Yes.

Page 134

1  Q.  And based on your response yesterday, you
2     indicated that you had been diagnosed with
3     dementia; is that correct?
4  A.  Dementia.
5       MR. HENDERSON: I don't know if
6     she said she was diagnosed with
7     dementia. She said she took it
8     for dementia.
9       MR. WALLER: I'll rephrase it.
10  Q.  Do you take the Namenda for dementia?
11  A.  Yes.
12  Q.  And how long have you been taking any
13     medication for dementia?
14  A.  I don't know.
15  Q.  Is it years?
16  A.  Maybe.
17  Q.  Well, were you taking medication for
18     dementia before July of 2007?
19  A.  Yes.
20  Q.  Am I correct to assume that there are some
21     periods of time where you mistakenly failed
22     to take some medication?
23       MR. HENDERSON: Object to the

Page 135

1    form.
2  Q.  You can answer.
3  A.  Has it ever been a time that I failed to
4     take...
5  Q.  Some medication, whatever it be?
6  A.  I would say no. Sometime during the day I
7     take it. It might not be at the same time.
8  Q.  What types of symptoms were you experiencing
9     that made you get these medications for
10     dementia?
11  A.  I guess it was dizziness.
12  Q.  Forgetfulness?
13  A.  No. Just dizzy.
14  Q.  Confusion?
15  A.  No. I wasn't confused. I was just -- you
16     know, I possibly couldn't walk straight.
17  Q.  Have you ever been diagnosed with
18     Alzheimer's?
19       MR. HENDERSON: Object to the
20     form.
21  Q.  Have you ever heard any doctor tell you that
22     you had Alzheimer's?
23  A.  No.

Page 136

1       MR. HENDERSON: Object to the
2     form.
3  Q.  You haven't?
4  A.  (Witness shakes head.)
5  Q.  Ma'am, is that right? Do you want me to
6     repeat my question? Are you still thinking?
7  A.  No. You can repeat it. Has anybody ever
8     diagnosed me with Alzheimer's?
9  Q.  Yes.
10  A.  No.
11  Q.  Has any doctor told you that the Namenda
12     medication, one of the side effects could be
13     confusion?
14  A.  No.
15  Q.  Your last doctor that you saw in Georgia --
16     and we talked about it yesterday -- do you
17     recall seeing a doctor in Georgia?
18  A.  Yes.
19  Q.  Who helps you set up appointments? Is it
20     Mr. Johnson's wife?
21  A.  Right.
22  Q.  Would she be the person most knowledgeable
23     about your medical conditions?

Deposition of Willie Eva Baldwin

Page 137

1    A. Yes.
2    Q. And, in fact, does she make sure that you
3        stay up to date and you take the medication
4        as depicted on Plaintiff's...
5    A. Yes.
6        MR. COLLINS: Object to the form.
7        We are referring to since the
8        accident, correct?
9        MR. WALLER: Yes.
10   Q. You've only lived with them since the
11       accident; is that right?
12   A. Yes.
13   Q. Plaintiff's Exhibit Five, is Ms. Johnson --
14       she's the one that helps you out and makes
15       sure you take these medications currently,
16       right?
17   A. Yes. She helps me.
18   Q. Did Ms. Irena Johnson know that you were
19       taking medication for dementia prior to her
20       death?
21       MR. COLLINS: Object to the form.
22       MR. HENDERSON: Object to the
23           form.

Page 138

1    Q. Would you like me to repeat it?
2    A. Yes.
3    Q. Did Ms. Irena Johnson know that you took
4        medication for dementia before the accident?
5        MR. COLLINS: Same objection.
6        MR. HENDERSON: Object to the
7           form.
8    Q. They are making a legal objection. You can
9        answer if you know.
10   A. No.
11   Q. Y'all lived together for over forty years;
12       is that right?
13   A. Right.
14   Q. And y'all did everything together pretty
15       much; is that right?
16   A. Right.
17   Q. And you took this medication every day; is
18       that right?
19   A. Yes.
20   Q. And you are telling us that Ms. Johnson --
21       you are not sure whether Ms. Johnson knew
22       that you took this medication for dementia?
23       MR. COLLINS: Object to the form.

Page 139

1        MR. HENDERSON: Object to the
2           form.
3    Q. You can answer. Would you like me to repeat
4        it?
5    A. She wouldn't know what it was for.
6    Q. Had you ever complained to her about any
7        symptoms associated with dementia?
8    A. No.
9    Q. What about Mr. Johnson here, did Mr. Johnson
10       know that you took medication for dementia
11       before the accident?
12       MR. COLLINS: Object to the form.
13       MR. HENDERSON: Object to the
14           form.
15   Q. Ma'am? Would you like me to repeat it?
16   A. Would he know...
17   Q. Did he know?
18       MR. COLLINS: Are we talking about
19           before the accident or after?
20       MR. WALLER: Before the accident.
21   Q. I'll repeat the question. Okay,
22       Ms. Baldwin? Do you want me to repeat it?
23   A. He doesn't know what all of those medicines

Page 140

1        are for.
2    Q. I'm looking on Plaintiff's Exhibit Five, and
3        I can read under the purpose it says
4        dementia. Is that right? Is that what's
5        listed on Plaintiff's Exhibit Five? It has
6        dementia right under the purpose.
7        MR. HENDERSON: These aren't
8           marked. Which one are you
9           talking about?
10   Q. Right here. I'm showing you Plaintiff's
11       Exhibit Five. I'm talking about number six,
12       Namenda. Do you see that, Ms. Baldwin,
13       right here?
14   A. Uh-huh (positive response).
15   Q. Do you see the second column it says
16       purpose?
17   A. Uh-huh (positive response).
18   Q. Under that it says dementia. Do you see
19       that?
20   A. Uh-huh (positive response).
21   Q. Who prepared this for you, Plaintiff's
22       Exhibit Five?
23   A. Well, my niece.

Page 141

1  Q.  Who is that?
2  A.  Sandra.
3  Q.  Mr. Johnson's wife?
4  A.  Right.
5  Q.  And you are telling me that up until today
6      Mr. Johnson didn't know that you suffer from
7      dementia?
8          MR. COLLINS:  Object to the form.
9          Asked and answered.
10 Q.  Do you need me to repeat it?  Would you like
11     me to repeat it?
12 A.  Go on.
13 Q.  Are you telling us that until today that
14     Mr. Johnson didn't know that you suffered
15     from dementia?
16 A.  I don't think he would.
17 Q.  Did you tell this doctor in Georgia that you
18     took all of these medications in Plaintiff's
19     Exhibit Five?
20 A.  Did I tell a doctor?
21 Q.  This last doctor in Georgia that you
22     visited, do you remember telling us about
23     that yesterday once you started living with

Page 142

1      Mr. Johnson?
2  A.  Uh-huh (positive response).
3  Q.  Do you remember telling us that?
4          MR. HENDERSON:  Which doctor are
5          you talking about?  What's his
6          name?
7          MR. WALLER:  Let's ask her.
8  Q.  What is the doctor's name in Georgia that
9      you saw, Ms. Baldwin?
10 A.  The physical doctor is Woods.
11 Q.  Dr. Woods?
12 A.  Yes.
13 Q.  Did you tell Dr. Woods when you saw him that
14     you were taking all of this medication that
15     you listed on Plaintiff's Exhibit Five?
16 A.  Yes.
17 Q.  You did?
18 A.  Yes.
19 Q.  Did he ever discuss with you...
20 A.  Well, I -- I might have told him about the
21     eye medicine.
22 Q.  Would this document, Plaintiff's Exhibit
23     Five, have been something that you presented

Page 143

1      to Dr. Woods or not?
2  A.  Did I -- I just told him what I was taking.
3  Q.  So you told him that you were taking every
4      medication that you have listed on
5      Plaintiff's Exhibit Five here?
6  A.  Yes.
7  Q.  Did he discuss with you any potential
8      negative effects or adverse reactions when
9      taking all of these medications together?
10         MR. HENDERSON:  Object to the
11         form.
12 Q.  Ma'am?  Did he discuss that with you?  He
13     just objected to the form.
14 A.  No.
15 Q.  He didn't discuss any of that?
16 A.  No.
17 Q.  Ma'am, if you can look on Plaintiff's
18     Exhibit Five right there that you are
19     looking at -- I'll show you this.  You've
20     got number four down on the bottom.  It says
21     over-the-counter drugs.  Do you want to look
22     at this so we can be on the same page?  You
23     have it on yours.  I guess that's an exact

Page 144

1      copy.  It has Ecotrin.  Do you see that?
2  A.  Ecotrin, over the counter, uh-huh (positive
3      response).
4  Q.  What is that for?
5  A.  Oh, that's a coated aspirin.
6  Q.  Is that pain medication?
7  A.  Yes.
8  Q.  How often do you take that?
9  A.  Once a day.
10 Q.  Did you take it?
11 A.  Today.
12 Q.  You took it today.  Did you take it the day
13     of July 27 of '07, the day of the accident?
14 A.  Yes, I think I did.
15 Q.  Do you know whether or not you took that?  I
16     know it's been a long time.  That's the
17     reason I'm asking.
18 A.  Yes.
19 Q.  You don't know?
20 A.  I would think I take them all.
21 Q.  Ms. Baldwin, is there a reason that you and
22     your sisters chose to fly into Atlanta as
23     opposed to driving to Atlanta?

36 (Pages 141 to 144)

Deposition of Willie Eva Baldwin

Page 145

1    A.  She didn't think that -- Oh, to drive.
2        Well, from -- we were saying thinking that
3        my car was so old, an '87, that probably it
4        was time that it might not make it.
5    Q.  Was there any other reason that you and your
6        sisters chose to fly into Atlanta as opposed
7        to drive into Atlanta?
8    A.  That's the reason.
9    Q.  Did you feel comfortable driving a
10       vehicle --
11   A.  Yes.
12   Q.  -- at that time?
13   A.  Very comfortable.
14   Q.  Do you still drive vehicles?
15   A.  No.
16   Q.  Why is that?
17   A.  Because too much happened.
18   Q.  What you mean by that?
19   A.  That the one that I rented was chipped up.
20       So...
21   Q.  Chipped up, you mean after the accident?
22   A.  No, no.
23   Q.  Explain that for me.

Page 146

1    A.  The one that I was driving was the rental
2        car, and it was chipped up like it was just
3        a glass car.
4    Q.  Prior to the day of the accident, which is
5        July 27, 2007, prior to that day had any
6        family member told you not to drive a
7        vehicle?
8            MR. HENDERSON:  Object to the
9            form.
10           MR. COLLINS:  Object to the form.
11   Q.  You can answer.
12   A.  It seemed that you had asked that before.
13   Q.  Ma'am?
14   A.  It seemed that you asked that before.
15   Q.  No, ma'am, I don't think I did.
16   A.  Just Irena, the one that was killed, thought
17       that to rent a car because my car being an
18       '87 just might not make this trip.
19   Q.  Right.  And I understand your answer.  And I
20       guess we are a little confused.  My question
21       is, though, Ms. Baldwin, prior to the day of
22       the accident in our case had any family
23       member...

Page 147

1    A.  No.
2    Q.  Let me get through with my question, please,
3        ma'am.
4        Prior to July 27 of '07 had any family
5        member whatsoever told you not to drive a
6        vehicle?
7    A.  No.
8    Q.  Prior to July 27 of '07 had any family
9        member told you they were concerned with
10       your driving ability?
11   A.  No.
12   Q.  Prior to July 27 of '07 had any family
13       member told you they were concerned with the
14       amount of medication you were taking while
15       driving?
16   A.  No.
17   Q.  Did that ever concern you?
18           MR. HENDERSON:  Object to the
19           form.
20   A.  No.
21   Q.  Do you still feel like you are capable of
22       driving a vehicle today?
23   A.  I don't want to.

Page 148

1    Q.  Why is that?
2    A.  Because of the accident.
3    Q.  Because you are scared of getting in another
4        accident?
5            MR. HENDERSON:  Object to the
6            form.
7    Q.  Why, because of the accident?
8    A.  Why, because of the accident?
9    Q.  Yes, ma'am.  You said you were not going to
10       drive another vehicle because of the
11       accident.  My question is why?
12   A.  I don't want to be involved in -- I might
13       be.  And it doesn't have to be my fault as
14       it wasn't my fault then.
15   Q.  Do you believe that any actions or inactions
16       taken by you on July 27 of 2007 contributed
17       to the death of your sister?
18           MR. HENDERSON:  Object to the
19           form.
20   A.  Any action, no.
21   Q.  You don't feel like any actions -- Is that
22       what you said, no?
23   A.  Yes.

**Page 149**

1  Q.  When you go to the doctor, who is listed as
2      your next of kin or your immediate contact?
3  A.  Well, when I go here, it's my niece or my
4      nephew.
5  Q.  Your nephew Plaintiff Robert Johnson?
6  A.  Yes.
7  Q.  If you didn't take the drops for the
8      glaucoma daily, would you tell the members
9      of the jury what would happen?  How would
10     your eyes be?
11         MR. HENDERSON:  Object to the
12         form.
13 Q.  Do you need me to repeat the question?
14 A.  You can.
15 Q.  Ma'am?
16 A.  Go on.
17 Q.  Would it help you if I did?
18 A.  No.
19 Q.  No?
20 A.  Because the doctor, you know, see about my
21     eyes.
22 Q.  Right.  What symptoms would you get that
23     caused you to go to the doctor to get the

**Page 150**

1      glaucoma medicine?
2  A.  I don't have any symptoms, I don't suppose.
3      I have dry eyes.  They just need some...
4  Q.  Were you wearing your glasses at the time of
5      the accident on July 27 of '07?
6  A.  Yes.
7  Q.  Did you have any sunglasses on?
8  A.  No.
9  Q.  Was there light still out at that time?
10 A.  It looked like it was day to me.
11 Q.  It looked like it was complete daylight?
12 A.  Uh-huh (positive response).
13 Q.  Is that a yes?
14 A.  (Witness nods head.)
15 Q.  Just say yes so she can get it on the
16     record?
17 A.  Yes.
18 Q.  I want to skip around a little bit.  Do you
19     recall driving to Florida?  When I say this,
20     I'm talking about the week of July 27 of
21     '07.  Okay?
22 A.  Uh-huh (positive response).
23 Q.  Do you recall driving to Florida on more

**Page 151**

1      than one occasion?
2  A.  Uh-huh (positive response).
3  Q.  You do?
4  A.  Uh-huh (positive response).
5  Q.  Is that a yes?
6  A.  Yes.
7  Q.  How many times did you drive to Florida?
8  A.  Just that once.
9  Q.  You drove to Florida and then you drove back
10     up to Atlanta?
11 A.  Back up to get on 85.
12 Q.  Have you ever spoken with the driver of that
13     black vehicle who was also involved in the
14     collision, Ms. Denita Colvin?
15 A.  Not that I know of.
16 Q.  Have you ever spoken to any witnesses who
17     claim they witnessed the accident?
18 A.  No.  They couldn't witness the accident when
19     it's just the car that hit me and me going
20     up that ramp.  There couldn't be any
21     witnesses.
22 Q.  Did you ever see the driver of the black car
23     after the accident?

**Page 152**

1  A.  No.  Just -- No, I didn't go over to the car
2      because after it turned, it seemed it was
3      going to come across the driveway.
4  Q.  What do you feel the driver of the black car
5      did wrong, if anything?
6  A.  Hit me at the back.
7  Q.  At the time that the black car impacted or
8      hit your vehicle, was your vehicle stalled,
9      stopped?
10 A.  No.
11 Q.  Was your vehicle moving forward?
12 A.  Moving forward.
13 Q.  How fast was your vehicle moving forward, if
14     you can estimate?
15 A.  I guess about -- I really don't know.  But
16     not that fast.  Possibly thirty or forty
17     miles an hour.
18 Q.  Did you ever go back to the scene of the
19     accident after you left and went to the
20     hospital?
21 A.  No.
22 Q.  You never took any measurements?
23 A.  Measurements?

Deposition of Willie Eva Baldwin

Page 153

1  Q. Yes, ma'am. You never went out and measured
2     the scene, did you?
3  A. Oh, no.
4  Q. Did you ever take any photos of the scene?
5  A. No.
6  Q. Did you ever take any photos of any of the
7     cars involved in the accident?
8  A. No. It wasn't but one car involved.
9  Q. One car involved in the accident?
10 A. Right.
11 Q. Was that your car?
12 A. The one that hit me from behind.
13 Q. Did you ever see the black vehicle before
14    the impact?
15 A. No.
16 Q. What were you doing at the time of the
17    impact?
18 A. Just going up -- driving up to go through
19    that one little door and make a left turn to
20    turn around.
21 Q. I'm confused because you told us earlier
22    that you had gone backwards in reverse; is
23    that right, at some time prior to the

Page 154

1     accident? Is that what you told us earlier?
2  A. No, I didn't. Not on that ramp.
3  Q. Right.
4  A. All on that ramp was going forward.
5  Q. What was the purpose of backing up at some
6     point in time before you say you got on the
7     ramp?
8  A. Because it seemed that I was just going to
9     go on and go on to Alabama.
10 Q. When you backed up, did you turn right or
11    left to get where you wanted to go?
12 A. No.
13 Q. What...
14 A. No turning.
15 Q. Okay. When you backed...
16 A. It was on the -- like the highway is here.
17    And I'm driving on the right side because I
18    know I want to pull off, you know, when it's
19    a place that I could pull off to turn
20    around. But just going and going, it seemed
21    that, you know, the big highway was just
22    going to continue. So I saw this ramp going
23    up.

Page 155

1  Q. Is that depicted in Forty-nine there, the
2     ramp that you saw going up?
3  A. Well, I made the ramp.
4  Q. You made the ramp? Is that what you said?
5  A. Yes. You can call this that you made the
6     ramp if that's the car that's struck me from
7     behind. But it seemed no one ever got out
8     of the car that was -- that hit me.
9  Q. You don't know if they were injured or not,
10    do you?
11 A. No, I don't.
12 Q. Do you even know if their car door was
13    operable where they could get out?
14 A. No, I don't know. It seemed that they never
15    attempted to get out. They just -- when it
16    sort of turned to come across that ramp, it
17    seemed that they just -- they were still in
18    the car.
19 Q. Are you aware of any witnesses saying that
20    you were backing up into oncoming traffic at
21    the time of the impact?
22 A. Well, they weren't telling the truth.
23 Q. My question was, are you aware of witnesses?

Page 156

1  A. No, I'm...
2  Q. You are not aware of anyone saying that?
3  A. No.
4  Q. Assuming witnesses put you backing up at the
5     time of the accident, would you disagree
6     with that statement?
7  A. Definitely.
8  Q. Assuming witnesses testify that you were
9     backing up into oncoming traffic at the time
10    of the accident, would you say that they are
11    fabricating their testimony?
12 A. Right. It's not the truth.
13        MR. COLLINS: Object to the form.
14 Q. Are you aware of my client, Ms. Colvin, the
15    driver of that black vehicle making a claim
16    against you for her injuries?
17 A. She was injured?
18 Q. Are you aware of Ms. Colvin making a claim?
19 A. No.
20 Q. You are not?
21 A. No.
22 Q. You know that Mr. Johnson here filed this
23    lawsuit against you and other people? Is

Deposition of Willie Eva Baldwin

Page 157

1    that your understanding?
2    A.  Uh-huh (positive response).
3    Q.  Is that a yes?
4    A.  Yes.
5    Q.  Do you know what the allegations are against
6        you?
7    A.  What?
8    Q.  I'm asking you, do you know what they are
9        saying that you did?
10   A.  What I did do?
11   Q.  I'm asking you.  There is no right or wrong
12       answer.
13   A.  No.
14   Q.  You are not aware?
15   A.  No.
16   Q.  We talked about this yesterday.  Will you
17       make sure that Mr. Henderson gets a list of
18       all doctors that you saw while you were in
19       Georgia?  Will you make sure he gets that?
20   A.  Of all of the doctors.
21   Q.  Yes, ma'am.  We can get that later, but will
22       you make sure Mr. Henderson gets that for
23       us.

Page 158

1    A.  Okay.
2        THE WITNESS:  How will you get it,
3        Mr. Henderson?
4        MR. HENDERSON:  I'll call you
5        about it.
6        THE WITNESS:  Okay.
7    Q.  I've just got a couple more.  Bear with me,
8        Ms. Baldwin.  You are doing great.
9        You had mentioned yesterday,
10       Ms. Baldwin, about missing a piece of
11       luggage at the airport; is that right?
12   A.  Right.
13   Q.  Isn't it true that that luggage contained
14       your medicine?
15   A.  No.
16   Q.  Whose luggage was that?
17   A.  Mine.
18   Q.  What did that luggage contain?
19   A.  Clothing.
20   Q.  Where was your medicine stored?
21   A.  In my carry-on bag.
22   Q.  Did you have your carry-on bag with you --
23   A.  Yes.

Page 159

1    Q.  -- the day of the accident?
2    A.  Yes.
3    Q.  When did you get that luggage bag back?
4    A.  I haven't gotten it back yet.
5    Q.  You never got it back?
6    A.  No.
7    Q.  Was there any medication whatsoever that was
8        stored in that luggage bag?
9    A.  No.
10   Q.  Do you know who would have watched you take
11       the medication -- your medication that's
12       listed on Plaintiff's Exhibit Five the day
13       of the accident?
14   A.  Who would have watched me?  Possibly nobody.
15   Q.  Do you have a distinct recollection of
16       taking every medicine you have listed on
17       Plaintiff's Exhibit Five the day of the
18       accident, July 27 of '07?
19           MR. COLLINS:  Object to the form.
20           Asked and answered.
21   Q.  Do you need some more time, ma'am?  Do you
22       need some more time to answer my question?
23   A.  Oh.

Page 160

1    Q.  That's okay.  Do you have a distinct
2        recollection that you took each one of these
3        medicines on July 27 of '07?
4    A.  Yes.
5    Q.  You do?
6    A.  Yes.
7    Q.  Would anybody have seen you take that?
8    A.  I'm not really sure.
9    Q.  Earlier you told Mr. Collins that you were
10       involved in a prior accident about two years
11       ago.  Do you remember talking about that in
12       Atlanta?
13   A.  Uh-huh (positive response).
14   Q.  Do you remember that?
15   A.  Uh-huh (positive response).
16   Q.  Is that a yes?
17   A.  Yes.
18   Q.  You had mentioned that the ladies -- Am I
19       correct to assume that your two sisters were
20       with you then, too?
21   A.  Yes.
22   Q.  Was anybody injured in that accident?
23   A.  No.

Deposition of Willie Eva Baldwin

---

Page 161

1  Q. Do you accept any fault whatsoever from that
2     particular accident?
3          MR. HENDERSON: Object to the
4          form.
5  A. No.
6  Q. Were you trying to turn left in that
7     accident, too?
8  A. No.
9          MR. COLLINS: Object to the form.
10         MR. WALLER: What's your
11         objection?
12         MR. COLLINS: I just object to the
13         form, too.
14         MR. HENDERSON: Not relevant.
15 Q. Ma'am, they are objecting to the form. You
16    can answer, if you know.
17 A. No. I wasn't trying to turn left.
18 Q. When you woke up the morning of July 27,
19    '07, when you woke up that morning, what
20    time did you and your sisters leave to head
21    to Cuthbert, Georgia?
22 A. I don't know.
23 Q. Do you have a recollection leaving that

---

Page 162

1     morning?
2  A. Yes.
3  Q. Do you know where all you went that day?
4     And let me rephrase.
5  A. No place.
6  Q. I represent to you -- I'm sorry. I'll
7     represent to you the accident in Montgomery
8     happened around seven p.m. that night. Do
9     you know what you did that day? If the
10    accident occurred in Montgomery at seven
11    p.m. that night, do you recall where all you
12    had been that particular day?
13 A. On the highway.
14 Q. You had been on the highway the whole time?
15 A. I don't know.
16 Q. Is it fair to say you just don't recall some
17    of the details of the accident?
18 A. Details of the accident?
19 Q. Yes, ma'am.
20         MR. HENDERSON: Object to the
21         form.
22 Q. Ma'am, you just told me you don't remember
23    what you did that day; is that right?

---

Page 163

1          MR. HENDERSON: Object to the
2          form.
3  Q. Is that right, Ms. Baldwin?
4  A. Nothing but drive.
5  Q. It is your recollection that you drove --
6     you were driving from the time you left that
7     morning until the time of the accident at
8     approximately seven p.m. in Montgomery; is
9     that right?
10 A. What was your question?
11 Q. I'm just trying to establish, Ms. Baldwin,
12    if you know what you did the day of July 27,
13    2007 from the time you left Atlanta until
14    the time of the accident in Montgomery.
15 A. Left Atlanta. I don't remember doing
16    anything.
17 Q. That's okay. Was this the first time you
18    had been on a plane in July of 2007?
19 A. No.
20 Q. You had been on one before?
21 A. Yes.
22 Q. I'm trying to get through, Ms. Baldwin.
23    Bear with me.

---

Page 164

1          Do you recall telling the police
2     officer that you had only been driving about
3     thirty minutes prior to the accident that
4     night?
5  A. Thirty minutes?
6  Q. Uh-huh (positive response).
7  A. Uh-uh (negative response).
8  Q. You don't recall telling the officer that?
9  A. No.
10         MR. WALLER: Ms. Baldwin, I think
11         that's all I have for you.
12         EXAMINATION
13 BY MR. PHILLIPS:
14 Q. Ms. Baldwin, did your sister Irena suffer
15    from the glaucoma that you know of?
16 A. Did she what?
17 Q. Did she have glaucoma?
18 A. Car cover?
19 Q. Glaucoma.
20         MR. HENDERSON: Glaucoma.
21         MR. PHILLIPS: Yes. Thank you.
22         MR. HENDERSON: Do you know if she
23         suffered from glaucoma?

|  | Page 165 |
|---|---|
| 1 | THE WITNESS: She didn't suffer |
| 2 | from it. |
| 3 | MR. HENDERSON: Do you know if she |
| 4 | had glaucoma? |
| 5 | THE WITNESS: No, I don't know. |
| 6 | MR. HENDERSON: She doesn't know, |
| 7 | John. |
| 8 | MR. PHILLIPS: Okay. Thank you. |
| 9 | Q. Do you know if she suffered from dementia? |
| 10 | A. No. |
| 11 | Q. How long did you and Irena live together? |
| 12 | A. Live together? |
| 13 | Q. Yes, ma'am. |
| 14 | A. Probably forty years. |
| 15 | Q. And let's just think about the last five |
| 16 | years y'all lived together. Who paid for |
| 17 | the power bill? |
| 18 | A. Who paid for the... |
| 19 | MR. HENDERSON: Power bill. |
| 20 | MR. COLLINS: Electricity. |
| 21 | A. Together. |
| 22 | Q. There was one bill that came to the house |
| 23 | and y'all split it? |

|  | Page 166 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. So the same for the phone bill? |
| 3 | A. The phone bill? |
| 4 | Q. Yes, ma'am. |
| 5 | A. Yes. |
| 6 | Q. It's kind of a strange question, but did you |
| 7 | and Irena have the same key that opened the |
| 8 | front door -- not shared the key, but it was |
| 9 | the same key that worked the front door? |
| 10 | A. We had our own keys. |
| 11 | Q. But that key was... |
| 12 | A. The same. |
| 13 | Q. If you traded keys with her, it would open |
| 14 | the same door, correct? In other words, |
| 15 | your key didn't open a separate door than |
| 16 | Ms. Irena's key, right? |
| 17 | A. No, no. |
| 18 | Q. Ms. Baldwin, have you had a conversation |
| 19 | with Mr. Johnson about the damages that he's |
| 20 | suing you for? |
| 21 | A. No. |
| 22 | Q. Have you asked him why he's suing you? |
| 23 | A. No. |

|  | Page 167 |
|---|---|
| 1 | MR. PHILLIPS: That's all I have. |
| 2 | Thank you. |
| 3 | MR. HENDERSON: Can we take a |
| 4 | quick break? |
| 5 | (Brief recess.) |
| 6 | EXAMINATION |
| 7 | BY MR. HENDERSON: |
| 8 | Q. Ms. Baldwin, I'm just going to ask you a few |
| 9 | questions, and I want to try to clear up a |
| 10 | few things that may have come across as |
| 11 | being confusing -- may have confused a few |
| 12 | of us in the deposition. |
| 13 | One thing is earlier you were talking |
| 14 | about going toward a door on the interstate. |
| 15 | Do you remember that, that you were going |
| 16 | toward a door? |
| 17 | A. Not on the interstate. On that ramp. |
| 18 | Q. On the ramp. Okay. I'm going to show you a |
| 19 | picture, Plaintiff's Exhibit Number |
| 20 | Twenty-six. Okay. Do you see the door that |
| 21 | you've been referring to about going towards |
| 22 | on that ramp? |
| 23 | A. No. I don't see the door. But it's up on |

|  | Page 168 |
|---|---|
| 1 | the ramp. It's just one exit up there. |
| 2 | Q. Okay. So you don't... |
| 3 | A. It's to the left. |
| 4 | Q. So you don't see it on this picture? |
| 5 | A. No. I don't see a door. |
| 6 | Q. Let me ask you a few more. But the door was |
| 7 | a place where you could go and turn around |
| 8 | off the interstate; is that right? |
| 9 | A. I assumed it would be that I could turn |
| 10 | around some place. |
| 11 | Q. Now, these lawyers have been talking to you |
| 12 | about stopping on the interstate or the |
| 13 | highway and backing up. Do you remember |
| 14 | stopping in the middle of the interstate? |
| 15 | A. No, I didn't. |
| 16 | Q. Do you remember backing up in the middle of |
| 17 | the interstate? |
| 18 | A. No. |
| 19 | Q. Where you backed up, was that on the side of |
| 20 | the interstate? |
| 21 | A. Right. On the right side. |
| 22 | Q. Would that have been in an area where cars |
| 23 | did not travel? |

Page 169

1   A.  Right.
2   Q.  Kind of on the edge of the highway?
3         MR. WALLER:  Object to the form.
4   Q.  Would that be on the edge of the highway?
5         MR. WALLER:  Object to the form.
6   A.  Yeah.
7   Q.  Ms. Baldwin, do you remember if your sister
8       Irena gave you any money for the hotel room?
9   A.  No.
10  Q.  Do you remember if she gave you any money
11      for the rental car?
12  A.  No.
13  Q.  Did you ask Irena to give you any money for
14      the hotel room?
15  A.  No.
16  Q.  Did you ask Irena to give you any money for
17      the rental car?
18  A.  No.
19  Q.  Would that have been something that she
20      would have done on her own?
21  A.  She would have done it on her own.
22  Q.  Did you require that Irena give you any
23      money for expenses?

Page 170

1   A.  No.
2   Q.  Would you have taken Irena on this trip
3       anyway if she hadn't given you any money for
4       expenses?
5   A.  Right.
6   Q.  And your other sister that went,
7       Ms. Prather, on the trip with you, she
8       didn't give you any money, did she?
9   A.  No.
10  Q.  And she didn't give you any money for
11      expenses, did she?
12  A.  No.
13        MR. HENDERSON:  That's all of the
14        questions I've got.
15        EXAMINATION
16  BY MR. COLLINS:
17  Q.  Ms. Baldwin, when you say you would have
18      taken Irena on the trip with you, isn't it a
19      fact that you didn't take her with you, that
20      y'all all went together?  I mean, y'all all
21      agreed to go on the trip together, right?
22  A.  Yes.
23  Q.  You weren't in charge of the trip, were you?

Page 171

1         MR. HENDERSON:  Object to the
2         form.
3   A.  No.
4   Q.  Were you in charge of the trip?
5   A.  No, no.
6   Q.  There was an agreement by all of y'all to go
7       on the same trip?
8   A.  Right.
9   Q.  And that purpose was to go visit family,
10      correct?
11  A.  Right.
12  Q.  And all of you made the decision to go visit
13      family, correct?
14  A.  Yes.
15  Q.  So it wasn't a trip that you spearheaded, so
16      to speak?
17  A.  No, no.
18  Q.  So when you said you would have taken Irena
19      on the trip with you, that's not accurate,
20      is it?  I mean, she was going anyway --
21        MR. HENDERSON:  Object to the
22        form.
23  Q.  -- correct?

Page 172

1   A.  Right.
2   Q.  Now, you said that you don't remember if she
3       gave you any money, right, for the rental
4       car?
5   A.  Oh, I know she didn't.
6   Q.  You know she didn't?
7   A.  Right.
8   Q.  Now, yesterday you said that she probably
9       did.  Which one is correct?
10  A.  She probably would have, but not at that
11      point.  I would think it was all on my
12      Discovery Card.
13  Q.  So it would have been paid for on your
14      Discovery Card, correct?
15  A.  Right.
16  Q.  Now, yesterday you testified that Irena
17      helped pay for the rental car?  She gave you
18      some money cash?
19  A.  Beg your pardon?
20  Q.  Yesterday I believe you testified that Irena
21      probably helped you pay for the rental car;
22      is that correct?
23        MR. HENDERSON:  Object to the

| Page 173 | | Page 175 | |
|---|---|---|---|
| 1 | form. | 1 | A. Sort of. |
| 2 | A. I'm not sure. | 2 | Q. Can you explain that? |
| 3 | Q. The fact is, you don't really know whether | 3 | A. It was all in her name. But we would go |
| 4 | or not she helped you or not, do you? You | 4 | down and pay the bill, and I would give her |
| 5 | don't really know, do you? | 5 | something. |
| 6 | MR. HENDERSON: Object to the | 6 | Q. So you would pay her some money for the |
| 7 | form. | 7 | electricity bill? |
| 8 | Q. I'm asking your opinion. Do you know one | 8 | A. Yes. |
| 9 | way or the other whether she really helped | 9 | Q. Now, the house was in her name; is that |
| 10 | you or not? | 10 | correct? |
| 11 | A. To put it on my Discovery Card, then I would | 11 | A. Right. |
| 12 | pay Discovery. | 12 | Q. Was the house paid off? |
| 13 | Q. Is it possible that Irena paid you a portion | 13 | A. Yes. |
| 14 | of the rental cost -- | 14 | Q. Did you pay her any rent to live there? |
| 15 | A. No. | 15 | A. No. |
| 16 | Q. -- in cash? | 16 | Q. Now, yesterday you testified that you-all |
| 17 | A. No. | 17 | handled your own affairs. She handled her |
| 18 | Q. Yesterday you said she probably did. Do you | 18 | affairs and you handled your own affairs, |
| 19 | remember saying that yesterday? | 19 | correct? |
| 20 | A. Probably I did. | 20 | A. Right. |
| 21 | Q. So which one would be more accurate, that | 21 | Q. And I believe you testified that you-all had |
| 22 | she probably did or that she didn't? | 22 | your own checking accounts, your own bank |
| 23 | A. She would have, I would think, you know, if | 23 | accounts? |

| Page 174 | | Page 176 | |
|---|---|---|---|
| 1 | she hadn't have been killed in the accident. | 1 | A. Yes. |
| 2 | Q. So are you saying that she had probably | 2 | Q. You were getting disability at the time, |
| 3 | would have paid you sometime later? | 3 | correct? |
| 4 | A. Yes. | 4 | A. Right. |
| 5 | Q. Was there an agreement that... | 5 | Q. Where was your checking deposited to? |
| 6 | A. No. | 6 | A. At PNC. |
| 7 | Q. Let me finish. Was there an agreement that | 7 | Q. PNC? What does that PNC stand for? |
| 8 | you would pay for the rental car on your | 8 | A. Pennsylvania National Bank. |
| 9 | card and that she would pay you back later? | 9 | Q. Is that in Philadelphia? |
| 10 | A. I don't know if we agreed to that. But I | 10 | A. Philadelphia. |
| 11 | just, you know, usually paid for the trip on | 11 | Q. Was that account solely your account? |
| 12 | Discovery. | 12 | A. Yes. |
| 13 | Q. And when you usually paid for the trip, did | 13 | Q. You were the only person on it? |
| 14 | she usually reimburse you or pay you back? | 14 | A. Right. |
| 15 | A. I'm not sure. | 15 | Q. Did Ms. Johnson receive -- to your knowledge |
| 16 | Q. So are you saying that it's possible that | 16 | receive her own retirement or disability |
| 17 | she might have paid you back? | 17 | check? |
| 18 | MR. HENDERSON: Object to the | 18 | A. Yes. |
| 19 | form. | 19 | Q. Does she have a separate account that her |
| 20 | A. Yes. | 20 | money was going into to your knowledge? |
| 21 | Q. With regards to your living arrangements, I | 21 | A. Yes. She had a separate account. |
| 22 | believe you testified that you-all split the | 22 | Q. Did y'all ever mix accounts? |
| 23 | electricity bill, correct? | 23 | A. No. |

February 27th and 28th, 2008
Deposition of Willie Eva Baldwin

Page 177

1  Q.  So the money that came into the household
2      was never commingled together, was it?  It
3      was never put together in one big pot, was
4      it?
5  A.  No.
6  Q.  She had her funds and you had your funds,
7      correct?
8  A.  Right.
9  Q.  Do you -- When was the last time you filed
10     an income tax return?  Do you remember?
11 A.  Last year.
12 Q.  You did file one last year?
13 A.  Yes.
14 Q.  And when you filed that income tax return,
15     did you list Irena Johnson on your income
16     tax return as a dependent?
17 A.  No.
18 Q.  Did you file an income tax return the year
19     before that?
20 A.  Yes.
21 Q.  Did you list Irena Johnson on there as a
22     dependent?
23 A.  No.

Page 178

1  Q.  Have you ever listed Irena Johnson on your
2      income tax return as a dependent?
3  A.  No.
4  Q.  When you filed your income tax return, did
5      you file as a single?
6  A.  Single.
7  Q.  Has Irena -- To the best of your knowledge,
8      has Irena ever listed you on her income tax
9      as a dependent?
10 A.  No.
11 Q.  Do you know whether or not she filed single
12     or head of household?
13 A.  No.
14 Q.  You don't know?
15 A.  No.
16 Q.  So Irena didn't take care of you and you
17     didn't take care of her, correct?
18 A.  Correct.
19     MR. PHILLIPS:  Object to the form.
20 Q.  In your opinion did you take care of Irena?
21 A.  No.
22     MR. PHILLIPS:  Object to the form.
23 Q.  Did you consider yourself being taken care

Page 179

1  of by Irena?
2      MR. PHILLIPS:  Object to the form.
3  Q.  You can go ahead and answer.
4  A.  No.
5  Q.  What about mail?  Did y'all have separate
6      pieces of mail coming to the house?
7  A.  Yes.
8  Q.  Did you ever open her mail?
9  A.  No.
10 Q.  Did she ever open your mail to your
11     knowledge?
12 A.  No.
13 Q.  Let me ask you about Hertz when you went to
14     go rent the car.  Did Hertz ever ask you
15     whether or not they felt that you were
16     capable of driving this vehicle?  Did they
17     ever indicate anything to you like that?
18 A.  No.
19 Q.  Did they ever ask you what kind of
20     medications you were on?
21     MR. PHILLIPS:  I'm going to have
22         to object to that just because
23         of leading on cross

Page 180

1  examination, just to preserve
2  it.  But, otherwise, go ahead,
3  Ms. Baldwin.
4  Q.  You can go ahead and answer the question.
5      Did Hertz ever ask you what medications
6      you were on?
7  A.  No.
8  Q.  Did they ever ask you have you been in any
9      accidents or anything in the past?
10 A.  I don't think so.
11 Q.  Did anybody at Hertz appear to be concerned
12     about whether or not you could drive their
13     vehicle?
14 A.  No.
15     MR. PHILLIPS:  Object to the form.
16 Q.  Did you ever tell Hertz that you were taking
17     all of these different medications?
18 A.  No.
19     MR. COLLINS:  I don't think I have
20         anything further at this point.
21     EXAMINATION
22 BY MR. WALLER:
23 Q.  Just a couple, Ms. Baldwin.  Your attorney

Page 181

| 1 | just talked to you and you replied to him |
| 2 | that at the time you were backing up you |
| 3 | thought it was safe to do so on the edge of |
| 4 | the roadway, I think is what you said.  Is |
| 5 | that right? |
| 6 | A.  Uh-huh (positive response). |
| 7 | Q.  Is that right? |
| 8 | A.  Uh-huh (positive response). |
| 9 | Q.  Say yes for... |
| 10 | A.  Yes. |
| 11 | Q.  I'm going to show you Plaintiff's Exhibit |
| 12 | Forty-nine and Plaintiff's Exhibit Fifty, |
| 13 | these two pictures.  In either one of these |
| 14 | pictures does it depict the area where you |
| 15 | backed up? |
| 16 | A.  Yeah. |
| 17 | Q.  Will you put a red X on that area where you |
| 18 | backed up -- where you thought it was the |
| 19 | edge of the roadway? |
| 20 | A.  This is not the highway. |
| 21 | Q.  And my question is, will you put an X where |
| 22 | you backed up in these pictures, whatever |
| 23 | they depict? |

Page 182

| 1 | A.  I can't put an X there where I backed up |
| 2 | because that's not 85. |
| 3 | MR. HENDERSON:  I think it's clear |
| 4 | that she doesn't recognize |
| 5 | these pictures.  And to get her |
| 6 | to put an X or draw on the |
| 7 | photographs wouldn't do us any |
| 8 | good since she doesn't |
| 9 | recognize these pictures as |
| 10 | being the... |
| 11 | THE WITNESS:  Because the highway |
| 12 | would be down. |
| 13 | MR. COLLINS:  I think she |
| 14 | recognized them enough to draw |
| 15 | the lane she was traveling in. |
| 16 | So... |
| 17 | MR. WALLER:  My response is this. |
| 18 | The pictures depict what they |
| 19 | depict.  And, David, if she |
| 20 | doesn't, she can say she |
| 21 | doesn't know. |
| 22 | Q.  But just based on what you are looking at |
| 23 | here, do you know, Ms. Baldwin, if the area |

Page 183

| 1 | where you backed up is depicted in either |
| 2 | one of these two pictures? |
| 3 | A.  No. |
| 4 | Q.  You don't know? |
| 5 | A.  It's not. |
| 6 | Q.  Okay.  That's fine.  I thought you said it |
| 7 | did. |
| 8 | MR. WALLER:  That's all I have. |
| 9 | MR. HENDERSON:  Anything else, |
| 10 | John? |
| 11 | MR. COLLINS:  Just for the record, |
| 12 | Plaintiff's Exhibit Fifteen |
| 13 | through Sixty indicates that we |
| 14 | had two Plaintiff's Exhibits |
| 15 | Twenty-one.  We are going to |
| 16 | change one of those exhibits to |
| 17 | reflect Plaintiff's Exhibit |
| 18 | Twenty-one A with, I assume, no |
| 19 | objections. |
| 20 | MR. HENDERSON:  That's fine. |
| 21 | * * * * * * * * * * * * |
| 22 | FURTHER DEPONENT SAITH NOT |
| 23 | * * * * * * * * * * * * |

Page 184

| 1 | REPORTER'S CERTIFICATE |
| 2 | STATE OF ALABAMA: |
| 3 | MONTGOMERY COUNTY: |
| 4 | I, Tracey H. Rives, Certified Shorthand |
| 5 | Reporter and Commissioner for the State of Alabama |
| 6 | at Large, do hereby certify that I reported the |
| 7 | deposition of: |
| 8 | WILLIE EVA BALDWIN |
| 9 | who was first duly sworn by me to speak the truth, |
| 10 | the whole truth and nothing but the truth, in the |
| 11 | matter of: |
| 12 | ROBERT JOHNSON, as Personal |
| 13 | Representative of THE ESTATE OF |
| 14 | IRENA JOHNSON, Deceased, |
| 15 | Plaintiff, |
| 16 | Vs. |
| 17 | DENITA COLVIN and |
| 18 | WILLIE EVA BALDWIN, et al., |
| 19 | Defendants. |
| 20 | Civil Action Number |
| 21 | 2:07CV1068-MHT |
| 22 | In the U.S. District Court |
| 23 | for the Middle District of Alabama |

February 27th and 28th, 2008

Deposition of Willie Eva Baldwin

Page 185

1   On February 27, 2008.
2        The foregoing 184 computer printed pages
3   contain a true and correct transcript of the
4   examination of said witness by counsel for the
5   parties set out herein.  The reading and signing of
6   same is hereby waived.
7        I further certify that I am neither of
8   kin nor of counsel to the parties to said cause,
9   nor in any manner interested in the results
10  thereof.
11       This 21st day of March 2008.
12
13
                _____
                Tracey H. Rives, Certified
14              Shorthand Reporter and
                Commissioner for the
15              State of Alabama at Large,
                ACCR#: 400, Expiration Date:
16              9/30/08
17
18
19
20
21
22
23