# HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
Post Office Box 62
Montgomery, AL  36101-0062
(334) 263-4455 Voice   (334) 263-9167 Fax
Tax ID: 63-0980443

March 21, 2008

Mr. Zachary Collins
Suite 215
Bell Building
207 Montgomery Street
Montgomery, AL 36104

| Invoice Number |
| --- |
| tr 71891 |

**Description of services**    Re: Robert Johnson, et al. vs. Denita Colvin, et al.

| Reference | | | | Extension |
| --- | --- | --- | --- | --- |
| Appearance-Full day | 2/27/08 and 2/28/08 | 1.00 | 100.00 | 100.00 |
| Original & 1 | of Willie Eva Baldwin | 185.00 | 2.950 | 545.75 |
| Delivery charge | - | 1.00 | 2.500 | 2.50 |
| | | **Invoice total:** | | **$648.25** |

Thanks so much!!  Tracey Rives

Thank you for using HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.  Please include copy of invoice with remittance.

Payable upon receipt. Thank you for your continued patronage.

NOW YOU MAY SCHEDULE YOUR DEPOSITIONS ONLINE AT
WWW.HAISLIPRAGAN.COM.


EXHIBIT
A

# HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
Post Office Box 62
Montgomery, AL  36101-0062
(334) 263-4455 Voice   (334) 263-9167 Fax
Tax ID: 63-0980443

March 26, 2008

Mr. Zachary Collins
207 Montgomery Street
Suite 215
Montgomery, AL 36104

| Invoice Number |
| --- |
| **JD 71920** |

**Description of services**   Re: Robert Johnson, etc. vs. Denita Colvin, et al.

| Reference | | | | Extension |
| --- | --- | --- | --- | --- |
| Appearance | March 6, 2008 | 1.00 | 100.00 | 100.00 |
| Original & 1 | Denita R. Colvin | 214.00 | 2.950 | 631.30 |
| Original & 1 | Christopher Miles | 104.00 | 2.950 | 306.80 |
| Color copies | | 59.00 | 1.000 | 59.00 |
| Exhibits | | 38.00 | 0.250 | 9.50 |
| Delivery charge | - | 1.00 | 2.500 | 2.50 |
| | | **Invoice total:** | | **$1,109.10** |

Thanks!  Julie A. Duncan

Thank you for using HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.  Please include copy of invoice with remittance.

Payable upon receipt. Thank you for your continued patronage.

NOW YOU MAY SCHEDULE YOUR DEPOSITIONS ONLINE AT WWW.HAISLIPRAGAN.COM.





Witnesses Brent and Christine Larson are available the following dates in March for deposition purposes: March 11, 13, 25, and 27. Please let me know as soon as you all can whether anyone has conflicts and we will reschedule accordingly. Thanks,

Chris

W. Christopher Waller, Jr.
Ball, Ball, Matthews & Novak, P.A.
2000 Interstate Park Drive, Suite 204
Montgomery, AL 36109
(334) 387-7680
(334) 387-3222 (fax)

NOTE: This is a confidential communication and may contain privileged and/or confidential information. If you are not the intended recipient, please delete this message and attachments, and do not read, copy, retain or disseminate the message or any attachment. If you have received this communication in error, please notify us immediately. Neither the transmission of this message or any attachment, nor any error in transmission or misdelivery shall constitute waiver of any applicable legal privilege.

----- Original Message -----
From: "Chris Waller" <cwaller@ball-ball.com>
To: "John Phillips" <jmphillips@dorelaw.com>, <zack@zackcollins.com>
Cc: "David Henderson" <dwhenderson@hillhillcarter.com>;





EXHIBIT

D

Bumberg No. 5206



EXHIBIT
E



Web-Based Email :: Mail Index :: INBOX

Web-Based Email
Version 4.12

New Features!

Notifier | Light Version | Log Out

Logged in as: zack@zackcollins.com

Check Email | Compose | Address Book | Cal

INBOX > Message Detail

Move to Folder [ Move ]

[ Print ] [ Send as Fax ]

**Subject:** Fw:
**From:** "Chris Waller" <cwaller@ball-ball.com>   (Add as Preferred Sender)
**Date:** Thu, Mar 06, 2008 3:57 pm
**To:** <zack@zackcollins.com>

See below...
----- Original Message -----
**From:** Chris Waller
**To:** zack@zackcollins.com ; Henderson, David
**Sent:** Tuesday, February 19, 2008 6:10 PM

Zack and David:

Please let this confirm Brent and Christine Larson's depositions have been set for Tuesday March 18th commenc
in Fort Dodge, IA. Most likely we will use a conference room at the Country Inn by Carlson. (I am awaiting confirm
room). Their contact info is 515-955-2259. I have just booked a room with them to stay that Monday night the 17t

As for the trip details, after a rigorous search, here is the best deal I came up with: I plan to fly out of Montgomery
March 17th on Flight number 6578 to Memphis. This flight leaves Montgomery at 11:30 Monday. It flies to Mempl
into Des Moines, Flight number 7039 (Delta).  The arrival time in Des Moines is 3:35 pm CST. From there we can
about 80 miles away. (David, see what you can find out from your client about securing a rental?)

After the depos Tuesday, there is a return flight from Des Moines to Memphis which leaves Des Moines at 5:10 C
Memphis to Montgomery connection is Flight number 7323. Arrival back in Montgomery is by 9:00 pm on Tuesda

I have just booked these and would suggest calling Delta to reserve seats if you want.  I can discuss at either of y
back from the Country Inn confirming the conference room, I will let you know. I will reserve the court reporter too

Chris

W. Christopher Waller, Jr.
Ball, Ball, Matthews & Novak, P.A.

EXHIBIT
F

# HUNEY-VAUGHN COURT REPORTERS, LTD.

**INVOICE**

CERTIFIED SHORTHAND REPORTERS

101 Locust Ave --- Suite 307 -- Des Moines, Iowa 50309          TAX ID #42-1431692
(515) 288-4910

ATT: .
ZACHARY T. COLLINS                                    INVOICE #:00117757
207 MONTGOMERY ST                                        DATE:03/24/08
SUITE 215                                              TERMS:  .0%/   0
MONTGOMERY        AL 36104

COURT/CASE #:                                         JOB #:JOHN.COLV002
JOHNSON VS. COLVIN                                    CLAIM #:

| ACTIVITY DESCRIPTION | DATE | REPORTER | AM |
|---|---|---|---|
| COPY OF DEPOSITION | 03/18/08 /CQ | | |
| BRENT A. LARSON | | | |
| EXHIBITS | 03/18/08 /CQ | | |
| COMPLIMENTARY WORD INDEX | 03/18/08 /CQ | | |
| | | | ----- |
| COPY OF DEPOSITION | 03/18/08 /CQ | | 121. |
| DEPO CHRISTINE M. LARSON | | | |
| COMPLIMENTARY WORD INDEX | 03/18/08 /CQ | | |
| E-MAIL CHARGE | 03/18/08 /CQ | | |
| | | | ----- |
| TRAV. TRANS. - SUB. FOR COPY | 03/18/08 | | 116. |

|  |  |  |
|---|---|---|
| SUBTOTAL | $ | 237. |
| SALES TAX | | |
| TOTAL DUE | $ | 237. |

WE APPRECIATE YOUR BUSINESS!

EXHIBIT
6

---

REMITTANCE ADVICE SLIP - PLEASE RETURN THIS STUB WITH PAYMENT

HUNEY-VAUGHN COURT REPORTERS, LTD.
601 LOCUST AVE - SUITE 307
DES MOINE J, IOWA 50303

| INVOICE # | INVOICE DATE | AMOUNT |
|---|---|---|
| 00117757 | 03/24/08 | $ 237.60 |
| CUST. # | ATTY. # | JOB # |
| COLL07 | COLL12 | JOHN.COLV002 |



EXHIBIT

Bunberg No. 5038



**Subject:** *no subject*
**From:** zack@zackcollins.com  (Add as Preferred Sender) ☺
**Date:** Tue, Apr 29, 2008 11:06 am
**To:** Chris Waller <cwaller@ball-ball.com>

May 22nd is fine..

EXHIBIT

I

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

ROBERT JOHNSON, as personal )
representative for the ESTATE OF )
IRENA JOHNSON, )
           )    **CASE NO.: 2:07cv1068-MHT**
           )
       Plaintiff, )
           )
v. )
           )
DENITA COLVIN and WILLIE EVA )
BALDWIN )
           )
       Defendants. )

## NOTICE OF SERVICE

TO: **DAVID H. HENDERSON (ASB-4048-D57H)**
Hill, Hill, Carter, Franco, Cole & Black, P.C.
P.O. Box 116
Montgomery, AL 36101-0116

**W. CHRISTOPHER WALLER, JR. (WAL187)**
Ball, Ball, Matthews, & Novak, P.C.
Post Office Box 2148
Montgomery, AL 36102-2148

Please take notice that the following discovery documents have been served to counsel of record in this matter on behalf of Robert Johnson by facsimile, email, to be followed by hand delivery:

         ( ) Interrogatories
         ( ) Answer to interrogatories
         (X) **Second Request for Production on Willie Eva Baldwin**
         ( ) Response to Request for Production
         (X) **Request for Admissions to Willie Eva Baldwin**
         ( ) Response to Request for Admissions
         ( ) Notice of Issuance of Non-Party Subpoenas
         ( ) Notice of Deposition
         ( ) Other: Initial Disclosures

Respectfully Submitted, this the 6th day of May, 2008.

                Zachary T. Collins
                Tonya D. Powell
                Attorneys for Plaintiff



**OF COUNSEL:**
ZACHARY T. COLLINS, ATTORNEY AT LAW, LLC.
207 Montgomery Street, Suite 215
Montgomery, AL 36104
(334) 263-5575
(334) 263-5569

## CERTIFICATE OF SERVICE

I, Zachary T. Collins, certify that on the 6th day of May, 2008, the foregoing document was served on counsel/adverse party listed below, properly addressed and pre-paid, in the following manner:

( ) Facsimile;
(X) Facsimile and email; original to follow by Hand Delivery
( ) United States mail, first class, properly addressed;
( ) United States mail, Express Mail delivery;
( ) Federal Express, overnight delivery;
( ) United Parcel Service, overnight delivery;
( ) Hand delivery;

OF COUNSEL:

**W. CHRISTOPHER WALLER, JR. (WAL187)**
**JAMES A. RIVES  (RIV005)**
Attorneys for Defendant Denita Colvin
**BALL, BALL, MATTHEWS & NOVAK, P.A.**
2000 Interstate Park Drive, Suite 204
Post Office Box 2148
Montgomery, AL 36102-2148
Telephone (334) 387-7680
Facsimile  (334) 387-3222

**DAVID H. HENDERSON (ASB-4048-D57H)**
**RANDALL MORGAN (ASB-8650-R70R)**
Attorneys for Defendant Willie Eva Baldwin
Hill, Hill, Carter, Franco, Cole & Black, P.C.
P.O. Box 116
Montgomery, AL 36101-0116

_____
Zachary T. Collins
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROBERT JOHNSON, as personal )
representative for the Estate of )
IRENA JOHNSON, )
)
    Plaintiff, )
)
v. )    CASE NO.: 2:07-CV-1068-MHT
)
DENITA COLVIN; WILLIE EVA )
BALDWIN, et al., )
)
    Defendants. )

### DEFENDANT WILLIE EVA BALDWIN'S RESPONSES TO PLAINTIFF'S REQUEST FOR ADMISSIONS

COMES NOW, Defendant, Willie Eva Baldwin, by and through the undersigned counsel of record and responds to the Plaintiff's Request for Admissions as follows:

### GENERAL OBJECTIONS

Defendant objects to each of Plaintiff's discovery requests to the extent that each is overly broad, vague, unduly burdensome, seeks information not designed nor reasonably calculated to the discovery of relevant evidence; and, purport to request information protected by the attorney/client privilege or the work-product doctrine or seeks information taken and/or prepared in anticipation of litigation, or privileged, not subject to discovery or which otherwise are impermissible subjects of discovery under the rules of civil procedure.

Defendant further objects to each discovery request to the extent each seeks documents or things which constitute confidential, proprietary information, or to which Defendant has a duty or obligation of confidentiality with respect to persons or entities not



EXHIBIT
K

parties to this litigation. This objection is made specifically, but without limitation, with respect to any request which entails disclosure of the identities or other confidential information of persons not parties to this litigation, whose privacy rights would be violated by such disclosure.

1.    Admit that vehicle that you drove on July 27, 2007 was a rental car owned by Hertz Rental Car Company to be driven during the period of July 26, 2007 through August 4, 2007.

**RESPONSE:**    **Based on information and belief, admit.**

2.    Admit the document attached hereto as Exhibit "A" is a true and correct copy of the rental car contract between you and Hertz Rental Car Company.

**RESPONSE:**    **Based on information and belief, admit.**

3.    Admit that the vehicle rental contract was entered into in the State of Georgia, city of Atlanta.

**RESPONSE:**    **Based on information and belief, admit.**

4.    Admit that you purchased an excess rental liability insurance policy during your rental period for bodily injury, including death, to third parties valued at up to $1,000.000.00.

**RESPONSE:**    **Defendant admits she purchased insurance through Hertz.**

5.    Admit that you are also covered through AllState Insurance Company for any losses made the basis of this lawsuit.

**RESPONSE:**    **Defendant admits she had insurance with AllState.**

6.    Admit, as you stated in your deposition, that there is insurance coverage through Hertz that will cover the loss claimed by the Plaintiff which forms the basis of this suit and that Hertz is not denying coverage to you or any third party in this lawsuit.

**RESPONSE:**    **Defendant objects as overly broad and calls for legal opinion and/or conclusion, not an issue in this suit, and not designed nor reasonably calculated to lead to the discovery of relevant evidence; however, without waiving said objections, Plaintiff has copy of policy.**

7.    Admit that you believe Irena Johnson is a "resident relative" subject to the exclusions of any insurance policy through Hertz Rental Car Company, underwritten by ACE American Insurance Company, and AllState Insurance Company.

**RESPONSE:**    **Defendant objects as this request seeks a legal opinion and/or conclusion.**

8.    If you admitted RFA 7, admit that you intend to file a dispositive motion (i.e. Motion for Summary Judgment) regarding the issues of "resident relative" status in this lawsuit.

**RESPONSE:**    **Defendant objects as this request seeks a legal opinion and/or conclusion and is invasive of Defendant's attorney's trial strategy.**

9.    If in RFA 3 you admitted that the rental contract was entered into in Georgia, admit that under Georgia law when relatives live together and the issue of "resident relative" exclusion is raised, the aggregate details of the family's living arrangements (i.e. whether the family members have established and maintained separate households under different managements) must be considered.

**RESPONSE:**    Defendant objects as overly broad and calls for legal opinion and/or conclusion, not an issue in this suit, and not designed nor reasonably calculated to lead to the discovery of relevant evidence; however, without waiving said objections, Plaintiff has copy of policy.

10.    If in RFA 3 you admitted that the rental contract was entered into in Georgia, admit that under Georgia law when relatives live together and the issue of "resident relative" exclusion is raised, the question of domicile and residence are mixed questions of law and fact and are ordinarily for a jury to determine.

**RESPONSE:**    Defendant objects as overly broad and calls for legal opinion and/or conclusion, not an issue in this suit, and not designed nor reasonably calculated to lead to the discovery of relevant evidence; however, without waiving said objections, Plaintiff has copy of policy.

11.    Admit that neither you, nor Irena Johnson maintained the status as head of the household in which you lived at 1235 North Conestoga Street in Philadelphia, Pennsylvania.

**RESPONSE:**    Defendant objects to this request as it is improper, vague, onerous, unduly burdensome, confusing, not relevant, Defendant's living status is not at issue, not designed nor reasonably calculated to lead to the discovery of admissible evidence.

12.    Admit that although you and Irena Johnson lived under the same roof, you each ran your personal affairs under different management.

**RESPONSE:**    Defendant objects to this request as it is improper, vague, onerous, unduly burdensome, confusing, not relevant, Defendant's living status is

not at issue, not designed nor reasonably calculated to lead to the discovery of admissible evidence.

13.     Admit that Irena Johnson held checking and savings accounts separate and apart from your checking and savings accounts.

**RESPONSE:**     Defendant objects to this request as it is improper, vague, onerous, unduly burdensome, not relevant, Defendant's living status is not at issue, not designed nor reasonably calculated to lead to the discovery of admissible evidence.

14.     Admit that you had no control over Irena Johnson's finances and that she had no control over your finances.

**RESPONSE:**     Defendant objects as this request seeks a legal conclusion, improper, vague, onerous, unduly burdensome, not relevant, Defendant's living status is not at issue, not designed nor reasonably calculated to lead to the discovery of admissible evidence.

15.     Admit that any income that you brought into the household shared by you and Irena Johnson was spent at your own discretion and that there was no commingling of monies by and between you and Irena Johnson and vice versa.

**RESPONSE:**     Defendant objects to this request as it is improper, vague, onerous, unduly burdensome, not relevant, Defendant's living status is not at issue, not designed nor reasonably calculated to lead to the discovery of admissible evidence.

16.    Admit, as you stated in your deposition, that the electricity bill at 1235 North Conestoga Street in Philadelphia, Pennsylvania was in Irena Johnson's name and you paid money to her to assist with the electric bill.

**RESPONSE:       Defendant objects to this request as it is improper, vague, onerous, unduly burdensome, not relevant, Defendant's living status is not at issue, not designed nor reasonably calculated to lead to the discovery of admissible evidence.**

17.    Admit that you assumed responsibility for one or more of the household bills and/or expenses when you lived with Irena Johnson at 1235 North Conestoga Street in Philadelphia Pennsylvania during the two (2) years preceding her death.

**RESPONSE:       Defendant objects to this request as it is improper, vague, onerous, unduly burdensome, not relevant, Defendant's living status is not at issue, not designed nor reasonably calculated to lead to the discovery of admissible evidence.**

18.    Admit that you were entirely responsible for your own debts and other affairs, personal or otherwise; that Irena Johnson had no control over your affairs, personal or otherwise; and that you had no control over her debts or affairs, personal or otherwise.

**RESPONSE:       Defendant objects as this request seeks a legal conclusion.**

19.    Admit, as you stated in your deposition, that Irena Johnson would not know what medications you were taking and/or for what illnesses those medications were prescribed.

**RESPONSE:       Defendant objects to this request as it calls for speculation.**

20.    Admit that you, Irena Johnson, and Ella Prather all share common relatives and friends in Cuthbert, Georgia.

**RESPONSE:**    **Admit.**

21.    Admit that the trip to see those relatives and friends in Cuthbert, Georgia is one that you, Ella Prather, and Irena Johnson have taken at least once a year for the last thirty (30) to forty (40) years.

**RESPONSE:**    **Admit.**

22.    Admit that the document attached hereto as Exhibit "B" a true and correct copy of the travel itinerary you, Irena Johnson, and Ella Prather established with the AAA travel agency in Haverford, Pennsylvania.

**RESPONSE:**    **Based on information and belief, admit.**

23.    Admit that Irena Johnson paid for her own roundtrip airline tickets from Pennsylvania to Atlanta, the same airline on which you and Ella Prather also traveled.

**RESPONSE:**    **Based on information and belief, admit that she would have paid for her airline ticket.**

24.    Admit that Irena Johnson helped pay for or reimbursed you in some amount for the Hertz rental car expenses and/or other travel expenses.

**RESPONSE:**    **Deny.**

25.    Admit that you paid for Ella Prather's roundtrip airline tickets and other travel expenses for the trip from Pennsylvania to Atlanta and Cuthbert, Georgia.

**RESPONSE:**    **Admit.**

26.    Admit that when you, Irena Johnson, and Ella Prather traveled to Cuthbert, Georgia on July 27, 2007 that each of you mutually benefitted from the trip thereto.

**RESPONSE:**        Defendant objects as this request seeks a legal conclusion; otherwise, denied.

27.    Admit, as you stated in your deposition, that had you all not traveled together on July 27, 2007, each of you would have had to rent separate vehicles and drive independently of one another.

**RESPONSE:**        Defendant admits she stated that in deposition; otherwise, denied.

28.    Admit that Irena Johnson did not ride with you in the Hertz Rental car on July 27, 2007 for her benefit only and thus, was not a guest under the Alabama Guest Statute.

**RESPONSE:**        Defendant objects as this request seeks a legal conclusion; otherwise, denied.

29.    Admit that on July 27, 2007 while driving to Cuthbert, Georgia you got lost and at one point ended up somewhere in Florida.

**RESPONSE:**        Defendant admits she became lost.

30.    Admit that on July 27, 2007 while driving to Cuthbert, Georgia you got lost and ended up on Interstate 85 near the Interstate 65 interchange and Day Street in Montgomery, Alabama.

**RESPONSE:**        Admit.

31.    Admit, as you stated in your deposition, that it is unsafe to backup into oncoming traffic on an interstate highway.

**RESPONSE:**        Defendant objects to this request as it seeks a legal conclusion and invades the province of the jury.

32.    Admit that, in your opinion, backing up into oncoming traffic could be considered reckless and wanton.

**RESPONSE:**    **Deny.**

33.    Admit that, in your opinion, backing up into oncoming traffic on a highway, interstate and any roadway, where there are other cars on the same roadway could be considered reckless and wanton.

**RESPONSE:**    **Deny.**

34.    Admit that under Alabama law, specifically, under the Guest Statute, that a driver backing up into oncoming traffic, if considered reckless and wanton, could change the status of an injured guest to that of a passenger.

**RESPONSE:**    **Defendant objects to this request as it seeks a legal conclusion; otherwise, denied.**

35.    Admit that, as you stated in your deposition on p. 130, lines 12-14, that in order to get on the ramp near the location of the collision formed the basis of this suit, you would have had to back up.

**RESPONSE:**    **Admit.**

36.    Admit that, as you stated in your deposition on p. 80, lines 11-22, that on July 27, 2007 while in Montgomery, Alabama on Interstate 85 south in the Day Street lane you did back up on the regular highway.

**RESPONSE:**    **Admit.**

37.    Admit that, as you stated in your deposition, that it is dangerous to back up in the middle of the highway and that if you did that, "everyone in the front car would be killed."

**RESPONSE:**     **Defendant admits she stated that in deposition; otherwise, denied.**

38.     Admit that when you backed up in the highway to get on the ramp you spoke about in your deposition, you were aware of the rights and safety of others on the same highway.

**RESPONSE:**     **Defendant objects to this request as it is overly broad, vague, confusing, unclear, speculative and calls for legal opinion.**

39.     Admit that when you backed up in the highway to get on the ramp you spoke about in your deposition, you consciously disregarded the rights and safety of others on the same highway.

**RESPONSE:**     **Deny.**

40.     Admit that Irena Johnson was killed as a proximate result of the collision by and between you and Defendant Denita Colvin.

**RESPONSE:**     **Defendant objects to this request as it seeks a legal conclusion and invades the province of the jury.  Without waiving said objections, Irena Johnson was killed as a result of the accident.**

_/s/ David W. Henderson_
RANDALL MORGAN [MOR037]
DAVID W. HENDERSON (HEN072)
Attorneys for Defendant Willie Eva Baldwin

OF COUNSEL:
HILL, HILL, CARTER, FRANCO,
     COLE & BLACK, P.C.
425 South Perry Street
P.O. Box 116
Montgomery, AL 36101-0116
(334) 834-7600

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy via United States Mail, postage prepaid, properly addressed this the 12th day of June, 2008 to the following:

Zachary T. Collins, Esq.
318 North Decatur Street
Montgomery, AL 36104

James A. Rives, Esq.
William Christopher Waller, Jr., Esq.
Ball Ball Matthews & Novak PA
P.O. Box 2148
Montgomery, AL 36102-2148

American Insurance Company
436 Walnut Street
Philadelphia, PA 19106-3703

J. Lenn Ryals, Esq.
Ryals, Plummer, Donaldson,
        Agricola & Smith, P.C.
60 Commerce Street, Ste. 1400
Montgomery, AL 36104

                                        /s/ David W. Henderson
                                        OF COUNSEL

# HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
Post Office Box 62
Montgomery, AL  36101-0062
(334) 263-4455 Voice  (334) 263-9167 Fax
Tax ID: 63-0980443

June 9, 2008

Mr. Zachary Collins
207 Montgomery Street
Suite 215
Montgomery, AL 36104

| **Invoice Number** |
| --- |
| **GH 72386** |

**Description of services**    Re: --Johnson vs. Denita Colvin, Willie Eva Baldwin,
and ACE American Insurance Co., et. al.,

| Reference | | | | Extension |
| --- | --- | --- | --- | --- |
| Copy | -Glenn Caffey | 85.00 | 1.950 | 165.75 |
| Exhibits | -- | 124.00 | 0.250 | 31.00 |
| Color copies | -- | 45.00 | 1.000 | 45.00 |
| Exhibit Binder | - | 1.00 | 7.500 | 7.50 |
| Delivery charge | - | 1.00 | 2.500 | 2.50 |

| | **Invoice total:** | **$251.75** |
| --- | --- | --- |

Thank you!  Gina Haislip

Thank you for using HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.  Please
include copy of invoice with remittance.

Payable upon receipt. Thank you for your continued patronage.

NOW YOU MAY SCHEDULE YOUR DEPOSITIONS ONLINE AT
WWW.HAISLIPRAGAN.COM.



1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

ROBERT JOHNSON, as           )
Personal Representative )
of THE ESTATE OF IRENA       )
JOHNSON, Deceased,           ) Case No. 2:07CV1068-MHT
                             )
        Plaintiff,           )
                             )
    vs.                      )
                             ) VIDEOTAPED
DENITA COLVIN,               ) DEPOSITION OF
WILLIE EVA BALDWIN, and )      BRENT A. LARSON
ACE AMERICAN INSURANCE       )
COMPANY,                     )
                             )
        Defendants.          )
------------------------)


THE VIDEOTAPED DEPOSITION OF

BRENT A. LARSON, taken before Chris A. Quinlin,

Certified Shorthand Reporter and Notary Public

of the State of Iowa, commencing at 9:34 a.m.,

March 18, 2008, at the Country Inn by Carlson,

3259 Fifth Avenue South, Fort Dodge, Iowa.


        Reported by:  Chris A. Quinlin, C.S.R.

EXHIBIT
Blumberg No. 5208
m

Page 2

```
 1          A P P E A R A N C E S
 2  Plaintiff by:     ZACHARY T. COLLINS
                      Attorney at Law
 3                    207 Montgomery Street
                      Suite 215
 4                    Montgomery, AL 36104
                      (334) 263-5575
 5
    Defendant Denita
 6  Colvin by:      W. CHRISTOPHER WALLER, JR.
                      Attorney at Law
 7                    Ball, Ball, Matthews and
                        Novak, P.A.
 8                    2000 Interstate Park Drive
                      Suite 204
 9                    Montgomery, AL 36109
                      (334) 387-7680
10
    Defendant Willie
11  Eva Baldwin by:   DAVID W. HENDERSON
                      Attorney at Law
12                    Hill, Hill, Carter, Franco,
                        Cole & Black, P.C.
13                    425 South Perry Street
                      Montgomery, AL 36104
14                    (334) 834-7600
15  Defendant ACE American
    Insurance Company
16  by:             JOHN M PHILLIPS
                      (via telephone)
17                    Attorney at Law
                      Dore, Lanier, Phillips
18                    76 South Laura Street
                      Suite 1701
19                    Jacksonville, FL 32202
                      (904) 358-7881
20
    Videographer:    AMY COOPER
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  Examination by:              Page
 3  Mr. Waller         5, 57
 4  Mr. Collins       29, 51
 5  Mr. Henderson      39, 58
 6  Mr. Phillips       49
 7
 8  Exhibit          Marked
 9  121                29
10  122                33
11  123                53
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          P R O C E E D I N G S
 2        THE VIDEOGRAPHER:  On the record
 3  beginning the videotaped deposition of Brent
 4  Larson, requested by the defense in the matter
 5  of Robert Johnson, Plaintiff, versus Denita
 6  Colvin, Willie Eva Baldwin, and ACE American
 7  Insurance Company in -- Defendants, in the
 8  United States District Court, Middle District of
 9  Alabama, Case Number 2:07CV1068-MHT, held at the
10  Country Inn by Carlson, 3259 Fifth Avenue South,
11  Fort Dodge, Iowa, on March 18, 2008, and the
12  approximate time is 9:34 a.m.
13        My name is Amy Cooper, certified
14  legal videographer of Fidelity Video Services,
15  Incorporated, Des Moines, Iowa.
16        Counsel will please identify
17  themselves for the record.
18        MR. HENDERSON:  David Henderson
19  for Defendant Willie Eva Baldwin.
20        MR. COLLINS:  Zachary Collins for
21  Plaintiff Robert Johnson.
22        MR. WALLER:  William Christopher
23  Waller, Junior, for Defendant Denita Colvin.
24        THE VIDEOGRAPHER:  The oath will
25  now be administered by Chris Quinlin, certified
```

Page 5

```
 1  court reporter of Huney-Vaughn Court Reporters,
 2  Des Moines, Iowa.
 3          BRENT A. LARSON,
 4  called as a witness, having been first duly
 5  sworn, testified as follows:
 6          DIRECT EXAMINATION
 7  BY MR. WALLER:
 8     Q.  Will you state your name for the
 9  record, please, sir?
10     A.  Brent Alan Larson.
11     Q.  Mr. Larson, have you given a deposition
12  before?
13     A.  I don't know.  I -- I've talked to all
14  kinds of -- all you people about this.  Is that
15  a deposition?
16     Q.  Well, no, sir.  Have -- Have you ever
17  been put under oath and asked questions?
18     A.  No, I've never been put under oath and
19  asked questions.
20     Q.  Okay.  As you know, we met just a
21  little while ago.  My name is Chris Waller.  I'm
22  going to ask you a couple of questions today,
23  Mr. Larson.
24        Before we get started, if I ask
25  you a question and you don't understand it,
```

Page 6

1 please feel free to ask me, and I'll be more
2 than happy to restate a question in a way that
3 you can understand it. Otherwise, if I ask you
4 a question, I'm going to assume that you
5 understood it and you answered it to the best of
6 your ability. Is that fair?
7 A. Sure.
8 Q. Okay. Mr. Larson, what is your
9 address?
10 A. 2634 Valley Avenue, Rockwell City, Iowa
11 50579.
12 Q. And you live there with your wife?
13 A. Yes.
14 Q. And your two children?
15 A. Correct.
16 Q. Okay. And your -- your wife had
17 mentioned your employer, but what is it you do
18 for a living?
19 A. I work with my dad at Sunderman Farm
20 Management Company, and we manage farms Monday
21 through Friday 8 to 5, and then we farm as a
22 family on the side.
23 Q. How long have you been working there?
24 A. Since September 2005.
25 Q. Have you ever been involved in previous

Page 7

1 litigation or lawsuits before?
2 A. No.
3 Q. From speaking with your wife, I
4 understand that you served in the military?
5 A. Correct.
6 Q. Would you give us the benefit of your
7 military experience?
8 A. I have -- Enlisted in '93, went to the
9 Air Force Academy, became an officer in '99, and
10 as an officer ended up at Maxwell Air Force Base
11 in Montgomery, Alabama, and I ended up teaching
12 officer training school, active duty, and then I
13 became a reservist teaching officer training
14 school in the summers, from approximately the
15 last week of June to the first week of August.
16 And this accident occurred when I
17 happened to be in Montgomery, Alabama, for my
18 six weeks of reserve duty.
19 Q. When did you begin teaching at
20 officers' training school?
21 A. May of two thousand -- two thousand --
22 must have been 2002 or 2003. I --
23 Q. Now, as part of the reservists --
24 A. I'm not certain.
25 Q. -- are you still required to go back to

Page 8

1 Alabama?
2 A. Yes.
3 Q. Tell us about that, please.
4 A. My reserve status or position requires
5 a certain amount of time. And that time is
6 fulfilled by -- by that six-week class. I teach
7 one four-and-a-half-week class, which takes
8 approximately six weeks to complete. And that
9 fulfills my reserve obligation, which is
10 formally two weeks a year and three weeks
11 every -- or two weeks a year and three days
12 every quarter.
13 So by teaching officer training
14 school, I can still be a reservist, I can do it
15 in the summer when the crops are growing, and I
16 don't really have to be here watching them grow,
17 so it works out well for me. Every other time
18 of the year is busy, so --
19 Q. Mr. Larson, I want to turn your
20 attention now to July 27, 2007. Do you recall
21 what you were doing that day?
22 A. Yes. In the summer my wife and kids go
23 to upstate New York to be with her parents. And
24 this past summer, in 2007, we decided that she'd
25 come down to be with me for the last -- I guess

Page 9

1 it was about a week or ten days.
2 And I think that was the day that
3 her and the kids had arrived, and we were out to
4 dinner that night, since it was our first night
5 there, and we were driving back to the -- to the
6 Air Force base on I-85 southbound and witnessed
7 this accident.
8 Q. And when you said "this accident," that
9 is the accident referred to in the -- case
10 that we're here about today?
11 A. Right.
12 Q. Can you describe for us the vehicles
13 involved in that particular accident?
14 A. Let's see. Miss Colvin was in a
15 black -- I think it was a Mercedes, relatively
16 newer vehicle. Also a relatively newer vehicle
17 was the one that was driven by -- I forget who
18 it was driven by, but the other party. They
19 were in a green Hyundai small car.
20 Q. And I'll --
21 A. A rental car from Enterprise, I think
22 it was, or Hertz.
23 Q. And I'll represent to you that driver
24 of the Hyundai was a Miss Baldwin.
25 A. Miss Baldwin. Thank you.

Page 10

1  Q. Were there any other vehicles involved
2  in the accident?
3  A. No.
4  Q. Moving back a little bit in time, where
5  had you and your family been out to eat that
6  night?
7  A. That's a good question. I -- I don't
8  know if I recall exactly where we'd been out to
9  eat. I really don't recall, to be honest with
10 you.
11 Q. What --
12 A. My wife could probably tell you.
13 Q. What time of day did the accident
14 occur?
15 A. It was about -- Oh, it had to be
16 around -- between 6:30 and 7:30, I would guess.
17 Around about that time frame. It was before the
18 kids go to sleep, so it couldn't have been too
19 late, but it was after our evening meal, so it
20 would be around the seven o'clock hour, I
21 suppose.
22 Q. Prior to the impact between the two
23 vehicles you just described for us, when is the
24 first time you recall seeing Miss Colvin's black
25 vehicle?

Page 11

1  A. Well, we were just behind it, in
2  that -- in that lane where it -- it peels off
3  and turns into Day Street and I-85 ends. I
4  noticed we were behind her, you know, as we were
5  driving there. I really noticed her when I saw
6  those reverse lights come on in Miss Baldwin's
7  car -- or when I saw the reverse lights on on
8  Miss Baldwin's car. And, of course, then, of
9  course, my -- all of our focus and attention was
10 on those two cars.
11 Q. Do you feel that you were traveling
12 behind Miss Colvin's black car for some time?
13 A. Not some time. I mean, at least
14 probably a half of a mile, because we -- we were
15 at the point where you had to get in that lane,
16 so we'd probably been there, you know, a quarter
17 to a half mile.
18 Q. And when you say "that lane," are you
19 referring to the Day Street exit lane?
20 A. Yes. The Day Street exit lane is the
21 best way to describe it, I guess.
22 Q. Okay. During the half a mile or so
23 that you traveled behind Miss Colvin's vehicle,
24 did you ever see her vehicle traveling
25 erratically?

Page 12

1  A. No.
2  Q. Did you ever see Miss Colvin's vehicle
3  traveling above the speed limit?
4       MR. COLLINS: Object to the form.
5       But go -- you can -- you can go
6  ahead and answer.
7  A. Right there at that point is where the
8  speed limit goes from -- I suppose it's about 60
9  down to 50 as you exit. I don't know exactly
10 what speed we were -- we were traveling, but I
11 do remember we weren't going fast. It wasn't
12 like traffic where you're trying to keep up with
13 everybody. It was very average, light to
14 moderate traffic for that time of day.
15      And I would say we were
16 traveling -- all those around us, you know, in
17 that lane were traveling probably around the
18 speed limit. Probably around the, you know, 45
19 to 60 mile an hour range as you transition to
20 that slower area. So it wasn't -- it was normal
21 speed for that area, from what I've experienced.
22      MR. COLLINS: Can we hang on a
23 second? I believe this is John calling in.
24      (An off-the-record discussion
25      was held.)

Page 13

1       MR. WALLER: John, do you -- do
2  you want to state your name and the party you're
3  representing?
4       MR. PHILLIPS: Yes. John
5  Phillips calling in on behalf of ACE Insurance
6  Company.
7       MR. COLLINS: Okay. John, we're
8  going to continue the examination of Brent
9  Larson. Okay?
10      MR. PHILLIPS: Okay. Thank you.
11 Go ahead.
12 Q. Mr. Larson, during the half a mile you
13 were traveling behind Miss Colvin's vehicle did
14 you see any actions taken on her part that would
15 have been consistent with the driver not paying
16 attention?
17      MR. HENDERSON: Object to the
18 form.
19 A. No.
20 Q. During the half a mile you traveled
21 behind Miss Colvin's vehicle did you see any
22 actions taken on her part that would have been
23 consistent with her driving impaired?
24      MR. COLLINS: Object to the form.
25      MR. HENDERSON: Object to the

Page 14

1  form.
2      A. No.
3      Q. Did you see -- During the half a mile
4  that you traveled behind Miss Colvin's vehicle
5  did you see any actions taken by her that would
6  have been consistent with someone driving
7  carelessly?
8          MR. COLLINS:  Object to form.
9          MR. HENDERSON:  Object to form.
10     A. No.
11     Q. Okay.  Mr. Larson, I want to turn your
12  attention now to -- and I believe you referenced
13  it earlier, but that -- the actions taken by the
14  Hyundai.
15     A. Okay.
16     Q. Can you describe for us what you saw on
17  July 27 of 2007?
18     A. Yes.  I saw Miss Baldwin's reverse
19  lights were on.  And a split second later, as
20  Miss Colvin swerved to the right to avoid an
21  accident, the two cars came together, and
22  Miss Colvin's car went off to the right, and
23  Miss Baldwin's car went off to the left.
24     Q. Are you able to give the members of the
25  jury an exact distance that your car was from

Page 15

1  Miss Colvin?
2      A. No.  We were far -- We were well behind
3  her.  I mean, we -- we saw the accident and
4  pulled off and very safely, you know -- we had
5  all kinds of room.  Yeah.
6      Q. Well behind Miss Colvin?
7      A. Right.  Well behind Miss Colvin, but --
8  however, we were the very first vehicle behind
9  her.
10     Q. Okay.
11     A. We were well behind her.
12     Q. Did you have a -- Well, was there
13  anything to obstruct or block your view from
14  witnessing the accident unfold?
15     A. No.  We had a full complete view of it.
16     Q. Would you characterize that area of the
17  interstate where the interchange is as flat or a
18  decline or an incline?
19     A. It's a bit of a depression.  You go
20  down and back up.  And they were in the area
21  where you kind of go back up.  And you either
22  have to exit to go north on -- I believe it's
23  I-65 north, and they were past the point where
24  you had to exit off.  And it appeared to me like
25  they were trying to get back down to that spot.

Page 16

1      Apparently -- I'm assuming now, that they were
2  trying to exit north and were going in reverse
3  trying to get back to that exit.
4      Q. When you say "they," you mean
5  Miss Baldwin?
6      A. Miss Baldwin, correct.
7      Q. Mr. Larson, can you describe for the
8  members of the jury what the Hyundai -- what
9  that vehicle was doing at the first moment you
10  noticed it?
11     A. The first moment I noticed the Hyundai,
12  it had its reverse lights on.  I -- I can't
13  testify that it was moving backwards because I
14  didn't have a side view to really see if the
15  tires were turning.  I assumed they were going
16  backwards to get to that I-65 north exit.
17         And she was right in the --
18  directly in the path of traffic.  I mean, her
19  wheels were in -- directly in where you would
20  normally be traveling forward.  And we saw her
21  reverse lights on and were shocked.
22     Q. Was that also your lane of travel?
23     A. It was.
24     Q. Did the Hyundai appear to be -- with
25  the reverse lights on appear to be in your lane

Page 17

1  of travel as well as Miss Colvin's lane of
2  travel?
3      A. Yes.  Directly between both of us.
4      Q. And did you believe the Hyundai to be
5  traveling towards you and Miss Colvin's vehicle?
6      A. I -- I believed that, yes.
7      Q. At the time?
8      A. At the time, yes.
9      Q. Did you make any remark to your wife
10  when you first noticed the Hyundai appear to be
11  backing up?
12     A. I don't recall that detail.
13     Q. Do you recall your wife telling you
14  anything during that time?
15     A. I -- Absolutely -- To be absolutely
16  positively sure about it, no, I don't recall
17  exactly if we said anything in the moment before
18  impact or not.
19     Q. You mentioned previously -- Well,
20  scratch that.
21         Can you tell us in either seconds
22  or moments the reaction time that you had with
23  respect to the Hyundai backing up?
24     A. Well, I -- I recall thinking, I
25  don't -- again, I don't recall if I voiced it to

Page 18

1 my wife or if she voiced it to me. I recall
2 thinking we're going to see an accident here,
3 because something had to give. Something had to
4 give.
5         The -- Miss Colvin was following
6 at a -- at a safe enough distance when you
7 figure both cars are traveling forward. When
8 one car -- When one of the cars stops and moves
9 back toward you, potentially, or just stops, you
10 know, immediately you're on top of that person
11 when you're going -- say we were going 50 miles
12 an hour at that point.
13         So at -- yes, I recall thinking I
14 bet you we're going to see an impact here in --
15 in a split second. And she swerved, did the
16 best she could do to evade Miss Baldwin, but
17 still caught her back right corner.
18     Q. When you said earlier that you were a
19 good ways back from Miss Colvin, are you able to
20 give the jury an exact distance that
21 Miss Colvin's vehicle was from Miss Baldwin's
22 vehicle at the time Miss Baldwin was in reverse?
23     A. In -- In the past when the police or
24 other people have talked to me I've said, you
25 know, it was probably a two-second following

Page 19

1 distance. But to -- to nail it down to a
2 distance or a time, really it's -- I shouldn't
3 probably nail down a time.
4         My opinion is that it was a safe
5 following distance had both cars been moving
6 forward. In my mind, that's a two-second
7 following distance. That's what they taught us
8 in driver's ed, so that's what I said. But to
9 clarify that, I really under oath can honestly
10 say I thought it was a safe following distance,
11 again, assuming both cars are traveling forward.
12     Q. Mr. Larson, in any of the actions
13 and/or maneuvers taken by Miss Colvin that day,
14 do you feel that any of those were unsafe?
15         MR. COLLINS: Object to the form.
16         You can go ahead and answer.
17     A. No. I -- I think Miss Colvin did what
18 I expected the cars to do. She tried to -- in
19 that circumstance, of course, you don't expect
20 to see a car in reverse on the interstate, but
21 under the circumstances she swerved to the
22 right, which is the same thing I would have done
23 had I been in that position.
24     Q. Did you see Miss Colvin -- Well, I'll
25 rephrase that question.

Page 20

1         Do you know if Miss Colvin
2 applied her brakes?
3     A. It -- I -- I remember -- I think I
4 remember seeing the -- the -- the car go like
5 this, kind of the back end raise up, as if the
6 brakes were applied.
7         I was so focused on the reverse
8 lights I -- that I really can't testify that I
9 saw her brake lights come on, but they -- they
10 must have been, because I -- I recall her
11 vehicle slowing, doing that traditional nosedive
12 when you hit the brakes.
13     Q. And what does that tell you, the
14 nosedive?
15     A. It tells you that she's braking. And
16 the -- the tracks would indicate that on the
17 interstate.
18     Q. At the point in time when you first
19 noticed Miss Baldwin's vehicle with the reverse
20 lights on, did you have occasion to check on
21 traffic to the left of you?
22     A. At that -- I did check traffic, you
23 know, once we needed to look around and see what
24 was going on around us. And there was traffic
25 around us to the left. Another SUV was over

Page 21

1 there, I believe, that stopped to help
2 Miss Baldwin's vehicle. But it was not heavy
3 traffic. It was light to moderate, I would say.
4     Q. Do you know, in -- in fact, if
5 Miss Baldwin could have maneuvered -- I'm
6 sorry -- Miss Colvin could have maneuvered to
7 the left in an effort to avoid the collision?
8     A. She probably could have maneuvered to
9 the left. Right. Probably could have.
10     Q. In traveling on I-85 that day and
11 noticing Miss Colvin's actions, do you feel that
12 her actions were reasonable under the
13 circumstances?
14     A. Absolutely.
15         MR. COLLINS: Object to the form.
16     Q. Mr. Larson, can you describe for the
17 members of the jury what part of Miss Baldwin's
18 vehicle impacted Mrs. Colvin's vehicle?
19     A. It was the right rear of Miss Baldwin's
20 vehicle.
21     Q. And what part of Miss Colvin's vehicle
22 was involved?
23     A. It was the front left corner.
24     Q. Would you agree that that's not a
25 direct frontal impact?

Page 22

1   A. It was not a direct frontal impact. I
2 agree.
3   Q. Mr. Larson, do you have any opinion on
4 whether or not Miss Colvin's actions
5 successfully was able to avoid a direct frontal
6 impact?
7   A. Absolutely. Her actions led to the
8 impact being much less severe.
9   Q. Do you believe that Miss Colvin had
10 enough time to react to avoid the impact
11 completely?
12      MR. COLLINS: Object to form.
13      You can go ahead and answer.
14   A. I -- I don't think so. Given the
15 circumstances, I -- I feel that she did the best
16 she could do. No different than I would have
17 done or any reasonable driver in those
18 circumstances.
19   Q. Based on your answer, in your opinion,
20 Mr. Larson --
21      MR. PHILLIPS: (Inaudible.)
22      MR. COLLINS: You're back on,
23 John.
24      MR. PHILLIPS: Okay. Thanks.
25   Q. Mr. Larson, in your opinion, was there

Page 23

1 anything else that Miss Colvin could have done
2 with respect to her actions or maneuvers in
3 which she would -- could have been able to avoid
4 the collision?
5   A. I don't think there's anything else she
6 could do. I mean, I -- I think she applied her
7 brakes, and I obviously saw her swerve and avoid
8 a direct impact, which was fortunate for all of
9 them, I think.
10   Q. After you left the restaurant with your
11 family, did you foresee that any driver on the
12 interstate would have been traveling in reverse
13 into oncoming traffic?
14      MR. HENDERSON: Object to form.
15   A. No.
16   Q. Mr. Larson, now I want to turn your
17 attention to after the impact. Can you describe
18 for us what happened?
19   A. Yeah. We -- I stopped and pulled up on
20 the -- on the right shoulder there and spoke
21 with -- ran up to Mrs. -- Miss Colvin's car and
22 pulled her door open and -- and just spoke with
23 her a second to make sure she was -- or see what
24 her -- her state of mind was and physical state
25 and told her to stay there. And -- And she said

Page 24

1 her chest hurt.
2   Q. What was her state of mind?
3   A. She was -- I guess the best way to say
4 it is simply dazed and confused and in a little
5 bit of pain, from what she told me.
6   Q. Did you-all have a conversation about
7 what had happened?
8   A. Yes. Just briefly. She --
9   Q. What did -- Sorry.
10   A. If I remember right, I -- I believe she
11 said, "Did you see that car's reverse lights
12 on?"
13      And I said, "Yeah. I have no
14 idea what they were thinking with their reverse
15 lights on."
16      And we just -- we talked about
17 her -- her car and how fortunate I felt she was
18 to have a safe car with an air bag in it, so --
19   Q. What did you do next?
20   A. I looked over to make sure someone was
21 helping the other car. And there were two other
22 gentlemen helping with -- with the other -- with
23 the Hyundai, so I didn't cross the interstate to
24 go over there.
25      And -- And an ambulance happened

Page 25

1 to be right behind us. I still don't know how
2 that happened.
3   Q. That was quick on the scene?
4   A. Yeah. It was on the road with us. I
5 don't know why it was there or how, but I -- I
6 believe it was actually a half mile to a mile
7 behind us. And there it was. So there was no
8 need for me to leave Miss Colvin's car.
9   Q. How long did you stay there and speak
10 with Miss Colvin?
11   A. It wasn't very long. It was
12 probably -- speaking with Miss Colvin, probably,
13 you know, five to ten minutes before the
14 authorities arrived and everybody else took
15 over.
16   Q. In that five- to ten-minute period was
17 there any indication that you had that
18 Miss Colvin was impaired at the time of the
19 accident?
20      MR. COLLINS: Object to the form.
21      MR. HENDERSON: Objection.
22   A. I had no indication that she was
23 impaired.
24   Q. During that five to ten minutes that
25 you were with Miss Colvin was there any

Page 26

1 indication that you had that she was slurring
2 her words?
3         MR. COLLINS: Object to the form.
4         MR. HENDERSON: Object to form.
5     A. No more than I would expect someone
6 that has just had an accident on the interstate.
7 And she was not slurring her words, per se. She
8 was just in shock.
9     Q. During the five to ten minutes that you
10 spoke there with Miss Colvin did she appear to
11 be in -- under the influence of alcohol?
12         MR. COLLINS: Object to the form.
13     A. She did not appear to be under the
14 influence of alcohol.
15     Q. Okay. Did she appear coherent?
16     A. She -- She did appear fairly coherent,
17 although just in -- she was kind of dazed and
18 shocked that she had just hit a car, so --
19     Q. During your five to ten minutes
20 speaking with Miss Colvin did you have any
21 reason to think, based on your conversation with
22 her and your observation of her, that she was
23 incapable of operating a motor vehicle safely?
24         MR. COLLINS: Object to the form.
25         MR. HENDERSON: Object to the form.

Page 27

1     A. Not at all. We actually had a little
2 conversation about how she got the car. So she
3 was fairly coherent as time -- as a few minutes
4 passed.
5     Q. Do you recall the police arriving on
6 the scene?
7     A. I do.
8     Q. Do you recall how many officers came?
9     A. I don't recall how many officers.
10 I -- I spoke with one in particular to see if it
11 was okay for me to leave the scene.
12     Q. And did you tell the police officer you
13 spoke with the exact same --
14     A. I --
15     Q. -- testimony you're telling us here
16 today?
17     A. I don't believe he went into details at
18 that point. Something about if they needed to
19 get ahold of me they'd contact me later, because
20 from the way I understood it was if there was no
21 serious injuries or -- or deaths, it wasn't
22 going to be something they would need my
23 testimony for, so -- but later -- later they
24 contacted me after one of the passengers passed
25 away.

Page 28

1     Q. Who contacted you?
2     A. Someone from the Montgomery Police
3 Department. If you say his name, I'll remember
4 it, because it was --
5     Q. Was it -- Was it a Corporal Caffey?
6     A. Caffey, yes. Corporal Caffey.
7     Q. And what did he say in that
8 conversation with you?
9     A. Well, we -- he made an appointment to
10 come meet me at my billeting room there on -- on
11 the base and just asked what I had saw. I had
12 basically given him -- gave him the exact same
13 testimony in my hotel room there.
14     Q. And did you tell Corporal Caffey during
15 that conversation that it was your opinion that
16 Miss Baldwin's vehicle was traveling in reverse
17 on the interstate into oncoming traffic?
18         MR. HENDERSON: Object to form.
19     A. I -- I told him the same thing, that I
20 saw the lights on. I -- I assumed she was
21 coming backwards. Why else would you have your
22 reverse lights on?
23     Q. Mr. Larson, have you understood all of
24 my questions I've asked today?
25     A. Yes.

Page 29

1     Q. Okay. And have you answered those
2 truthfully and to the best of your ability?
3     A. Yes.
4         MR. WALLER: I pass the witness.
5         MR. COLLINS: Thank you.
6         CROSS-EXAMINATION
7 BY MR. COLLINS:
8     Q. Mr. Larson, I'm Zack Collins. I
9 believe I spoke to you once before on the phone.
10     A. Yes. Right.
11     Q. I too am going to ask you a series of
12 questions. If you don't understand -- If you
13 don't understand any question I ask, just ask me
14 to rephrase it, and I will.
15     A. Okay.
16     Q. As you know, I represent Robert --
17 Robert Johnson. He's the plaintiff in this
18 case.
19         (Exhibit 121 was marked for
20         identification.)
21     Q. I'm going to show you, Mr. Larson, what
22 I've previously marked as Plaintiff's Exhibit
23 Number 121. I want you to take a look at that
24 document and just tell me if -- if you can
25 identify what's depicted in that -- that

Page 30

1 document, that exhibit, and if it fairly and
2 accurately depicts the location where the
3 accident occurred on July 27, 2007.
4 **A. As far as I can remember, that's fairly**
5 **close to how it looked.**
6 Q. Okay. And if you could, Mr. Larson,
7 could you take this ink pen for me? And if you
8 could highlight -- Do you -- Strike that
9 question.
10 Do you see the lane that you and
11 your wife were traveling in?
12 A. Yes.
13 Q. Okay. Can you just make an X or an
14 arrow pointing in the direction that you were
15 traveling on that particular document for me?
16 A. (Witness complied.)
17 Q. Okay. And just put your initials --
18 your initials by that -- by that arrow.
19 A. (Witness complied.)
20 Q. And where you've drawn that arrow, does
21 that fairly and accurately depict the lane of
22 travel that you and your wife traveled on
23 July 27, 2007?
24 A. Yes.
25 Q. Okay. And if you could, Mr. Larson,

Page 31

1 approximately how far away was Denita Colvin?
2 If you could draw it on that map -- Your
3 distance between you and Denita Colvin, can you
4 kind of draw that on the map and put -- put
5 another little arrow and put her initials, DC,
6 by that?
7 MR. WALLER: I'll object to the
8 form to the extent that your other question
9 called for draw a direction of travel.
10 MR. COLLINS: Okay.
11 MR. WALLER: I -- I don't think
12 he was asked to draw where his car was when the
13 accident happened.
14 Q. Well, if -- if you can draw where the
15 other car is in relation to where your car
16 was --
17 **A. Okay.**
18 Q. -- on that -- on that arrow.
19 If you can put -- If you want to
20 go ahead and just draw your car on there, where
21 the direction of -- of travel is, that would be
22 fine too.
23 **A. Okay. Because we -- using this scale,**
24 **my car would have been back here.**
25 Q. It would have been off the map?

Page 32

1 **A. Right.**
2 Q. Okay.
3 **A. Right.**
4 Q. In terms of where the accident actually
5 happened at?
6 **A. Correct.**
7 Q. Okay. Well, don't worry about it then.
8 But that picture --
9 **A. Because this is the -- this is a pretty**
10 **tight scale here. This is, I assume, the march**
11 **where you start to -- where you could peel off**
12 **if you wanted to. And so yeah, we pulled up and**
13 **parked right there.**
14 Q. Okay. So based on that particular
15 exhibit, you -- your car would not have been on
16 that -- on that map there?
17 **A. Um-hum. Yeah. From the point -- At**
18 **the point -- At the moment of impact, we were**
19 **probably back here off the map somewhere just a**
20 **little ways.**
21 Q. Okay. All righty. Do you see -- On
22 this particular map do you see the tip of the --
23 or the beginning of the median? Do you see that
24 indicated on the --
25 **A. Yes. Right there, that median?**

Page 33

1 Q. Yeah. That's correct.
2 **A. Yes.**
3 Q. Do you know, approximately how far away
4 from that beginning of the median would your car
5 have been?
6 **A. I -- I hesitate to give a distance.**
7 **I -- The -- The point is we were far enough back**
8 **that we were able to slow down and normally pull**
9 **off up here by Miss Colvin's car. We had --**
10 Q. Okay. When you say "slow down and
11 normally pull off," did -- you didn't have to
12 take any evasive actions yourself, did you?
13 **A. Correct.**
14 Q. Okay. All right. That's all I need
15 for that particular exhibit.
16 **A. Okay.**
17 (Exhibit 122 was marked for
18 identification.)
19 Q. I'm going to show you what I've marked
20 as Plaintiff's Exhibit Number 122. I want you
21 to take a look at that and read it for me, if
22 you could.
23 Now, you do remember giving a
24 statement to Corporal Caffey; correct?
25 **A. Yes.**

Page 38

1 that it wasn't an issue.
2    Q. Okay.
3    A. But when I saw reverse lights come on,
4 yes, I -- I recall seeing the rear of her
5 vehicle raise up as if she was braking and
6 swerving.
7    Q. Now -- Now, when you say "raise up,"
8 when the tail end of a vehicle raises up from a
9 brake, isn't that characterized as a hard brake?
10    A. Yes.
11    Q. Usually a sudden stop?
12    A. Right. Harder than your normal brake
13 at a stoplight type of thing.
14    Q. Okay. All right. Denita Colvin, did
15 she contact you after the accident sometime
16 later? Did she call you at your home and --
17    A. She called the home, yes --
18    Q. Okay.
19    A. -- and left a -- said, "Thanks for
20 stopping," or something like that. I didn't --
21    Q. You didn't --
22    A. I didn't take her call.
23    Q. You didn't talk to her at all?
24    A. No.
25    Q. Okay. Okay. And were you aware

Page 39

1 that -- at the time of the accident that Denita
2 Colvin was, in fact, DUI?
3    A. No.
4    Q. Have -- Have you ever heard that before
5 at all?
6    A. No.
7    Q. You gave an opinion as to how she -- or
8 whether or not she was coherent and how she may
9 have been driving and the fact that she evaded
10 the accident. Would your opinion change if you
11 knew that she was, in fact, driving under the
12 influence of alcohol?
13        MR. WALLER: Object to the form.
14    A. No.
15        MR. COLLINS: Okay. I have
16 nothing further.
17        CROSS-EXAMINATION
18 BY MR. HENDERSON:
19    Q. Mr. Larson, again, my name is David
20 Henderson, and I represent the defendant
21 Miss Willie Eva Baldwin. And I want to ask you
22 a few questions like these other lawyers, and
23 the same ground rules apply.
24        Have you talked to any of these
25 lawyers in this room before your deposition

Page 40

1 today?
2    A. I've spoke with -- with Zack and Chris.
3    Q. Okay. And what did you speak with them
4 about?
5    A. I have no idea. Unless you show me a
6 piece of paper of what I told them, I can't
7 recount those details.
8    Q. Was it basically about what you knew
9 about this accident?
10    A. Yes.
11    Q. Okay. So they called you, I guess, at
12 some point in time before this deposition and
13 asked you about what you knew about the
14 accident?
15    A. Correct. Right.
16    Q. Okay. I want to talk to you a little
17 bit about what you witnessed. And I think that
18 you've done a pretty good job of telling us
19 today, but I just wanted to make sure that I was
20 clear on a couple of things.
21        One is that if I'm understanding
22 your testimony correctly, you don't really have
23 any opinion as to whether or not Miss Baldwin
24 was actually in reverse at the time, as far as
25 moving backwards, from your perspective. Is

Page 41

1 that a fair way to say that?
2        MR. COLLINS: Object to form.
3        MR. WALLER: Object to form.
4    A. My opinion is that she was moving
5 backwards. Why else would you have your reverse
6 lights on? I can't say that she was for sure
7 because I didn't have the proper -- she wasn't
8 moving back enough fast -- backwards enough --
9 fast enough to -- to tell that in the matter of
10 a split second.
11    Q. Right. So --
12    A. But why else would you have your
13 reverse lights on if you weren't moving
14 backwards, is my opinion.
15    Q. Right.
16        But as far -- I mean, you
17 couldn't tell that she was actually moving
18 backwards --
19    A. I could not.
20    Q. -- from your perspective?
21    A. I could not.
22    Q. Okay. And earlier you testified that
23 there was no obstruction to your view of
24 Miss Baldwin's vehicle; is that correct?
25    A. That's correct.

Page 38

1 that it wasn't an issue.
2    Q. Okay.
3    A. But when I saw reverse lights come on,
4 yes, I -- I recall seeing the rear of her
5 vehicle raise up as if she was braking and
6 swerving.
7    Q. Now -- Now, when you say "raise up,"
8 when the tail end of a vehicle raises up from a
9 brake, isn't that characterized as a hard brake?
10    A. Yes.
11    Q. Usually a sudden stop?
12    A. Right. Harder than your normal brake
13 at a stoplight type of thing.
14    Q. Okay. All right. Denita Colvin, did
15 she contact you after the accident sometime
16 later? Did she call you at your home and --
17    A. She called the home, yes --
18    Q. Okay.
19    A. -- and left a -- said, "Thanks for
20 stopping," or something like that. I didn't --
21    Q. You didn't --
22    A. I didn't take her call.
23    Q. You didn't talk to her at all?
24    A. No.
25    Q. Okay. Okay. And were you aware

Page 39

1 that -- at the time of the accident that Denita
2 Colvin was, in fact, DUI?
3    A. No.
4    Q. Have -- Have you ever heard that before
5 at all?
6    A. No.
7    Q. You gave an opinion as to how she -- or
8 whether or not she was coherent and how she may
9 have been driving and the fact that she evaded
10 the accident. Would your opinion change if you
11 knew that she was, in fact, driving under the
12 influence of alcohol?
13        MR. WALLER: Object to the form.
14    A. No.
15        MR. COLLINS: Okay. I have
16 nothing further.
17        CROSS-EXAMINATION
18 BY MR. HENDERSON:
19    Q. Mr. Larson, again, my name is David
20 Henderson, and I represent the defendant
21 Miss Willie Eva Baldwin. And I want to ask you
22 a few questions like these other lawyers, and
23 the same ground rules apply.
24        Have you talked to any of these
25 lawyers in this room before your deposition

Page 40

1 today?
2    A. I've spoke with -- with Zack and Chris.
3    Q. Okay. And what did you speak with
4 about?
5    A. I have no idea. Unless you show me a
6 piece of paper of what I told them, I can't
7 recount those details.
8    Q. Was it basically about what you knew
9 about this accident?
10    A. Yes.
11    Q. Okay. So they called you, I guess, at
12 some point in time before this deposition and
13 asked you about what you knew about the
14 accident?
15    A. Correct. Right.
16    Q. I want to talk to you a little
17 bit about what you witnessed. And I think that
18 you've done a pretty good job of telling us
19 today, but I just wanted to make sure that I was
20 clear on a couple of things.
21        One is that if I'm understanding
22 your testimony correctly, you don't really have
23 any opinion as to whether or not Miss Baldwin
24 was actually in reverse at the time, as far as
25 moving backwards, from your perspective. Is

Page 41

1 that a fair way to say that?
2        MR. COLLINS: Object to form.
3        MR. WALLER: Object to form.
4    A. My opinion is that she was moving
5 backwards. Why else would you have your reverse
6 lights on? I can't say that she was for sure
7 because I didn't have the proper -- she wasn't
8 moving back enough fast -- backwards enough --
9 fast enough to -- to tell that in the matter of
10 a split second.
11    Q. Right. So --
12    A. But why else would you have your
13 reverse lights on if you weren't moving
14 backwards, is my opinion.
15    Q. Right.
16        But as far -- I mean, you
17 couldn't tell that she was actually moving
18 backwards --
19    A. I could not.
20    Q. -- from your perspective?
21    A. I could not.
22    Q. Okay. And earlier you testified that
23 there was no obstruction to your view of
24 Miss Baldwin's vehicle; is that correct?
25    A. That's correct.

Page 42

1   Q. Okay. And --
2   A. Well, Miss -- Well, Miss Colvin's
3 vehicle I -- I was directly behind. She was in
4 front of -- or Miss Baldwin was in front of
5 Miss Colvin. But at that point in time
6 you're -- you're in a depression, so you can see
7 both cars fairly easily.
8   Q. Well, and that was going to be my
9 question, as to why, I guess, Miss Colvin's
10 vehicle did not obstruct your view of
11 Miss Baldwin's vehicle.
12   A. Yeah. It's not level right there.
13 It's -- I -- I was far enough back, I -- I don't
14 know exactly how far, but far enough that we had
15 a little bit of a higher ground right there.
16   Q. Okay.
17   A. Or they were higher than us, however
18 you want to say that.
19   Q. And when you saw Miss Baldwin's
20 vehicle, could you see her whole entire vehicle?
21   A. I believe so. I -- I -- I could -- It
22 was far enough above Miss Colvin's to be able to
23 see the reverse lights, I can say that for sure,
24 because I saw them clearly, not through her
25 windows.

Page 43

1   Q. Could you see her rear bumper?
2   A. I can't recall. I -- I can say that I
3 saw the reverse lights. Wherever those were, I
4 could see to that level.
5   Q. Okay.
6   A. I can safely say that for sure.
7   Q. So as we're sitting here today, you're
8 not sure whether or not you could see from the
9 reverse lights down to the ground behind her
10 vehicle?
11   A. I'm fairly sure I did, but I -- to
12 say -- to say -- to say that 100 percent sure,
13 I -- I can honestly testify I saw her reverse
14 lights on.
15   Q. Okay.
16   A. And I had a clear view of those.
17   Q. Could -- Do you remember seeing any
18 asphalt in between Miss Colvin's vehicle and
19 Miss Baldwin's vehicle?
20   A. In reference to my last answer, I -- I
21 could see -- I saw reverse lights on. As far as
22 that great level of detail, I mean, we're ten
23 months past it.
24   Q. Okay. And that would have been up
25 above Miss Colvin's vehicle? You would have

Page 44

1 been looking above her vehicle --
2   A. Correct.
3   Q. -- not through her vehicle?
4   A. Correct.
5   Q. Okay.
6   A. Correct.
7   Q. Do you have any estimation as to the
8 distance how far Miss Colvin's vehicle was
9 behind Miss Baldwin's vehicle --
10   A. Boy.
11   Q. -- at the time that you noticed the
12 reverse lights?
13   A. As you can see in my past testimonies,
14 I -- I mentioned, you know, a safe following
15 distance, which in my opinion was a two-second
16 following distance; however, my point of saying
17 that is that I felt she was at a safe following
18 distance for the conditions. Whether it was two
19 seconds or three seconds or 100 feet or 500
20 feet, I -- the point is I feel that she was at a
21 safe following distance that I would have been
22 at had I been behind the Hyundai at that point.
23   Q. Okay. And when you realized that an
24 accident was about to occur, did you veer to the
25 left or veer to the right or did you stay in the

Page 45

1 lane that you were traveling in?
2   A. I stayed in my lane, because I was well
3 behind Miss Colvin.
4   Q. Okay. And the left -- I think you
5 testified earlier that you were the only -- only
6 car back behind Miss Colvin at that time; is
7 that correct?
8   A. In that lane. I was the first car
9 behind her.
10   Q. Okay. Could have -- Could Miss Colvin
11 have veered in the left lane to avoid the
12 accident?
13     MR. WALLER: Object to the form.
14 It calls for speculation.
15     You can answer.
16   A. I -- I think she could have. Again, I
17 don't specifically recall, because she went
18 right, which is the direction I expected her to
19 go.
20   Q. Okay. Have you had any conversations
21 with your wife about the accident?
22   A. Yes.
23   Q. About how it happened?
24     Did your wife tell you that she
25 noticed Miss Baldwin's vehicle slowing down from

Page 46

1  about 25 miles an hour down to zero?
2    A. I don't recall a conversation about
3  that. The first I know is that we saw her
4  reverse lights on, and it drew our all -- drew
5  all of our attention to that point.
6    Q. Okay. And you don't have any
7  recollection of noticing her slow down prior to
8  the accident?
9    A. I do not have any recollection of that.
10   Q. Okay. And did your wife tell you, as
11 I'll represent to you that she testified before
12 you today, but she said that she was kind of
13 surprised that the accident happened. Did she
14 tell you that?
15   A. I -- I don't recall what my wife told
16 me specifically about the accident. We've
17 talked about it many times. It's not every day
18 you witness such an accident.
19   Q. Okay. Do you think there was any way
20 that Miss Colvin could have avoided the
21 accident?
22       MR. WALLER: Object to the form.
23 It calls for speculation.
24       You can answer.
25   A. Given the circumstances, I feel that

Page 47

1  she did what I would have done. I -- you know,
2  you -- I -- I don't think there's anything else
3  that could have been done, I mean, save from,
4  you know, the circumstances being different, you
5  know, had she been hundreds of feet behind her,
6  you know.
7    Q. Do you think if she would have veered
8  into the left lane that she would have been able
9  to avoid the accident, where no cars were
10 coming?
11       MR. WALLER: Object to the form.
12   A. No. I think the result would have been
13 the same.
14   Q. Okay. So you think that even if she
15 would have veered to -- veered to the left she
16 would have still struck Miss Baldwin's vehicle?
17   A. Yes, in my opinion.
18   Q. Okay. And you don't share your -- your
19 wife's same opinion that she was a little bit
20 surprised that the accident occurred?
21       MR. WALLER: Object to the form.
22 Asked and answered.
23   A. No. I -- I wasn't surprised. I -- I
24 mean, you're -- you're surprised that you
25 witnessed an accident, but, I mean, you're --

Page 48

1  there's a car in reverse on the interstate.
2    Q. Yeah.
3    A. What do you expect?
4    Q. Do you have any estimation as to the
5  reaction time, whether or not Miss Colvin
6  properly reacted to the situation that occurred?
7    A. My opinion is that she reacted
8  appropriately. Again, as any reasonable person
9  would have -- would have done.
10   Q. Okay.
11   A. And I saw her swerve to the right,
12 apparently brake, and just caught the back
13 corner.
14   Q. And you're learning today that she was
15 cited with a DUI, that she had a blood alcohol
16 content of .11, which was above the legal limit
17 in Alabama. That doesn't bear any at all on
18 your opinions today as to how she handled the
19 situation, how she reacted to the action -- to
20 the reverse lights, the conditions on the road?
21       MR. WALLER: Object to the form
22 of the question.
23   A. Correct.
24       MR. HENDERSON: I think that's
25 all I've got.

Page 49

1        MR. COLLINS: John, do you have
2  any questions for Mr. Larson?
3        MR. PHILLIPS: I just have a
4  couple.
5        THE VIDEOGRAPHER: Off the record
6  at 10:29.
7        (An off-the-record discussion
8        was held.)
9        THE VIDEOGRAPHER: On the record
10 at 10:30.
11       MR. COLLINS: Okay, John.
12       MR. PHILLIPS: Okay. Are we
13 ready?
14       MR. COLLINS: Yes.
15       CROSS-EXAMINATION
16 BY MR. PHILLIPS:
17   Q. Mr. Larson, what is your vocation?
18   A. What is my what?
19   Q. What do you do?
20   A. My occupation?
21   Q. Yes.
22   A. I am a farm manager and a farmer, and I
23 am a reservist.
24   Q. Do you have degrees or training in
25 accident construction or motor vehicle

Page 50

1 accidents?
2   **A. What?**
3        MR. HENDERSON: Do you have any
4 training in accident reconstruction or motor
5 vehicle accidents?
6   **A. No.**
7   Q. So where you had given your opinion
8 today, that's just your opinion as to how things
9 might have happened or could have happened?
10       MR. WALLER: Object to the form
11 of the question.
12   **A. It's my opinion of how they actually**
13 **happened.**
14   Q. Okay. But where you speculated, have
15 you based that on any science or training?
16       MR. WALLER: Object to the form
17 of the question.
18   **A. No.**
19       MR. PHILLIPS: Okay. That's all
20 I have.
21       MR. COLLINS: I just have a few
22 follow-up.
23       Do you got anything, Chris?
24       MR. WALLER: No.
25

Page 51

1        RECROSS-EXAMINATION
2 BY MR. COLLINS:
3   Q. Mr. Larson, you indicated that you
4 didn't feel like there was anything Denita
5 Colvin could have done to avoid the accident.
6        I'm just going to ask you this
7 question. I'm not trying to pry into your
8 business or embarrass you, but would you have
9 consumed enough alcohol to be over the legal
10 limit and controlled a motor vehicle, you know,
11 at any time? I mean, have you ever driven DUI
12 before?
13       MR. WALLER: Object to the form
14 of the question.
15   Q. Have you --
16   **A. The question again was have I ever**
17 **driven --**
18   Q. Would you consume so much alcohol that
19 you -- it may impair your -- your ability to
20 operate a vehicle and -- and then get behind a
21 vehicle?
22       MR. WALLER: Object to the form
23 of the question.
24       MR. PHILLIPS: I'm going to
25 object to form and move to strike.

Page 52

1        MR. WALLER: I would move to
2 strike as well.
3   Q. Okay. You can go ahead and answer the
4 question.
5   **A. No.**
6   Q. Okay. Do you -- Have you ever consumed
7 alcohol and driven a vehicle?
8   **A. No.**
9        MR. WALLER: Object to the form
10 of the question.
11   Q. Okay. And as Mr. Henderson asked you,
12 the fact that she was DUI does not change
13 your -- your opinion as to whether or not she
14 could have safely avoided the accident?
15       MR. WALLER: Object to the form.
16 Asked and answered.
17   **A. No, it doesn't change my opinion. I**
18 **feel she safely did what the -- what I would**
19 **have done.**
20   Q. Now, do you remember talking to Mike
21 Nicholson -- or excuse me -- Mike Nicholson on
22 August 9th, 2007, at about 3:04 eastern time?
23 Do you remember talking to the insurance company
24 for Denita Colvin?
25   **A. Yes. The Hertz guy? Is that with**

Page 53

1 Hertz?
2   Q. No, it wouldn't be Hertz. It would be
3 Denita Colvin's insurance carrier, USAA. Do you
4 remember giving a statement to any insurance
5 carrier?
6   **A. Yes. I've -- I've received a few**
7 **calls. I don't -- Yeah.**
8        (Exhibit 123 was marked for
9        identification.)
10   Q. Okay. I'm going to show you what I've
11 marked as Plaintiff's Exhibit Number 123.
12 Actually, take a look at that statement. And
13 I'll represent to you that it's a statement that
14 we just received this morning regarding this
15 case and what you may have told an insurance
16 adjuster.
17        Can you take a look at that?
18 Specifically I believe it's pages 4 and 5. And
19 tell me if that statement accurately and fairly
20 depicts the statement that you gave to the
21 insurance company listed on -- on the front of
22 that document.
23       MR. COLLINS: I need another copy
24 of it too to refer -- just to refer to it. If
25 you don't mind me just --

Page 54

```
 1        MR. WALLER: Yeah. I want to
 2 refer too, though, so --
 3        MR. COLLINS: Okay. That's fine.
 4        MR. WALLER: And assuming
 5 we're -- we're not going with the usual
 6 stipulations, I'll object to the line of this
 7 questioning as improper impeachment, to the
 8 extent that that's what this line of questioning
 9 is.
10        MR. COLLINS: I'm not offering it
11 to impeach him. I'm -- I'm offering it as his
12 statement. In fact, it's a statement I just
13 received. And I believe I can certainly ask him
14 questions that may lead to some discoverable
15 information by a statement I just received this
16 morning, so --
17        MR. WALLER: I'll just put my
18 legal objection on, Mr. Collins.
19        Mr. Collins, do you mind if I
20 read that real quick?
21        MR. COLLINS: Oh, yeah. Yeah.
22        MR. WALLER: Thank you.
23        MR. COLLINS: Pages 4 and 5.
24        MR. WALLER: I'll give it back.
25        MR. COLLINS: Okay.
```

Page 55

```
 1    A. Does it matter how accurate this is?
 2 Because here it says I said the Mercedes was
 3 slamming into us. That's not accurate. The
 4 Mercedes was hitting the Hyundai.
 5    Q. I'll just refer to certain parts of it.
 6 Yeah.
 7    A. Okay.
 8    Q. Okay. Now, Mr. Larson, you've had the
 9 opportunity to review that statement. And does
10 it fairly and accurately depict the statement
11 that you -- you made on that day?
12    A. Yes.
13    Q. Okay. There may be some -- some
14 typographical errors, some things in there to
15 that nature; correct?
16    A. Correct.
17    Q. I'm going to refer you to page 4 of
18 that statement. Can you take a look at that for
19 me?
20        And about two-thirds of the way
21 down there's a question there. And I'll -- I'll
22 ask you the question.
23        "And where was the -- this other
24 vehicle at, the one that was backing up?"
25        Can you read your answer?
```

Page 56

```
 1    A. I said -- I clarified. I said is that
 2 the one that was backing up directly in front
 3 of -- of the Mercedes in the same lane.
 4    Q. Okay. And the question is, "In the
 5 same lane as the Mercedes?"
 6        And what was your answer,
 7 Mr. Larson?
 8    A. I said, "In the same lane. We were all
 9 in the Day Street exit lane. We were all right
10 in the middle of the lane. We were in the lane
11 and nobody was off on the shoulder."
12        This transcription says, "The,"
13 comma, "my point," comma, "the Hyundai was going
14 reverse in the middle of the Day Street exit
15 lane right in the middle of the road. It wasn't
16 off to the side at all."
17    Q. And on page 5 at the top the question
18 is, "Right. So it wasn't like it was partially
19 in the -- in the lane. He," I guess it should
20 be she, "was completely in the lane."
21        What was your answer?
22    A. I wrote -- I said, "Uh, yeah, she was
23 completely in the lane driving backwards right
24 in the middle of the lane, you know, right --
25 right directly in the path of the Mercedes."
```

Page 57

```
 1    Q. Okay. Now, Mr. Larson, with regards to
 2 the statement and with regards to what you
 3 remember, I think you testified that you can't
 4 say for a fact that the car was, in fact, moving
 5 backwards, but you know for a fact that the car
 6 was at least stopped in the middle of the lane
 7 with the reverse lights on; is that correct?
 8    A. Right. And without brake lights on,
 9 you have to assume it was moving backwards at
10 some rate of speed.
11    Q. But even if it wasn't moving fast
12 backwards, it was at least completely stopped in
13 the middle of the lane; is that correct?
14    A. At least, correct.
15    Q. At least.
16        MR. COLLINS: Okay. Nothing
17 further.
18        MR. WALLER: I -- Mr. Henderson?
19        MR. HENDERSON: You can go.
20        MR. WALLER: I just have one.
21        REDIRECT EXAMINATION
22 BY MR. WALLER:
23    Q. Mr. Larson, what Mr. Collins just went
24 over with you, is that consistent with what you
25 told us here today?
```

Page 58

1    A. Yes.

2    Q. This prior statement?

3    A. Yes.

4       MR. WALLER:  That's all I have.

5       MR. HENDERSON:  I've -- I've got

6  just one follow-up.

7       RECROSS-EXAMINATION

8  BY MR. HENDERSON:

9    Q. You testified earlier that you felt

10 that Miss Colvin was a safe distance behind

11 Miss Baldwin; correct?

12   A. Correct.

13   Q. And I think you testified two or three

14 seconds behind Miss Baldwin.  Is that fair to

15 say?

16   A. No.  I -- I have said in the past when

17 I have given explanations that in my opinion a

18 safe distance is, you know, two to three

19 seconds.  As far as testifying to that, I -- I

20 can't say that it was exactly two or three

21 seconds.  Again, I'm not an expert in accident

22 reconstruction, as -- as that gentleman pointed

23 out.

24      My point is that I feel, my

25 opinion is that she was a safe following

Page 59

1  distance behind Mrs. Baldwin.

2    Q. Okay.

3    A. Whatever that distance or time -- I

4  mean, as far as quantifying it, really I cannot

5  quantify it.  It just looked safe to me.

6    Q. Okay.  Was it also your testimony that

7  you were a safe distance back behind

8  Miss Colvin, your vehicle?

9    A. Yes.  I was way behind her.  I was

10 several seconds behind her, many seconds.

11   Q. Were you more than two or three seconds

12 behind her?

13   A. Oh, yes.  Yes.  Probably three to four

14 seconds or -- yeah.

15      MR. HENDERSON:  Okay.  All right.

16 That's all I've got.

17      MR. COLLINS:  John, do you have

18 anything?

19      MR. PHILLIPS:  Nothing further.

20 Thank you.

21      MR. WALLER:  Thank you.

22      THE VIDEOGRAPHER:  Off the record

23 ending the deposition on Tape 1 at 10:41.

24      (Deposition concluded at

25      10:41 a.m.)

Page 60

The videotaped deposition of
1  BRENT A. LARSON is now complete.  When
   transcribed, the original of the deposition
2  shall be given to Mr. Waller.  The original
   exhibits shall be distributed as follows:
3  Exhibits 121, 122, and 123 shall remain with the

4  original deposition transcript.
   (UNLESS OTHERWISE DIRECTED BY
5  COUNSEL OR THE PARTIES HERETO, THE STENOGRAPHIC
   NOTES FOR THE FOREGOING DEPOSITION SHALL BE
6  DESTROYED AFTER A PERIOD OF 3 YEARS FROM THE

7  DATE OF TAKING OF SAID DEPOSITION.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 61

1    C E R T I F I C A T E

2       I, the undersigned, a Certified
     Shorthand Reporter and Notary Public of the
3    State of Iowa, do hereby certify that I acted as
     the Certified Shorthand Reporter in the
4    foregoing matter at the time and place indicated
     herein; that I took in shorthand the proceedings
5    had at said time and place; that said shorthand
     notes were reduced to typewriting under my
6    supervision and direction, and that the
     foregoing pages are a full and correct
7    transcript of the shorthand notes so taken; that
     said deposition was not submitted for review.
8
       I further certify that I am
9    neither attorney nor counsel for, or related to
     or employed by any of the parties in the
10   foregoing matter, and further that I am not a
     relative or employee of any attorney or counsel
11   employed by the parties hereto, or financially
     interested in the action.
12
       IN WITNESS WHEREOF, I have
13   hereunto set my hand and seal this _____ day of
     _____, 2008.
14

15

16

17      _____
        CERTIFIED SHORTHAND REPORTER
18      AND NOTARY PUBLIC

19

20

21

22

23

24

25



PLAINTIFF'S
EXHIBIT
121
(Blumberg No. 5113)

LEGEND

A - GUARD RAIL
B - VEHICLE DEBRI
C - EXIT SIGN FOR I-65
NORTH
D - ROAD WORK SIGN
E - SCUFF MARK IN GRASS

CONCRETE BARRIER

SHOULDER

AREA OF IMPACT

E    C

SHEET 3 OF 3 SHEETS
I- 85 (SOUTHBOUND ONLY) AT
INTERCHANGE
DRAWN BY - SGT R.E. LEWIS #947
ASSISTED BY - CPL G.E. CAFFEY #496
DATE DRAWN - 07/29/2007
CASE # - 07-5632
EVENT # - 66807
DATE OF COLLISION - 07/27/2007

AY STREET

65 NORTH

0    25    50

**Page 1**

1
2          IN THE UNITED STATES DISTRICT COURT
3            FOR THE MIDDLE DISTRICT OF ALABAMA
4
5    ROBERT JOHNSON, as Personal
     Representative of the Estate of
6    IRENA JOHNSON, Deceased,
7         Plaintiff,
8    vs.           CIVIL ACTION NO.
                   2:07-CV-1068-MHT
9    DENITA COLVIN, WILLIE EVA
     BALDWIN, and ACE AMERICAN
10   INSURANCE COMPANY, et al.,
11        Defendants.
12
13
14
15         * * * * * * * * * * * *
16      DEPOSITION OF GLENN CAFFEY, taken pursuant to
17   stipulation and agreement before Gina L. Haislip,
18   Registered Professional Reporter and Commissioner for
19   the State of Alabama at Large, in the Law Offices of
20   Ball, Ball, Matthews & Novak, 2000 Interstate Park
21   Drive, Montgomery, Alabama, on Thursday, May 22, 2008,
22   commencing at approximately 9:04 a.m.
23         * * * * * * * * * * * *

**Page 2**

1
2         APPEARANCES
3
4
5    FOR THE PLAINTIFF:
6    Mr. Zachary T. Collins
     Attorney at Law
7    Suite 213
     207 Montgomery Street
8    Montgomery, AL 36104
9
     FOR DEFENDANT DENITA COLVIN:
10
     Mr. W. Christopher Waller, Jr.
11   BALL, BALL, MATTHEWS & NOVAK, P.A.
     Attorneys at Law
12   Suite 204
     2000 Interstate Park Drive
13   Montgomery, AL 36109
14
     FOR DEFENDANT WILLIE EVA BALDWIN:
15
     Mr. David W. Henderson
16   HILL, HILL, CARTER, FRANCO, COLE & BLACK
     Attorneys at Law
17   425 South Perry Street
     Montgomery, AL 36104
18
19   Mr. J. Lenn Ryals
     RYALS, PLUMMER, DONALDSON, AGRICOLA & SMITH, PC
20   Attorneys at Law
     Suite 1400
21   60 Commerce Street
     Montgomery, AL 36104
22
23         * * * * * * * * * * * *

**Page 3**

1
2              EXAMINATION INDEX
3    GLENN CAFFEY
4       BY MR. WALLER          5
5       BY MR. COLLINS         59
6       BY MR. HENDERSON           66
7       BY MR. COLLINS         82
8
9         * * * * * * * * * * * *
10
11             EXHIBIT INDEX
12   DX
13   1    Alabama Uniform Traffic Accident Report    40
14   2    Alabama Uniform Traffic Accident Report    48
          (corrected copy)
15
16   3    7/28/07 Voluntary Statement Form, statement   51
          of Denita Colvin (5 pages)
17
     PX
18
     122  Case file from MPD                 62
19
20
          * * * * * * * * * * * *
21
22
23

**Page 4**

1              STIPULATION
2        It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of
5           GLENN CAFFEY
6    is taken pursuant to the Federal Rules of Civil
7    Procedure and that said deposition may be taken before
8    Gina L. Haislip, Registered Professional Reporter and
9    Commissioner for the State of Alabama at Large,
10   without the formality of a commission, that objections
11   to questions other than objections as to the form of
12   the question need not be made at this time but may be
13   reserved for a ruling at such time as the said
14   deposition may be offered in evidence or used for any
15   other purpose by either party provided for by the
16   Statute.
17       It is further stipulated and agreed by and
18   between counsel representing the parties in this case
19   that the filing of said deposition is hereby waived
20   and may be introduced at the trial of this case or
21   used in any other manner by either party hereto
22   provided for by the Statute regardless of the waiving
23   of the filing of the same.

EXHIBIT IV    1 (Pages 1 to 4)

Deposition of Glenn Caffey

May 22, 2008

Page 5

1    It is further stipulated and agreed by and
2    between the parties hereto and the witness that the
3    signature of the witness to this deposition is hereby
4    waived.
5
6          * * * * * * * * * * * * * *
7              GLENN CAFFEY
8    The witness, after having first been duly
9    sworn to speak the truth, the whole truth and nothing
10   but the truth testified as follows:
11             EXAMINATION
12   BY MR. WALLER:
13   Q.  State your name for the Record, please.
14   A.  Glenn Caffey.
15   Q.  Where do you live, Mr. Caffey?
16   A.  Montgomery.  5620 Ash Grove Court.  That's
17   here in Montgomery, 36116.
18   Q.  Mr. Caffey, I understand that you were
19   formerly with the Montgomery Police
20   Department; is that correct?
21   A.  That's correct, sir.
22   Q.  Tell me about your history in the police
23

Page 6

1    A.  Law enforcement career lasted -- well, it's
2    still intact.  But with MPD, it's roughly 22
3    years.  Been in law enforcement, I guess,
4    about 25 years, 25, 26 years.  Currently I'm
5    employed with Alabama State University as a
6    campus police office.  Retired from MPD three
7    months ago, January 27th of this year.
8    Q.  2008?
9    A.  Yes, sir.
10   Q.  What was your rank when you retired?
11   A.  Corporal.
12   Q.  Do you mind if I call you Corporal Caffey?
13   A.  Yeah, that's fine.
14   Q.  Corporal, without going into the specifics of
15   your 22 years in law enforcement, when did you
16   start with the police department?
17   A.  I started January 1980.  I worked there for
18   roughly a year, resigned my position, stayed
19   doing odd jobs for about three years, and
20   decided to go back.  I think it was like in
21   '84 when I went back.  January '84, I think it
22   was.  Worked in, let's see, patrol division,
23   detective division, narcotics and

Page 7

1    intelligence, records, communications, and
2    traffic.
3    Q.  Now, this is during your stint?
4    A.  During the stint, yes, the total stint.
5    Q.  With respect to traffic accidents, for the
6    benefit of the jury, will you give us your
7    involvement with that?
8    A.  I retired officially in 2003.  I was out of
9    law enforcement doing -- working campus police
10   for roughly two years.  I went back July, I
11   think, of 2006 or July of 2005, somewhere
12   around there, but I went back in I think it
13   was 2006.  And when I went back, I was
14   assigned to the traffic division, accident
15   investigation.  That's where I stayed until
16   retirement again.
17   Q.  During your time at the Montgomery Police
18   Department, did you achieve or attain any
19   certifications?
20   A.  Yes, sir.  Pretty much you name it, I ran the
21   gamut on it.
22   Q.  With respect to accident investigations and/or
23   reconstruction?

Page 8

1    A.  No, I never did the reconstruction.  Just
2    simply accident investigation.
3    Q.  Corporal, for the benefit of the jury, can you
4    give the jury an estimate of how many traffic
5    accidents you worked during your time with the
6    Montgomery Police Department?
7    A.  The latter two years, I would say upward of
8    1500, maybe.
9    Q.  Corporal, can you give for the benefit of the
10   jury an estimate of how many fatalities that
11   you worked, and we'll say as a chief
12   investigating officer?
13   A.  Chief, I would say either three or four.  I'm
14   not sure.  I assisted.  Because if you're not
15   the lead investigator, you're going to assist
16   on traffic fatalities.  And I would say I did
17   maybe eight or nine assisting and maybe three
18   or four being the lead investigator.
19   Q.  Corporal, backing up a tad bit, are you a
20   native of Montgomery?
21   A.  Yes, sir, this is home.
22   Q.  Did you attend schools in Montgomery?
23   A.  Yes.

Deposition of Glenn Caffey

May 22, 2008

Page 9

1    Q.    Where did you graduate high school?
2    A.    Sidney Lanier, class of '75.
3    Q.    And did you have any post-high-school
4          education?
5    A.    No. No, sir.
6    Q.    Corporal, would give us the duties of a chief
7          investigating officer with respect to your
8          investigation and handling of a traffic
9          accident.
10   A.    The way we work the -- being the lead
11         investigator is almost like a round robin. If
12         there's five or six on the shift, you know, I
13         might have been number three in the order.
14         The first officer would get the first
15         fatality, and then it goes on until it get
16         down to me. And then we just, you know, go
17         right back around. And after you get past I
18         think it was five or six officers, you just
19         roll right back around to your -- whenever
20         your number is called, whether it's off duty,
21         you know, after your shift or on your -- well,
22         you're not called in on your off day, but
23         after your shift is over. And our shift was

Page 10

1    generally over with about 11 o'clock. We
2    would stay on call until 3 in the morning. If
3    a fatality happened or something that they
4    thought might be a fatality, you would be
5    called in for it.
6         The lead investigator will take care of
7    just about all the paperwork. You have other
8    guys assisting you where if you needed to go
9    to the hospital, they need to have blood drawn
10   and submitted to forensic, one of the
11   assisting officers would do that. They also
12   would assist you as to taking measurements.
13   But all the statements, you know, from
14   witnesses, doing the report, putting together
15   the case file is going to be the lead
16   investigator's job to do.
17   Q.   Can you describe for us the training that you
18        had to undergo in order to become qualified to
19        investigate accidents for the police
20        department?
21   A.   Well, it's pretty much like you get all the
22        training while you're in the academy; however,
23        my academy time was a few years back. But

Page 11

1    when I went to AI, you're going to ride with
2    some of the senior guys or the guys that
3    actually have been there for a while, and then
4    it really is like a refresher course. You
5    know, it's almost like riding a bicycle. When
6    you learn it in the academy, it's basically
7    the same thing. You just -- It comes back
8    natural pretty much.
9    Q.   Describe for us your time in the academy. How
10        long was that?
11   A.   I think it was about 16 weeks.
12   Q.   And at the end of the 16 weeks, did you take
13        any tests, whether it be written or physical
14        tests?
15   A.   Yes, you have to. And it's how to do -- Then
16        it was how to do drag factors. And some of
17        the things have changed since then because
18        then we would actually go out and you draw the
19        diagram from measurement. But now it's global
20        positioning, and you just go out and put in
21        the little coordinates, and it pretty much
22        draws everything up for you on the computer.
23        So it's a little easier now to recreate the

Page 12

1    accident scene, opposed to what it was
2    20-something years ago.
3    Q.   Would you characterize the time 20-something
4        years ago as more thorough and intensive in
5        gathering facts and putting forth conclusions
6        in your accident?
7    A.   It would probably be the same thing except
8        it's -- it's just more modern and it's more
9        easy to do. But you basically are -- you're
10       doing the exact same thing.
11   Q.   The computer that you just referenced earlier,
12       is that something that the department has?
13   A.   Well, the GPS is. But, now, we have to take
14       it to City Hall and get them to punch in all
15       the coordinates. And once -- you know, you
16       put it into the GPS, but City Hall will
17       actually -- there's something they're doing to
18       it where they actually can recreate this
19       accident scene and draw it to scale.
20   Q.   Corporal, as of the year 2007, was this
21       practice in place at that time with the police
22       department?
23   A.   Yes, it was.

Deposition of Glenn Caffey

May 22, 2008

Page 13

1  Q.  Corporal, do you recall responding to an
2      accident July 27 of 2007?
3  A.  Yes, sir.
4  Q.  Before we get started, I do notice you brought
5      something here today.  What is that exactly
6      that you brought with you?
7  A.  This is a copy of the case file that I put
8      together involving that accident on I-85.
9  Q.  The homicide file?
10  A.  Yes, sir.
11  Q.  Corporal, take us through, please, when you
12      first became aware that an accident had
13      happened on July 27, 2007.
14  A.  I was dispatched to the call.  I was working
15      the west side and it actually happened on the
16      west side, so I was dispatched to the call.
17      When I arrived on the scene, medics were
18      there.  There were more police officers there,
19      but I was the lead guy.  So you try to --
20      While they're working on the driver of vehicle
21      number one and also vehicle number two, I was
22      trying to find out the witnesses, get them
23      separated, find out what the witness saw so

Page 14

1      that -- because I would have something to go
2      on based on, you know, what the witnesses are
3      telling me.
4          I was able to locate two witnesses that
5      saw the accident, and they gave like a brief
6      synopsis of what happened.  And I knew that
7      driver -- well, then it was the vehicle that
8      was -- There were two vehicles involved.  One
9      was a black Mercedes.  I believe the other one
10      was a Hyundai Sonata.  I think it was a
11      Hyundai Sonata.
12  Q.  Corporal, let me stop you there real quick.
13      You mentioned several things.  When you
14      referenced lead guy, were you the chief
15      investigating officer for this accident?
16  A.  Yes, sir.
17  Q.  You also mentioned the medics being on the
18      scene.  Can you recall specifically whether
19      that was fire personnel, ambulance?
20  A.  Anytime an accident happened to that
21      magnitude, really, if we think there are
22      injuries, we're going to have medics.  You're
23      going to have fire rescue go.  You're going to

Page 15

1      have heavy equipment if it's a real serious
2      accident, ambulance.  I think Care Ambulance
3      was on the scene or later.  They might have
4      arrived after I arrived on the scene.  And
5      being on the interstate, you're going to have
6      a lot of police officers because there's a lot
7      of traffic on the interstate, and you've got
8      to divert some of the traffic in order to
9      conduct the investigation.
10  Q.  Corporal, can you tell us specifically when
11      the dispatcher called y'all out to the scene?
12  A.  I can look at my notes and tell you the exact
13      time that I was called and arrived at the
14      scene.
15  Q.  That would be great.
16  A.  It's in here someplace.
17  Q.  As you're searching for that, can you tell us
18      what exactly you're looking for?
19  A.  It's a form as to every officer that was on
20      the scene, including the medics, what time
21      they arrived, what time they were -- I mean,
22      they were dispatched, what time they arrived.
23      So you would have a breakdown as to how many,

Page 16

1      you know, police officers or emergency
2      personnel was on the scene.  I know it's in
3      here.
4  Q.  Corporal, what's it called?  I may be able to
5      help you out.  I think we're all in receipt of
6      the subpoenaed homicide file.
7  A.  To be honest with you --
8          MR. COLLINS:  What exactly are you
9          looking for, Glenn?
10          THE WITNESS:  It's a list of all the
11          officers that were on the scene.
12          MR. COLLINS:  Oh, okay.
13          THE WITNESS:  Here it is.
14  A.  My unit was 285, and that's when I
15      was dispatched.  I arrived on the scene at
16      1913 hours, which is 7:13.  I was dispatched
17      at 7:05.
18  Q.  Who arrived on the scene with you that night?
19  A.  Let's see.  285, 283.  Commander arrived at
20      1917.
21  Q.  Is it Corporal Commander?
22  A.  Yes, sir.
23  Q.  Are there any other officers that arrived on

Deposition of Glenn Caffey

May 22, 2008

Page 17

1    the scene?
2    A.  280.  The supervisor arrived at 1930.
3    Q.  Who would that have been?
4    A.  Sergeant Lewis.
5    Q.  Any other officers that you're aware of that
6    arrived on the scene that night?
7    A.  There are several police officers that were on
8    the scene.
9    Q.  But you were the first to arrive; is that
10   correct?
11   A.  Yes, sir, of the AI.
12   Q.  Corporal Caffey, do you have an independent
13   recollection of the events that -- well, an
14   independent recollection of your investigation
15   and specifically the night in question when
16   you arrived on the scene?
17   A.  Yes, sir.
18   Q.  You had mentioned earlier that you had
19   confirmed and spoken to two witnesses.  Was
20   there -- What was the first thing you did when
21   you arrived on the scene?
22   A.  I went to both vehicles to assess, you know,
23   the injuries.  And I know that -- I noticed

Page 18

1    that Ms. Johnson in the Hyundai Sonata had
2    more serious injuries than Ms. Colvin.
3    Q.  Now, who is Ms. Colvin?  Was she --
4    A.  Ms. Colvin was in the black Mercedes.
5    Q.  Were you able to determine this from your time
6    there at the scene?
7    A.  Yeah.  Yeah.
8    Q.  Did you have any conversation with Ms. Johnson
9    at the scene of the accident?
10   A.  No, sir.
11   Q.  When you arrived and checked on Ms. Johnson,
12   was there any person or persons already
13   attending to her at that time?
14   A.  Yes, sir.
15   Q.  Can you describe for us ...
16   A.  One of the witnesses was there with
17   Ms. Johnson, and the medics were trying to --
18   I guess you call it jaws of life to get the
19   door off so that they can get to her.  But the
20   witness was actually -- She was all mangled
21   inside the vehicle, and the witness was
22   holding her, trying to, you know, I guess, you
23   know, just talk to her and, you know, keep her

Page 19

1    calm.
2    Q.  Which witness was this?
3    A.  It would have been ...
4    Q.  Well, here's a better question.  Can you
5    describe for us what this witness looked
6    like?
7    A.  There were two witnesses.  One was a black
8    guy, and the other one was a white guy.  Brent
9    Larson was from -- he was with Ms. Colvin, and
10   Christopher Miles, he was with Ms. Johnson.
11   Q.  Corporal, once you checked on Ms. Johnson,
12   what, if anything else, did you do at that
13   point?
14   A.  There wasn't too much I could do with
15   Ms. Johnson.  I noticed that there were two
16   more ladies with Ms. Johnson that was there.
17   They seemed to -- you know, they were --
18   Medics attended to them, but it was nothing
19   real serious with those two.
20        And then I went over and looked in on
21   Ms. Colvin.  By that time she was already on
22   the stretcher.  The medics were going to -- I
23   mean, the ambulance was going to take her to

Page 20

1    the hospital.  And I just told her that, you
2    know, I would -- as soon as I clear up pretty
3    much everything that was on the scene, then I
4    would come to the hospital and, you know, talk
5    with them.
6    Q.  Did you and Ms. Colvin have a conversation at
7    that point in time at the scene?
8    A.  I want to say she was explaining to me the
9    accident in general, but to the -- to a -- a
10   real detail of the accident, you know, it was
11   basically just trying to get everybody to the
12   hospital, you know, get medical attention, and
13   then we'll go from there once you, you know,
14   get to the hospital.
15   Q.  Can you give us a time frame of how long any
16   conversation you had with Ms. Colvin at the
17   scene lasted?
18   A.  I would say a minute, minute and a half,
19   maybe.  It was a brief conversation.
20   Q.  And this may sound like a --
21   A.  It would have been the same thing with the
22   other driver, also.  It wasn't a very long
23   conversation.

Deposition of Glenn Caffey

May 22, 2008

Page 21

1  Q.  Who did you determine to be the other driver
2      of the other vehicle, of the Hyundai vehicle?
3  A.  It was Willie Eva Baldwin I think is her name.
4  Q.  In the minute to a minute and a half you spoke
5      with Ms. Colvin at the scene, how did she
6      appear?
7  A.  Real nervous, I guess, you know, being
8      involved in an accident like that.  And a lot
9      of times when people are involved in an
10      accident to that magnitude, they're almost
11      incoherent.  You can't really understand
12      exactly because they're jumping all over as
13      to, you know, what happened, and it's kind of
14      hard until they actually, you know, are
15      stabilized and you can talk to them.
16  Q.  When you say that, would you characterize her
17      as in an excited state?
18  A.  Yes.
19  Q.  During the minute or minute and a half you had
20      with Ms. Colvin at the scene, was there
21      anything that indicated to you that she might
22      be under the influence of alcohol or drugs?
23  A.  No, sir.

Page 22

1  Q.  During the minute to a minute and a half you
2      had with Ms. Colvin at the scene, did you
3      notice an odor of alcohol coming from her?
4  A.  No, sir, I did not.
5  Q.  At that point in time, and this is after your
6      minute to minute and a half conversation with
7      Ms. Colvin and when she left to go to the
8      hospital, at that point in time, was there any
9      reason for you to think that alcohol would
10      have played a factor in this accident?
11      MR. HENDERSON:  Object to the form.
12  A.  No, sir.
13  Q.  Corporal, I want to move on.  Stay with me.  I
14      want to still talk about the scene.  But you
15      referenced you had a conversation with
16      Ms. Baldwin, the driver of the Hyundai; is
17      that right?
18  A.  Yes, sir.
19  Q.  Can you tell me what was said during y'all's
20      conversation?
21  A.  She basically stated that she was just driving
22      along, and the vehicle hit her from behind.
23  Q.  How did Ms. Baldwin appear to be?

Page 23

1  A.  Ms. Baldwin was a little bit more calmer than
2      Ms. Colvin.
3  Q.  And during y'all's conversation, was she
4      speaking coherently?
5  A.  Yes.
6  Q.  Based on your impression of her, was she in a
7      rational state of mind?
8  A.  Yes, sir.
9  Q.  At any time in your conversation with
10      Ms. Baldwin at the scene, did she indicate to
11      you that she was traveling or may have been
12      traveling in reverse?
13  A.  No, sir.  She stated she was just driving
14      along, and the black car hit her from behind.
15  Q.  Corporal, at the scene, was there anything
16      else that was said between you and Ms. Baldwin
17      at that time?
18  A.  No.  I can't recall.
19  Q.  Did you have a chance to speak with any other
20      party inside the vehicle driven by
21      Ms. Baldwin?
22  A.  On the scene, no, sir.
23  Q.  And you've mentioned earlier about the

Page 24

1      witnesses.  Will you tell me the conversations
2      you had with the witnesses at the scene?
3  A.  Basically with both witnesses they stated
4      that -- And they actually told me what
5      position they were -- their vehicle was in
6      prior to the accident.  And both witnesses
7      stated that the Sonata was backing up on the
8      interstate, and it was kind of weird seeing a
9      car on an interstate backing up.  And
10      Mr. Miles, he was saying that it's almost like
11      is it really backing up, you know, the car?  I
12      can see it, but you just don't normally see a
13      car backing up on the interstate.  And almost
14      like, you know, is this car really doing what
15      I think it is?
16      Mr. Larson was very adamant, the car was
17      backing up on the interstate.  And he gave me
18      his business card, because I told them
19      depending on the outcome of the accident, I
20      would get back in touch with them if I needed
21      to get a statement from them.  And he gave me
22      his business card and told me where he was
23      staying.

6 (Pages 21 to 24)

Deposition of Glenn Caffey

May 22, 2008

Page 25

1  Q.  Did Mr. Larson indicate to you where his
2      vehicle was positioned with respect to the
3      accident?
4  A.  Yes, sir.  The accident, according to both
5      witnesses, happened in the right lane on
6      I-85.  There are two lanes that 85 turns into
7      65 south.  The other two vehicles were in
8      those lanes.
9  Q.  The right lane of traffic you just described
10     for us, would that be consistent with the Day
11     Street lane?
12 A.  Day Street exit, yes, sir.
13 Q.  And where did Mr. Larson indicate his vehicle
14     was positioned?
15 A.  I want to say he said his vehicle was in the
16     far left lane and Chris Miles' vehicle was in
17     the closest lane.  I might have it in -- I
18     would have to look at the statement, but one
19     was in the right lane and one was in the left
20     lane.
21 Q.  When you mentioned statement, did you take a
22     statement from these two individuals?
23 A.  Yes, sir.

Page 26

1  Q.  When did you take the statement?
2  A.  The statement was taken -- The next day I took
3      a statement from -- I want to be exact.
4  Q.  Corporal, feel free to review your notes at
5      any time you need to.
6  A.  The statement from Mr. Miles was done July
7      29th at 2010 hours at his residence, and the
8      statement from Mr. Larson was done July 30th
9      at 1645 hours at Maxwell Air Force Base,
10     Building 48.
11 Q.  Would that have been approximately two -- or
12     respectively two and three days after this
13     accident?
14 A.  One was done the day after the accident.  I
15     think the other one was done two days after
16     the accident.
17 Q.  And the statements that you took from these
18     two witnesses, would those statements have
19     been consistent with their oral testimony,
20     what they told you the day of the accident?
21 A.  Yes, sir.
22 Q.  Is there any way to refresh your recollection
23     with respect to what each witness said?

Page 27

1  A.  Sure.
2  Q.  Corporal, it appears that you just reviewed or
3      looked through your notes.  And what in
4      particular were you looking at or looking for?
5  A.  I pulled the two statements out, one from
6      Mr. Larson and one from Mr. Miles.
7  Q.  What did Mr. Larson indicate to you in your
8      recorded statement?  And I tell you what.  You
9      don't need to read the whole thing, but can
10     you tell us the substance of where his
11     position -- his vehicle was?
12 A.  He was directly -- Excuse me.  He was directly
13     behind the black Mercedes.
14 Q.  And that's Mr. Larson?
15 A.  Yes.
16 Q.  And you recall Mr. Larson being adamant that
17     the Hyundai was backing up?
18 A.  Yes.
19 Q.  Did he state what lane of travel the Hyundai
20     was backing up in?
21 A.  According to his statement, they were directly
22     behind the vehicle and it was directly in our
23     lane.

Page 28

1  Q.  Corporal, if Mr. Larson was behind the black
2      Mercedes, which I'll represent to you was
3      driven by Ms. Colvin, where would the other
4      witness, Chris Miles, have been?
5  A.  He was in the far left lane on I-85.
6  Q.  Corporal, after you had a chance to speak with
7      these two individuals, what, if anything, did
8      you do next in your investigation?  And I
9      guess for clarity purposes, I'm still at the
10     scene of the accident --
11 A.  Okay.
12 Q.  -- briefly speaking with these gentlemen.
13 A.  After -- I went to the hospital.  There was
14     another accident investigator at the hospital
15     because his job was to get a consent to
16     extract blood so that it could be submitted to
17     forensic science.
18 Q.  Now, why is that?
19 A.  Normally in an accident you want to determine
20     if alcohol played a part in the accident.  And
21     we would get blood submitted to forensic, and
22     when the results come back, if alcohol played
23     a part, based on, you know, the content,

May 22, 2008

Deposition of Glenn Caffey

Page 29

1    whether you're going to do a DUI or not.
2    Q.  Is that a standard procedure in a serious
3        accident?
4    A.  Yes.
5    Q.  Up to this point in time, was there any
6        indication in your opinion that alcohol had
7        played a factor?
8    A.  No, sir.
9    Q.  Or that it might have played a factor?
10   A.  No, sir.
11   Q.  Who voluntarily gave permission for blood to
12       be drawn?
13   A.  Ms. Colvin gave permission.
14   Q.  Did any other individual give permission for
15       blood to be drawn?
16   A.  I believe that Ms. Baldwin gave permission
17       also.
18   Q.  Which would have been the two drivers.
19   A.  Yeah.  And it would also be in the case file
20       as to ...
21   Q.  Can you tell us who that officer was that was
22       at the hospital?
23   A.  Thornton.  Officer Thornton.

Page 30

1    Q.  Were all three occupants of the Hyundai and
2        then Ms. Colvin, were they all admitted to the
3        same hospital?
4    A.  Yes, sir.
5    Q.  And where was that?
6    A.  Jackson Hospital.
7    Q.  Corporal, when you arrived at Jackson, what
8        did you do?
9    A.  I went into the emergency room with
10       Ms. Johnson, and I observed them, you know,
11       trying to do all they could -- all they can to
12       save her.
13           From there I went and spoke with
14       Ms. Baldwin.  And her sister -- All three
15       ladies were sisters.  Ms. Baldwin was in one
16       room, and her sister was in another room.
17       Now, I never spoke with Ms. I think it's
18       Prather.  I never spoke with her at the
19       hospital, but I spoke with Ms. Baldwin.  And
20       they pronounced Ms. Johnson, you know, dead
21       there at the hospital shortly after that.
22   Q.  Shortly after the accident?
23   A.  Arriving at the hospital, yes, sir.

Page 31

1    Q.  Arriving?
2            When you spoke with Ms. Baldwin at the
3        hospital, can you tell us how long that
4        conversation lasted approximately?
5    A.  Yeah.  Approximately 10, 15 minutes, 20
6        minutes.  I'm not sure how long it was.
7    Q.  What did she tell you?
8    A.  We just went -- basically went over the
9        accident.  And she said that, you know, she
10       was just driving along, and the vehicle hit
11       her from behind.  I asked her, you know, did
12       she recall backing up on the interstate.  She
13       said, no, she was just driving along and that
14       vehicle hit her from behind.  She never
15       admitted to, you know, backing up on the
16       interstate.
17   Q.  Did Ms. Baldwin tell you how they came about
18       to arrive in Montgomery?
19   A.  Yes, sir, she did.
20   Q.  And what did she tell you about that?
21   A.  We briefly hit on as to how they got to
22       Montgomery, but the next day they went into
23       detail as to, you know, what happened and

Page 32

1    how -- them leaving.  I think they left
2    Philadelphia.  Ms. Prather was from Detroit,
3    and Ms. Baldwin and Ms. Johnson lived together
4    in Philadelphia.  They were coming to -- or
5    going to a city called Culbert (sic),
6    C-U-L-B-E-R-T, I believe, Georgia.  That's
7    where all three grew up.  Ms. Johnson's son
8    lived close to Warner Robins, I think it is,
9    south of Atlanta.
10   Q.  Do you remember his name?  Would that have
11       been Robert Johnson?
12   A.  Yes, that's it.
13           She told me that they flew into Atlanta.
14       They rented a car from Hertz.  They were going
15       to go to Ms. Johnson's son's house in Warner
16       Robins.  But somewhere along the line they got
17       lost and they drove all the way to the state
18       of Florida.  She said that once they passed, I
19       guess, Warner Robins, the next thing on their
20       mind is let's go to Culbert, Georgia.  It's
21       far south, down by the state line.  And they
22       passed that also.
23           They went into Florida, turned around,

8 (Pages 29 to 32)

Deposition of Glenn Caffey

May 22, 2008

Page 33

1  and came back I-75 back to Atlanta, bypassing
2  Warner Robins again. When they arrived in
3  Atlanta, they got on I-85. And I guess they
4  was going to just come toward -- Her thing was
5  to go back to Culbert, but there's another way
6  you can get to Culbert by going through
7  Columbus, Georgia.
8  Q.  Ms. Baldwin told you that?
9  A.  Yeah. They were going to go back to Culbert.
10  But it was late that night, so they stopped at
11  a Holiday Inn, I believe, in Newnan, Georgia.
12  And she told me that Ms. Johnson called her
13  son and told him that they were going to spend
14  the night at Holiday Inn. And from Holiday
15  Inn, the next day I guess they was going to go
16  back to Culbert. But getting on 85, somewhere
17  they got lost again, and they wound up in
18  Ramer, Alabama.
19  Q.  Where is that?
20  A.  That's south Montgomery County. I was able to
21  get a credit card receipt where they purchased
22  gas in Ramer. They stopped in Ramer, got gas
23  in Ramer. Some kind of way they wound up back

Page 34

1  in Montgomery on I-85.
2  Q.  Did Ms. Baldwin indicate who was driving the
3  vehicle during this whole time?
4  A.  She did all the driving.
5  Q.  And going back to her conversation with you
6  about staying the night in the hotel, did
7  he -- did she indicate to you that Mr. Johnson
8  had come to the hotel or had visited his
9  mother?
10  A.  No. No. According to them, he didn't come to
11  the hotel. And they got up the next day, and
12  they were going to -- I guess it's just one of
13  these outings, you know, just go back to the
14  original city where they were born and
15  raised. There was something in Culbert
16  they -- It's like a family reunion or
17  something in Culbert. They had a lot of
18  family members there.
19  Q.  Did Mrs. Baldwin during your conversation with
20  her at the hospital, did she seem confused?
21  A.  She would talk about certain things, and then
22  she'll go into left field on you. And you
23  have to try to get her focused again to come

Page 35

1  back to, you know, the accident or what I was
2  talking about, the trip. And then she'll
3  start talking again, and then she'll start,
4  you know, going in all directions.
5  Q.  Based on what she told you, was she able to
6  describe some of these details with
7  specificity?
8  A.  Yes.
9  Q.  Did Ms. Baldwin indicate that she was on any
10  medication at the time?
11  A.  I noticed a bag in the car that had a lot of
12  pill bottles, and I wrote down all the names
13  of the medication. And during the
14  conversation that -- the taped conversation, I
15  asked her about all the medication, and she
16  was able to tell me what each pill was for,
17  the dosage and all.
18  Q.  In detail?
19  A.  In detail.
20  Q.  Without having any notes to look at?
21  A.  Yeah. In detail, yeah.
22  Q.  When did you take her transcribed or her
23  recorded statement? Was that at the hospital?

Page 36

1  A.  No. That was the next day. Because when I
2  arrived at work the next day, Ms. Johnson's
3  son was at the hospital, because the doctors
4  were afraid to -- because of Ms. Baldwin's age
5  and Ms. Prather's age, not to just, you know,
6  let them go to a hotel because their sister
7  had just been killed in an accident. One was
8  90. I think the other was 84 or 85. So they
9  admitted them in the hospital, kept them at
10  the hospital overnight.
11  And when I arrived the next day, the son
12  and some more family members was at the
13  hospital. I picked them up and brought them
14  to the police station so that I could get a
15  statement from Ms. Prather and Ms. Baldwin.
16  Q.  I'll represent to you, based on the testimony
17  here in this case, that the accident occurred
18  on a Friday. Is that your recollection?
19  A.  Yes, sir.
20  Q.  Do you know who contacted Ms. Johnson's son
21  and when he was contacted?
22  A.  I believe it would have been the sarge.
23  Sergeant Lewis contacted Robert Johnson and

Deposition of Glenn Caffey                                                                                    May 22, 2008

Page 37

1    had -- within an hour or two hours of the
2    accident to let him know that his mom had been
3    killed in an accident.
4  Q.  And when did he arrive in Montgomery?
5  A.  I saw him around 2:30, 3 o'clock the next
6    day. Now, I don't know what time he arrived
7    at the hospital, but I spoke with him about
8    2:30 or 3 o'clock.
9  Q.  And what was your conversation with
10    Mr. Johnson?
11  A.  I wanted him to, you know, to come to the
12    police station. I went to the hospital, and
13    they followed me to the police station to get
14    a statement from the two. And that way he was
15    going to take both of his aunts back to
16    Georgia with him.
17  Q.  Did he indicate to you whether he had had any
18    conversations with the ladies about what had
19    occurred during the accident?
20  A.  Yeah, and also his wife. And it was kind of
21    strange because she told me that this wasn't
22    unusual for the three ladies. They would get
23    in a car and they would just drive. I guess,

Page 38

1    you know, being 90 years old and you still can
2    drive a car, they just liked to get in the car
3    and just drive and go shopping and -- So this
4    wasn't unusual for them to -- because I looked
5    at the mileage that was on the Hertz rental
6    agreement and the mileage that was on the car
7    at the time of the accident, and I noticed it
8    was like 850, 900 miles. And it's kind of
9    strange that you know, a lady in, you know,
10    her late nineties, you know, doing almost 900
11    miles in a 24-hour period. But ...
12  Q.  When Mr. Johnson's wife made the remark about
13    it wasn't unusual, did she make any remark
14    about that it wasn't unusual, that the trials
15    and tribulations of getting lost several times
16    had occurred?
17  A.  No.
18  Q.  When you met the Johnson family, did you go
19    back to the hospital with them?
20  A.  No. No. Once we left the hospital, they went
21    back -- I think they had picked up everything
22    at the hospital that they needed, and they
23    actually left and went either back to Georgia

Page 39

1    or Culbert or Warner Robins. I'm not sure.
2  Q.  That next day, which would have been a
3    Saturday, the day after the accident, did you
4    or any of your colleagues have occasion to go
5    back to the scene of the accident?
6  A.  I want to say it was the Saturday, late that
7    evening, we went back to the scene. And we
8    shut down the interstate just to get the
9    coordinates with the GPS so that we could, you
10    know, get a scale model of the accident scene.
11  Q.  Did you take measurements?
12  A.  Yes, sir.
13  Q.  And what was your purpose in getting the
14    coordinates and taking measurements?
15  A.  So that you can -- really, if you ever need to
16    recreate the accident, you can, as to
17    pinpointing the cars, pinpointing the point of
18    impact. You can do that 10, 15, 20 years
19    later because you have, you know, all the
20    coordinates from a point of reference so that
21    you could really recreate the accident if need
22    be.
23  Q.  To your knowledge were any photographs taken

Page 40

1    of either of the vehicles involved in the
2    collision or the accident scene?
3  A.  Photographs were taken the night of the
4    accident.
5  Q.  Do you know who took the photographs?
6  A.  I believe Saba is a corporal. Saba, S-A-B-A,
7    Tolliver, I think she's a corporal. But she
8    works in crime scene.
9  Q.  And was that standard practice and procedure
10    of AI to take those photos?
11  A.  Yes, sir.
12  Q.  Corporal, I'm going to show you what has been
13    marked numerous times, but for the purpose of
14    this deposition, we'll mark it Defendant's 1.
15    (Defendant's Exhibit 1 was marked for
16    identification.)
17  Q.  I'm going to ask you if you've seen this
18    document.
19  A.  Yes, sir.
20  Q.  Corporal, will you explain to the members of
21    the jury what this is?
22  A.  This is the Uniform Traffic Accident Report
23    that I submitted on the accident that happened

Page 41

1    July 27th.
2  Q.  And is this the normal standard and procedure
3      to construct this Alabama Uniform Traffic
4      Accident Report in forming your opinions and
5      conclusions about an accident?
6  A.  Yes, sir.
7  Q.  Now, looking over Defendant's 1 we've just
8      identified, did you complete and gather the
9      information necessary to complete this
10     document?
11 A.  Yes, sir.  Everything on this document is
12     completed except the test results of the blood
13     samples.
14 Q.  Corporal, we had talked about your
15     investigation.  Before completing this
16     document we've identified as Defendant's 1,
17     what, if anything else, did you do in your
18     investigation that we haven't covered?
19 A.  I guess, you know, the vehicles that were
20     involved, we had to -- I had to go down to --
21     They were actually stored, I think, at B & R
22     Wrecker Service.  And we had to take a master
23     mechanic down to make sure that everything was

Page 42

1   working on the vehicle.  You have to go
2   through the vehicle and, you know, take
3   everything out.  Something that's pertinent
4   that you're going to use in the case, we would
5   put in as physical evidence.  If not, it would
6   have been returned to the owners.
7       And being in the case, Ms. Baldwin, after
8   I, you know, got all her medicine and all that
9   stuff out of the car and she was able to tell
10  me what everything was, her medicine was given
11  to her there at the police station.
12 Q.  Let me back up a little bit.  When you had
13     your conversation with Ms. Baldwin, in your
14     opinion did she seem remorseful or sorry for
15     any actions that she may have done to
16     contribute to the accident?
17     MR. HENDERSON:  Object to the form.
18        You can answer.
19     MR. WALLER:  It's just a legal
20        objection.  You can answer if
21        you know.
22 A.  The doc and I, we spoke about it at the
23     hospital because -- and Ms. Baldwin, it was --

Page 43

1   like I said, it was strange with Ms. Baldwin
2   because your sister has just been killed in an
3   accident, and she was real calm about it.  And
4   the doctor was like, should we tell her now
5   that her sister has been killed in the
6   accident?  Because with her age, they didn't
7   want her to just freak out.  And when he
8   finally told her, it was -- she was more
9   like -- she was real calm about it.
10      Normally in traffic fatalities, you know,
11  family members, they just -- they tend to lose
12  it.  But she was real calm, as though -- my
13  opinion, as though it wasn't -- I don't think
14  it just -- you know, it hit home then that her
15  sister had been killed.  And that's why the
16  doctor wanted to admit her at the hospital, to
17  keep her there just in case, you know,
18  something were to come up or -- They were --
19  Really for a precaution on her part.
20 Q.  Corporal, during your conversations with
21     Ms. Baldwin, whether it was at the scene or at
22     the hospital or at her house later in the
23     litigation, at any time did you confront her

Page 44

1   with what the witnesses were saying and the
2   other parties were saying?
3  A.  Yes.
4  Q.  And what, if any, response did you get from
5      Ms. Baldwin?
6  A.  Ms. Baldwin was very adamant, I was just
7      driving along and she hit me from behind.
8  Q.  Did Ms. Baldwin indicate to you what lane of
9      travel she was in at the time of the impact?
10 A.  It would be in the notes someplace, but I want
11     to say that she told me she was in that right
12     lane.
13 Q.  Once you confronted Ms. Baldwin with what the
14     witnesses stated and what the other parties
15     involved stated, was there any animosity that
16     she displayed?  Did she get mad?  Did she get
17     angry?
18 A.  No.  She was just saying, you know, I was just
19     driving along, and she hit me from behind.
20 Q.  Corporal, if you can look at Defendant's 1.
21     You prepared this.  And again, is this the
22     usual course of your practice to prepare this
23     document in AI?

Deposition of Glenn Caffey

May 22, 2008

Page 45

1  A.  Yes.
2  Q.  What did you determine to be the cause of this
3     accident?
4  A.  Vehicle number one, driven by Ms. Baldwin, and
5     vehicle number two, driven by Ms. Colvin.
6     Vehicle number one was in the right lane on
7     I-85 west.  Well, 85 goes from Montgomery east
8     and west, but we say 85 south and 85 north.
9     So I would go 85 south.  She was in the right
10    lane going across the Day Street exit.
11    Vehicle number two, Ms. Colvin, was behind
12    her.  Vehicle number one backing down 85.  And
13    vehicle number two did -- because she laid
14    down skid marks.  Vehicle number two tried to
15    avoid the accident.
16 Q.  Corporal, you just mentioned skid marks.  Did
17    you observe skid marks at the scene?
18 A.  Yes, sir.
19 Q.  Okay.  And can you tell the jury what that
20    tells you?
21 A.  That vehicle number two applied her brakes.
22 Q.  Vehicle number two, was that driven by
23    Ms. Colvin?

Page 46

1  A.  Yes, sir.
2  Q.  Is that also consistent with the witnesses'
3     testimony?
4  A.  Yes.  According to the witnesses, when vehicle
5     number two hit vehicle number one, it kind of
6     did a 360 and it wound up on the left side of
7     85, opposed to being directly in that center
8     lane.  Vehicle number two swerved to the
9     right.  And in my opinion if vehicle number
10    two had hit vehicle number one directly from
11    behind, Ms. Colvin might have been killed in
12    the accident, also.
13 Q.  Based on that answer, Corporal, do you feel
14    that Ms. Colvin's actions prevented a more
15    serious injury?
16        MR. COLLINS:  Object to the form.
17        Go ahead.
18 A.  Yes, sir.
19 Q.  Looking back on Defendant's 1, who did you
20    determine to be the prime contributing unit?
21 A.  Vehicle number one.
22 Q.  And will you tell the jury what that means and
23    why that's important in your analysis?

Page 47

1  A.  Prime contributing unit, across the top of the
2     report if you're looking -- the fifth line
3     going from left to right -- or the fourth
4     line, I believe it is, going from left to
5     right, prime contributing unit is unit number
6     one.  Unit number one in this case is going to
7     be Willie Eva Baldwin, and unit number one is
8     going to be at fault in the accident.
9  Q.  Corporal, going down to unit number two, which
10    you just told us is Ms. Colvin, there's a box
11    where it calls for the officer's opinion on
12    certain things.  And in particular on
13    Ms. Colvin, the standard box called for your
14    opinion on whether alcohol or drugs were
15    involved.  And what did you indicate?
16 A.  No.
17 Q.  And is that --
18 A.  Excuse me.  No.  No.
19 Q.  And that's no on alcohol and drugs?
20 A.  And drugs, yes.
21        And the next box is type test given, and
22    we submitted blood.  So that blood circle --
23    it would have been circled blood test.  It's

Page 48

1     circled.
2  Q.  So when this report was completed, the only
3     thing that -- am I correct to say that the
4     only thing that it lacked was the results of
5     that blood test?
6  A.  The result.  And her blood result should be on
7     this second accident report.
8  Q.  I'm going to show you what I'm going to mark
9     as Defendant's 2 and ask you to identify this
10    document.
11        (Defendant's Exhibit 2 was marked for
12        identification.)
13 A.  It's going to be the corrected copy of the
14    Uniform Traffic Accident Report.
15 Q.  Corporal, you would have prepared this
16    corrected copy as well?
17 A.  Yes, sir.
18 Q.  Can you list for us all the revisions,
19    corrections, or changes that were made to this
20    corrected report?
21 A.  It's showing as vehicle number one, Willie Eva
22    Baldwin, test results of her blood was .000
23    for alcohol, and vehicle number two, test

12 (Pages 45 to 48)

Page 49

1    results of Ms. Denita Colvin, blood was .115.
2    Q.  Officer, based on -- Well, are there any other
3       corrections or revisions that were made?
4    A.  I don't think so, sir.
5    Q.  Corporal, based on this Defendant's 2, which
6       is the corrected copy, on the officer's
7       opinion of alcohol and drugs, are those boxes
8       still checked no?
9    A.  Yes, sir.
10   Q.  And, Corporal, for the jury, what does that
11      mean?
12   A.  I didn't -- I didn't revise it, because in my
13      opinion when the accident happened, there was
14      no -- there was no smell of alcohol. I didn't
15      see where drugs might have played a part in
16      the accident. That's why officer's opinion,
17      it was checked no. I didn't do a field
18      sobriety test because, as I said, she was on
19      the stretcher basically when I got there. So
20      I didn't do a field sobriety test. But we
21      submitted blood. The blood results came back
22      a .115.
23          And I contacted Ms. Colvin and informed

Page 50

1    her that it was a .115. The legal limit in
2    the state of Alabama is .08. She was over the
3    legal limit, and I needed for either -- It
4    could have been done two ways. She could come
5    to headquarters and I would arrest her for
6    DUI, or I have to go to her house and pick her
7    up and bring her to headquarters.
8    Q.  When did this happen? Can you give me a time
9       line of after the accident?
10   A.  It had to have been several weeks because it
11      usually takes, you know, three, four, five
12      weeks, I believe, before the results come back
13      from forensic. I'm not sure, but I would say
14      probably about three, four, or five weeks
15      maybe.
16   Q.  Would you characterize Ms. Colvin's actions in
17      responding to your call as cooperative?
18   A.  Yes, sir. Yes, sir. We set up an appointment
19      time. She came to the police station with her
20      husband. I arrested her for DUI, placed her
21      in jail, and she made bond on it.
22   Q.  And just for clarification, now, at the scene
23      she wasn't charged with anything; is that

Page 51

1    correct?
2    A.  Yes, she wasn't charged at all.
3    Q.  Did Ms. Colvin indicate to you or did y'all
4       have any conversations about what, if
5       anything, she consumed the day of the
6       accident?
7    A.  She stated that she had consumed a glass of
8       wine. And I said .115. And she said, maybe
9       it was a large glass of wine.
10   Q.  Do you have anything that would refresh your
11      recollection on that issue?
12   A.  It might -- It might be in her statement. I'm
13      not sure. Because I think I took two
14      statements from Ms. Colvin.
15   Q.  Can you refer to her statement?
16          MR. WALLER: Let me see if I've got
17          it marked.
18   Q.  I'll tell you what might help. Let me show
19      you these documents we'll mark as Defendant's
20      3.
21          (Defendant's Exhibit 3 was marked for
22          identification.)
23   Q.  Can you identify these documents?

Page 52

1    A.  Yes, sir. It's a statement I took from
2       Ms. Denita Colvin the 28th of July at her --
3       Let's see. It was taken at her residence,
4       4033 Oak Shadow Lane in Montgomery.
5    Q.  And would this document have been something
6       that would have been contained in your
7       homicide file that you brought today?
8    A.  Yes, sir. I just located it here.
9    Q.  Okay. Would you take a minute to review that
10      statement, and then I want to ask you a couple
11      of questions on it, please, sir.
12   A.  Okay.
13   Q.  When was this statement taken?
14   A.  July 28th at 1925 hours.
15   Q.  Now, in that, did Ms. Colvin indicate how the
16      accident occurred?
17   A.  Yes, sir.
18   Q.  And what did she tell you?
19   A.  She stated she was traveling on I-85 south
20      approaching the 65 south/65 north
21      interchange. She was in the middle lane, Day
22      Street exit. I was going to get off on the
23      Day Street exit, and I was on the middle lane

May 22, 2008

Deposition of Glenn Caffey

Page 53

1    going about 45 miles per hour when a gray
2    Hyundai appeared to be backing up in my
3    direction on the interstate in the middle of
4    the interstate -- in the middle of the
5    interstate. I then tried to slow up as
6    quickly as I could, looking all around me,
7    behind me, on the left side of me, the right
8    side of me, the Hyundai steady coming straight
9    in my direction. I then tried to avoid
10   hitting the Hyundai directly in the rear by
11   turning my vehicle to the right slightly so
12   that I would not hit the guardrail on my right
13   head-on. The Hyundai smashed into my front
14   end as I was -- as it was steady -- steadily
15   backing up.
16   Q.  Is that statement consistent with your results
17        of the investigation?
18   A.  Yes, sir, it is.
19   Q.  Is that statement consistent with the witness
20        statements you took?
21   A.  Yes, sir.
22   Q.  Is that statement inconsistent with
23        Ms. Baldwin's statement to you?

Page 54

1    A.  Yes, sir, it is.
2    Q.  In that conversation, did Ms. Colvin
3        indicate -- Or let me ask you this. Did you
4        ask Ms. Colvin whether she had consumed any
5        alcohol?
6    A.  I asked her, really, what she had had for --
7        from the moment she got up that morning. She
8        told me from vitamins to -- You know, I can
9        read it for you.
10   Q.  Well ...
11   A.  But she said she had -- what she had for
12        breakfast. She had vitamins. And it got to
13        the point -- Because she told me that she had
14        had two glasses of wine. And I think it was
15        the last page of the statement. I asked her
16        had she had any alcoholic beverage to drink
17        prior to that accident, and she said, I had
18        two glasses of wine earlier that day. And I
19        asked her what time it was. It was about
20        2 p.m.
21   Q.  Corporal, from your testimony earlier, was
22        there another instance where she told you she
23        only had one glass of wine?

Page 55

1    A.  I could have been confused as to -- But I know
2        she -- it might have been the second time I
3        spoke with her or the time when I made the
4        arrest she said it, because when it came
5        back -- Yeah, it was the time I made the
6        arrest when it came back at .115, and she said
7        it was a large glass of wine. So that's when
8        she made that statement.
9    Q.  And that statement that we just referred to
10        was made the day after the accident; is that
11        right?
12   A.  The day after the accident on the 28th.
13   Q.  Corporal, I want to now turn more to the
14        results of your investigation. Did you find
15        any evidence that either vehicle involved in
16        the collision was traveling above the posted
17        speed limit?
18   A.  No, sir.
19   Q.  How would you characterize the actions taken
20        by Ms. Colvin on the day of the accident?
21   A.  From the skid marks and not seeing any skid
22        marks from the Sonata, I think Ms. Colvin took
23        evasive actions to prevent the accident. And

Page 56

1        by laying the skid marks down and from the
2        impact of her vehicle on the Sonata, I think
3        she was trying to avoid the accident and just
4        the left end of her vehicle clipped the rear
5        of that Sonata on the right side.
6    Q.  Do you have an opinion based on your
7        investigation and your speaking with the
8        witnesses and other things you did in forming
9        your conclusions, do you have an opinion
10        whether or not Ms. Colvin had enough time to
11        react to the accident as it was unfolding?
12   A.  Yeah. From looking at how she laid down skid
13        marks, she tried to avoid that accident. So
14        she had time to react to it and she tried. I
15        honestly believe she tried because of the skid
16        marks that she laid down.
17   Q.  Would you characterize operating a vehicle in
18        reverse on an interstate as inherently
19        dangerous?
20            MR. HENDERSON: Object to the form.
21   A.  It is. Yes, sir, it is.
22   Q.  Would you characterize operating a vehicle in
23        reverse on the interstate as a reckless

Page 57

1  disregard for the safety of the passengers in
2  that vehicle and other drivers?
3       MR. HENDERSON:  Object to the form.
4  A.  Yes, sir.
5  Q.  During any of the conversations you had with
6  Ms. Baldwin, did she ever indicate to you that
7  at any point in time, let's say from three
8  hours up before the accident, that she had
9  backed up at all?
10 A.  No.
11 Q.  That may be a bad question.  Maybe I need to
12 rephrase it.
13      Did you understand my question?
14 A.  Yeah.  You're asking did she mention to me
15 that she actually backed up on the interstate.
16 Q.  (Nods affirmatively.)
17 A.  No.
18      Now, I think at some point we spoke.  She
19 saw 65 north, and I think they wanted to go 65
20 north to come back around to get 85.  Because,
21 you know, now you see Day Street in front of
22 you, 85 just ran out, and there's 65 north.
23 And I came to the conclusion that she was

Page 58

1  trying to go 65 north.  That's probably the
2  reason she was backing up on the interstate.
3  Q.  Corporal, did you ever see any evidence,
4  either -- well, see any evidence at the scene
5  that Ms. Baldwin had attempted to apply her
6  brakes?
7  A.  No, sir.
8  Q.  Once you completed this corrected report that
9  we've identified as Defendant's 2, did this
10 fact with respect to Ms. Colvin's blood
11 alcohol level, did that change any of your
12 earlier opinions with respect to what you
13 believed to be the sole cause of the accident?
14 A.  No, sir, it didn't change it.
15 Q.  Based on your investigation and your
16 experience and training, was there anything
17 that you believe Ms. Colvin could have done
18 differently in an effort to avoid the accident
19 completely?
20 A.  No, sir.
21 Q.  During your conversations with the two
22 witnesses we've talked about earlier, did you
23 hear from either witness or for that matter

Page 59

1  did any other evidence at the scene indicate
2  that Ms. Colvin was impaired at the time of
3  the accident?
4  A.  No, sir.
5  Q.  Even after your revised report, what is your
6  opinion with respect to whether alcohol was a
7  contributing factor to this accident?
8  A.  Ms. Colvin came over the legal limit, but I
9  don't think the alcohol played a part in the
10 accident.  The accident, vehicle number one
11 was backing up on the interstate.  Vehicle
12 number two tried to avoid the accident by
13 swerving to the right, and there was a
14 collision.  It's unfortunate that vehicle
15 number two, you know, hit vehicle one and one
16 of the occupants in vehicle number one died,
17 but I don't think vehicle number two was at
18 fault in the accident.  It was solely the
19 vehicle number one backing up on the
20 interstate.
21      MR. WALLER:  Thank you, Corporal.
22 That's all I have at this time.
23      EXAMINATION

Page 60

1  BY MR. COLLINS:
2  Q.  Corporal, according to Defendant's Exhibit
3  Number 1 and 2 there -- Take a look at those.
4  Those are the police reports, is that correct,
5  the accident reports?
6  A.  Yes, sir.
7  Q.  Explain to the ladies and gentlemen of the
8  jury what the prime contributing circumstance
9  was in this case.  Is it indicated on that
10 report at all?
11 A.  09.  09 is improper backing.
12 Q.  And is that a code that's significant with
13 what happened in this case?
14 A.  Yes, sir.
15 Q.  Now, you have your entire case file there; is
16 that correct?
17 A.  Yes, sir.  It's kind of in disarray, but --
18 Q.  Kind of split up a little bit.  I'm going to
19 provide to you what I'll represent to you is a
20 copy of the subpoenaed case file that was
21 provided to me by the Montgomery Police
22 Department.  Can you take a look through that
23 and see if it accurately reflects your case

May 22, 2008

Deposition of Glenn Caffey

Page 61

1    file as you brought today --
2  A.  Yes, sir, I'm sure it is.
3  Q.  -- and as you remember?
4  A.  Yes, sir, I'm sure it is.
5  Q.  Just flip through it.  We want to make sure we
6      don't get any documents that you don't
7      recall.
8  A.  I don't know why that would be up front,
9      but --
10 Q.  I'll represent to you I may have printed it
11     out in a different order than the way it was
12     provided to me.
13 A.  Yeah.  It seems like it's in -- Yeah.
14 Q.  Does it appear to be the same thickness as the
15     case file you brought?
16 A.  Yes, it appears to be.
17 Q.  It appears to be the case file that you put
18     together in your investigation of this case;
19     is that correct?
20 A.  Yes, sir.
21 Q.  Take a look at the photographs, though, for me
22     in the back.  And just pull one or two of them
23     out of there for me, if you don't mind,

Page 62

1      Corporal.
2  A.  I'll try to keep your case file together and
3      not mess it up like mine.
4  Q.  Okay.  Looking at that photographs that was
5      part of the case file that I've marked as
6      Plaintiff's Exhibit Number 122, do you
7      recognize anything in that photograph?
8          (Plaintiff's Exhibit 122 was marked
9          for identification.)
10 A.  Yes, sir.
11 Q.  Tell the ladies and gentlemen of the jury what
12     you recognize in that particular photograph.
13 A.  This is the photo of vehicle number two as it
14     came to rest on I-85.
15 Q.  Now, did you take those photographs?
16 A.  No, sir.  Saba Tolliver took these photographs
17     from crime scene.  When there's a -- If
18     there's a fatality or we think there's going
19     to be a fatality, we call crime scene out to
20     do these photos.  If it's just a regular
21     fender-bender or something that, you know, you
22     don't think anyone is going to die in the
23     accident, I would take the photos myself, or

Page 63

1      some officer that works at AI would come and
2      we'll do the photos ourselves.  But when the
3      medics say that this is real serious and the
4      subject might die, we call crime scene out to
5      take photos.
6  Q.  And did Corporal Tolliver provide to you the
7      photographs that she took?
8  A.  Yes, sir.
9  Q.  And do you remember looking at --
10         MR. COLLINS:  I'm going to put them
11         as a part of the entire case
12         file.
13         MR. WALLER:  Okay.
14 Q.  Do you remember looking at those photographs
15     when she provided them to you?
16 A.  Yes, sir.
17 Q.  Now, does that photograph and all of the
18     photographs that are a part of Plaintiff's
19     Exhibit Number 122, do they accurately and
20     fairly depict the scene of the accident on
21     July 27 as you remember it?
22 A.  I'm pretty sure so, yes.
23         MR. COLLINS:  Do y'all have any

Page 64

1      objection to me attaching them
2      just as one exhibit?  We've
3      already had them marked before,
4      so there's no need in --
5          MR. WALLER:  That's fine.  But it
6      may be easier, and this is up to
7      you, if he has one and two
8      specific, do an A and B, 122-A,
9      122-B and C.
10         MR. COLLINS:  All right.
11 A.  I didn't know that she took that many photos,
12     but it seems like she took quite a few.
13 Q.  And, Corporal Caffey, again, do those photos
14     accurately and fairly depict the accident
15     scene as it appeared on that day --
16 A.  Yes, sir.
17 Q.  -- as you remember it?
18     You mentioned something about you had
19     found a credit card receipt.
20 A.  Yes, sir.
21 Q.  Do you remember whose credit card was used to
22     purchase that gas?
23 A.  I'm pretty sure it was Ms. Baldwin.

Page 65

1  Q.  You don't know for a fact, though?
2  A.  It might be in that -- It's not in the case
3     file?
4  Q.  It should be in the case file, if you'd like
5     to take a look at it.
6  A.  Yes, sir.  I think --
7  Q.  I don't think it's very readable, though, but
8     you ...
9  A.  I think it's Ms. Baldwin because --
10    MR. WALLER:  It looks like it may
11    follow the handwritten schedule.
12    THE WITNESS:  I just passed it
13    someplace.
14    MR. COLLINS:  Corporal Caffey, we'll
15    withdraw that question if you
16    don't remember.  We've already
17    gotten that admitted in another
18    deposition.
19    THE WITNESS:  Okay.
20    MR. COLLINS:  So I have no further
21    questions at this time.
22    THE WITNESS:  I apologize for not
23    being able to locate it.

Page 66

1         EXAMINATION
2  BY MR. HENDERSON:
3  Q.  Corporal Caffey, my name is David Henderson.
4     I represent Ms. Baldwin in this case.
5  A.  Okay.
6  Q.  And today I've got a few questions for you
7     about the accident.
8         First I wanted to ask you, have you
9     talked to any lawyers that are involved in
10    this case before your deposition today?
11 A.  I spoke with Mr. Waller.
12 Q.  Okay.  Did you speak with him about this case?
13 A.  Yes, sir.
14 Q.  Okay.  Did you give him a statement about this
15    case?
16 A.  No, sir.
17 Q.  What did you talk to him about?
18 A.  Pretty much what we're talking about today.
19 Q.  Okay.  Kind of the same type --
20 A.  Yes, sir.
21 Q.  -- testimony that you've given today?
22        Okay.  Did you meet in person with him
23    or ...

Page 67

1  A.  Yes, sir, I would say maybe a month or two
2     months ago.  It's been a while.  I'm not sure
3     of the exact date.
4  Q.  Okay.  Have you talked to anybody else about
5     this case?
6  A.  No, sir.
7  Q.  Have you had any -- You talked earlier about
8     you've been with the -- or been in law
9     enforcement approximately 25 years or so, and
10    you talked about having various training, the
11    police academy and various certifications
12    throughout your course of career as a police
13    officer.  Have you ever received any training
14    to determine if someone is intoxicated?
15 A.  I mean, we do the field sobriety tests.  But I
16    was unable to perform a field sobriety test in
17    this case because, you know, both subjects
18    were -- had to be admitted to the hospital.
19 Q.  Okay.  So you've had training in a field
20    sobriety test.
21 A.  Yes, sir.
22 Q.  How do you perform or can you just give a
23    brief description of a field sobriety test?

Page 68

1  A.  Well, it's basically, you know, you're going
2     to have the heel-to-toe, you know, the index
3     finger, and you have them stand on one foot
4     just to see if they can actually follow simple
5     instructions as to -- you know, if they're
6     going to stagger, if there's the smell of
7     alcohol on them, to give you something to say
8     that maybe we can go and do an intox if you
9     think that they didn't -- If they fail the
10    field sobriety test, you can take them to
11    headquarters and perform an intox on them
12    to -- you know, which is a breath analysis of
13    the alcohol content.
14 Q.  Okay.  What about a horizontal glaze (sic)
15    test?  Is that another test that would be
16    performed on an individual?
17 A.  Well, if it is, it's a test that I've never
18    performed, so ...
19 Q.  All right.  So you didn't perform a horizontal
20    glaze test on her at the scene?
21 A.  No, sir.  No, sir.
22 Q.  Okay.  And were y'all equipped with hand-held
23    breathalyzers to use at the scene?

May 22, 2008

Deposition of Glenn Caffey

**Page 69**

1  A.  No, sir.  I didn't have one in my vehicle, and
2      I don't think any of the officers have a
3      hand-held.  If they do, I don't know about it.
4  Q.  So your standard procedure is if someone fails
5      the field sobriety test, then you would take
6      them down to the station for a formal
7      breathalyzer test?
8  A.  Yes, sir, and I would perform the intox.
9  Q.  Okay.  And also you mentioned earlier about a
10     blood test.
11 A.  Yes, sir.
12 Q.  And that it would be standard procedure in
13     serious accidents to perform a blood test.
14 A.  Yes, sir.
15 Q.  And you have been trained in the procedure or
16     the protocol for performing those type tests,
17     correct?
18 A.  Yes, sir.
19 Q.  And do those tests only come up when it's a
20     fatality or ...
21 A.  A serious accident, we would perform a test
22     like that.  If the subject is going to be
23     admitted to the hospital, we would perform --

**Page 70**

1      we would get a blood sample.  But if they're
2      involved in an accident and they're not going
3      to the hospital, it's not real serious, then
4      you perform a field sobriety test.  Or if you
5      don't -- you know, you just think, yeah, I can
6      smell a strong odor of alcohol, I would, you
7      know, take them to headquarters and perform a
8      breathalyzer.
9  Q.  Okay.  Have you ever had any training on the
10     effects of alcohol on a person?
11 A.  Yes, sir, I ...
12 Q.  Okay.  And what are some of the effects of
13     alcohol on a person?
14 A.  I mean, you would have -- A lot of people are
15     very talkative.  Some, you know, of them are
16     going to be slurred speech.  It's various
17     things.  And, you know, I guess just the smell
18     of alcohol would actually be -- you know, you
19     get that little red flag.
20 Q.  And you stated earlier that in Alabama the
21     legal limit is .08; is that correct?
22 A.  Yes, sir.
23 Q.  And talking about other side effects of

**Page 71**

1      alcohol and I guess to use, for lack of a
2      better term, impairment, could a slower
3      reaction time to a situation on the roadway,
4      could that be a possible side effect of
5      someone that is over the legal limit for
6      alcohol?
7  A.  I'm sure it could be, yeah.
8  Q.  Okay.  Have you seen or been involved in any
9      studies on the impairment of someone that was
10     impaired with alcohol?
11 A.  No, sir.
12 Q.  But it's your testimony today that that could
13     be a factor, a loss of reaction time.
14 A.  I'm sure it could be.  Depending on the amount
15     of alcohol, I'm sure it could be.
16 Q.  And other than what you've just told me, the
17     slurred speech and talkative, someone that's
18     talkative, are there any other effects like --
19     I guess, obviously, you mentioned earlier the
20     field sobriety test.  Would somebody not be
21     able to walk like a straight line?
22 A.  Yes.  And some of them, you'll just get --
23     they can't stand up.  You know, you have them

**Page 72**

1      stand on one foot.  A lot of them just fall
2      down.  You have to actually catch some people
3      to keep them from hurting themselves.
4          But the field sobriety test is just a
5      tool you use in order to -- If they pass all
6      your tests, then you can say, well, maybe
7      there might be alcohol here, but I don't think
8      it's to the point where it's, you know, over
9      the limit or it impaired their driving, and
10     you wouldn't -- I wouldn't arrest them for
11     DUI.  But if they, you know, fail the sobriety
12     test, then I would place them under arrest for
13     DUI, take them downtown, and actually run an
14     intox on them.
15 Q.  Okay.  And if someone was impaired by alcohol
16     and their reaction time was lessened by the
17     effect of the alcohol, how could that affect
18     their driving?
19 A.  I guess in various ways, you know, as to
20     stopping distance or actually seeing the
21     vehicle.  It can impair us, you know, several
22     different ways.
23 Q.  So in a situation where something on the

18 (Pages 69 to 72)

Deposition of Glenn Caffey

May 22, 2008

Page 73

1 roadway occurs, would it take them sometimes
2 longer to figure out, hey, there's a car
3 that's stopped in front of me maybe?
4 A. I guess so. You know, take, for instance,
5 last night. I was on my way to Shorter. I
6 hadn't had any -- I didn't have anything to
7 drink. And there was some debris in the
8 roadway. I wasn't able to avoid it. I hit
9 it. I think it was like, you know, roadkill
10 or whatever it was. But, you know, I hit
11 that, and I didn't have any alcohol. So I
12 guess alcohol could play a factor as to, you
13 know, what you see and how you react to it.
14 Q. Could it possibly play a factor on response
15 time, for example, swerving out of the way to
16 avoid hitting an object or applying your
17 brakes in time to avoid striking an object?
18 A. I'm sure it could.
19 MR. WALLER: For the Record, I'm
20 going to object to the form on
21 this line of questioning to the
22 extent that it seeks expert
23 information which this witness

Page 74

1 is not qualified to answer.
2 You can answer if you know.
3 A. Yes, I'm sure it could.
4 Q. You spoke earlier about some skid marks being
5 in the roadway from Ms. Colvin. Do you know
6 how long those skid marks were?
7 A. No, sir. If it's not in this case file, I'm
8 not sure how long it would have been.
9 Q. Do you know if those skid marks were
10 referenced on the accident report that's been
11 admitted into evidence in this case?
12 A. No. It's just showing the area of impact, the
13 roadwork sign and the scuff marks in the
14 grass.
15 Q. Would skid marks on Ms. Colvin's vehicle from
16 applying her brakes, would that have been
17 something that would have been important to
18 have been noted on the accident report?
19 A. It wouldn't have been on the accident report,
20 per se. It would have been someplace in the
21 narrative.
22 Q. Or what about the diagram? Would it have been
23 noted on the diagram?

Page 75

1 A. And that's why I see where they have the dark
2 marks. This one doesn't show the complete ...
3 It doesn't show on the accident report, the
4 scale diagram.
5 Q. Okay. And would that have been something that
6 would have been important to make a note of on
7 the diagram --
8 A. It should have been.
9 Q. -- in the accident report?
10 A. Yes, sir, it should have been.
11 Q. And today as we sit here, are you testifying
12 from your memory --
13 A. Yes, sir.
14 Q. -- of this accident back in 2007 that there
15 were actually skid marks from Ms. Colvin's
16 vehicle?
17 A. Yes, sir.
18 MR. WALLER: Object to the form.
19 Q. And you have recalled other information in
20 this case as we sit here today from your
21 recollection; is that correct?
22 A. Yes, sir.
23 Q. And as we sit here today, you don't recall how

Page 76

1 long those skid marks were.
2 A. No, sir.
3 Q. Would there have been a measurement of those
4 skid marks taken?
5 A. I thought that it might -- it would have
6 reflected it in the report, but evidently I
7 don't see it on the accident report. Now, I'm
8 not sure if it's in the narrative or not.
9 Q. Okay. Do you have any idea -- Well, I guess
10 since you don't know how long they were, you
11 don't know at what point in time she applied
12 those brakes --
13 A. No, sir.
14 Q. -- before the impact.
15 A. No, sir.
16 Q. Let me represent to you that a witness in this
17 case, which was Bruce Larson's wife -- she was
18 in the vehicle with Mr. Larson -- has
19 testified in her deposition that she saw the
20 accident, that she witnessed the accident, and
21 that she believed that Ms. Colvin had time to
22 avoid the accident. Were you aware of that
23 testimony?

May 22, 2008

Deposition of Glenn Caffey

Page 77

1  A.  No, sir.
2  Q.  Would that testimony in any way change your
3    previous opinions this morning stating that
4    alcohol played no factor in this accident?
5  A.  No, sir.
6      MR. WALLER:  Object to the form.
7  A.  It wouldn't change it.  Because the day that I
8    took the statement from Mr. Larson, his wife
9    was present.  She made no indication that --
10   what you just said.
11 Q.  Okay.  Did you take a specific statement from
12   Ms. Larson?
13 A.  No.  I took one from Mr. Larson.  Ms. Larson
14   was there at the apartment, and I think there
15   were like three small kids.  And she was
16   taking care of the kids, either two or three
17   kids.
18 Q.  Did she speak up at any time during his
19   statement?
20 A.  She said a couple of things, but it wasn't to
21   what you just stated, no.
22 Q.  Would that have been proper for her if it --
23   Was it a recorded statement of Mr. Larson?

Page 78

1  A.  Yes, sir.
2  Q.  Would that have been proper for her to speak?
3  A.  It was almost like we're in one room and she's
4    in a kitchen or a dining room.  And she would
5    say something, and you could hear what she was
6    saying.  And it was -- And I think I asked
7    Mr. Larson about taking a statement from his
8    wife, and he was saying that she would say the
9    exact same thing that I'm saying.
10 Q.  Okay.
11 A.  Maybe not in those words, but it was along
12   that line.
13 Q.  Sure.
14     And as we sit here today, I don't guess
15   you can render any opinion as to whether or
16   not the alcohol would have played a factor in
17   her being able to avoid that.  I think that
18   you said earlier that you didn't believe that
19   it did play a factor.  But if the facts are
20   such that there was a big gap between
21   Ms. Colvin's vehicle, say it was more than
22   three car lengths --
23 A.  Okay.

Page 79

1  Q.  Traveling at that speed, approximately --
2    Well, I think that you stated that there was
3    no evidence that she was speeding; is that
4    correct?
5  A.  Yes, sir.
6  Q.  Okay.  So if she had a greater distance of
7    three car lengths and if there's testimony
8    that the lane to the left of her was clear and
9    we've got the median area, that under those
10   facts -- and she wasn't able to avoid the
11   accident, under those facts, do you still
12   believe that alcohol did not play any role in
13   her being able to avoid the accident?
14 A.  (Witness nods affirmatively).
15 Q.  Okay.  And that's a yes?
16 A.  I believe that the alcohol didn't play a
17   factor in the accident.  It didn't play a
18   factor in the accident.
19 Q.  Okay.  Let me ask you this question.  If the
20   facts are that Ms. Baldwin's vehicle stopped
21   on I-85 and Ms. Colvin is coming along and she
22   is -- she notices that the vehicle is stopped
23   five car lengths ...

Page 80

1  A.  Uh-huh (positive response).
2  Q.  Okay.  Under those facts, would it still be
3    your opinion that alcohol played no factor in
4    a hypothetical question such as that?
5  A.  From the witnesses' standpoint, both
6    witnesses, vehicle number one was backing on
7    I-85.  Vehicle number two was traveling west
8    on 85, traveling south on 85.  By vehicle
9    number one backing up on 85 and vehicle number
10   two closing on 85, that's what caused the
11   accident.  If vehicle number two had --
12   According to the witnesses, vehicle number one
13   was backing.  So I can't say that it was, you
14   know, sitting still and vehicle two hit her.
15   I'm going strictly on what the witnesses told
16   me and that vehicle number two was backing on
17   the interstate when vehicle number -- vehicle
18   number one was backing when vehicle number two
19   hit it.
20 Q.  Okay.  In a hypothetical, if vehicle number
21   two had a sufficient time length --
22 A.  I understand what you're saying --
23 Q.  Right.

20 (Pages 77 to 80)

Page 81

1  A.  -- but I can't go with a hypothetical or if.
2      I've got two witnesses stating that vehicle
3      number one is backing and vehicle number two
4      is closing.  And vehicle number two I noticed
5      swerved to the right and hit vehicle number
6      one while it was backing.  This is what
7      impartial witnesses are telling me that didn't
8      have anything to do with the accident, and
9      that's what I base my conclusion on.
10 Q.  Are there any other possibilities of why
11     Ms. Colvin was not able to avoid the accident?
12         MR. WALLER:  Object to the form.
13             Calls for speculation.
14 A.  I can't answer that.
15 Q.  As we sit here today, you don't know of any
16     other reasons why she wasn't able to avoid
17     impacting Ms. Baldwin's vehicle.
18         MR. WALLER:  Same objection.
19 A.  I mean, I can't give you an answer on that.
20     I'm sorry.
21         MR. HENDERSON:  That's all I've got.
22         MR. RYALS:  No questions.
23         MR. COLLINS:  I've got just one

Page 82

1      follow-up.
2          EXAMINATION
3  BY MR. COLLINS:
4  Q.  In the 1500 or so cases that you've
5      investigated, Corporal Caffey, have you ever
6      seen an instance where two drivers both have
7      been negligent in some form?
8  A.  I just can't recall on that one, you know.
9  Q.  I mean, is that a possibility?
10 A.  I'm sure one could have been doing something
11     that -- both vehicles could have been doing
12     something that, you know, caused the
13     accident.
14         Generally with an accident like that or
15     to that magnitude, I'm looking for witnesses,
16     because I know one driver is going to tell me
17     something and another one is going to tell me
18     something entirely different.  So I want to
19     get witnesses that actually saw the accident.
20     And if I can't determine -- if I don't have
21     any witnesses and I can't determine who is at
22     fault in the accident, then I would 99 the
23     report saying that I just can't determine

Page 83

1      who's at fault in the accident.  And I would
2      let, if they've got insurance, let the
3      insurance deal with that.
4  Q.  I guess my question is, it is possible,
5      though, that both of the drivers could have
6      done something --
7  A.  I'm sure, yes.
8          MR. WALLER:  Object to the form.
9              Asked and answered.
10 A.  I'm sure that, yeah, that's possible.
11 Q.  Okay.  And you're saying just based on this
12     investigation, though, that you believe
13     Ms. Baldwin was the sole proximate cause.
14 A.  Yes.
15 Q.  But the door is still open that Ms. Colvin
16     could have possibly had some fault.
17         MR. WALLER:  Object to the form.
18             That's not the testimony.
19 Q.  Possibly.
20         MR. WALLER:  Object to the form.
21 A.  In this case, vehicle number one is going to
22     be responsible in my opinion as -- be
23     responsible for the accident.

Page 84

1          MR. COLLINS:  Okay.  Nothing
2      further.
3          MR. WALLER:  That's all I've got.
4      Thank you.
5      * * * * * * * * * * * *
6      FURTHER DEPONENT SAITH NOT
7      * * * * * * * * * * * *
8      REPORTER'S CERTIFICATE
9  STATE OF ALABAMA:
10 Montgomery County:
11     I, Gina L. Haislip, Registered Professional
12 Reporter and Commissioner for the State of Alabama at
13 Large, do hereby certify that I reported the
14 deposition of:
15         GLENN CAFFEY
16 who was first duly sworn by me to speak the truth, the
17 whole truth and nothing but the truth, in the matter
18 of:
19     ROBERT JOHNSON, as Personal
20     Representative of the Estate of
21     IRENA JOHNSON, Deceased,
22     Plaintiff,
23     vs.

May 22, 2008

Deposition of Glenn Caffey

Page 85

1    DENITA COLVIN, WILLIE EVA
2    BALDWIN, and ACE AMERICAN
3    INSURANCE COMPANY, et al.,
4    Defendants.
5    In the U.S. District Court
6    For the Middle District of Alabama
7    Case Number
8    2:07-CV-1068-MHT
9  on Thursday, May 22, 2008.
10        The foregoing 84 computer printed pages
11  contain a true and correct transcript of the
12  examination of said witness by counsel for the parties
13  set out herein.  The reading and signing of same is
14  hereby waived.
15        I further certify that I am neither of kin
16  nor of counsel to the parties to said cause nor in any
17  manner interested in the results thereof.
18        This 7th day of June 2008.
19
20
21        _____
      Gina L. Haislip, ACCR #263
22      Expiration Date:  9-30-2008
      Registered Professional Reporter
23      and Commissioner for the State

# DEPOSITION OF
# WILLIE EVA BALDWIN

## February 27th and 28th, 2008

## Pages 1 through 185

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
Post Office Box 62
**Montgomery, AL  36104**
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net



EXHIBIT

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

---

Page 1

1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE MIDDLE DISTRICT OF ALABAMA
3    ROBERT JOHNSON, as Personal
     Representative of THE ESTATE OF
4    IRENA JOHNSON, Deceased,
5          Plaintiff,
6    vs.           CIVIL ACTION NO.
                   2:07CV1068-MHT
7
     DENITA COLVIN and
8    WILLIE EVA BALDWIN, et al.,
9          Defendants.
10         * * * * * * * * * * * *
11       DEPOSITION OF WILLIE EVA BALDWIN, taken
12   pursuant to stipulation and agreement before Tracey
13   H. Rives, Certified Shorthand Reporter and
14   Commissioner for the State of Alabama at Large, in
15   the Law Offices of Barrickman, Allred & Young, 5775
16   Glenridge Drive, Atlanta, Georgia, on Wednesday the
17   27th day of February 2008 commencing at
18   approximately 2:15 p.m EST. and the Law Offices of
19   Ball, Ball, Matthews & Novak, 2000 Interstate
20   Drive, Montgomery, Alabama, on Thursday, the 28th
21   day of February 2008 commencing at approximately
22   5:05 p.m. CST.
23         * * * * * * * * * * * * *

---

Page 2

1
2              APPEARANCES
3
4    FOR THE PLAINTIFF:
5    ZACHARY T. COLLINS, ESQ.
     TONYA D. POWELL, ESQ.
6    Attorneys at Law
     207 Montgomery Street
7    Suite 215
     Montgomery, Alabama
8
     FOR THE DEFENDANT DENITA COLVIN:
9
     W. Christopher Waller, Jr., Esq.
10   BALL, BALL, MATTHEWS,
        & NOVAK
11   Attorneys at Law
     Suite 204
12   2000 Interstate Park Drive
     Montgomery, Alabama
13
     FOR THE DEFENDANT WILLIE EVA BALDWIN:
14
     David W. Henderson, Esq.
15   HILL, HILL, CARTER, FRANCO,
        COLE & BLACK
16   Attorneys at Law
     425 South Perry Street
17   Montgomery, Alabama
18   FOR THE DEFENDANT ACE AMERICAN INSURANCE COMPANY:
19   John M. Phillips, Esq.
     DORE, LANIER & PHILLIPS
20   Attorneys at Law
     76 South Laura Street
21   Suite 1701
     Jacksonville, FL 32202
22
23

---

Page 3

1              APPEARANCES (cont'd)
2    ALSO PRESENT:  Denita Colvin
                    Robert Johnson
3
4          * * * * * * * * * * * *
5
                 INDEX
6
7    EXAMINATION                      PAGE
8    By Mr. Collins ..................... 5
9    By Mr. Collins (cont'd on 2/28) .............. 94
10   By Mr. Waller .................. 124
11   By Mr. Phillips .............................. 164
12   By Mr. Henderson ............................. 167
13   By Mr. Collins ............................. 170
14   By Mr. Waller .......................... 181
15   EXHIBITS
16   PX-5 - List of medications ................... 23
17   PX-6 - Ms. Baldwin's driver's license ...... 35
18   PX-7 - AAA itinerary .......................... 45
19   PX-8 - Handwritten itinerary ............. 53
20   PX-9 - Hertz estimate of charges ........... 54
21   PX-10 - Hertz rental agreement ................ 60
22   PX-11 - Accident report (corrected copy) ...... 73
23

---

Page 4

1               INDEX (cont.'d)
2    EXHIBITS                          PAGE
3    PX-12 - Department of Police document .......... 92
4    PX-13 - Ms. Baldwin's statement ............... 93
5    PX-14 - Responses to Plaintiff's
6          Interrogatories ..................... 104
7
         PX-15-59 - Photographs of scene ............... 109
8          * * * * * * * * * *
9
10       It is hereby stipulated and agreed by and
11   between counsel representing the parties that the
12   deposition of WILLIE EVA BALDWIN may be taken
13   before Tracey H. Rives, Certified Shorthand
14   Reporter and Commissioner for the State of Alabama
15   at Large, without the formality of a commission and
16   all formality with respect to other procedural
17   requirements is waived; that objections to
18   questions other than objections as to the form of
19   the question need not be made at this time but may
20   be reserved for a ruling at such time as the said
21   deposition may be offered in evidence or used for
22   any other purpose by either party as provided for
23   by the Federal Rules of Civil Procedure.

---

Page 5

1    It is further stipulated and agreed by
2 and between the parties hereto and the witness that
3 the signature of the witness to this deposition is
4 hereby waived.
5        * * * * * * * * * * * * * *
6        WILLIE EVA BALDWIN
7        The witness, after having first been
8 duly sworn to speak the truth, the whole truth, and
9 nothing but the truth testified as follows:
10        EXAMINATION
11 BY MR. COLLINS:
12    Q.    Ms. Baldwin, my name is Zach Collins. We
13        have met. Not just today, but we have met
14        before. And I, too, have been to the house
15        when you were present. I represent your
16        nephew Mr. Johnson.
17        And can you just state for the
18        record, I've never talked to you about this
19        case at any time, have I? You've got to say
20        yes or no. Do you remember me talking to
21        you about this case?
22    A.    Yes. Uh-huh (positive response).
23    Q.    Are you sure about that?

Page 6

1    A.    I think so.
2    Q.    Can you tell me when you talked to me about
3        this case?
4    A.    Was that yesterday?
5    Q.    No, ma'am. I wasn't here yesterday. I
6        believe you may have talked to your attorney
7        about this case, Mr. David Henderson. Do
8        you remember talking to him?
9    A.    I think so.
10        MR. COLLINS: Just for the record,
11        I have not talked to her about
12        the case.
13    Q.    Ms. Baldwin, if I ask you a question -- Have
14        you ever done a deposition before?
15    A.    I don't think so.
16    Q.    This is just an opportunity for us to talk
17        about the case that you are involved in.
18        And, again, I represent your nephew,
19        Mr. Johnson. I'm going to ask you some
20        questions, and occasionally I may not
21        understand your answer, so I will probably
22        ask you some follow-up questions just for
23        clarification. When you are prepared to

Page 7

1        answer the question, just make sure you say
2        yes or no or answer it verbally. But don't
3        shake your head side to side or up and down
4        because she has to take it down. Okay?
5    A.    Uh-huh (positive response).
6    Q.    I have a tendency of talking loud. Please
7        know I'm not screaming at you. I just --
8        They'll tell you, I just kind of talk loud.
9        I think I may be going deaf or something,
10        but I just talk loud.
11    A.    I am, too, sort of.
12    Q.    Okay. Are you on any medications? Have you
13        taken any medications today, this morning?
14    A.    Yes.
15    Q.    Can you tell me what medications you've
16        taken?
17        Before you do that, spell your name for
18        us.
19    A.    W-i-l-l-i-e.
20    Q.    And your middle name is...
21    A.    E-v-a.
22    Q.    And last name...
23    A.    B-a-l-d-w-i-n.

Page 8

1    Q.    Thank you. And tell me what medications
2        that you are currently on that you've taken
3        this morning.
4    A.    This morning, Fexofendadine.
5    Q.    Can you spell that for me?
6    A.    F-e-x-o-f-e-n-d-a-d-i-n-e.
7    Q.    Do you know what that medication is for?
8    A.    It's an antihistamine.
9    Q.    Why are you taking it? What illness or
10        ailment do you have that causes you to have
11        to take that particular medicine? Do you
12        know?
13    A.    Uh-uh (negative response).
14    Q.    Was that a yes or a no?
15    A.    No, I don't know.
16    Q.    What other medication have you taken this
17        morning?
18    A.    This morning K-o-l-o-r-c-o-n (sic) 10
19        P-o-t-a-s-s-i-u-m.
20    Q.    Do you know what that's for?
21    A.    It goes with the water pill.
22    Q.    When you say the water pills, what are you
23        referring to?

Page 9

1    A.  I'm going take another -- oh, another one.
2        The water pill is L-e-s-i-x (sic).
3    Q.  Do you know what that's for?  When you say
4        water pill, what does it help you with?
5    A.  It helps me go to the bathroom too much.
6    Q.  So it slows down your urinary tract system
7        or stops you from using the bathroom all the
8        time?
9    A.  It helps send me.
10   Q.  Oh, it helps send you to the bathroom.  All
11       right.
12   A.  F-u-r-o-s-e-m-i-d-e.
13   Q.  Do you know what that medicine is for?
14   A.  That's -- It's in parentheses after the
15       L-a-s-i-x.
16   Q.  Okay.  So that's part of the Lasix?
17   A.  Yeah.
18   Q.  Now, those three medicines, you've taken
19       those this morning; is that correct?
20   A.  Right.
21   Q.  Now, I believe -- Do you also take eye
22       drops?
23   A.  Yes.

Page 10

1    Q.  What's the name of that medicine?
2    A.  A-l-p-h-a-g-a-n.  It is a solution of zero
3        point one.
4        MR. WALLER:  Do y'all want to do
5        this?  Zach, I don't mean to
6        interrupt.
7            Ma'am, could you give us
8        that and we can put that on the
9        record?  We can attach it, so
10       we can all have it.  Would that
11       help you out, Zach?
12   Q.  Ms. Baldwin, all of the medicines that
13       you've taken this morning, do any of those
14       medicines prevent you from being able to
15       testify right now at this deposition?
16   A.  I don't think so.
17   Q.  None of them affect your mental abilities to
18       be able to answer questions that I ask you?
19   A.  I don't think so.
20   Q.  You are not having any side effects from any
21       of those medicines right now, are you?
22   A.  No.
23   Q.  At the appropriate time you can give a list

Page 11

1        to your attorney and I'll get a copy from
2        him.  Okay?
3            MR. WALLER:  Do y'all want to --
4            While we've got it now, Zach,
5            so we can all see it.  Ma'am,
6            do you have another copy of
7            that?
8            MR. COLLINS:  Oh, is she reading
9            from a list?
10           MR. WALLER:  Yes.  Ma'am, is that
11           a copy that we can have?
12           THE WITNESS:  I can copy it.
13           MR. WALLER:  Is that another copy
14           that you are looking at now?
15           THE WITNESS:  Yes.
16           MR. WALLER:  Is that in addition
17           to this other one that
18           Mr. Johnson has?
19           MR. COLLINS:  Help us out, David.
20           THE WITNESS:  I think it's the
21           same thing.
22           MR. HENDERSON:  They are two
23           different ones.  One is

Page 12

1        updated -- this one is dated
2        12/28/2007.  This other one is
3        more recent, February 18th,
4        '08.
5            MR. PHILLIPS:  Let's copy them
6            both, please.
7    Q.  Ms. Baldwin, state your address.  Where do
8        you currently live?
9    A.  My address present now?
10   Q.  Yes, your present address.
11   A.  208 Bella Vista Terrace, McDonough.
12   Q.  Who do you live there with?
13   A.  My nephew, Robert Lavaughn Johnson.
14   Q.  Does his wife live there as well?
15   A.  Yes.
16   Q.  And how long have you lived there?
17   A.  Since July the 27th.
18   Q.  Since the accident that we are here today?
19   A.  Yes.
20   Q.  Where did you live prior to that?
21   A.  1235 North Conestoga Street.  And that's in
22       Philadelphia, Pennsylvania.
23   Q.  Who did you live with?

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 13

1  A.  My sister.
2  Q.  What is her name?
3  A.  Robert's mother.
4  Q.  Can you give her name, for the record,
5      please?
6  A.  Irena Johnson.
7  Q.  And did you own that home on Conestoga in
8      Philadelphia?
9  A.  Once upon time. It's been quite a while.
10 Q.  And what happened? Did you sell it to
11     Ms. Johnson?
12 A.  Yes.
13 Q.  And do you remember when you told sold it to
14     her?
15 A.  No.
16 Q.  Was it ten years ago? Twenty years ago?
17 A.  Oh, longer than that.
18 Q.  Maybe thirty years ago?
19 A.  Possibly.
20 Q.  So about thirty years ago you owned that
21     home, correct?
22 A.  Right. I think we purchased it in -- it
23     might have been in '42.

Page 14

1  Q.  1942. When you say we purchased it, who are
2      you referring to?
3  A.  My husband.
4  Q.  And at some point after that you sold it to
5      your sister Irena Johnson?
6  A.  Yes.
7  Q.  When you said it to her, was the home solely
8      in her name?
9  A.  I would think so.
10 Q.  And when did you begin living with your
11     sister Irena Johnson?
12 A.  It's not clear to me because I lived in
13     Willow Grove for a few years.
14 Q.  What's Willow Grove?
15 A.  That's a suburb of Philadelphia.
16 Q.  Who did you live with in Willow Grove?
17 A.  With my husband.
18 Q.  And did you move in with your sister Irena
19     Johnson after your husband passed away?
20 A.  Yes.
21 Q.  Do you remember when your husband passed
22     away?
23 A.  No.

Page 15

1  Q.  Is it fair to say that you -- Take your time
2      if some of these questions are difficult.
3      You just let me know and we will stop and
4      you can take a break. Okay?
5          But how long did you live with Irena,
6      just you and Irena? Was it ten years?
7      Fifteen years?
8  A.  More.
9  Q.  About twenty years?
10 A.  Yeah.
11 Q.  And has it only been you two that just lived
12     together, you and Irena?
13 A.  Yes.
14 Q.  Now, during the time in which you and Irena
15     lived together, were you working?
16 A.  No.
17 Q.  Were you retired at that point?
18 A.  Yes.
19 Q.  When did you retire? Do you remember what
20     year?
21 A.  In seventy -- Let's see. It might have been
22     '76. I'm not sure. In the '70s.
23 Q.  So in about '76 you retired, and you and

Page 16

1      Irena lived together; is that correct?
2  A.  Yes.
3  Q.  And is it fair to say since that point,
4      sometime around 1976 you and Irena lived
5      together alone, just you and her?
6  A.  Yes.
7  Q.  Tell me about the house that y'all lived in.
8      How many bedrooms was it?
9  A.  Three.
10 Q.  Three bedrooms?
11 A.  Yeah.
12 Q.  Now, did you have your own room?
13 A.  Yes.
14 Q.  And she had her own room?
15 A.  Yes.
16 Q.  Now, the house was solely in Irena's name at
17     that point, correct?
18 A.  Yes.
19 Q.  Was Irena working at that time?
20 A.  Part of the time.
21 Q.  Now, when you say part of the time, would
22     you say she worked maybe twenty hours a week
23     or so?

Page 17

1   A.  Yes.
2   Q.  Was this at the laundry facility that she
3       worked at?
4   A.  Yes.
5   Q.  How did y'all handle the bills in the house?
6       Did y'all put everything together?
7   A.  I bought all foods and she prepared.
8   Q.  Now, did y'all have the same bank accounts?
9   A.  No.
10  Q.  Y'all had separate bank accounts?
11  A.  Yes.
12  Q.  So y'all didn't mix y'all's money together,
13      did you?
14  A.  No.
15  Q.  Is it safe to say that whatever money she
16      brought in, she had her own way of
17      accounting for her money?
18  A.  Right.
19  Q.  And she spent that money however she saw
20      fit?
21  A.  Right.
22  Q.  Would it be safe to say that you did the
23      same?  Whatever money you brought into the

Page 18

1       house, you accounted for it and you spent it
2       how you saw fit?
3   A.  Yes.
4   Q.  Did you have any control over -- and I'm
5       talking about when y'all lived together --
6       did you have any control over where Irena
7       went?
8   A.  No.
9   Q.  She pretty much had her own schedule?
10  A.  Right.
11  Q.  And she came and went as she pleased?  Would
12      it be safe to say that?
13  A.  Right.
14  Q.  And you as well, you came and went as you
15      pleased?
16  A.  Yes.
17  Q.  No one told you when and what time you had
18      to come home, did they?
19  A.  No.
20  Q.  Would it be safe to say, Ms. Baldwin, that
21      even though y'all lived together under the
22      same roof that y'all essentially had --
23      y'all owned your own individual type

Page 19

1       household that you ran?  Would it be safe to
2       say that?  That y'all had your own affairs
3       that you ran even though y'all lived under
4       the same roof?
5           MR. PHILLIPS:  Object to the form.
6   Q.  Do you understand my question?
7   A.  No.
8   Q.  The fact that y'all lived together under the
9       same roof, that didn't mean that you-all
10      shared each others affairs, did it?
11  A.  Sort of.
12  Q.  Sort of?
13  A.  Yeah.  We bowled together three times a
14      week.
15  Q.  So y'all did social things together, right?
16  A.  Yeah.
17  Q.  But in terms of one person ruling the
18      household or having a domination over the
19      household, that wasn't a fact, was it?
20  A.  No.
21          MR. PHILLIPS:  Object to the form.
22  Q.  In terms of either you or Ms. Johnson being
23      the head of the household, would that have

Page 20

1       been either one of y'all?
2   A.  No.
3   Q.  So it would be safe to say that y'all kind
4       of had your separate households?
5           MR. PHILLIPS:  Object to the form.
6   A.  We practically just did the same thing.
7   Q.  With regard to your social activities?
8   A.  Right.
9   Q.  That's what you are referring to?
10  A.  Right.
11  Q.  How old are you, Ms. Baldwin?
12  A.  Ninety-one.
13  Q.  What is your Social Security number?
14  A.  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 A.
15  Q.  Now, before you retired what line of work
16      did you do?
17  A.  Teach.
18  Q.  Now, did you hold some type of certificate
19      to teach?
20  A.  Yes.
21  Q.  Were you licensed with a state agency?
22  A.  Yes, I was licensed.
23  Q.  What state were you licensed in?

Page 21

1   A.  Pennsylvania.
2   Q.  And how long did you hold that license?
3   A.  Until I retired.
4   Q.  Until you retired.  Do you remember when you
5       got it?
6   A.  I had it written down someplace.
7   Q.  Maybe you might remember this way.  Do you
8       know how many years you taught before you
9       retired?
10  A.  Not that long because it was under a
11      disability.
12  Q.  When you say it was under disability, is
13      that why you retired?
14  A.  Yes.
15  Q.  And tell me about your disability.  What was
16      the disability that caused you to retire?
17  A.  They thought it was my heart.  And the
18      pacemaker, that didn't help at all.  Later
19      they took it out because they said the
20      pacemaker was the problem.
21  Q.  Do you remember when you got that pacemaker?
22  A.  No.
23  Q.  Do you remember what approximate year that

Page 22

1       was?
2   A.  No, I don't.  In the '70s, though.
3   Q.  When you retired because of your disability,
4       did you get some form of disability income?
5   A.  I guess I collected Social Security.
6   Q.  Are you on Social Security right now?
7   A.  Yes.
8   Q.  Is it SSD?  Is that what you get, Social
9       Security disability?  Or is it SSI?  Do you
10      know?
11  A.  It's the high standard of whatever it is.
12  Q.  And you've been getting that since the '70s?
13  A.  Yes.  I'm about to break them.
14  Q.  While you are looking for that, do you know
15      how much you get in Social Security
16      disability income?
17          While you are looking for that, I'm
18      going to ask you a couple of questions.  If
19      you need me to pause for a second, I will.
20      Okay?
21          Have you ever been to Alabama before?
22  A.  Yes.
23  Q.  Do you know anyone or are you related to

Page 23

1       anyone that lives in Alabama?
2   A.  I don't think so.
3   Q.  As far as you know, you have no relatives in
4       Alabama?
5   A.  I don't think so.
6   Q.  Have you ever been arrested before?
7   A.  No.
8   Q.  Have you ever filed bankruptcy before?
9   A.  No.
10  Q.  Have you ever sued anyone before, been a
11      plaintiff in a case?
12  A.  No.
13  Q.  Have you ever been sued before?
14  A.  No.
15  Q.  And what about being a witness in a case?
16      Have you ever been a witness in any case and
17      had to go to court and testify about it or
18      sit in a deposition like this about it?
19  A.  No.
20  Q.  And that card that you are looking for, you
21      can provide it to your attorney.
22          (Plaintiff's Exhibit Number Five
23           marked for identification.)

Page 24

1   Q.  Let's go back real briefly, Ms. Baldwin, and
2       talk about your medical history.  And I have
3       a -- Let me show you what I'm going to mark
4       as Plaintiff's Exhibit Number Five.  And I
5       believe this is a document that you just
6       provided everybody in the room.  Will you
7       take a look at that?  Is that the document
8       you just gave everyone in the room?
9   A.  Yes.
10  Q.  Why don't you just take a look at it.  Look
11      at that one right there.  Let's talk about
12      the first prescription.  It's called
13      Aricept.
14  A.  Right.
15  Q.  It looks like the purpose is for dementia?
16  A.  Right.
17  Q.  When were you diagnosed with dementia?  Do
18      you remember?
19  A.  It's been a long time.
20  Q.  A long time?
21  A.  Yes.
22  Q.  Were you diagnosed with dementia prior to
23      July 27th of 2007?

Deposition of Willie Eva Baldwin                                February 27th and 28th, 2008

Page 25

1   A.  Yes.
2   Q.  Before the accident?
3   A.  Uh-huh (positive response).
4   Q.  And on the date of the accident, were you
5       taking Aricept or any other medicine for
6       dementia?
7   A.  Yes.  N-a-m-e-n-d-a.
8   Q.  That's listed on Plaintiff's Exhibit Number
9       Five as number six; is that correct?
10  A.  Uh-huh (positive response), number six.
11  Q.  Do you take both Aricept and Namenda?
12  A.  Yes.
13  Q.  You take both of them for dementia?
14  A.  Yes.
15  Q.  I believe you take a ten milligram tablet of
16      Aricept and a five milligram tablet of
17      Namenda; is that correct?
18  A.  Yes.
19          MR. HENDERSON:  Let me just
20          clarify this.  Are you talking
21          about now or before or at the
22          time of the accident?
23          MR. COLLINS:  Actually kind of

Page 26

1       both.
2   Q.  Do you take both of them now?
3   A.  Yes.
4   Q.  Prior to July 27, 20007 were you taking both
5       of those at that time?
6   A.  Beg your pardon?
7   Q.  Were you taking both of those medicines at
8       that time?
9   A.  Yes.
10  Q.  Number two Fexofendadine, that's the
11      antihistamine I think you testified earlier.
12      Are you taking that now?
13  A.  Yes.
14  Q.  And on July 27th, the day of the accident,
15      were you taking that medicine was well?
16  A.  Yes.
17  Q.  And let's for speed's sake, all of the
18      medicines that you have listed there, one
19      through eight, are you currently taking all
20      of those medicines right now?
21  A.  Yes.
22  Q.  And you take them on a daily basis?
23  A.  Yes.

Page 27

1   Q.  And if I believe I understand you correctly,
2       you have taken at least some of those today
3       or will take some of those today; is that
4       correct?
5   A.  I've already taken them.
6   Q.  You've taken all of them?
7   A.  Yes.
8   Q.  Now, on July 27th were you taking those
9       eight medications?
10  A.  Yes.
11          (Brief recess.)
12  Q.  With regards to the eight medications that
13      you were taking on the date of the accident,
14      July 27, 2007, I believe you testified that
15      you are still taking those same eight
16      medications today; is that correct?
17  A.  Yes.
18  Q.  Do you have any side effects from any of
19      those medications?  Do they make you dizzy
20      or slow moving or something to that effect?
21  A.  It seems that Aricept makes me have a lot of
22      dreams.  And it may be that I've been
23      looking at television and all of this stuff

Page 28

1       going on.
2   Q.  Is that -- When you say it makes you have
3       dreams, is that in the daytime, sometimes in
4       the daytime?
5   A.  No.
6   Q.  Just at nighttime?
7   A.  Right.
8   Q.  Does the Aricept make you see things
9       sometimes that are really not there in the
10      daytime?
11  A.  No.
12  Q.  But none of them make you dizzy and things
13      of that nature, do they?
14  A.  (Witness shakes head.)
15  Q.  Is that no?
16  A.  I don't think so.
17          MR. HENDERSON:  Ms. Baldwin, you
18          may want to speak up so
19          everybody can hear you.
20          THE WITNESS:  All right.
21  Q.  These eye drops that you take, are you
22      taking three different types of eye drops?
23  A.  Yes.

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 29

1   Q.  And you take those on a daily basis?
2   A.  Yes.
3   Q.  Are those for glaucoma?
4   A.  Well, yes.  High blood pressure and for
5       glaucoma.
6   Q.  You've got by the second one, the A-z-o-p-t,
7       high pressure and glaucoma.  Do you mean
8       that you have high pressure in your eyes?
9   A.  Yes.
10  Q.  How long have you had glaucoma?  Do you
11      remember when you were diagnosed with
12      glaucoma?
13  A.  A long, long time ago.
14  Q.  A long, time ago?
15  A.  Yes.
16  Q.  Is it safe to say you've been taking these
17      eye drops or these eye drops for your
18      glaucoma for several years?
19  A.  Oh, yes.
20  Q.  Do you know approximately how many years?
21  A.  Uh-uh (negative response).
22  Q.  More than ten?
23  A.  More than ten.

Page 30

1   Q.  And on July 27, 2007 had you taken those eye
2       drops for your glaucoma?
3   A.  Yes.
4   Q.  Where do you normally get your prescriptions
5       filled at, Ms. Baldwin, here in Georgia?
6   A.  In Georgia?
7   Q.  Do you get them filled in Georgia?
8   A.  No.  My -- I get them mostly in the mail.
9       It's Prescription Solution.
10  Q.  And are they prescribed by a doctor, by a
11      physician?
12  A.  Yes.
13  Q.  What physician prescribed these particular
14      eye drops?  Do you know his or her name?
15          Is that something you think you can get
16      to us at a later date?
17  A.  Probably.
18  Q.  Who is your general doctor?  Do you have one
19      here in Georgia?
20  A.  Yes.  Woods.
21  Q.  Dr. Woods?
22  A.  Yes.
23  Q.  Is Dr. Woods a male or female?

Page 31

1   A.  Male.
2   Q.  Do you know his first name?
3   A.  That's the general.
4   Q.  That's your general --
5   A.  Yes.
6   Q.  -- general practitioner?
7   A.  Uh-huh (positive response).
8           MR. COLLINS:  Can you get that to
9       me?
10          MR. HENDERSON:  Yes, if we can
11      track it down.
12  Q.  Ms. Baldwin, I'm going to ask your attorney
13      just to get that to us.  I'll send some
14      questions with him and follow up with that.
15      Okay?
16  A.  Beg your pardon?
17  Q.  I'll ask your attorney to get that from you
18      and he can get that to us, the information
19      for Dr. Woods.
20  A.  I have an appointment with him shortly.
21  Q.  Okay.  Are you looking for the appointment
22      card in your purse?
23  A.  Yes.  His name is Bruce A. Woods.

Page 32

1   Q.  Bruce A. Woods?
2   A.  Yes.
3   Q.  And he's in McDonough, or is he in Atlanta?
4   A.  He's in McDonough.
5   Q.  We can get that information.
6   A.  Address?
7   Q.  Do you want to give it to us?  Go ahead.
8   A.  259 Jonesborough Road, McDowell (sic),
9       Georgia.
10  Q.  What's that zip code?
11  A.  30253.
12  Q.  Thank you, Ms. Baldwin.
13          Are you currently using inhalers as
14      well?  Is that correct?
15  A.  Part of the time.
16  Q.  When you say part of the time, does your
17      prescription say that you have to use them
18      every day?
19  A.  No.
20  Q.  How often are you to use your inhalers?
21  A.  When I'm having trouble.
22  Q.  So only when necessary?
23  A.  Yes.

Page 33

1　Q.　When was the last eye exam you had,
2　　　Ms. Baldwin? Do you remember?
3　A.　Yeah. This week.
4　Q.　This week?
5　A.　(Witness nods head.)
6　Q.　You had one already, or you are about to get
7　　　one?
8　A.　I just had it.
9　Q.　When was that? Today is Wednesday. Was it
10　　　Monday or Tuesday?
11　A.　Probably it was last week. Did you say the
12　　　eye doctor?
13　Q.　Eye doctor, yes. You say you had an
14　　　appointment last week, you believe?
15　A.　Yes. I believe I've taken that out. One
16　　　day I had the examination. And that --
17　　　Since I've had it, I don't have it with me.
18　Q.　And when you had that eye exam, I assume
19　　　that you still have glaucoma; is that
20　　　correct?
21　A.　I guess I have it.
22　Q.　And you are still taking eye drops for that
23　　　glaucoma?

Page 34

1　A.　Right.
2　Q.　What about your last physical? Did you have
3　　　a physical prior to the accident on July
4　　　27th?
5　A.　No.
6　Q.　You didn't. Have you had one since then?
7　A.　A total physical?
8　Q.　A total physical, yes, ma'am.
9　A.　I guess I have.
10　Q.　You have?
11　A.　Yes.
12　Q.　Do you remember when?
13　A.　That was with...
14　Q.　That was with Dr. Woods?
15　A.　No. No.
16　　　This is the eye physician. That was
17　　　last week. The eye physician is
18　　　Dr. McDowell.
19　Q.　Dr. McDowell?
20　A.　Yes.
21　Q.　Do you have his address on there?
22　A.　Yes. His card. It's in the Peachtree
23　　　Pavilion, which is 5775 Peachtree Street

Page 35

1　　　downward road.
2　Q.　We will get that address. If that's not the
3　　　right one, we will find it.
4　　　Ms. Baldwin, let me ask you a couple of
5　　　other questions. With regards to your
6　　　driving history, how long have you held a
7　　　driver's license?
8　A.　Since early, early '40s.
9　Q.　And is that a Pennsylvania driver's license?
10　A.　It is now.
11　Q.　What was the first state?
12　A.　Georgia.
13　Q.　Georgia. Okay. And at some point you moved
14　　　to Pennsylvania and got a Pennsylvania
15　　　driver's license?
16　A.　Yes.
17　Q.　And do you still currently have a
18　　　Pennsylvania driver's license?
19　A.　Good until 2011.
20　　　　(Plaintiff's Exhibit Number Six
21　　　　marked for identification.)
22　Q.　2011. I'm going to show you what I'm going
23　　　to mark as Plaintiff's Exhibit Number Six.

Page 36

1　　　Do you have your driver's license with you
2　　　right now? You don't have to pull it out.
3　　　What I'm going to show you is this document
4　　　right here and tell me if that looks like a
5　　　copy of your Pennsylvania driver's license.
6　A.　Yes.
7　Q.　It does?
8　A.　It does. Yes. 2011. That's it.
9　Q.　So this is a copy of your actual driver's
10　　　license; is that correct?
11　A.　Right.
12　Q.　Now, Ms. Baldwin, do you have any type of
13　　　restrictions on your driver's license that
14　　　you know of?
15　A.　No.
16　Q.　I notice on the back of your driver's
17　　　license it says that you are to wear
18　　　corrective lenses. Those are the glasses
19　　　that you have on right now?
20　A.　Right.
21　Q.　And I assume you had those glasses on the
22　　　day of the accident, right?
23　A.　Yes.

Deposition of Willie Eva Baldwin

Page 37

1   Q.  Has your driver's license ever been
2        suspended?
3   A.  No.
4   Q.  No revocations of any sort?
5   A.  No.
6   Q.  Has your license ever lapsed for any reason?
7   A.  No.
8   Q.  Have you ever been involved in any accidents
9        whatsoever, automobile accidents?
10  A.  I don't think so.
11  Q.  You don't think so?
12  A.  (Witness shakes head.)
13  Q.  Think just a little bit for me.  Let's say
14       within the past ten years have you ever hit
15       someone with your vehicle, caused an
16       accident?
17  A.  No.
18  Q.  Has anyone ever hit you and caused you any
19       injuries in an accident or just caused an
20       accident in general within the past ten
21       years?  Has anyone ever...
22  A.  Anyone ever hit me?
23  Q.  Yes.

Page 38

1   A.  Yes.
2   Q.  How long ago has that been?
3   A.  That was about a year ago.
4   Q.  Someone hit you about a year ago?
5   A.  Yes.
6   Q.  Where was that at?
7   A.  In Atlanta.
8   Q.  In Atlanta.  Were you driving your vehicle?
9   A.  Yes, mine.
10  Q.  Is that the New Yorker that you were...
11  A.  Fifth Avenue.
12  Q.  Fifth Avenue?
13  A.  Yes, New Yorker.
14  Q.  Was there a police report done on that?
15  A.  Was there...
16  Q.  A police report done on that?
17  A.  Yes.
18  Q.  Now, whose fault was it in that accident?
19       MR. HENDERSON:  Object to the
20       form.
21  A.  He came from behind me and hit the left back
22       door and bent it in.
23  Q.  Who all was in that vehicle?

Page 39

1   A.  The same.
2   Q.  The same ladies?
3   A.  Yes.
4   Q.  Was anybody injured?
5   A.  Injured?
6   Q.  Yes, hurt.
7   A.  No.
8   Q.  You said that was about a year ago.  Was
9        that before the July 27th accident?
10  A.  It probably was two years ago.
11  Q.  So it was about two years ago when you had
12       come from Pennsylvania to Atlanta?
13  A.  I was coming from Georgia, Cuthbert going to
14       Philadelphia.
15  Q.  You were coming from Cuthbert to
16       Philadelphia.  And do you remember where
17       that accident took place, what city that
18       accident took place?
19  A.  Atlanta.
20  Q.  It did happen in Atlanta?
21  A.  Yes.
22  Q.  Did your car have any damage to it?
23  A.  Yes.  The back left door was bent in.

Page 40

1   Q.  Did you get it repaired?  Did you get your
2        vehicle repaired after that accident?
3   A.  Yes.
4   Q.  Who paid for those repairs?  Did you file an
5        insurance claim on that?
6   A.  Well, I had to catch up with the person that
7        was driving this truck that hit the back.
8   Q.  Did he try to leave the scene?
9   A.  He didn't try.  He left.  But since I was --
10       I followed him, he eventually stopped.
11  Q.  Now, when he stopped, did you-all call the
12       police?
13  A.  Yes.
14  Q.  And did they make a report of that accident?
15  A.  I don't know.  They said we could settle it
16       ourselves.
17  Q.  Now, did you ever file a claim with your
18       insurance company to have your vehicle fixed
19       regarding that accident?
20  A.  No.
21  Q.  You didn't?
22  A.  No.
23  Q.  Was your vehicle ever fixed after that

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 41

1        accident?
2    A.  You know, I think so.  I'm not really sure.
3    Q.  And if you think so, would you have paid for
4        that yourself?
5    A.  Yes, I paid for it.
6    Q.  Who was your insurance company?  Is it
7        Allstate?
8    A.  Allstate.
9    Q.  So you don't know whether or not you
10       actually contacted Allstate and let them
11       know about it?
12   A.  No.
13   Q.  Is it possible that you did, though?
14   A.  No, I didn't.
15   Q.  You didn't.  Okay.
16       Do you remember what part of Atlanta --
17       Atlanta is huge.  There is a lot of suburbs.
18       Do you remember what part of Atlanta that
19       was in?
20   A.  It was the part -- you know, I can
21       describe -- that seemingly you can when you
22       come under this thing up there -- the way I
23       come through Atlanta, I would have to go

Page 42

1        through and keep to my left.
2    Q.  Okay.
3    A.  So I did and kept to my left.  But I was on
4        the right lane and went under this whatever.
5        And that driver seemingly was going to go
6        the same way, but it seemed that he took for
7        granted that I was going to go to that part
8        that was beyond and go on that route.
9    Q.  Do you remember what highway or interstate
10       it was?  Was it I-75?
11   A.  85.  Anyway, it had to be 85 or 75.
12   Q.  So was it through downtown Atlanta --
13   A.  Yes.
14   Q.  -- when downtown splits off 75 and 85 splits
15       off?  Was it through that area?
16   A.  It possibly was.
17   Q.  Do you remember a lot of tall buildings and
18       things of the like in that area,
19       skyscrapers?
20   A.  Yes.
21   Q.  Now, you say that accident may have been two
22       years ago?
23   A.  Yes, it possibly was two years ago.

Page 43

1    Q.  What time of year would that have been?
2        Would that have been around the same time?
3    A.  Yes, in July.
4    Q.  In July.  Have you been in any other
5        accidents?
6    A.  No.
7    Q.  Whether or not you were at fault or someone
8        else was at fault, do you remember any other
9        accidents that you may have been in?
10   A.  No.
11   Q.  Now, I believe you were in the room when
12       your nephew testified that you and your
13       sisters make this trip to Georgia -- from
14       Pennsylvania to Cuthbert every year?
15   A.  Right.
16   Q.  And how long have you been doing that?
17   A.  Ever since probably I'll say the middle '40s
18       maybe.
19   Q.  And is every year the same time?
20   A.  About the same time.
21   Q.  Now, you have another sister Ella Prather;
22       is that correct?
23   A.  Yes.

Page 44

1    Q.  And she lives in Detroit; is that correct?
2    A.  Right.
3    Q.  How does she accompany you-all on that trip?
4    A.  She comes by a bus from Detroit to
5        Philadelphia.
6    Q.  And does she do that every time?
7    A.  Yes.
8    Q.  And then once she arrives in Philadelphia,
9        then you-all travel from Philadelphia to the
10       south; is that correct?
11   A.  Right.
12   Q.  And you-all have always done that by
13       automobile; is that correct?
14   A.  Right.
15   Q.  And the vehicle that you-all traveled in has
16       always been your vehicle?
17   A.  Right.
18   Q.  Have you ever rented a vehicle to make that
19       trip?
20   A.  No.
21   Q.  You always drove your car?
22   A.  Right.
23   Q.  Now, how long a drive is that from

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 45

1    Philadelphia to, let's say, Atlanta?
2    A.  Philadelphia to....
3    Q.  To Atlanta.  Do you remember?
4    A.  Thirteen hundred miles, I think.  I always
5        got AAA to layout the route.
6    Q.  AAA would always map everything out for you?
7    A.  Right.
8            (Plaintiff's Exhibit Number Seven
9            marked for identification.)
10   Q.  And I'm going to show you what I'm going to
11       mark as Plaintiff's Exhibit Number Seven,
12       what appears to be a copy of a AAA document.
13       It's actually two pages.  Let me staple it
14       together for you.
15           Why don't you take a look at that
16       document for me, Ms. Baldwin, and tell me if
17       you recognize that document.  Does that
18       document look familiar to you?
19   A.  Not yet.
20   Q.  Let me ask you this question.  Is your name
21       on that document, Ms. Baldwin?  Do you see
22       your name on there anywhere?
23   A.  Yes.

Page 46

1    Q.  At the top of that document there is an
2        address, 394 West Lancaster in Haverford,
3        Pennsylvania.  Is that the agent that you
4        used to make your plans for this trip?
5    A.  I guess it is.
6    Q.  When you make those plans, do you go to a
7        physical location and sit down with a AAA
8        agent and they mapped everything out for
9        you?
10   A.  Yes.
11   Q.  Now, there is two other names on that
12       document as well.  Would those names be Ella
13       Prather and Irena Johnson?
14   A.  Right.
15   Q.  Now, who made the plans through AAA?
16   A.  I did.
17   Q.  You made the plans?
18   A.  Yes.
19   Q.  When you made those plans, did you make
20       those plans for your sister Ella and your
21       sister Irena?
22   A.  I just made the plans for the car to go.
23   Q.  Say again.  I didn't understand.

Page 47

1    A.  I just made the plan for the car to go, not
2        who was going to be.  I don't know.
3    Q.  Okay.  That's all right.  So you just made
4        the plans -- Since all of you-all were
5        traveling together, you just made the plans
6        for everybody?
7    A.  Yes.
8    Q.  It's indicated on that document that you-all
9        would be leaving on July 26, that was a
10       Thursday, flying to Atlanta?  Do you see
11       that date on there, July 26?
12   A.  Oh, yes.
13   Q.  Is that the day you-all were scheduled to
14       leave Pennsylvania --
15   A.  Yes.
16   Q.  -- to fly to Atlanta?
17   A.  Yes.
18   Q.  And is it indicated on there anywhere,
19       Ms. Baldwin, that you-all were going to rent
20       a vehicle from Hertz once you got to
21       Atlanta?  Do you see that on there?
22   A.  Yes, I see.
23   Q.  Now, when you made these reservations at

Page 48

1        AAA, did you have to pay for it right then?
2        Did you have to pay for your airline tickets
3        and reserve the rental car at that time?
4    A.  Did I have to pay for the tickets?  It seems
5        that we just went in and paid for the
6        tickets.  And...
7    Q.  When you say -- I don't mean to cut you off.
8        When you say we just went in, did
9        Ms. Johnson go in with you?
10   A.  Yes.
11   Q.  And did she, too, make this same reservation
12       at the same time?
13   A.  I just made the reservation for the car to
14       go.
15   Q.  But when you-all went in to plan this trip,
16       Ms. Johnson physically went in to AAA with
17       you; is that correct?  She went to the
18       location with you?
19   A.  Oh, yes.
20   Q.  Did she, too, tell the agent that you-all
21       spoke with that she, too, wanted to go to
22       Atlanta, Georgia by way of airplane?  Did
23       she say she wanted to make the same trip

**Page 49**

1    that you wanted to make?
2 A.  No.  It just started with the three of us.
3    And they just went with, you know, making it
4    for the three of us.
5 Q.  So this wasn't a trip that you were making
6    by yourself --
7 A.  Uh-uh (negative response).
8 Q.  -- and then you just asked them to tag along
9    with you?  You-all went in to make this same
10   trip together, correct?
11 A.  I'm not sure.
12 Q.  Do you remember how the trip was paid for?
13   Did everybody pay for their own trip?
14 A.  No.
15 Q.  Who paid for it?
16 A.  You mean by the...
17 Q.  To buy the plane tickets.  Who paid for the
18   airline tickets?
19 A.  I think I did.  But Irena paid -- gave me
20   the money, hers.  But I paid for Eloise and
21   mine.  But I paid for all of them as far as
22   they are concerned.
23 Q.  Are you saying you paid for them on your

**Page 50**

1    credit card, and then they gave you the
2    money back?
3 A.  Who?
4 Q.  Irena.
5 A.  No.  Yeah, she gave it to me before.
6 Q.  Okay.  Before you-all went to AAA to make
7    this reservation, Irena had already given
8    you her money?
9 A.  To make it with AAA -- I'm not sure.
10 Q.  Let me try to see if I can ask the question
11   a little clearer.  Did Irena pay for her own
12   trip?
13 A.  Yes.  By plane, yes.
14 Q.  She paid for her own airline ticket,
15   correct?
16 A.  Uh-huh (positive response).
17 Q.  Did Ella pay for her own airline?
18 A.  No.  I usually paid for hers.
19 Q.  Was there a reason why you usually paid for
20   Ella and not for Irena?
21 A.  Because she had never worked.  She always
22   stayed at home.
23 Q.  So Irena because she had her own income and

**Page 51**

1    her own checking account and handled her own
2    affairs would pay for her own trip; is that
3    correct?
4 A.  Yes.
5      MR. HENDERSON:  Let's make sure we
6    are talking about the airfare.
7      You said trip.
8 Q.  The airfare; is that correct?
9 A.  Yes.
10 Q.  Let me ask you this.  What was the purpose
11   of the trip?
12 A.  Just a visit to see the other part of the
13   family.
14 Q.  Was that something that Irena wanted to do
15   as well as Ella and as well as you?
16 A.  Sure.
17 Q.  Did you ever tell Irena and Ella that I'm
18   going to Cuthbert, Georgia, will y'all just
19   ride with me?  Or did everybody make the
20   decision that they are all going to
21   Cuthbert, Georgia?
22 A.  I think we just made the decision that the
23   other part of the family is there, and so we

**Page 52**

1    are all going.
2 Q.  So would it be safe to say that Irena making
3    the trip to Cuthbert benefitted her and also
4    benefitted you?  I mean, you-all were just
5    traveling together?
6 A.  Yeah.
7 Q.  When you got to -- when you got on the
8    plane -- Let's talk about the trip, the day
9    you actually took the trip to Atlanta.  That
10   would be July 26, 2007.  When you got on the
11   plane to Atlanta, was your plane delayed for
12   any reason?
13 A.  Yes.
14 Q.  Can you tell me why?
15 A.  The president was there doing his thing.
16 Q.  What president are you referring to?  George
17   Bush?
18 A.  Yes.
19 Q.  The United States president?
20 A.  Right.
21 Q.  When you say doing his thing, had his plane
22   come into the same airport?
23 A.  Yes, he was there.

Page 53

1 Q. Did you see him?
2 A. No, I didn't see him. We sat on the plane
3 and waited until his business was over.
4 Q. And how long did President Bush hold y'all
5 up? Do you know?
6 A. It was quite a little while. About an hour,
7 I guess.
8 Q. So y'all had to sit on the plane for about
9 an hour and wait on President Bush?
10 A. Right.
11 Q. So that would explain why your plane was
12 delayed coming into Atlanta; is that
13 correct?
14 A. Yes.
15 Q. Let's talk about when you got to Atlanta.
16 Did you rent a vehicle? Did you go to Hertz
17 rental car and rent a vehicle?
18 A. I guess I did.
19 (Plaintiff's Exhibit Number Eight
20 marked for identification.)
21 Q. Before we go there, I'm going to mark this
22 as Plaintiff's Exhibit Number Eight. I'm
23 going to show you this document. You may

Page 54

1 not have seen it before. Do you recognize
2 that document there, Ms. Baldwin?
3 A. Uh-huh (positive response).
4 Q. You do recognize that?
5 A. Uh-huh (positive response).
6 Q. Whose handwriting is that?
7 A. Mine.
8 Q. That is your handwriting?
9 A. Yes.
10 Q. So you had the itinerary mapped out for this
11 trip; is that correct?
12 A. Right.
13 Q. And that itinerary included Ms. Prather,
14 Ms. Johnson, and Ms. Baldwin, that's you; is
15 that correct?
16 A. Yes.
17 Q. And according to this itinerary, you-all had
18 planned to once you get to Atlanta was at
19 some point leave and go to Cuthbert, Georgia
20 and remain there until about August 4th.
21 Does that sound about right?
22 A. That sounds about right, yes.
23 (Plaintiff's Exhibit Number Nine

Page 55

1 marked for identification.)
2 Q. I'm going to show you, Ms. Baldwin, what
3 I've marked as Plaintiff's Exhibit Number
4 Nine. I want you to take a look at those
5 documents and tell me if you can identify
6 those documents? Have you ever seen that
7 before?
8 And you can take a look at the second
9 page and see if your signature is on there
10 as well. Have you ever seen that document
11 before? Do you see a name on it,
12 Ms. Baldwin?
13 A. Yes.
14 Q. Is that your signature at the bottom of that
15 page, the second page, Plaintiff's Exhibit
16 Number Nine?
17 A. Yes.
18 Q. Is there the name of a rental car company on
19 that document?
20 A. Yes, Hertz.
21 Q. Hertz rental car?
22 A. Yes.
23 Q. Do those look like a copy of the documents

Page 56

1 that you got when you paid for the rental
2 car?
3 A. I don't know.
4 Q. Do you remember signing anything when you
5 got the rental car?
6 A. Yeah.
7 Q. Do you remember paying for the rental car?
8 A. Let's see. Do they say?
9 Q. Does it say on there how much you paid for
10 that rental car, Ms. Baldwin?
11 A. Yes.
12 Q. How much does it say?
13 A. Total estimate charge eight hundred ten
14 dollars twenty-seven cents.
15 Q. I want you to turn to the very first page of
16 that document, and I want you to take a look
17 at it. There is an area on the document
18 that says optional services. Do you see
19 that on there?
20 A. Yes. That would have been eight hundred ten
21 twenty-seven.
22 Q. Right where it says optional services in
23 that little block, do you see those three

14 (Pages 53 to 56)

Deposition of Willie Eva Baldwin                                        February 27th and 28th, 2008

Page 57

1      lines that says LDW, LIS and PPO?
2   A.  Yes.
3   Q.  Do you remember taking out insurance for
4      this rental car, Ms. Baldwin?
5   A.  Yes.
6   Q.  Did you ask for that insurance to cover the
7      vehicle and cover any losses in the event
8      something happened?
9   A.  Yes.
10  Q.  They told you how much the insurance cost
11     and you agreed to pay that amount for the
12     insurance?
13  A.  Yes.
14  Q.  Where it says LIS accepted, can you tell me
15     how much insurance you paid for under LIS?
16     The little line next to it, what's that
17     amount right next to it?
18  A.  One hundred and sixteen fifty-five.
19  Q.  Now, did you make this payment and accept
20     this insurance at the Atlanta International
21     Airport?
22  A.  Yes, I had accepted insurance there.
23  Q.  Was that in the State of Georgia; Atlanta,

Page 58

1      Georgia?
2   A.  I don't know.
3   Q.  Did you do that in Atlanta, Georgia?
4   A.  I guess so.
5   Q.  Was it in the Atlanta airport?
6   A.  I'm not sure.
7   Q.  Where did you rent the vehicle from?
8   A.  Atlanta, I guess.
9   Q.  And, again, on the second page, that is your
10     signature; is that correct?
11  A.  The second page, yes.
12  Q.  Now, let me ask you...
13  A.  Wait a minute.  The second page.  Yes,
14     that's my signature.
15  Q.  Who paid for rental car, Ms. Baldwin?
16  A.  I did.
17  Q.  Now, you paid for it on your credit card.
18     Did you have to use a credit card or debit
19     card to make that payment?
20  A.  I don't have a debit card.
21  Q.  What about a credit card?
22  A.  Possibly with a credit card.
23  Q.  Did you use that to rent the vehicle, or did

Page 59

1      you use cash?
2   A.  No.  I didn't use cash.
3   Q.  So you used some form of plastic; is that
4      correct?
5   A.  Yes.
6   Q.  Now, did anyone else help you pay for that
7      rental car?
8   A.  No.
9   Q.  You paid for it by yourself?
10  A.  Yes.
11  Q.  Did anybody reimburse you?  Did Ms. Johnson
12     give you some of the money to help you take
13     care of eight hundred and ten dollars?
14  A.  I'm quite sure she did.
15  Q.  But Ms. Prather, she wouldn't have given you
16     any money; is that correct?
17  A.  No.
18  Q.  Now, you-all were going to Cuthbert, Georgia
19     together as a family, correct?
20  A.  Right.
21  Q.  Three sisters, correct?
22  A.  Right.
23  Q.  Why didn't you-all rent separate cars?

Page 60

1   A.  We would have needed three drivers.
2   Q.  I didn't hear you.  What did you say?
3   A.  If we had rented three cars, we would have
4      needed three drivers.
5   Q.  Okay.  So are you saying it was beneficial
6      for you-all to just rent one car?
7   A.  Yes, rent one car and three of us get in it.
8   Q.  So it kind of helped everybody out in the
9      situation, right?
10  A.  Right.
11  Q.  Ms. Johnson, it helped her out a little bit;
12     is that correct?
13  A.  Uh-huh (positive response).
14  Q.  It helped you out a little bit as well,
15     correct?
16  A.  Right.
17  Q.  And it also helped Ms. Prather out because
18     y'all didn't have to rent separate cars; is
19     that right?
20  A.  Right.
21         (Plaintiff's Exhibit Number Ten
22          marked for identification.)
23  Q.  Now, once you rented the vehicle from

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 61

1  Hertz -- I'm done with that document. Thank
2  you. Let me show you another document
3  before I move forward. Here is another
4  document that I believe you may have
5  received. I'm going to ask you if you
6  remember receiving this document. This is a
7  copy of it. It may have come in a
8  folder-like form. Would you take a look at
9  that and see if you remember seeing a
10  document similar to that that was in some
11  folder-like form?
12      You don't have to read all the way
13  through it, but just kind of flip through
14  the pages and see if you ever remember
15  seeing anything like that.
16      Ms. Baldwin, I'm going to represent to
17  you that that document is a copy of this
18  document. Do you remember receiving any
19  type of document like this from Hertz that
20  was in this little folder exactly like this?
21  Just take a look at it. And they may have
22  stuck these little tickets here inside that
23  folder. Do you remember receiving those

Page 62

1  tickets and then that little jacket as well?
2  A. No.
3  Q. You don't remember receiving that? Okay.
4      That's quite all right.
5  A. This must be charged to VISA.
6  Q. That's correct. Okay.
7      You already talked about the little
8  cards. But I just wanted to know if you
9  remembered receiving a folder equivalent to
10  the one that I've just given to you.
11  A. No, I don't remember.
12  Q. Okay. That's quite all right. Thank you.
13      So looking at that document you can't
14  say you remember seeing any document like
15  that?
16  A. (Witness shakes head.)
17  Q. Ms. Baldwin, we can move on. You can stick
18  that down here.
19  A. Okay.
20  Q. Do you remember what kind of vehicle you
21  rented, what kind of car it was?
22  A. (Witness shakes head.)
23  Q. You don't remember the type? Do you

Page 63

1  remember what color it was?
2  A. Wine, I guess you could say.
3  Q. You say it was wine colored?
4  A. Yes. Sort of reddish.
5  Q. In the reddish...
6  A. Yeah.
7  Q. I'm going to show you this document just to
8      kind of -- maybe we can refresh your memory
9      a little bit. Does that photograph -- Does
10      that photograph look like the type of car
11      that you rented? Is that the vehicle that
12      you rented that day, the green car there?
13  A. (Witness indicates.)
14  Q. Yes.
15  A. I guess it does.
16  Q. Do you remember renting a vehicle like that?
17  A. Oh, that's a...
18  Q. Is that a reddish or a greenish car?
19  A. It was reddish.
20  Q. The one that you rented?
21  A. Right.
22  Q. Who owned that vehicle? Do you know who
23      owned the vehicle that you rented? Was it

Page 64

1  owned by Hertz?
2  A. I would think so.
3  Q. Do you remember the license plate that was
4      on it?
5  A. No.
6  Q. When you rented the vehicle, the vehicle
7      that you remember renting, did you check it
8      to make sure everything worked fine on it,
9      the headlights --
10  A. Uh-huh (positive response).
11  Q. -- the turn signals, the brake lights --
12  A. Uh-huh (positive response).
13  Q. -- the brakes? Did you check and make sure
14      the car was in good repair?
15  A. Yes.
16  Q. Tell me how you did that.
17  A. Until I got to where I was going to get off,
18      I could check it -- you know, until it was
19      time that I didn't want to go any further in
20      Alabama, then I could check it on the
21      highway if I needed those things. But...
22  Q. But before you -- I'm sorry. Go ahead.
23  A. But once I decided, turn around, don't go

16 (Pages 61 to 64)

Page 65

1    any further in Alabama, then this little
2    chute that -- you know, that you could turn
3    around in, it was just -- just one --
4    couldn't but one car go through that -- that
5    door up there at the end of -- that you
6    would make your left to turn around.
7    Q.  We are going to talk about the accident in
8        just a moment.  Okay?  What I'm referring to
9        is, when you rented the vehicle when you
10       were in Atlanta at the airport, before you
11       had gotten into the car, did you check it
12       and make sure everything worked properly?
13   A.  Yes.
14   Q.  And did everything work properly on it?
15   A.  Yes.
16   Q.  The lights and turn signals and brake lights
17       and everything was working properly?
18   A.  (Witness nods head.)
19   Q.  As you were driving the vehicle, was it
20       driving just fine?
21   A.  Yes.
22   Q.  You didn't have any mechanical problems or
23       no other types of problems with the vehicle?

Page 66

1    A.  No.
2    Q.  Once you left the Atlanta airport, where did
3        you go when you left Atlanta?  When you,
4        Irena, and Ella got in the vehicle to leave
5        Atlanta, where did y'all go?
6    A.  It seemed that it was -- it was sort of to
7        the right, and the car was over to a little
8        section to the right.
9    Q.  I'm not talking about the day of the
10       accident.  I'm talking about the first day
11       you rented the car on July 26 when your
12       plane got to Atlanta and you went and rented
13       the car, as soon as you left the airport --
14       before you got to Montgomery, as soon as you
15       left the airport, where did y'all go, you
16       and Ella and Irena?  Do you remember?
17   A.  (Witness shakes head.)  Just to try to pick
18       up the luggage.
19   Q.  I'm talking about once you got the luggage
20       and actually got into the vehicle.
21   A.  Well, we hadn't gotten the luggage until
22       yet.
23   Q.  Did you have to get the vehicle to go get

Page 67

1    your luggage?
2    A.  No.  It was this, you know, table that it
3        would be on.  But all was on except one
4        piece, which we haven't found yet.
5    Q.  Once you did get most of the luggage...
6    A.  But...
7    Q.  I'm sorry.  Go ahead.
8    A.  But that was found.  It was really crushed
9        up.  But it seemed that maybe everything was
10       in there.  Anyway, they finished tearing
11       that up.
12   Q.  And once you got the luggage and loaded it
13       into the vehicle, the rental car, the Hertz
14       rental car, where did you-all go when you
15       left the airport?
16   A.  When we got the luggage?
17   Q.  Yes, after you got the luggage.  You don't
18       remember?
19       When you left Atlanta, did y'all get
20       lost?
21   A.  I guess we were lost because we were going
22       on to Alabama.
23   Q.  Before you had gotten to Alabama, did you

Page 68

1    ever go to Florida?
2    A.  Yes, we went to Florida.
3    Q.  What part of Florida did you go to?
4    A.  I don't know where.
5    Q.  Do you know how you got to Florida?
6    A.  Yeah.
7    Q.  How?
8    A.  Drove there.  And once we were in Florida,
9        we knew we didn't want to be in Florida.
10   Q.  Were you driving at the time?
11   A.  Yes.
12   Q.  Did you drive the entire time?
13   A.  Yes.
14   Q.  Now, do you remember what part of Florida
15       you had gotten to?
16   A.  No.
17   Q.  Do you remember what highway or interstate
18       you were on?
19   A.  I thought it was 85, I thought.
20   Q.  So when you got to Florida, did you-all turn
21       around and come back?
22   A.  Right.
23   Q.  That same day?

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 69

1   A.  That same day.
2   Q.  How long will y'all been driving?  Do you
3       know?
4   A.  Since that morning, I guess.
5   Q.  Since that morning.  Okay.  So your plane --
6       Strike that.
7           After you left Florida when you turned
8       around in Florida, did you end back up in
9       Georgia?
10  A.  Right.
11  Q.  Do you remember what part of Georgia you
12      ended back up in?
13  A.  No.
14  Q.  Does the name Newnan sound familiar?
15      Newnan, Georgia, does it sound familiar?
16  A.  Not connecting this.
17  Q.  Did you-all stay the night in a hotel
18      somewhere?
19  A.  It didn't seem that we did.
20  Q.  So after you got back from Florida, y'all
21      didn't spend the night in a hotel?  Do you
22      remember?
23  A.  Uh-uh (negative response).

Page 70

1   Q.  Do you remember ever staying in a hotel
2       during this trip?  When you came down last
3       year from Pennsylvania to Atlanta, do you
4       remember staying in a hotel at any time
5       during that trip?
6   A.  No, I don't think so.
7   Q.  So when did you-all end up in Alabama?
8   A.  On the 27th.
9   Q.  On the 27th.  So you came in -- As your
10      airline tickets indicate, you flew in on the
11      26th, correct?  The morning of July 26th,
12      correct, you flew into Atlanta?  Does that
13      sound about right?
14  A.  Yes.
15  Q.  Then you rented a vehicle from Hertz at the
16      airport, correct?
17  A.  Atlanta airport.
18  Q.  Atlanta airport, correct?
19  A.  Uh-huh (positive response).
20  Q.  You left the Atlanta airport and you
21      traveled and you got lost in Florida.  Does
22      that sound about right?
23  A.  Uh-huh (positive response).

Page 71

1   Q.  And then you ended up back in Georgia?
2   A.  Back.
3   Q.  And then back in Alabama.  Did y'all ever
4       stop and take a rest anywhere?
5   A.  Uh-uh (negative response).  I don't think
6       so.
7   Q.  You drove the entire time from the morning
8       of July 26 until the evening hours of July
9       27th?  Y'all never stopped at all?
10  A.  I don't remember stopping.  But...
11  Q.  Is it possible that you could have?
12  A.  It's possible that we could have.
13  Q.  So it's possible that y'all may have spent
14      the night in Newnan, Georgia; is that
15      correct?  Y'all may have done that?
16          If I represent to you that your sister
17      Ella said that you-all spent the night in
18      Newnan, Georgia, would she be correct?
19  A.  I don't know.
20  Q.  So you don't remember anything about
21      spending the night anywhere, do you?
22  A.  (Witness shakes head.)
23  Q.  That's okay.  Let's talk about the accident

Page 72

1       that happened on July 27th.  Ms. Baldwin,
2       when I used the word hotel, sometimes I
3       assume that's motel, too.  Did y'all stay at
4       a motel?  Do you remember a motel or
5       anything like a Motel 6 or any type of
6       lodging facility that you stayed at?
7   A.  I'm not sure.
8   Q.  On July 27, 2007 at about seven o five do
9       you remember being involved in an automobile
10      accident?
11  A.  Yes.
12  Q.  Now, I want you to tell me in your own words
13      what happened.
14  A.  Well, to get off of 85 and turn around, you
15      had to go up this little path, and only one
16      car could go through.  And as I was going
17      up, a car came from behind and just
18      spattered the car.
19  Q.  Okay.  So as you were going up the little
20      ramp area, the area that you are referring
21      to, you were hit from behind?
22  A.  Right.
23  Q.  Do you know who it was that hit you from

18 (Pages 69 to 72)

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 73

1        behind?
2    A.   No, I didn't know them.
3    Q.   You didn't know at that time?
4    A.   No.
5    Q.   Did you later learn who it was that hit you
6         from behind?
7    A.   Just in reading who it was.
8    Q.   Do you remember what you read that let you
9         know who it was that hit you from behind?
10   A.   Some of your writings.
11   Q.   Were those things that you presented to your
12        attorney? I don't want you to tell me what
13        your attorney told you. Were those some of
14        the documents that I presented to your
15        attorney is what you looked at?
16   A.   I guess so.
17   Q.   Did you ever see the police report?
18   A.   No.
19             (Plaintiff's Exhibit Number 11
20              marked for identification.)
21   Q.   Let me show you what I've marked as
22        Plaintiff's Exhibit Number Eleven. I want
23        you to take a look at that document. I

Page 74

1         represent to you that this is the corrected
2         copy of the accident report. Have you ever
3         seen that accident report before?
4    A.   Not that I remember.
5    Q.   Did you ever talk to anyone regarding the
6         accident?
7    A.   No.
8    Q.   Do you remember talking to a Montgomery
9         police officer about the accident?
10   A.   It seemed that we might have eventually got
11        off there, and this is the lady that hit me
12        from behind.
13   Q.   Do you see her name on that report?
14   A.   Denita R. Colvin.
15   Q.   Do you remember what kind of vehicle
16        Ms. Colvin was driving when she hit you from
17        behind?
18   A.   It seemed that it was -- it was a dark
19        color.
20   Q.   When you say dark, was it black?
21   A.   It was black.
22   Q.   Do you remember what kind of vehicle it was?
23   A.   No. It was sort of an older vehicle because

Page 75

1         it just splattered up -- the Hertz vehicle
2         just splattered up like it was glass.
3    Q.   Ms. Baldwin, I want you to take a look at
4         that police report, that accident report.
5         And if you look at the area where it says
6         unit number one --
7    A.   Yes.
8    Q.   -- over to your left-hand side, I believe
9         your attorney can show you. Do you see your
10        name on that report?
11   A.   Yes.
12   Q.   And that unit number one would identify that
13        you were driving in vehicle number one
14        according to the police report. Does that
15        sound about right?
16   A.   Yes.
17   Q.   Now, below that you'll see where by
18        Ms. Colvin's name it will say unit number
19        two.
20   A.   Uh-huh (positive response).
21   Q.   Do you see anywhere on that report that
22        shows that Ms. Colvin was driving in unit
23        number two?

Page 76

1    A.   Yes.
2    Q.   Now, do you know whether or not there were
3         any witnesses to this accident?
4    A.   I wouldn't say it was no more than who was
5         in the car.
6    Q.   Now which car are you referring to?
7    A.   The one that hit.
8    Q.   Now, let me ask you this question. When you
9         were driving on 85 getting ready to turn
10        around, did you notice any other vehicles on
11        the interstate, any other cars that were
12        driving alongside you, ahead of you?
13   A.   They couldn't drive beside me because I was
14        going up this ramp to where one car could
15        only go through. And as I was going up that
16        ramp to go through that one door, a car
17        behind came and hit me.
18   Q.   When you say go through that door, what are
19        you referring to? What door are you
20        referring to?
21   A.   Where you could only go up the ramp, and the
22        door I'm talking about is a door for just
23        one car to go through.

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 77

1    Q.   Were there any other vehicles on the
2         interstate that you were driving on?
3    A.   I wasn't on the interstate. I was before.
4         Yeah, it was a lot of cars.
5    Q.   Do you know about how many cars may have
6         been on the road?
7    A.   No.
8    Q.   How fast were you driving? Do you remember?
9    A.   Probably thirty or forty miles an hour.
10   Q.   Thirty or forty miles an hour?
11   A.   Yeah, looking for some place to get off.
12   Q.   Do you know what the speed limit is on that
13        road?
14   A.   No.
15   Q.   Did you see any signs that indicate what the
16        speed -- the posted speed limit was?
17   A.   I'm quite sure I did, but I don't remember
18        what it would be.
19   Q.   Did you see any signs that would indicate
20        what the minimum speed that you would have
21        to drive?
22   A.   No. I'm probably sure I did, but I don't
23        remember.

Page 78

1    Q.   And you believe you were driving about
2         thirty or forty miles an hour?
3    A.   Yes.
4    Q.   Why would you have been going that slow?
5    A.   Looking for some place to get off.
6    Q.   You say you were looking for a place to get
7         off?
8    A.   Yes.
9    Q.   Now, when you were looking for this place to
10        get off, did you somehow stop so that you
11        can kind of make a turn? Did you stop in
12        the road?
13   A.   No. Probably a little slower to get on this
14        ramp that was going up to that door for
15        turning around.
16   Q.   Did you...
17   A.   I assume, you know, you go up and turn to
18        your left, that that was going to put you
19        somewhere to turn around.
20   Q.   So is it your testimony that you never, ever
21        stopped your vehicle on the road?
22   A.   I never stopped.
23   Q.   Now, I want you to look at page two of that

Page 79

1    accident report, Ms. Baldwin.
2    A.   Page two.
3    Q.   And towards the bottom of the page there is
4         a paragraph that says describe what
5         happened, refer to vehicles by number. Can
6         you read that for me, Ms. Baldwin?
7    A.   Witness advised that vehicle one was
8         traveling west on -- that's 1085 South in
9         the right lane when suddenly vehicle one
10        started backing up on 1085 in the lane of
11        traffic. Witness further advised that
12        vehicle two took evasive action, however was
13        unable to avoid the collision.
14            We weren't down on that highway then.
15        The driver of vehicle one advised that she
16        was traveling on 1085 south and vehicle two
17        collided with her vehicle in the rear.
18        Driver of vehicle one advised that she never
19        put her vehicle in reverse. Driver of
20        vehicle two advised that when she noticed
21        vehicle one, it was backing on the
22        interstate.
23            We weren't down on the interstate.

Page 80

1    Q.   Okay. Continue.
2    A.   Driver of vehicle two further advised she
3         attempted to avoid the collision by swerving
4         to the right.
5    Q.   Okay.
6    A.   But we weren't on the highway then. We were
7         on that ramp.
8    Q.   Now, you saw where it said witnesses advised
9         that you were backing up on interstate.
10        Would that be incorrect?
11   A.   That's incorrect. We went -- well, a long
12        time before that since it seemed that all I
13        saw was going further into Alabama. But
14        there was that ramp I saw, so I did back up
15        on, you know, the regular highway until I
16        could make the -- it would be a left-hand
17        turn to get on this ramp to go up and go
18        through that little door.
19   Q.   So at some point you did back up on the
20        highway to try to catch the ramp. Is that
21        what you are testifying to?
22   A.   Yes.
23   Q.   And that was because you -- Was that because

Page 81

1    you were too far in Alabama, and you didn't
2    want to go that far?
3    A.  Right.  Had been to Florida.  Didn't want to
4        get further into Alabama.
5    Q.  You were the only person that was driving;
6        is that correct?
7    A.  Right.  See, on the -- That's the way it
8        looked.  And the highway is down here.  But
9        when you go up this ramp there, only one car
10       can go through there at a time.
11   Q.  And let me see that exhibit.  We are going
12       to talk about that for a second.  Just for
13       the record, I believe, Ms. Baldwin, you are
14       referring to page number four on Plaintiff's
15       Exhibit Number Eleven.  Is this the diagram
16       that you were just talking about?
17   A.  Yes.
18   Q.  Now, hang on one second.  Let me allow you
19       to use this ink pen here.  Ms. Baldwin, I'm
20       going to refer to page number four --
21       actually page number five.  It is the same
22       drawing, but it's a little bit bigger and it
23       might help you identify it a little better.

Page 82

1    All right?
2    A.  Okay.
3    Q.  What I want you to do, Ms. Baldwin, I think
4        you testified that you were traveling in the
5        one lane right there, correct?  I want you
6        to take one of these green stars, if you
7        can, and just put it in the area that you
8        were just so we can show that that was your
9        vehicle in that approximate area.  Okay?
10       MR. HENDERSON:  At what time?
11   Q.  At approximately seven o two, seven o three,
12       right before the accident where you believe
13       your vehicle was.
14       MR. HENDERSON:  When you say right
15           before the accident, there is a
16           lot of time there.
17   Q.  Immediately preceding the accident at seven
18       o two or seven or three -- during the time
19       frame when you tried to take the one little
20       road.
21       MR. WALLER:  Can I interject
22           something?
23       Ms. Baldwin, do you need

Page 83

1    orientation on that map from
2    Mr. Henderson, your attorney?
3    Q.  Take a look at that.  Do you understand what
4        all of that means on this particular map?
5    A.  Uh-huh (positive response).  I hadn't been
6        on this little space long to go up and go
7        through that exit and turn to my left.
8    Q.  Now, where you placed the X an on this
9        particular diagram on Plaintiff's Exhibit
10       Number Eleven...
11       MR. HENDERSON:  I'm sorry.  That's
12           a star.
13   Q.  Excuse me.  The star.  Is that where you
14       contend your vehicle was?
15   A.  I would say that I hadn't been going up very
16       long.
17   Q.  Where did you back up at and try to...
18   A.  Down in the highway.
19   Q.  You were in the highway when you backed up?
20   A.  Yeah.
21   Q.  And did you actually put your vehicle in
22       reverse and start backing up to try to catch
23       that exit?

Page 84

1    A.  Yes.  I stood there until it was safe for me
2        to back up, you know, and go to my right to
3        get to that.
4    Q.  And that was in the highway that you did
5        that, that you backed up?
6    A.  Right.
7    Q.  Do you remember -- Let me ask you this.
8        Once Ms. Colvin's car hit you from behind,
9        do you remember the car going up in the air?
10   A.  It didn't seem to go up in the air.  It just
11       seemed to sort of turn around as if it was
12       going to go back to the left.
13   Q.  And were you injured in the accident?
14   A.  Injured?
15   Q.  Yes, ma'am.  Were you hurt?
16   A.  (Witness shakes head.)
17   Q.  You weren't hurt?
18   A.  (Witness shakes head.)
19   Q.  How did you get out of the vehicle?
20   A.  I just got out.
21   Q.  You just got out?
22   A.  Yes.
23   Q.  When you got out, what's the first thing you

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 85

1   did?
2   A.  Well, I looked back at my sister, the one
3      that was killed. And she was, you know,
4      laying over -- from the right side she was
5      laying over to the left side. And when the
6      car hit, she said, oh. And it was a lot of
7      blood coming from -- so much so that the
8      jacket that she had on the seat beside her
9      was so full of blood and the seat of the car
10     that we just left that as it was. And the
11     ambulance picked her up.
12   Q.  Did you see anybody else come in and try to
13     help out with the accident?
14   A.  No.
15   Q.  You don't remember any guys coming in and
16     trying to get you out of the car?
17   A.  No.
18   Q.  Did anybody try to get Ms. Prather out of
19     the car?
20   A.  Only the people of the ambulance that was
21     going to take us -- you know, that helped
22     her out.
23   Q.  Prior to them arriving, did anyone...

Page 86

1   A.  Nobody, no. Nobody. We were just the two
2      cars up there.
3   Q.  There were no other cars around?
4   A.  No.
5   Q.  Did anybody try to -- Did you try to help
6      your sister Ms. Johnson get up?
7   A.  No, because the people in the ambulance was
8      helping her.
9   Q.  Okay. That's fair enough. After you had
10     gotten out and you-all waited for the
11     paramedics to come, did you say anything to
12     Ms. Prather about what happened?
13   A.  No, I don't think so.
14   Q.  Did you go to the hospital?
15   A.  They took us to the hospital.
16   Q.  The ambulance took you to the hospital as
17     well?
18   A.  Right.
19   Q.  Was your sister injured -- Ms. Prather, was
20     she hurt?
21   A.  It doesn't seem so. But she doesn't
22     remember it. I guess it just, you know,
23     dulled the brains.

Page 87

1   Q.  Let me ask you this question. In your
2      interrogatories I asked you -- the questions
3      I had asked you, and you were to answer and
4      give them back to us. I had asked you is it
5      customary for you to stop or back up on the
6      roadway. And I believe your answer was very
7      seldom.
8   A.  Very seldom.
9   Q.  Have you ever done that before where you
10     just stopped in the middle of the highway
11     and backed up?
12   A.  I wasn't on the middle of...
13   Q.  Or in the highway?
14   A.  In the highway.
15   Q.  Have you ever done that before?
16   A.  Yes.
17   Q.  You have?
18   A.  Uh-huh (positive response). Pulled to the
19     side -- to, you know, the extreme right.
20   Q.  But when you stopped and backed up, were you
21     in the highway when you did that and then
22     you pulled to the side?
23   A.  Right.

Page 88

1   Q.  Let me ask you this question. Was anybody
2      injured or was there an accident behind that
3      conduct before when you did that? Did
4      anybody ever get hurt?
5   A.  No.
6   Q.  Do you think it's safe to stop in the
7      highway and back up?
8   A.  Yes.
9   Q.  You think it is safe to do that?
10   A.  If you don't see anyplace of pulling off to
11     your right.
12   Q.  Assuming that it's -- Let me ask you this
13     question. If there are other cars coming
14     behind you, would it be safe -- in your
15     opinion would it be safe, then, to stop in
16     the highway?
17   A.  Extremely at the right, but not in the
18     highway. You know, but that space that's
19     not part of the highway where if you broke
20     down you would stop anyway.
21   Q.  That's fine. But if you were in the highway
22     and you -- not in that space you are talking
23     about, but if you were in the highway?

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 89

1  A.  Oh, no.  Never back up there.
2  Q.  Is that dangerous?
3  A.  Sure.
4  Q.  What do you think would happen if you did
5     that?
6  A.  They would kill everybody in that front car.
7  Q.  When you backed up -- you say you were in
8     the highway when you backed up -- did you
9     think about whether or not someone....
10 A.  But I wasn't, you know, out in the traveling
11    lane.  I was beside -- that space that if
12    you had car trouble that you would pull over
13    there.
14 Q.  Is it possible that you may have thought
15    that you were in that space and you were in
16    the highway?
17 A.  No.
18 Q.  I think you testified earlier that you were
19    in the highway when you backed up.  Were you
20    in the highway when you backed up?
21 A.  Possibly.  But you are calling the
22    highway -- it's those lanes that tell you,
23    you know, that you are in one, two, three

Page 90

1     lane, that's the highway.  But not that lane
2     that you don't drive on, the one that's on
3     the right.
4  Q.  So would it be safe to say that if you were
5     in the highway, the lane that you do drive
6     on and you back up, that would be dangerous?
7  A.  Worse than dangerous.
8  Q.  And would it be safe to say if someone
9     backed up in that lane that you drive in
10    with oncoming traffic, that injury or death
11    might very well happen?
12 A.  It sure would.
13         MR. HENDERSON:  Object to the
14         form.
15 Q.  When the accident happened, did you get
16    out -- did you see any debris in the road?
17    From where the vehicles were tore up, did
18    you see anything in the road?
19 A.  No.  It was clear, that little ramp.
20 Q.  What I'm referring to, once the collision
21    happened, once the accident happened, did
22    you see any parts of either Ms. Colvin's car
23    or the Hyundai that you rented...

Page 91

1  A.  No.  It didn't seem that it bothered that
2     car that hit me.  It just splattered it.
3  Q.  It just splattered which one?
4  A.  The one that I was driving.  And it didn't
5     seem that they were hurt.  It seemed that
6     they just sat there.
7  Q.  Who did?
8  A.  The other car.  It did -- When it hit, it --
9     on the other little space there, it had
10    turned to come across that little ramp that
11    we were going up.
12 Q.  At some point, Ms. Baldwin, when you had
13    gone to the hospital and Ms. Prather had
14    gone to the hospital, at some point did you
15    go down to the Montgomery Police Station?
16 A.  It seemed that at some point we did, because
17    it seemed that they didn't -- couldn't keep
18    up with the license.  And it was some
19    walking around down there.
20 Q.  Do you remember giving a statement about
21    your version of the events that took place
22    on July 27, 2007?  Did you give a statement
23    to the police about what happened?

Page 92

1  A.  I would think I did.
2         (Plaintiff's Exhibit Number 12
3         marked for identification.)
4  Q.  Let me show you what I'm going to mark as
5     Plaintiff's Exhibit Number Twelve and ask
6     you if you remember receiving that document,
7     reading it and signing it.  And I'll
8     represent to you that that's a copy of the
9     document.  Is that your signature on there?
10 A.  Yes.
11 Q.  I want you to read for the record the
12    portion of that document that's highlighted
13    in yellow for me.  Tell me if you remember
14    that.
15 A.  I fully understand the foregoing statement
16    and do willingly agree to answer questions.
17    I understand and know what I'm doing.  No
18    promises or threats have been made to me by
19    anyone and no pressure of any kind has been
20    made against me by anyone.
21 Q.  Okay.  So you were asked to make a
22    statement, and you made it on your own free
23    will?

Page 93

1   A.   Yes.
2   Q.   Now, do you remember if they recorded that
3        statement; in other words, if they had a
4        little tape recorder device similar to what
5        we have here today when they recorded your
6        statement or not?
7   A.   You mean this is the police --
8   Q.   Yes.
9   A.   -- in Montgomery?
10  Q.   In Montgomery, yes, ma'am.
11  A.   No, I don't.
12            (Plaintiff's Exhibit Number 13
13            marked for identification.)
14  Q.   I'm going to show you what I've marked as
15       Plaintiff's Exhibit Thirteen. I want you to
16       take a look at that document. It's about
17       twelve pages long, and I represent to you
18       that it constitutes the statement that you
19       gave to Corporal Caffey following the
20       accident. I want you to take a few minutes
21       to look at it if you haven't already. Take
22       a look at that and see if that statement is
23       the statement that you gave on that date

Page 94

1   July 28th, 2007.
2            MR. COLLINS: For the record,
3        Ms. Baldwin is still under
4        oath. She is reviewing
5        Plaintiff's Exhibit Number
6        Thirteen. However, due to
7        scheduling we are going to
8        break for the evening,
9        reconvene tomorrow in
10       Montgomery beginning at about
11       four o'clock.
12            Anything else anybody needs
13       on the record?
14       MR. HENDERSON: I don't think so.
15       (Deposition adjourned.)
16       (Deposition reconvened on
17       Thursday, the 28th day of
18       February 2008 at approximately
19       5:05 p.m. CST)
20       EXAMINATION (cont.'d)
21  BY MR. COLLINS:
22  Q.   Ms. Baldwin, how are you doing?
23  A.   Struggling.

Page 95

1   Q.   Are you struggling? We are going to try to
2        make this as painless as possible. Okay?
3   A.   Thank you.
4   Q.   We are back on the record, and you remember
5        you are still under oath from yesterday.
6        Okay?
7   A.   Yes.
8   Q.   I'm going to finish asking you some
9        questions that I didn't get a chance to talk
10       to you about yesterday.
11            Do you remember I showed you
12       Plaintiff's Exhibit Number Thirteen. That
13       was a statement that you had given to the
14       Montgomery Police Department and we had
15       asked you to take a copy of it home and read
16       it. Did you get a chance to do that?
17  A.   No.
18  Q.   Do you remember your attorney giving you a
19       copy yesterday before we left the
20       deposition? Did you get a chance to look at
21       that document and review it last night?
22  A.   No.
23  Q.   Now, I represent to you that that document

Page 96

1        is the statement that you gave Corporal
2        Caffey, I believe, on July 28th, which is
3        the date after the accident. Do you
4        remember giving a statement to the police
5        about the accident? Do you remember talking
6        to the police about the accident?
7   A.   No.
8   Q.   Yesterday we had showed you a document and
9        you said you did remember.
10  A.   Yes, I did, because today seemed to -- it
11       was here, there, and everywhere.
12  Q.   Okay. Now, does that -- do you need a
13       couple of minutes to read that statement, or
14       are you comfortable testifying to what you
15       believe you said the day of the accident?
16       If you need some time to read it.
17  A.   Yes, sir, I do.
18  Q.   Okay. Just let us know when you are done.
19       Okay?
20  A.   Uh-huh (positive response).
21  Q.   Ms. Baldwin, do you remember yesterday I
22       showed you what has been marked as
23       Plaintiff's Exhibit Number Twelve. And it

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 97

1    was a document that contained your statement
2    indicating that you fully understand the
3    statement that you were giving and you were
4    giving that statement voluntarily. Do you
5    remember seeing this document yesterday?
6    A.  Yes.
7    Q.  Is that your signature on the bottom of
8        Plaintiff's Exhibit Number Twelve?
9    A.  Yes, to the right.
10   Q.  Okay.
11              MR. COLLINS:  And, for the record,
12              with agreement of the parties
13              we stipulate that the statement
14              constituted in Plaintiff's
15              Exhibit Number Thirteen is the
16              statement that Ms. Baldwin had
17              given on July 28th, 2007
18              regarding the accident that
19              makes the basis of this case.
20   Q.  Ms. Baldwin, I'm just going to ask you a
21       couple of questions based on your statement
22       and see if you can just help me out a little
23       bit. Okay?

Page 98

1              Now, I asked you yesterday,
2        Ms. Baldwin, if you remember spending the
3        night somewhere in Newnan, Georgia. And I
4        believe you told me no, you didn't remember
5        spending the night.
6    A.  I don't.
7    Q.  If you would, turn to page number eight.
8        And if you look at the bottom you'll see the
9        page designations at the bottom of your
10       document. But turn to the eighth page of
11       that document, and let me know when you get
12       there.
13   A.  Okay.
14   Q.  And I'll read to you, Ms. Baldwin, from the
15       statement about a quarter of the page down
16       it says, question: Okay. So y'all go back
17       to Atlanta and this is Thursday evening, and
18       then you get on 85 and you-all stop in
19       Newnan, Georgia to spend the night. Is that
20       where y'all spend the night? And your
21       answer is: I...
22             And then the question again is: Do you
23       remember spending the night? And your

Page 99

1    answer was:  Yes. Do you remember saying
2    that on July 28th, 2007?
3    A.  Spending the night?
4    Q.  Does that help you remember whether or not
5        you spent the night in Newnan, Georgia?
6    A.  Spending the night, was that at a motel or
7        the hospital?
8    Q.  At a motel -- a motel or hotel. And I
9        believe you said that you spent the night at
10       Holiday Inn, I think. Is that -- If you
11       look down, is that what you told....
12   A.  I don't know.
13   Q.  Do you remember telling Corporal Caffey that
14       you spent the night at the Holiday Inn?
15   A.  No, I don't remember it now.
16   Q.  Okay. Let's talk about when you got to
17       Alabama. I believe you testified yesterday
18       that you -- when you left Georgia, you came
19       straight on to Alabama and then you realized
20       that you were too far into Alabama and you
21       wanted to turn around.
22   A.  Right.
23   Q.  Do you remember going to Ramer, Alabama?

Page 100

1    A.  Ramer?
2    Q.  Yes.
3    A.  (Witness shakes head.)
4    Q.  You don't remember? Do you know where
5        Ramer, Alabama is?
6    A.  No.
7    Q.  Do you remember stopping and purchasing gas
8        in Ramer, Alabama?
9    A.  No.
10   Q.  Do you remember where you stopped and got
11       gas on your way from Georgia to Alabama?
12   A.  No.
13   Q.  You don't really remember?
14   A.  (Witness shakes head.)
15   Q.  When you got into Alabama, did you drive
16       just on Interstate 85 or did you ride all
17       around different portions of Montgomery,
18       Alabama?
19   A.  No.
20   Q.  You were just on the interstate?
21   A.  Right, 85.
22   Q.  85. You never got off at all and went to
23       another part of --

Page 101

1    A.  No.
2    Q.  -- this area in Montgomery, Alabama?
3    A.  No.
4    Q.  That's enough with this document here. We
5        are pretty much done with that.
6            Let's talk about Cuthbert, Georgia.
7        Tell me again, Ms. Baldwin, who were you,
8        Irena, and Ella -- who were you-all going to
9        visit in Cuthbert, Georgia?
10   A.  Family.
11   Q.  Can you give me the names of family?
12   A.  Lois Brown.
13   Q.  And how was she related to you?
14   A.  Niece.
15   Q.  And do you know her telephone number?
16       Ms. Baldwin, you don't have to get it out
17       right now. But if you can get it to your
18       attorney, he can give it to me later. Okay?
19            And who else were y'all going to see?
20   A.  Ann Johnson.
21   Q.  And how are you related to Ann Johnson?
22   A.  I'm her aunt.
23   Q.  Now, Ann Johnson, is she related to -- how

Page 102

1        was she related to Irena Johnson?
2    A.  She's Irena's niece.
3    Q.  And Lois Brown is also Irena's niece; is
4        that correct?
5    A.  Right.
6    Q.  Now, does Lois Brown and Ann Johnson live
7        together or do they live separately? Do
8        they live in different houses, or do they
9        live together?
10   A.  Different houses.
11   Q.  Was there anyone else you-all were going to
12       see in Cuthbert?
13   A.  A sister-in-law.
14   Q.  Your sister-in-law?
15   A.  Yeah.
16   Q.  What's her name?
17   A.  Lucille Johnson.
18   Q.  Now, how was she your sister-in-law?
19   A.  She was once married to my brother, oldest
20       brother.
21   Q.  Now, was there anyone else you-all were
22       going to see in Cuthbert, Georgia?
23   A.  Just whoever was in the house with Lucille.

Page 103

1    Q.  Now, when you had planned to get to
2        Cuthbert, did you-all have some type of
3        activity planned like a family dinner or
4        reunion of sorts that you-all had planned?
5    A.  No.
6    Q.  What usually happens when you-all go to
7        Cuthbert and what kind of activities do
8        you-all usually partake in?
9    A.  Just go from house to house, and Lois
10       usually fixes dinner.
11   Q.  And, again, I think you testified
12       yesterday...
13   A.  We may go out to dinner.
14   Q.  Okay.
15   A.  I can't tell you where that is.
16   Q.  I think you testified yesterday that this is
17       something you-all do every single year,
18       correct?
19   A.  Yes.
20   Q.  And it's kind of like a reunion?
21   A.  Well, we don't call it a reunion, not then.
22       But sometime ago it was a reunion.
23   Q.  But now it's just all of the sisters come

Page 104

1        down and everybody just goes to visit
2        everybody?
3    A.  Right.
4    Q.  And that's something that Irena wanted to
5        do; is that correct?
6    A.  Right.
7    Q.  Something that you wanted to do?
8    A.  Uh-huh (positive response).
9    Q.  And something that Ella wanted to do; is
10       that correct?
11   A.  Right.
12           (Plaintiff's Exhibit Number 14
13           marked for identification.)
14   Q.  Ms. Baldwin, I'm going to show you what I've
15       marked as Plaintiff's Exhibit Number
16       Fourteen. And I'm going to ask you if you
17       can take a look at that document and see if
18       you've seen that document before. And on
19       the very last page or next to the last page,
20       I believe your signature may be on there,
21       and tell me if you signed that document.
22       And you can flip the pages if you need to,
23       Ms. Baldwin.

Page 105

1    Ms. Baldwin, all I want you to do is
2    take a look at that document. You don't
3    have to read it. Just take a look at the
4    document and see if you've seen it before
5    and if you in fact signed that document on
6    the last page.
7    Is that last page, Ms. Baldwin? Does
8    that appear to be your signature somewhere
9    on that page?
10   A.  Yes.
11   Q.  It looks like you read those
12   interrogatories. I'm just going to ask you
13   a couple of questions with regard to those
14   interrogatories and the other attorneys may
15   ask you some questions about those as well.
16   Ms. Baldwin, was Irena and Ella, were
17   they passengers in the vehicle?
18   A.  Yes.
19   Q.  Now, do you know what a guest is?
20   A.  A guest?
21   Q.  Yes.
22   A.  Yes. Somebody that really doesn't live with
23   you.

Page 106

1    MR. HENDERSON:  Object to the
2    form.
3    Q.  Would you characterize Irena as a guest in
4    the automobile with you?
5    MR. HENDERSON:  Object to the
6    form.
7    Q.  Or would you characterize her as a
8    passenger?
9    MR. HENDERSON:  Object to the
10   form. You are asking about a
11   legal conclusion.
12   MR. COLLINS:  I understand the
13   objection.
14   MR. HENDERSON:  And she obviously
15   doesn't understand the legal
16   definition of a guest or a
17   passenger. But under the facts
18   that she presented, it would
19   appear that she's a passenger.
20   Q.  With regards to interrogatory number
21   thirteen, you indicated that you also had
22   insurance with Allstate. Did you file a
23   claim with Allstate for this particular

Page 107

1    case? Did you let Allstate know -- your
2    insurance company know about this particular
3    accident?
4    A.  I don't remember.
5    Q.  You don't remember. You may have? You just
6    don't remember?
7    A.  No, I don't remember.
8    Q.  And interrogatory number twenty-two asks is
9    it customary in your driving experience that
10   you stop on the roadways including
11   interstate, highways, and expressways that
12   are traveled by other drivers -- if you look
13   at number twenty-four in that document. And
14   your answer was very seldom. And I believe
15   yesterday you testified that...
16   A.  Twenty-two?
17   Q.  Yes, ma'am.
18   MR. COLLINS:  Do you want to help
19   her out, David?
20   A.  Very, very seldom.
21   Q.  Very, very seldom. And I believe yesterday
22   you said that you have done it before; is
23   that correct?

Page 108

1    MR. HENDERSON:  Let me object to
2    the form. I don't think that
3    she said that she stopped in a
4    lane of highway, but she
5    stopped off to the side of the
6    road because obviously she
7    testified yesterday that it
8    would be dangerous to stop in
9    the lane of a highway.
10   MR. COLLINS:  Actually I think she
11   testified that she stopped in
12   the highway before.
13   THE WITNESS:  No, not in the
14   highway.
15   MR. COLLINS:  There was another
16   question I think she -- when I
17   asked her is it customary that
18   she stop on the roadway, I
19   believe she -- we can address
20   that at a later date. I'll
21   withdraw the question for right
22   now.
23   Q.  Just a couple of more things, Ms. Baldwin.

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 109

1   We are done with that document there. Let
2   me ask you one more question about Cuthbert.
3   Are there any other relatives in Cuthbert
4   that may be sick or sometimes ill when
5   you-all travel to see them?
6   A.   Well, my sister-in-law is ill.  But she's in
7   bed at all times.
8   Q.   Is that Lucille Johnson?
9   A.   Right.
10  Q.   Is that one of the reasons why you-all
11  travel to see her because she's...
12  A.   No.
13  Q.   But when you make it to Cuthbert, you do go
14  and see her?
15  A.   Definitely.
16  Q.   Anybody else that may be ill or anything to
17  that effect?
18  A.   No.  That's the only ill one there.
19       (Plaintiff's Exhibit Numbers 15
20       through 59 marked for
21       identification.)
22  Q.   The last thing I want to do, Ms. Baldwin --
23  and I'll give the other attorneys an

Page 110

1   opportunity to ask you some questions -- I'm
2   going to show you about forty-six
3   photographs that were taken of the accident.
4   Okay?  I want you to just kind of flip
5   through them and look at them and tell me if
6   the scene looks familiar to you.  When you
7   got out of the car after the accident, if
8   you remember seeing Ms. Colvin's vehicle and
9   your vehicle that you had rented in that
10  same or similar condition.
11       Just take a look at those photographs.
12  Just flip through them and tell me if you
13  remember that scene -- if those photographs
14  accurately depict the scene as you saw it
15  that day.  And if you could kind of keep
16  them in order.
17       Ms. Baldwin, you had an opportunity to
18  look at those photographs, correct?
19  A.   Yes.
20  Q.   Do the images in those photographs look
21  familiar to you?  The vehicles and the
22  scenery, does all of that look familiar to
23  you?

Page 111

1   A.   This is the closest one to it.
2   Q.   Does that appear to be the car that you had
3   rented from Hertz?
4   A.   This car seems to be blue.
5   Q.   Okay.  What color was the Hertz car?
6   A.   It looks like it was a rust color or wine or
7   reddish looking.
8   Q.   But take a look at the entire scene and the
9   car.  You said there was a black car that
10  hit you as well; is that correct?  The black
11  car is the car that hit you from behind?
12       MR. WALLER:  Object to the form.
13  Q.   What color was the car that hit you from
14  behind?
15       MR. WALLER:  Object to the form.
16  A.   It seems to have been black.  But you don't
17  show that car -- you don't show another car
18  on this little strip going up.
19  Q.   Can you take a look at the picture where
20  your hand is right here, this picture right
21  here, there on the top.  And I believe
22  that's Plaintiff's Exhibit Number -- What's
23  the number at the bottom there?

Page 112

1   A.   Fifteen.
2   Q.   Fifteen.  What color is the vehicle in that
3   photograph?
4   A.   It's sitting over here, but it's dark.
5   Q.   Does it appear to be black or blue?
6   A.   It appears to be black.
7   Q.   Do you remember that vehicle being the
8   vehicle that was involved in the accident
9   that you were in?
10  A.   It seemingly might have been.
11  Q.   What about the vehicle right here, does that
12  kind of look like the vehicle that you may
13  have been in that you were driving?
14  A.   That is a hit from possibly the right side.
15  Q.   And where was the car that you were driving
16  hit from?
17  A.   Mostly on the right, I guess, that my sister
18  said, oh, and, you know, fell over to the
19  left.  And it was all of this blood over
20  there.
21  Q.   If I represent to you that that is the
22  vehicle that you rented from Hertz --
23  A.   This is?

Page 113

1   Q.  Yes.
2       -- would that sound about right?  Could
3   it possibly have been the vehicle that you
4   rented from Hertz?
5       MR. PHILLIPS:  Object to the form.
6   A.  It could have, but not been a blue one.
7   Q.  Do any of those pictures look familiar to
8   you, Ms. Baldwin?
9   A.  Not too much.
10  Q.  Now, when you got out of the vehicle after
11  the accident, did you take a look at the
12  scene?  Did you look and see what was going
13  on?
14  A.  No, because it was -- Yeah.  Because it
15  wasn't anybody there but the people that
16  were in the car that hit me.  They didn't
17  seem to be getting out doing anything.  Just
18  sitting in the car.
19  Q.  And when you got out -- You testified
20  yesterday that you had got out of the car;
21  is that correct?
22  A.  Yes.
23  Q.  And that you checked on your sisters and

Page 114

1   then you waited for help; is that correct?
2   A.  Right.
3   Q.  While you were waiting, did you look around
4   to see what vehicles...
5   A.  It seems that nobody was around.
6   Q.  Did you see any cars that looked like they
7   had been in a collision?
8   A.  No, no.
9   Q.  Did you see a black car?
10  A.  That was standing facing me.  Not facing me,
11  facing the right side of the Hertz car that
12  I was driving.
13  Q.  Is that the Hertz car that you were driving?
14  A.  This one?
15  Q.  Yes.
16  A.  The color is wrong.
17  Q.  Is that the only thing wrong?  Does that
18  look like the type of vehicle you had
19  rented, though?  Is that the only thing you
20  represent as being wrong is the color?
21  A.  I'm not sure.  And I guess that one
22  that's -- with its face torn -- that's going
23  to come back across seemingly.  But after it

Page 115

1   hit, it just parked over there.
2   Q.  If you would, Ms. Baldwin, slide the
3   photographs over to me and I'm going to go
4   through some of them.
5   A.  Okay.  This is six.
6   Q.  And I'll put them back in order.  Don't
7   worry about that.  Okay?
8   A.  Okay.
9   Q.  Ms. Baldwin, I'm going to show you what is
10  Plaintiff's Exhibit Number Twenty-nine.
11  Does that photograph look like the vehicle
12  that you rented from Hertz?
13  A.  I'm not sure.
14  Q.  Is it similar in type, just the color is
15  different?
16      MR. PHILLIPS:  Object.  It's been
17          asked and answered.  She
18          doesn't seem to recall.
19  A.  At this point I'm not sure.
20  Q.  Okay.  You just can't remember?
21  A.  (Witness shakes head.)
22  Q.  And you say there was a black car over to
23  the right-hand side.  I'm going to show you

Page 116

1   what's been marked as Plaintiff's Exhibit
2   Number Thirty.  Does that appear to be the
3   black car that you remember seeing?
4   A.  You mean this one?
5   Q.  The one in the middle of the page.
6   A.  Going in the wrong direction.  And it isn't
7   going up that little strip behind me.
8   Q.  Okay.  Just one second, Ms. Baldwin.  Take a
9   look at Plaintiff's Exhibit Number
10  Forty-nine.  Does that appear to be the area
11  that you were traveling in Montgomery on
12  July 27th?
13  A.  Yes.
14  Q.  So that...
15  A.  That's that -- yes, the strip that's going
16  up.
17  Q.  Okay.
18  A.  It's only one door up there to go through.
19  Q.  Okay.  Now, when you say -- Strike that.
20  Let me ask you this question.  So you do
21  recognize the images in Plaintiff's Exhibit
22  Number Forty-nine.  You see the signs up
23  there?  Do you recognize those?

Page 117

1   A.  Maybe.
2   Q.  Okay.  I think you just said you did.  Do
3       you remember whether or not you were
4       traveling on that road on July 27th of 2007?
5   A.  Yes.
6   Q.  You were?
7   A.  Yes.
8   Q.  So does that picture fairly and accurately
9       depict the scene as you remember on July 27,
10      2007?
11  A.  Yes.  See, you drive up here.  And to turn
12      around, only one could go through there to
13      turn around.
14          MR. HENDERSON:  Ms. Baldwin, just
15          so I'm clear.  When you point
16          up there, do you mean there was
17          just one lane that you could go
18          through?
19      THE WITNESS:  Just one -- it was
20          just one lane.
21      MR. HENDERSON:  And that's what
22          you mean when you say door, it
23          was just -- the lane was the

Page 118

1       door, right?
2       THE WITNESS:  No.
3       MR. COLLINS:  Object to the form.
4       MR. WALLER:  Object to the form.
5   Q.  Ms. Baldwin, do this for us.  Take this ink
6       pen and draw an X in the lane in which you
7       say you were traveling that you were going
8       through to...
9   A.  Well, it wasn't but one lane.
10  Q.  Can you put an X in the lane looking at that
11      picture where you were traveling?
12  A.  Well, I guess it could be this one.
13      MR. HENDERSON:  Ms. Baldwin,
14          that's only if you know.  Don't
15          put it down if you don't know.
16  A.  No.  And this is all wrong.  Nobody was over
17      here.  It's just that you could go up this
18      lane to go through this one door to your
19      left to turn around.
20  Q.  And, if you could for us, Ms. Baldwin, I
21      notice you have the pen there.  Could you
22      indicate, if you remember, which lane you
23      were traveling in when you got ready to turn

Page 119

1       around?  Just put a nice big X right there.
2       It doesn't have to be too big.
3   A.  To turn around?
4   Q.  Yes.
5   A.  I wasn't going to turn around in this lane.
6       I didn't want to go on over into Alabama any
7       further.  So I was going to get on this
8       thing.  Well, you had called -- what -- 85
9       is down here.  And going up this lane, just
10      one car could go up and through.
11  Q.  This probably would show up a little bit
12      better than that, Ms. Baldwin, if you can
13      get the top off.  Just use that end right
14      there and make a marking where you were
15      indicating you were traveling.
16          MR. HENDERSON:  If you know.
17  Q.  If you know.
18  A.  This lane.
19  Q.  And I represent to you that Ms. Baldwin just
20      drew a red line with a red Sharpie marker
21      indicating the lane that she was driving.
22          And I indicate that Ms. Baldwin just
23      drew a second red line.  What's the purpose

Page 120

1       of the second red line?
2   A.  This is where I was traveling.
3   Q.  Okay.  Now, Ms. Baldwin, is that in the
4       middle of the interstate or the highway?
5   A.  That's not the highway.
6   Q.  Is it in the middle of the road?
7   A.  When you say road...
8   Q.  Yes, ma'am.  Tell me...
9   A.  That's that place that I had gotten off of
10      85 down here.
11  Q.  Okay.
12  A.  And I was going forward here.
13  Q.  Ms. Baldwin, tell me how many lanes are
14      indicated in that photograph?  Do you see
15      how many different lanes?  Can you count
16      them?
17  A.  Just one.  Is that it?
18  Q.  Okay.  And which one were you traveling in?
19      The one where you drew the red lines?
20  A.  Yeah, between this -- just going straight up
21      to go through this one door which only one
22      car could go through.
23  Q.  Okay.  Do you see that door on that

Page 121

1    photograph right now, Ms. Baldwin?
2    A.  No.
3         MR. HENDERSON:  Let me represent
4         that I don't see it on there
5         either because you can't see
6         past the car.
7         THE WITNESS:  Right.
8    A.  But this is...
9    Q.  Ms. Baldwin, you can hang on to that marker.
10        I'm going to show you a couple of more
11        photographs and then we will be done.  Okay?
12        We will straighten these out here
13        afterwards.
14           I'm going to show you what's been
15        marked as Plaintiff's Exhibit Number Fifty.
16        And it's similar to this photograph on
17        Forty-nine.  And can you look up now and
18        tell me if you see the door?  Can you tell
19        me if you see the door that you are
20        referring to?
21   A.  Why did you get this person standing there
22        because nobody was standing in that little
23        ramp.

Page 122

1    Q.  And I'll represent to you, Ms. Baldwin, that
2        those photographs were taken after the
3        accident.  And so you may see people inside
4        the photographs that may have not been there
5        at the time of the accident.
6    A.  Let's see.
7    Q.  Do you see the door that you were referring
8        to?
9    A.  It should be up here.
10   Q.  If you see it, why don't you circle it for
11        me with the red marker if you see the door
12        that you are referring to.
13   A.  No, these arrows are all wrong.
14   Q.  Can you tell me how?
15   A.  They seem to be pointing go on through.
16   Q.  Okay.
17   A.  And not a left turn.
18        MR. HENDERSON:  Let's wait one
19        second for his question,
20        Ms. Baldwin.
21   Q.  On that document it appears you drew a door;
22        is that correct?
23   A.  Right.

Page 123

1    Q.  Where you say the door should be?
2    A.  Yes.
3    Q.  Are you saying, Ms. Baldwin, the lane that
4        you just drew on this photograph, is that
5        the lane that you were driving in?
6    A.  Yes.
7    Q.  And you drew that in red?
8    A.  There is only one lane.
9    Q.  In red marker, right?
10   A.  Right.
11   Q.  Let me show you this document I'm going to
12        represent to you as Plaintiff's Exhibit
13        Number Fifty-five.  Can you look on that
14        document and tell me if you see any letters
15        written in the straight -- in the roadway.
16   A.  No.
17   Q.  Why don't you take a look at it again, look
18        down on the road and see if you see any
19        letters that are written in what looks like
20        paint, orange paint just in that photograph.
21   A.  It wasn't anybody up there.
22   Q.  What I'm looking for is for you to look at
23        that image right there and see if you see

Page 124

1        where somebody wrote three letters POI in
2        the road.  Do you see it?
3    A.  Yes, I see that.
4    Q.  Can you circle that for me with that red
5        marker?
6    A.  Okay.
7    Q.  And I'm going to represent to you,
8        Ms. Baldwin, that POI means point of impact.
9        Is it possible that you were driving in that
10        lane when the collision occurred?
11   A.  I guess so.  It wasn't but one lane there.
12   Q.  All right, Ms. Baldwin.  I don't think I
13        have anything further at this point.  I'm
14        going to turn you over to Mr. Waller.  He
15        may have some questions for you.
16        Mr. Phillips, who is on the telephone, he
17        may have some questions for you.  And then
18        your attorney, I'm sure he's going to have
19        some questions for you as well.
20             EXAMINATION
21   BY MR. WALLER:
22   Q.  Ms. Baldwin, are you doing okay?  Do you
23        need to take a break?

Page 125

1    A.   I'm doing okay.
2    Q.   I'm going to try to be as fast as I can.
3         Okay?
4    A.   Okay.
5    Q.   Ms. Baldwin, we met yesterday for the first
6         time.  And, as you know, I'm one of the
7         attorneys representing Ms. Colvin.  And I'll
8         represent to you Ms. Colvin was the driver
9         of the black vehicle involved in the
10        collision.  Do you remember Ms. Colvin from
11        yesterday?  I represent to you that I'm
12        representing Ms. Colvin who was the driver
13        of that black vehicle.  Okay?
14   A.   Yes.
15   Q.   If at any time I ask you a question and you
16        don't understand it, please stop me and I'll
17        restate it.  Okay?
18   A.   Yes.
19   Q.   Mr. Collins was showing you Plaintiff's
20        Exhibit Fifty.  This is the one that you
21        wrote on.  Do you mind if I come over there
22        right next to you?
23   A.   Sure.  Come on.

Page 126

1    Q.   Ms. Baldwin, let me ask you this.  Does this
2         diagram in the scene that's depicted right
3         here, does that accurately depict the
4         roadway immediately after the accident?
5              MR. HENDERSON:  If you know,
6         Ms. Baldwin.
7    A.   If I can discard all of that.
8    Q.   So by all of that, you are saying discard
9         the individual who is right here on the
10        right of the picture?  Is that what you are
11        talking about?
12   A.   Unless that person got -- No, nobody got out
13        of the car that hit me.
14   Q.   Let me do this, Ms. Baldwin.  I'll represent
15        to you that this is a police officer.  And
16        this picture was taken after the accident.
17        Okay?
18   A.   Okay.
19   Q.   Here is my question based on that.  Okay.
20        Does this picture -- this scene identified
21        in Plaintiff's Exhibit Fifty with the
22        exception of the police officer and the
23        cars, does this scene of the roadway, does

Page 127

1         that accurately depict the roadway as you
2         remember it --
3    A.   Yes.
4    Q.   -- at the time of the accident?
5    A.   Yes.
6    Q.   Mr. Collins had asked to you identify how
7         many lanes are depicted on this roadway.  It
8         is my understanding you testified there was
9         one lane?
10   A.   Right.
11   Q.   In looking on this picture, you don't have
12        any reason to disagree with that, do you?
13   A.   No.
14   Q.   This individual right here to the right,
15        Ms. Baldwin -- do you see this individual on
16        Plaintiff's Exhibit Fifty?
17   A.   Uh-huh (positive response).
18   Q.   Where do you believe he is standing?  Is he
19        standing in the roadway or on the shoulder?
20   A.   It should be -- well, he was on -- It wasn't
21        any shoulder.  It was just a scoop up.
22   Q.   But based on this picture right here and --
23        and I'm asking you about this picture --

Page 128

1         where do you think this gentleman is
2         standing?  In the lane still?
3    A.   No.  He wouldn't be in the lane.  Oh, from
4         looking at this picture, it looks like he's
5         in the lane because it looks like you have
6         all of this as the lane.
7    Q.   Ms. Baldwin, you'll recall yesterday that
8         you testified that at some time prior to the
9         collision or prior to the accident that you
10        had backed your car up; is that correct?
11   A.   Not on this, not on that ramp.
12   Q.   Where did you back your car up, Ms. Baldwin,
13        in relation to the ramp which is Plaintiff's
14        Exhibit Fifty?
15   A.   It was beside the ramp where, you know, you
16        can stop.  It's no traveling down there.
17   Q.   Let me do this real quick.  I'm going to see
18        if I can have a picture that shows that area
19        so you can tell us about it.  Okay?
20   A.   Okay.
21   Q.   Ms. Baldwin, can you tell us how many
22        seconds went by from the time that you
23        backed the vehicle up until the time that

Page 129

1    the accident happened?
2        MR. HENDERSON: Object to the
3        form. Only if you know.
4    A.  No, I couldn't tell you.
5    Q.  Would minutes be a better description, if
6        you know?
7    A.  Yeah. And I wouldn't know those.
8    Q.  Was it less than an hour from the time...
9    A.  Oh, yes.
10   Q.  Was it less than five minutes from the time
11       that you backed up until the accident?
12   A.  I didn't back up to the accident.
13   Q.  Right. And that was the way I phrased, and
14       I'll rephrase it. I'm glad you told me. I
15       want to be sure we both understand. Okay?
16       Was the period of time less than five
17       minutes from the time that you backed up
18       until the time of the accident?
19       MR. HENDERSON: If you know.
20   Q.  You can answer, if you know.
21   A.  No, I don't know.
22   Q.  I'm asking your opinion. You don't know
23       whether or not it was less than five

Page 130

1    minutes?
2    A.  No, I'm not sure.
3    Q.  Ms. Baldwin, isn't it true that you don't
4        know for a fact, do you, that at the time of
5        your backing up the accident happened
6        immediately thereafter?
7    A.  Well, as I pulled to my right and got on
8        that ramp going up, it was no time.
9    Q.  When you say no time, you mean pretty
10       instantaneous after that?
11   A.  Right.
12   Q.  And to get on the ramp, would you have had
13       to back up to get on that ramp?
14   A.  Yes, I would.
15   Q.  Yesterday you had mentioned at some point
16       you were going to turn left. Do you
17       remember saying that?
18   A.  Right.
19   Q.  Will you show us -- Scratch that. Did you
20       have a chance to turn left before the
21       accident?
22   A.  I might have. But it looked like all I
23       could see was that 85 is just going on and

Page 131

1    on. So that was the only place I saw that I
2    could turn around.
3    Q.  Were you tired by that time?
4        MR. HENDERSON: Object to the
5        form.
6    Q.  Ma'am, you can answer.
7    A.  No. I wasn't tired.
8    Q.  You weren't tired?
9    A.  No.
10   Q.  That particular day, Ms. Baldwin, do you
11       recall traveling south of Montgomery?
12   A.  South of -- No, not south of Montgomery. It
13       seemed that if I had kept going 85, I would
14       have gone on into Montgomery.
15   Q.  Let me show you Plaintiff's Exhibit
16       Fifty-five that Mr. Collins just showed you.
17       He represented those letters POI. Would you
18       have any reason to disagree with the police
19       officer's opinion that the point of impact
20       between the vehicles was depicted as shown
21       in Plaintiff's Exhibit Fifty-five?
22   A.  No.
23   Q.  I'll even rephrase it even though you

Page 132

1    answered. Assuming a police officer or the
2    facts established that the point of impact
3    is located on Plaintiff's Exhibit Fifty-five
4    as you are looking at here, would you have
5    any reason whatsoever to disagree with that?
6    A.  No.
7    Q.  Ma'am?
8    A.  No. It's too much in that picture. That --
9        just disregard all of this stuff.
10   Q.  When you say stuff, you mean the cars that
11       are in the picture?
12   A.  Yes, these.
13   Q.  But the scene of the accident, that's a fair
14       depiction, would you agree, with the
15       exception of the cars? Is that right?
16   A.  Well, I don't know because I wouldn't know
17       if any cars were down there.
18   Q.  Ms. Baldwin, I'm going to turn your
19       attention real quick and go over some
20       questions that I had written down when
21       Mr. Collins was asking you questions. I'm
22       going to try to do my best not to repeat
23       what he asked you yesterday. I just have a

Page 133

1 few.
2      Do you have any children?
3 A.  No.
4 Q.  Have you ever been married?
5 A.  Yes.
6 Q.  Who were you married to?
7 A.  Renzie L. Baldwin.
8 Q.  Was that your only marriage?
9 A.  Yes.
10 Q.  Have you ever served in the military?
11 A.  No.
12 Q.  Mr. Collins talked about your medical
13      conditions yesterday, and you provided us
14      with an exhibit showing your medications.
15      Do you remember that?
16 A.  Yes.
17 Q.  I want to ask you something about the drug
18      Namenda.
19 A.  Namenda?
20 Q.  Yes, ma'am.
21 A.  N-a-m-e-n-d-a.
22 Q.  Correct.  Do you take that?
23 A.  Yes.

Page 134

1 Q.  And based on your response yesterday, you
2      indicated that you had been diagnosed with
3      dementia; is that correct?
4 A.  Dementia.
5      MR. HENDERSON:  I don't know if
6      she said she was diagnosed with
7      dementia.  She said she took it
8      for dementia.
9      MR. WALLER:  I'll rephrase it.
10 Q.  Do you take the Namenda for dementia?
11 A.  Yes.
12 Q.  And how long have you been taking any
13      medication for dementia?
14 A.  I don't know.
15 Q.  Is it years?
16 A.  Maybe.
17 Q.  Well, were you taking medication for
18      dementia before July of 2007?
19 A.  Yes.
20 Q.  Am I correct to assume that there are some
21      periods of time where you mistakenly failed
22      to take some medication?
23      MR. HENDERSON:  Object to the

Page 135

1      form.
2 Q.  You can answer.
3 A.  Has it ever been a time that I failed to
4      take...
5 Q.  Some medication, whatever it be?
6 A.  I would say no.  Sometime during the day I
7      take it.  It might not be at the same time.
8 Q.  What types of symptoms were you experiencing
9      that made you get these medications for
10      dementia?
11 A.  I guess it was dizziness.
12 Q.  Forgetfulness?
13 A.  No.  Just dizzy.
14 Q.  Confusion?
15 A.  No.  I wasn't confused.  I was just -- you
16      know, I possibly couldn't walk straight.
17 Q.  Have you ever been diagnosed with
18      Alzheimer's?
19      MR. HENDERSON:  Object to the
20      form.
21 Q.  Have you ever heard any doctor tell you that
22      you had Alzheimer's?
23 A.  No.

Page 136

1      MR. HENDERSON:  Object to the
2      form.
3 Q.  You haven't?
4 A.  (Witness shakes head.)
5 Q.  Ma'am, is that right?  Do you want me to
6      repeat my question?  Are you still thinking?
7 A.  No.  You can repeat it.  Has anybody ever
8      diagnosed me with Alzheimer's?
9 Q.  Yes.
10 A.  No.
11 Q.  Has any doctor told you that the Namenda
12      medication, one of the side effects could be
13      confusion?
14 A.  No.
15 Q.  Your last doctor that you saw in Georgia --
16      and we talked about it yesterday -- do you
17      recall seeing a doctor in Georgia?
18 A.  Yes.
19 Q.  Who helps you set up appointments?  Is it
20      Mr. Johnson's wife?
21 A.  Right.
22 Q.  Would she be the person most knowledgeable
23      about your medical conditions?

Page 137

1    A.  Yes.
2    Q.  And, in fact, does she make sure that you
3         stay up to date and you take the medication
4         as depicted on Plaintiff's...
5    A.  Yes.
6             MR. COLLINS:  Object to the form.
7         We are referring to since the
8         accident, correct?
9             MR. WALLER:  Yes.
10   Q.  You've only lived with them since the
11        accident; is that right?
12   A.  Yes.
13   Q.  Plaintiff's Exhibit Five, is Ms. Johnson --
14        she's the one that helps you out and makes
15        sure you take these medications currently,
16        right?
17   A.  Yes.  She helps me.
18   Q.  Did Ms. Irena Johnson know that you were
19        taking medication for dementia prior to her
20        death?
21            MR. COLLINS:  Object to the form.
22            MR. HENDERSON:  Object to the
23        form.

Page 138

1    Q.  Would you like me to repeat it?
2    A.  Yes.
3    Q.  Did Ms. Irena Johnson know that you took
4         medication for dementia before the accident?
5             MR. COLLINS:  Same objection.
6             MR. HENDERSON:  Object to the
7         form.
8    Q.  They are making a legal objection.  You can
9         answer if you know.
10   A.  No.
11   Q.  Y'all lived together for over forty years;
12        is that right?
13   A.  Right.
14   Q.  And y'all did everything together pretty
15        much; is that right?
16   A.  Right.
17   Q.  And you took this medication every day; is
18        that right?
19   A.  Yes.
20   Q.  And you are telling us that Ms. Johnson --
21        you are not sure whether Ms. Johnson knew
22        that you took this medication for dementia?
23            MR. COLLINS:  Object to the form.

Page 139

1             MR. HENDERSON:  Object to the
2         form.
3    Q.  You can answer.  Would you like me to repeat
4         it?
5    A.  She wouldn't know what it was for.
6    Q.  Had you ever complained to her about any
7         symptoms associated with dementia?
8    A.  No.
9    Q.  What about Mr. Johnson here, did Mr. Johnson
10        know that you took medication for dementia
11        before the accident?
12            MR. COLLINS:  Object to the form.
13            MR. HENDERSON:  Object to the
14        form.
15   Q.  Ma'am?  Would you like me to repeat it?
16   A.  Would he know...
17   Q.  Did he know?
18            MR. COLLINS:  Are we talking about
19        before the accident or after?
20            MR. WALLER:  Before the accident.
21   Q.  I'll repeat the question.  Okay,
22        Ms. Baldwin?  Do you want me to repeat it?
23   A.  He doesn't know what all of those medicines

Page 140

1         are for.
2    Q.  I'm looking on Plaintiff's Exhibit Five, and
3         I can read under the purpose it says
4         dementia.  Is that right?  Is that what's
5         listed on Plaintiff's Exhibit Five?  It has
6         dementia right under the purpose.
7             MR. HENDERSON:  These aren't
8         marked.  Which one are you
9         talking about?
10   Q.  Right here.  I'm showing you Plaintiff's
11        Exhibit Five.  I'm talking about number six,
12        Namenda.  Do you see that, Ms. Baldwin,
13        right here?
14   A.  Uh-huh (positive response).
15   Q.  Do you see the second column it says
16        purpose?
17   A.  Uh-huh (positive response).
18   Q.  Under that it says dementia.  Do you see
19        that?
20   A.  Uh-huh (positive response).
21   Q.  Who prepared this for you, Plaintiff's
22        Exhibit Five?
23   A.  Well, my niece.

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 141

1  Q.  Who is that?
2  A.  Sandra.
3  Q.  Mr. Johnson's wife?
4  A.  Right.
5  Q.  And you are telling me that up until today
6      Mr. Johnson didn't know that you suffer from
7      dementia?
8          MR. COLLINS:  Object to the form.
9          Asked and answered.
10 Q.  Do you need me to repeat it?  Would you like
11     me to repeat it?
12 A.  Go on.
13 Q.  Are you telling us that until today that
14     Mr. Johnson didn't know that you suffered
15     from dementia?
16 A.  I don't think he would.
17 Q.  Did you tell this doctor in Georgia that you
18     took all of these medications in Plaintiff's
19     Exhibit Five?
20 A.  Did I tell a doctor?
21 Q.  This last doctor in Georgia that you
22     visited, do you remember telling us about
23     that yesterday once you started living with

Page 142

1      Mr. Johnson?
2  A.  Uh-huh (positive response).
3  Q.  Do you remember telling us that?
4          MR. HENDERSON:  Which doctor are
5          you talking about?  What's his
6          name?
7          MR. WALLER:  Let's ask her.
8  Q.  What is the doctor's name in Georgia that
9      you saw, Ms. Baldwin?
10 A.  The physical doctor is Woods.
11 Q.  Dr. Woods?
12 A.  Yes.
13 Q.  Did you tell Dr. Woods when you saw him that
14     you were taking all of this medication that
15     you listed on Plaintiff's Exhibit Five?
16 A.  Yes.
17 Q.  You did?
18 A.  Yes.
19 Q.  Did he ever discuss with you...
20 A.  Well, I -- I might have told him about the
21     eye medicine.
22 Q.  Would this document, Plaintiff's Exhibit
23     Five, have been something that you presented

Page 143

1      to Dr. Woods or not?
2  A.  Did I -- I just told him what I was taking.
3  Q.  So you told him that you were taking every
4      medication that you have listed on
5      Plaintiff's Exhibit Five here?
6  A.  Yes.
7  Q.  Did he discuss with you any potential
8      negative effects or adverse reactions when
9      taking all of these medications together?
10         MR. HENDERSON:  Object to the
11         form.
12 Q.  Ma'am?  Did he discuss that with you?  He
13     just objected to the form.
14 A.  No.
15 Q.  He didn't discuss any of that?
16 A.  No.
17 Q.  Ma'am, if you can look on Plaintiff's
18     Exhibit Five right there that you are
19     looking at -- I'll show you this.  You've
20     got number four down on the bottom.  It says
21     over-the-counter drugs.  Do you want to look
22     at this so we can be on the same page?  You
23     have it on yours.  I guess that's an exact

Page 144

1      copy.  It has Ecotrin.  Do you see that?
2  A.  Ecotrin, over the counter, uh-huh (positive
3      response).
4  Q.  What is that for?
5  A.  Oh, that's a coated aspirin.
6  Q.  Is that pain medication?
7  A.  Yes.
8  Q.  How often do you take that?
9  A.  Once a day.
10 Q.  Did you take it?
11 A.  Today.
12 Q.  You took it today.  Did you take it the day
13     of July 27 of '07, the day of the accident?
14 A.  Yes, I think I did.
15 Q.  Do you know whether or not you took that?  I
16     know it's been a long time.  That's the
17     reason I'm asking.
18 A.  Yes.
19 Q.  You don't know?
20 A.  I would think I take them all.
21 Q.  Ms. Baldwin, is there a reason that you and
22     your sisters chose to fly into Atlanta as
23     opposed to driving to Atlanta?

36 (Pages 141 to 144)

Page 145

1   A.  She didn't think that -- Oh, to drive.
2       Well, from -- we were saying thinking that
3       my car was so old, an '87, that probably it
4       was time that it might not make it.
5   Q.  Was there any other reason that you and your
6       sisters chose to fly into Atlanta as opposed
7       to drive into Atlanta?
8   A.  That's the reason.
9   Q.  Did you feel comfortable driving a
10      vehicle --
11  A.  Yes.
12  Q.  -- at that time?
13  A.  Very comfortable.
14  Q.  Do you still drive vehicles?
15  A.  No.
16  Q.  Why is that?
17  A.  Because too much happened.
18  Q.  What you mean by that?
19  A.  That the one that I rented was chipped up.
20      So...
21  Q.  Chipped up, you mean after the accident?
22  A.  No, no.
23  Q.  Explain that for me.

Page 146

1   A.  The one that I was driving was the rental
2       car, and it was chipped up like it was just
3       a glass car.
4   Q.  Prior to the day of the accident, which is
5       July 27, 2007, prior to that day had any
6       family member told you not to drive a
7       vehicle?
8       MR. HENDERSON:  Object to the
9           form.
10      MR. COLLINS:  Object to the form.
11  Q.  You can answer.
12  A.  It seemed that you had asked that before.
13  Q.  Ma'am?
14  A.  It seemed that you asked that before.
15  Q.  No, ma'am, I don't think I did.
16  A.  Just Irena, the one that was killed, thought
17      that to rent a car because my car being an
18      '87 just might not make this trip.
19  Q.  Right.  And I understand your answer.  And I
20      guess we are a little confused.  My question
21      is, though, Ms. Baldwin, prior to the day of
22      the accident in our case had any family
23      member...

Page 147

1   A.  No.
2   Q.  Let me get through with my question, please,
3       ma'am.
4       Prior to July 27 of '07 had any family
5       member whatsoever told you not to drive a
6       vehicle?
7   A.  No.
8   Q.  Prior to July 27 of '07 had any family
9       member told you they were concerned with
10      your driving ability?
11  A.  No.
12  Q.  Prior to July 27 of '07 had any family
13      member told you they were concerned with the
14      amount of medication you were taking while
15      driving?
16  A.  No.
17  Q.  Did that ever concern you?
18      MR. HENDERSON:  Object to the
19          form.
20  A.  No.
21  Q.  Do you still feel like you are capable of
22      driving a vehicle today?
23  A.  I don't want to.

Page 148

1   Q.  Why is that?
2   A.  Because of the accident.
3   Q.  Because you are scared of getting in another
4       accident?
5       MR. HENDERSON:  Object to the
6           form.
7   Q.  Why, because of the accident?
8   A.  Why, because of the accident?
9   Q.  Yes, ma'am.  You said you were not going to
10      drive another vehicle because of the
11      accident.  My question is why?
12  A.  I don't want to be involved in -- I might
13      be.  And it doesn't have to be my fault as
14      it wasn't my fault then.
15  Q.  Do you believe that any actions or inactions
16      taken by you on July 27 of 2007 contributed
17      to the death of your sister?
18      MR. HENDERSON:  Object to the
19          form.
20  A.  Any action, no.
21  Q.  You don't feel like any actions -- Is that
22      what you said, no?
23  A.  Yes.

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 149

1  Q.  When you go to the doctor, who is listed as
2  your next of kin or your immediate contact?
3  A.  Well, when I go here, it's my niece or my
4  nephew.
5  Q.  Your nephew Plaintiff Robert Johnson?
6  A.  Yes.
7  Q.  If you didn't take the drops for the
8  glaucoma daily, would you tell the members
9  of the jury what would happen?  How would
10  your eyes be?
11         MR. HENDERSON:  Object to the
12         form.
13  Q.  Do you need me to repeat the question?
14  A.  You can.
15  Q.  Ma'am?
16  A.  Go on.
17  Q.  Would it help you if I did?
18  A.  No.
19  Q.  No?
20  A.  Because the doctor, you know, see about my
21  eyes.
22  Q.  Right.  What symptoms would you get that
23  caused you to go to the doctor to get the

Page 150

1  glaucoma medicine?
2  A.  I don't have any symptoms, I don't suppose.
3  I have dry eyes.  They just need some...
4  Q.  Were you wearing your glasses at the time of
5  the accident on July 27 of '07?
6  A.  Yes.
7  Q.  Did you have any sunglasses on?
8  A.  No.
9  Q.  Was there light still out at that time?
10  A.  It looked like it was day to me.
11  Q.  It looked like it was complete daylight?
12  A.  Uh-huh (positive response).
13  Q.  Is that a yes?
14  A.  (Witness nods head.)
15  Q.  Just say yes so she can get it on the
16  record?
17  A.  Yes.
18  Q.  I want to skip around a little bit.  Do you
19  recall driving to Florida?  When I say this,
20  I'm talking about the week of July 27 of
21  '07.  Okay?
22  A.  Uh-huh (positive response).
23  Q.  Do you recall driving to Florida on more

Page 151

1  than one occasion?
2  A.  Uh-huh (positive response).
3  Q.  You do?
4  A.  Uh-huh (positive response).
5  Q.  Is that a yes?
6  A.  Yes.
7  Q.  How many times did you drive to Florida?
8  A.  Just that once.
9  Q.  You drove to Florida and then you drove back
10  up to Atlanta?
11  A.  Back up to get on 85.
12  Q.  Have you ever spoken with the driver of that
13  black vehicle who was also involved in the
14  collision, Ms. Denita Colvin?
15  A.  Not that I know of.
16  Q.  Have you ever spoken to any witnesses who
17  claim they witnessed the accident?
18  A.  No.  They couldn't witness the accident when
19  it's just the car that hit me and me going
20  up that ramp.  There couldn't be any
21  witnesses.
22  Q.  Did you ever see the driver of the black car
23  after the accident?

Page 152

1  A.  No.  Just -- No, I didn't go over to the car
2  because after it turned, it seemed it was
3  going to come across the driveway.
4  Q.  What do you feel the driver of the black car
5  did wrong, if anything?
6  A.  Hit me at the back.
7  Q.  At the time that the black car impacted or
8  hit your vehicle, was your vehicle stalled,
9  stopped?
10  A.  No.
11  Q.  Was your vehicle moving forward?
12  A.  Moving forward.
13  Q.  How fast was your vehicle moving forward, if
14  you can estimate?
15  A.  I guess about -- I really don't know.  But
16  not that fast.  Possibly thirty or forty
17  miles an hour.
18  Q.  Did you ever go back to the scene of the
19  accident after you left and went to the
20  hospital?
21  A.  No.
22  Q.  You never took any measurements?
23  A.  Measurements?

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 153

1    Q.  Yes, ma'am.  You never went out and measured
2         the scene, did you?
3    A.  Oh, no.
4    Q.  Did you ever take any photos of the scene?
5    A.  No.
6    Q.  Did you ever take any photos of any of the
7         cars involved in the accident?
8    A.  No.  It wasn't but one car involved.
9    Q.  One car involved in the accident?
10   A.  Right.
11   Q.  Was that your car?
12   A.  The one that hit me from behind.
13   Q.  Did you ever see the black vehicle before
14        the impact?
15   A.  No.
16   Q.  What were you doing at the time of the
17        impact?
18   A.  Just going up -- driving up to go through
19        that one little door and make a left turn to
20        turn around.
21   Q.  I'm confused because you told us earlier
22        that you had gone backwards in reverse; is
23        that right, at some time prior to the

Page 154

1         accident?  Is that what you told us earlier?
2    A.  No, I didn't.  Not on that ramp.
3    Q.  Right.
4    A.  All on that ramp was going forward.
5    Q.  What was the purpose of backing up at some
6         point in time before you say you got on the
7         ramp?
8    A.  Because it seemed that I was just going to
9         go on and go on to Alabama.
10   Q.  When you backed up, did you turn right or
11        left to get where you wanted to go?
12   A.  No.
13   Q.  What...
14   A.  No turning.
15   Q.  Okay.  When you backed...
16   A.  It was on the -- like the highway is here.
17        And I'm driving on the right side because I
18        know I want to pull off, you know, when it's
19        a place that I could pull off to turn
20        around.  But just going and going, it seemed
21        that, you know, the big highway was just
22        going to continue.  So I saw this ramp going
23        up.

Page 155

1    Q.  Is that depicted in Forty-nine there, the
2         ramp that you saw going up?
3    A.  Well, I made the ramp.
4    Q.  You made the ramp?  Is that what you said?
5    A.  Yes.  You can call this that you made the
6         ramp if that's the car that's struck me from
7         behind.  But it seemed no one ever got out
8         of the car that was -- that hit me.
9    Q.  You don't know if they were injured or not,
10        do you?
11   A.  No, I don't.
12   Q.  Do you even know if their car door was
13        operable where they could get out?
14   A.  No, I don't know.  It seemed that they never
15        attempted to get out.  They just -- when it
16        sort of turned to come across that ramp, it
17        seemed that they just -- they were still in
18        the car.
19   Q.  Are you aware of any witnesses saying that
20        you were backing up into oncoming traffic at
21        the time of the impact?
22   A.  Well, they weren't telling the truth.
23   Q.  My question was, are you aware of witnesses?

Page 156

1    A.  No, I'm...
2    Q.  You are not aware of anyone saying that?
3    A.  No.
4    Q.  Assuming witnesses put you backing up at the
5         time of the accident, would you disagree
6         with that statement?
7    A.  Definitely.
8    Q.  Assuming witnesses testify that you were
9         backing up into oncoming traffic at the time
10        of the accident, would you say that they are
11        fabricating their testimony?
12   A.  Right.  It's not the truth.
13        MR. COLLINS:  Object to the form.
14   Q.  Are you aware of my client, Ms. Colvin, the
15        driver of that black vehicle making a claim
16        against you for her injuries?
17   A.  She was injured?
18   Q.  Are you aware of Ms. Colvin making a claim?
19   A.  No.
20   Q.  You are not?
21   A.  No.
22   Q.  You know that Mr. Johnson here filed this
23        lawsuit against you and other people?  Is

Page 157

1      that your understanding?
2   A.  Uh-huh (positive response).
3   Q.  Is that a yes?
4   A.  Yes.
5   Q.  Do you know what the allegations are against
6      you?
7   A.  What?
8   Q.  I'm asking you, do you know what they are
9      saying that you did?
10  A.  What I did do?
11  Q.  I'm asking you.  There is no right or wrong
12     answer.
13  A.  No.
14  Q.  You are not aware?
15  A.  No.
16  Q.  We talked about this yesterday.  Will you
17     make sure that Mr. Henderson gets a list of
18     all doctors you saw while you were in
19     Georgia?  Will you make sure he gets that?
20  A.  Of all of the doctors.
21  Q.  Yes, ma'am.  We can get that later, but will
22     you make sure Mr. Henderson gets that for
23     us.

Page 158

1   A.  Okay.
2      THE WITNESS:  How will you get it,
3      Mr. Henderson?
4      MR. HENDERSON:  I'll call you
5      about it.
6      THE WITNESS:  Okay.
7   Q.  I've just got a couple more.  Bear with me,
8      Ms. Baldwin.  You are doing great.
9         You had mentioned yesterday,
10     Ms. Baldwin, about missing a piece of
11     luggage at the airport; is that right?
12  A.  Right.
13  Q.  Isn't it true that that luggage contained
14     your medicine?
15  A.  No.
16  Q.  Whose luggage was that?
17  A.  Mine.
18  Q.  What did that luggage contain?
19  A.  Clothing.
20  Q.  Where was your medicine stored?
21  A.  In my carry-on bag.
22  Q.  Did you have your carry-on bag with you --
23  A.  Yes.

Page 159

1   Q.  -- the day of the accident?
2   A.  Yes.
3   Q.  When did you get that luggage bag back?
4   A.  I haven't gotten it back yet.
5   Q.  You never got it back?
6   A.  No.
7   Q.  Was there any medication whatsoever that was
8      stored in that luggage bag?
9   A.  No.
10  Q.  Do you know who would have watched you take
11     the medication -- your medication that's
12     listed on Plaintiff's Exhibit Five the day
13     of the accident?
14  A.  Who would have watched me?  Possibly nobody.
15  Q.  Do you have a distinct recollection of
16     taking every medicine you have listed on
17     Plaintiff's Exhibit Five the day of the
18     accident, July 27 of '07?
19        MR. COLLINS:  Object to the form.
20        Asked and answered.
21  Q.  Do you need some more time, ma'am?  Do you
22     need some more time to answer my question?
23  A.  Oh.

Page 160

1   Q.  That's okay.  Do you have a distinct
2      recollection that you took each one of these
3      medicines on July 27 of '07?
4   A.  Yes.
5   Q.  You do?
6   A.  Yes.
7   Q.  Would anybody have seen you take that?
8   A.  I'm not really sure.
9   Q.  Earlier you told Mr. Collins that you were
10     involved in a prior accident about two years
11     ago.  Do you remember talking about that in
12     Atlanta?
13  A.  Uh-huh (positive response).
14  Q.  Do you remember that?
15  A.  Uh-huh (positive response).
16  Q.  Is that a yes?
17  A.  Yes.
18  Q.  You had mentioned that the ladies -- Am I
19     correct to assume that your two sisters were
20     with you then, too?
21  A.  Yes.
22  Q.  Was anybody injured in that accident?
23  A.  No.

Deposition of Willie Eva Baldwin                                          February 27th and 28th, 2008

Page 161

1    Q.  Do you accept any fault whatsoever from that
2        particular accident?
3              MR. HENDERSON:  Object to the
4              form.
5    A.  No.
6    Q.  Were you trying to turn left in that
7        accident, too?
8    A.  No.
9              MR. COLLINS:  Object to the form.
10             MR. WALLER:  What's your
11             objection?
12             MR. COLLINS:  I just object to the
13             form, too.
14             MR. HENDERSON:  Not relevant.
15   Q.  Ma'am, they are objecting to the form.  You
16       can answer, if you know.
17   A.  No.  I wasn't trying to turn left.
18   Q.  When you woke up the morning of July 27,
19       '07, when you woke up that morning, what
20       time did you and your sisters leave to head
21       to Cuthbert, Georgia?
22   A.  I don't know.
23   Q.  Do you have a recollection leaving that

Page 162

1        morning?
2    A.  Yes.
3    Q.  Do you know where all you went that day?
4        And let me rephrase.
5    A.  No place.
6    Q.  I represent to you -- I'm sorry.  I'll
7        represent to you the accident in Montgomery
8        happened around seven p.m. that night.  Do
9        you know what you did that day?  If the
10       accident occurred in Montgomery at seven
11       p.m. that night, do you recall where all you
12       had been that particular day?
13   A.  On the highway.
14   Q.  You had been on the highway the whole time?
15   A.  I don't know.
16   Q.  Is it fair to say you just don't recall some
17       of the details of the accident?
18   A.  Details of the accident?
19   Q.  Yes, ma'am.
20             MR. HENDERSON:  Object to the
21             form.
22   Q.  Ma'am, you just told me you don't remember
23       what you did that day; is that right?

Page 163

1              MR. HENDERSON:  Object to the
2              form.
3    Q.  Is that right, Ms. Baldwin?
4    A.  Nothing but drive.
5    Q.  It is your recollection that you drove --
6        you were driving from the time you left that
7        morning until the time of the accident at
8        approximately seven p.m. in Montgomery; is
9        that right?
10   A.  What was your question?
11   Q.  I'm just trying to establish, Ms. Baldwin,
12       if you know what you did the day of July 27,
13       2007 from the time you left Atlanta until
14       the time of the accident in Montgomery.
15   A.  Left Atlanta.  I don't remember doing
16       anything.
17   Q.  That's okay.  Was this the first time you
18       had been on a plane in July of 2007?
19   A.  No.
20   Q.  You had been on one before?
21   A.  Yes.
22   Q.  I'm trying to get through, Ms. Baldwin.
23       Bear with me.

Page 164

1        Do you recall telling the police
2        officer that you had only been driving about
3        thirty minutes prior to the accident that
4        night?
5    A.  Thirty minutes?
6    Q.  Uh-huh (positive response).
7    A.  Uh-uh (negative response).
8    Q.  You don't recall telling the officer that?
9    A.  No.
10             MR. WALLER:  Ms. Baldwin, I think
11             that's all I have for you.
12             EXAMINATION
13   BY MR. PHILLIPS:
14   Q.  Ms. Baldwin, did your sister Irena suffer
15       from the glaucoma that you know of?
16   A.  Did she what?
17   Q.  Did she have glaucoma?
18   A.  Car cover?
19   Q.  Glaucoma.
20             MR. HENDERSON:  Glaucoma.
21             MR. PHILLIPS:  Yes.  Thank you.
22             MR. HENDERSON:  Do you know if she
23             suffered from glaucoma?

Page 165

1    THE WITNESS:  She didn't suffer
2        from it.
3    MR. HENDERSON:  Do you know if she
4        had glaucoma?
5    THE WITNESS:  No, I don't know.
6    MR. HENDERSON:  She doesn't know,
7        John.
8    MR. PHILLIPS:  Okay.  Thank you.
9    Q.  Do you know if she suffered from dementia?
10   A.  No.
11   Q.  How long did you and Irena live together?
12   A.  Live together?
13   Q.  Yes, ma'am.
14   A.  Probably forty years.
15   Q.  And let's just think about the last five
16       years y'all lived together.  Who paid for
17       the power bill?
18   A.  Who paid for the...
19       MR. HENDERSON:  Power bill.
20       MR. COLLINS:  Electricity.
21   A.  Together.
22   Q.  There was one bill that came to the house
23       and y'all split it?

Page 166

1    A.  Yes.
2    Q.  So the same for the phone bill?
3    A.  The phone bill?
4    Q.  Yes, ma'am.
5    A.  Yes.
6    Q.  It's kind of a strange question, but did you
7        and Irena have the same key that opened the
8        front door -- not shared the key, but it was
9        the same key that worked the front door?
10   A.  We had our own keys.
11   Q.  But that key was...
12   A.  The same.
13   Q.  If you traded keys with her, it would open
14       the same door, correct?  In other words,
15       your key didn't open a separate door than
16       Ms. Irena's key, right?
17   A.  No, no.
18   Q.  Ms. Baldwin, have you had a conversation
19       with Mr. Johnson about the damages that he's
20       suing you for?
21   A.  No.
22   Q.  Have you asked him why he's suing you?
23   A.  No.

Page 167

1    MR. PHILLIPS:  That's all I have.
2        Thank you.
3    MR. HENDERSON:  Can we take a
4        quick break?
5    (Brief recess.)
6    EXAMINATION
7    BY MR. HENDERSON:
8    Q.  Ms. Baldwin, I'm just going to ask you a few
9        questions, and I want to try to clear up a
10       few things that may have come across as
11       being confusing -- may have confused a few
12       of us in the deposition.
13       One thing is earlier you were talking
14       about going toward a door on the interstate.
15       Do you remember that, that you were going
16       toward a door?
17   A.  Not on the interstate.  On that ramp.
18   Q.  On the ramp.  Okay.  I'm going to show you a
19       picture, Plaintiff's Exhibit Number
20       Twenty-six.  Okay.  Do you see the door that
21       you've been referring to about going towards
22       on that ramp?
23   A.  No.  I don't see the door.  But it's up on

Page 168

1    the ramp.  It's just one exit up there.
2    Q.  Okay.  So you don't...
3    A.  It's to the left.
4    Q.  So you don't see it on this picture?
5    A.  No.  I don't see a door.
6    Q.  Let me ask you a few more.  But the door was
7        a place where you could go and turn around
8        off the interstate; is that right?
9    A.  I assumed it would be that I could turn
10       around some place.
11   Q.  Now, these lawyers have been talking to you
12       about stopping on the interstate or the
13       highway and backing up.  Do you remember
14       stopping in the middle of the interstate?
15   A.  No, I didn't.
16   Q.  Do you remember backing up in the middle of
17       the interstate?
18   A.  No.
19   Q.  Where you backed up, was that on the side of
20       the interstate?
21   A.  Right.  On the right side.
22   Q.  Would that have been in an area where cars
23       did not travel?

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 169

1  A.  Right.
2  Q.  Kind of on the edge of the highway?
3        MR. WALLER:  Object to the form.
4  Q.  Would that be on the edge of the highway?
5        MR. WALLER:  Object to the form.
6  A.  Yeah.
7  Q.  Ms. Baldwin, do you remember if your sister
8      Irena gave you any money for the hotel room?
9  A.  No.
10 Q.  Do you remember if she gave you any money
11     for the rental car?
12 A.  No.
13 Q.  Did you ask Irena to give you any money for
14     the hotel room?
15 A.  No.
16 Q.  Did you ask Irena to give you any money for
17     the rental car?
18 A.  No.
19 Q.  Would that have been something that she
20     would have done on her own?
21 A.  She would have done it on her own.
22 Q.  Did you require that Irena give you any
23     money for expenses?

Page 170

1  A.  No.
2  Q.  Would you have taken Irena on this trip
3      anyway if she hadn't given you any money for
4      expenses?
5  A.  Right.
6  Q.  And your other sister that went,
7      Ms. Prather, on the trip with you, she
8      didn't give you any money, did she?
9  A.  No.
10 Q.  And she didn't give you any money for
11     expenses, did she?
12 A.  No.
13        MR. HENDERSON:  That's all of the
14        questions I've got.
15        EXAMINATION
16 BY MR. COLLINS:
17 Q.  Ms. Baldwin, when you say you would have
18     taken Irena on the trip with you, isn't it a
19     fact that you didn't take her with you, that
20     y'all all went together?  I mean, y'all all
21     agreed to go on the trip together, right?
22 A.  Yes.
23 Q.  You weren't in charge of the trip, were you?

Page 171

1        MR. HENDERSON:  Object to the
2        form.
3  A.  No.
4  Q.  Were you in charge of the trip?
5  A.  No, no.
6  Q.  There was an agreement by all of y'all to go
7      on the same trip?
8  A.  Right.
9  Q.  And that purpose was to go visit family,
10     correct?
11 A.  Right.
12 Q.  And all of you made the decision to go visit
13     family, correct?
14 A.  Yes.
15 Q.  So it wasn't a trip that you spearheaded, so
16     to speak?
17 A.  No, no.
18 Q.  So when you said you would have taken Irena
19     on the trip with you, that's not accurate,
20     is it?  I mean, she was going anyway --
21        MR. HENDERSON:  Object to the
22        form.
23 Q.  -- correct?

Page 172

1  A.  Right.
2  Q.  Now, you said that you don't remember if she
3      gave you any money, right, for the rental
4      car?
5  A.  Oh, I know she didn't.
6  Q.  You know she didn't?
7  A.  Right.
8  Q.  Now, yesterday you said that she probably
9      did.  Which one is correct?
10 A.  She probably would have, but not at that
11     point.  I would think it was all on my
12     Discovery Card.
13 Q.  So it would have been paid for on your
14     Discovery Card, correct?
15 A.  Right.
16 Q.  Now, yesterday you testified that Irena
17     helped pay for the rental car?  She gave you
18     some money cash?
19 A.  Beg your pardon?
20 Q.  Yesterday I believe you testified that Irena
21     probably helped you pay for the rental car;
22     is that correct?
23        MR. HENDERSON:  Object to the

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 173

1      form.
2  A.  I'm not sure.
3  Q.  The fact is, you don't really know whether
4      or not she helped you or not, do you?  You
5      don't really know, do you?
6          MR. HENDERSON:  Object to the
7      form.
8  Q.  I'm asking your opinion.  Do you know one
9      way or the other whether she really helped
10     you or not?
11  A.  To put it on my Discovery Card, then I would
12     pay Discovery.
13  Q.  Is it possible that Irena paid you a portion
14     of the rental cost --
15  A.  No.
16  Q.  -- in cash?
17  A.  No.
18  Q.  Yesterday you said she probably did.  Do you
19     remember saying that yesterday?
20  A.  Probably I did.
21  Q.  So which one would be more accurate, that
22     she probably did or that she didn't?
23  A.  She would have, I would think, you know, if

Page 174

1     she hadn't have been killed in the accident.
2  Q.  So are you saying that she had probably
3     would have paid you sometime later?
4  A.  Yes.
5  Q.  Was there an agreement that...
6  A.  No.
7  Q.  Let me finish.  Was there an agreement that
8     you would pay for the rental car on your
9     card and that she would pay you back later?
10  A.  I don't know if we agreed to that.  But I
11     just, you know, usually paid for the trip on
12     Discovery.
13  Q.  And when you usually paid for the trip, did
14     she usually reimburse you or pay you back?
15  A.  I'm not sure.
16  Q.  So are you saying that it's possible that
17     she might have paid you back?
18         MR. HENDERSON:  Object to the
19     form.
20  A.  Yes.
21  Q.  With regards to your living arrangements, I
22     believe you testified that you-all split the
23     electricity bill, correct?

Page 175

1  A.  Sort of.
2  Q.  Can you explain that?
3  A.  It was all in her name.  But we would go
4     down and pay the bill, and I would give her
5     something.
6  Q.  So you would pay her some money for the
7     electricity bill?
8  A.  Yes.
9  Q.  Now, the house was in her name; is that
10     correct?
11  A.  Right.
12  Q.  Was the house paid off?
13  A.  Yes.
14  Q.  Did you pay her any rent to live there?
15  A.  No.
16  Q.  Now, yesterday you testified that you-all
17     handled your own affairs.  She handled her
18     affairs and you handled your own affairs,
19     correct?
20  A.  Right.
21  Q.  And I believe you testified that you-all had
22     your own checking accounts, your own bank
23     accounts?

Page 176

1  A.  Yes.
2  Q.  You were getting disability at the time,
3     correct?
4  A.  Right.
5  Q.  Where was your checking deposited to?
6  A.  At PNC.
7  Q.  PNC?  What does that PNC stand for?
8  A.  Pennsylvania National Bank.
9  Q.  Is that in Philadelphia?
10  A.  Philadelphia.
11  Q.  Was that account solely your account?
12  A.  Yes.
13  Q.  You were the only person on it?
14  A.  Right.
15  Q.  Did Ms. Johnson receive -- to your knowledge
16     receive her own retirement or disability
17     check?
18  A.  Yes.
19  Q.  Does she have a separate account that her
20     money was going into to your knowledge?
21  A.  Yes.  She had a separate account.
22  Q.  Did y'all ever mix accounts?
23  A.  No.

Page 177

1  Q.  So the money that came into the household
2      was never commingled together, was it?  It
3      was never put together in one big pot, was
4      it?
5  A.  No.
6  Q.  She had her funds and you had your funds,
7      correct?
8  A.  Right.
9  Q.  Do you -- When was the last time you filed
10     an income tax return?  Do you remember?
11 A.  Last year.
12 Q.  You did file one last year?
13 A.  Yes.
14 Q.  And when you filed that income tax return,
15     did you list Irena Johnson on your income
16     tax return as a dependent?
17 A.  No.
18 Q.  Did you file an income tax return the year
19     before that?
20 A.  Yes.
21 Q.  Did you list Irena Johnson on there as a
22     dependent?
23 A.  No.

Page 178

1  Q.  Have you ever listed Irena Johnson on your
2      income tax return as a dependent?
3  A.  No.
4  Q.  When you filed your income tax return, did
5      you file as a single?
6  A.  Single.
7  Q.  Has Irena -- To the best of your knowledge,
8      has Irena ever listed you on her income tax
9      as a dependent?
10 A.  No.
11 Q.  Do you know whether or not she filed single
12     or head of household?
13 A.  No.
14 Q.  You don't know?
15 A.  No.
16 Q.  So Irena didn't take care of you and you
17     didn't take care of her, correct?
18 A.  Correct.
19     MR. PHILLIPS:  Object to the form.
20 Q.  In your opinion did you take care of Irena?
21 A.  No.
22     MR. PHILLIPS:  Object to the form.
23 Q.  Did you consider yourself being taken care

Page 179

1      of by Irena?
2      MR. PHILLIPS:  Object to the form.
3  Q.  You can go ahead and answer.
4  A.  No.
5  Q.  What about mail?  Did y'all have separate
6      pieces of mail coming to the house?
7  A.  Yes.
8  Q.  Did you ever open her mail?
9  A.  No.
10 Q.  Did she ever open your mail to your
11     knowledge?
12 A.  No.
13 Q.  Let me ask you about Hertz when you went to
14     go rent the car.  Did Hertz ever ask you
15     whether or not they felt that you were
16     capable of driving this vehicle?  Did they
17     ever indicate anything to you like that?
18 A.  No.
19 Q.  Did they ever ask you what kind of
20     medications you were on?
21     MR. PHILLIPS:  I'm going to have
22        to object to that just because
23        of leading on cross

Page 180

1      examination, just to preserve
2      it.  But, otherwise, go ahead,
3      Ms. Baldwin.
4  Q.  You can go ahead and answer the question.
5      Did Hertz ever ask you what medications
6      you were on?
7  A.  No.
8  Q.  Did they ever ask you have you been in any
9      accidents or anything in the past?
10 A.  I don't think so.
11 Q.  Did anybody at Hertz appear to be concerned
12     about whether or not you could drive their
13     vehicle?
14 A.  No.
15     MR. PHILLIPS:  Object to the form.
16 Q.  Did you ever tell Hertz that you were taking
17     all of these different medications?
18 A.  No.
19     MR. COLLINS:  I don't think I have
20        anything further at this point.
21     EXAMINATION
22 BY MR. WALLER:
23 Q.  Just a couple, Ms. Baldwin.  Your attorney

Page 181

1  just talked to you and you replied to him
2  that at the time you were backing up you
3  thought it was safe to do so on the edge of
4  the roadway, I think is what you said. Is
5  that right?
6  A.  Uh-huh (positive response).
7  Q.  Is that right?
8  A.  Uh-huh (positive response).
9  Q.  Say yes for...
10  A.  Yes.
11  Q.  I'm going to show you Plaintiff's Exhibit
12     Forty-nine and Plaintiff's Exhibit Fifty,
13     these two pictures. In either one of these
14     pictures does it depict the area where you
15     backed up?
16  A.  Yeah.
17  Q.  Will you put a red X on that area where you
18     backed up -- where you thought it was the
19     edge of the roadway?
20  A.  This is not the highway.
21  Q.  And my question is, will you put an X where
22     you backed up in these pictures, whatever
23     they depict?

Page 182

1  A.  I can't put an X there where I backed up
2     because that's not 85.
3        MR. HENDERSON: I think it's clear
4        that she doesn't recognize
5        these pictures. And to get her
6        to put an X or draw on the
7        photographs wouldn't do us any
8        good since she doesn't
9        recognize these pictures as
10        being the...
11     THE WITNESS: Because the highway
12        would be down.
13     MR. COLLINS: I think she
14        recognized them enough to draw
15        the lane she was traveling in.
16        So...
17     MR. WALLER: My response is this.
18        The pictures depict what they
19        depict. And, David, if she
20        doesn't, she can say she
21        doesn't know.
22  Q.  But just based on what you are looking at
23     here, do you know, Ms. Baldwin, if the area

Page 183

1  where you backed up is depicted in either
2  one of these two pictures?
3  A.  No.
4  Q.  You don't know?
5  A.  It's not.
6  Q.  Okay. That's fine. I thought you said it
7     did.
8        MR. WALLER: That's all I have.
9        MR. HENDERSON: Anything else,
10        John?
11     MR. COLLINS: Just for the record,
12        Plaintiff's Exhibit Fifteen
13        through Sixty indicates that we
14        had two Plaintiff's Exhibits
15        Twenty-one. We are going to
16        change one of those exhibits to
17        reflect Plaintiff's Exhibit
18        Twenty-one A with, I assume, no
19        objections.
20     MR. HENDERSON: That's fine.
21  * * * * * * * * * * * *
22  FURTHER DEPONENT SAITH NOT
23  * * * * * * * * * * * *

Page 184

1        REPORTER'S CERTIFICATE
2  STATE OF ALABAMA:
3  MONTGOMERY COUNTY:
4     I, Tracey H. Rives, Certified Shorthand
5  Reporter and Commissioner for the State of Alabama
6  at Large, do hereby certify that I reported the
7  deposition of:
8        WILLIE EVA BALDWIN
9  who was first duly sworn by me to speak the truth,
10  the whole truth and nothing but the truth, in the
11  matter of:
12     ROBERT JOHNSON, as Personal
13     Representative of THE ESTATE OF
14     IRENA JOHNSON, Deceased,
15     Plaintiff,
16     Vs.
17     DENITA COLVIN and
18     WILLIE EVA BALDWIN, et al.,
19     Defendants.
20     Civil Action Number
21     2:07CV1068-MHT
22     In the U.S. District Court
23     for the Middle District of Alabama

Page 185

```
 1    On February 27, 2008.
 2          The foregoing 184 computer printed pages
 3    contain a true and correct transcript of the
 4    examination of said witness by counsel for the
 5    parties set out herein.  The reading and signing of
 6    same is hereby waived.
 7          I further certify that I am neither of
 8    kin nor of counsel to the parties to said cause,
 9    nor in any manner interested in the results
10    thereof.
11          This 21st day of March 2008.
12
13          _____
              Tracey H. Rives, Certified
14            Shorthand Reporter and
              Commissioner for the
15            State of Alabama at Large,
              ACCR#: 400, Expiration Date:
16            9/30/08
17
18
19
20
21
22
23
```

UNITED STATES DISTRICT COURT OF ALABAMA
FOR THE MIDDLE DISTRICT, NORTHERN DIVISION

| | | |
|---|---|---|
| **ROBERT JOHNSON, as personal representative of the Estate of IRENA JOHNSON** | * * * * | |
| **Plaintiff,** | * * | |
| **v.** | * * | **CIVIL ACTION NO. 2:07cv1068-MHT** |
| **WILLIE EVA BALDWIN, et. al.,** | * * | |
| **Defendants.** | * * | |

## EVIDENTIARY SUBMISSIONS

**COMES NOW**, the Plaintiff, by and through his counsel of record and files with his Brief in Support of Plaintiff's Motion for Leave to Amend his Second Amended Complaint the following evidentiary submissions:

1.  **Exhibit A** -Invoice for Willie Eva Baldwin's deposition dated March 21, 2008.

2.  **Exhibit B** - Invoice for Denita Colvin and Christopher Miles' depositions dated March 26, 2008.

3.  **Exhibit C** - Email regarding Larson depositions dated February 25, 2008.

4.  **Exhibit D** - Email regarding Larson depositions dated February 25, 2008.

5.  **Exhibit E** - Email regarding Larson depositions dated February 25, 2008.

6.  **Exhibit F** - Email regarding Larson depositions dated March 6, 2008.

7.  **Exhibit G** - Invoice of Larson depositions conducted in Fort Dodge, IA dated March 24, 2008.

1

8.      **Exhibit H** - Email regarding deposition scheduling of Cpl. Glenn Caffey dated April 18, 2008 and April 22, 2008.

9.      **Exhibit I** - Email regarding Caffey deposition dated April 29, 2008.

10.     **Exhibit J** -   Copy of Plaintiff's Notice of Service of Discovery to Defendant Baldwin dated May 6, 2008.

11.     **Exhibit K** - Copy of Defendant Baldwin's Responses to Plaintiff's Requests for Admissions dated June 12, 2008.

12.     **Exhibit L** - Invoice of Cpl. Glenn Caffey's deposition dated June 9, 2008.

13.     **Exhibit M** – Deposition of Brent Larson conducted on March 18, 2008 in Fort Dodge, Iowa.

14.     **Exhibit N** – Deposition of Cpl. Glenn Caffey conducted on May 22, 2008 in Montgomery, Alabama.

15.     **Exhibit O** – Deposition of Defendant Willie Eva Baldwin commencing on February 27, 2008 in Atlanta, Georgia and finishing on February 28, 2008 in Montgomery, Alabama.

Respectfully submitted this the 4th day of August, 2008.

*/s/ Zachary T. Collins*
_____
ZACHARY T. COLLINS (COL126)
Attorney for the Plaintiff

**OF COUNSEL:**
ZACHARY T. COLLINS, ATTORNEY AT LAW, LLC
318 N. Decatur Street
Montgomery, Alabama 36104
Tel: 334-263-5575
Fax: 334-263-5569

## <u>CERTIFICATE OF SERVICE</u>

I, Zachary T. Collins, certify that on the  4th day of August, 2008, the foregoing document was served on counsel/adverse party listed below, properly addressed and pre-paid, in the following manner:

(  ) Facsimile;
(  ) Facsimile, original to follow by United States mail, first class, properly addressed;
(  ) United States mail, first class, properly addressed;
(  ) United States mail, Express Mail delivery;
(  ) Federal Express, overnight delivery;
(  ) United Parcel Service, overnight delivery;
(  ) Hand delivery;
(X) CM/ECF

<u>OF COUNSEL</u>:

**DAVID H. HENDERSON (ASB-4048-D57H)**
**RANDALL MORGAN (ASB-8650-R70R)**
Attorneys for Defendant Willie Eva Baldwin
Hill, Hill, Carter, Franco, Cole & Black, P.C.
P.O. Box 116
Montgomery, AL 36101-0116

**J. LENN RYALS, ESQ.**
Attorneys for Defendant Willie Eva Baldwin
**RYALS, PLUMMER, DONALDSON**
     **AGRICOLA & SMITH, P.C.**
60 Commerce Street, Ste. 1400
Montgomery, Alabama 36104

*/s/ Zachary T. Collins*
_____
**OF COUNSEL**