# DEPOSITION OF
# WILLIE EVA BALDWIN

## February 27th and 28th, 2008

## Pages 1 through 185

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Bumberg No. 5398

EXHIBIT
B

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

---

**Page 1**

1     IN THE UNITED STATES DISTRICT COURT
2     FOR THE MIDDLE DISTRICT OF ALABAMA
3  ROBERT JOHNSON, as Personal
     Representative of THE ESTATE OF
4  IRENA JOHNSON, Deceased,
5     Plaintiff,
6  vs.     CIVIL ACTION NO.
           2:07CV1068-MHT
7
  DENITA COLVIN and
8  WILLIE EVA BALDWIN, et al.,
9     Defendants.
10  * * * * * * * * * * * * *
11    DEPOSITION OF WILLIE EVA BALDWIN, taken
12  pursuant to stipulation and agreement before Tracey
13  H. Rives, Certified Shorthand Reporter and
14  Commissioner for the State of Alabama at Large, in
15  the Law Offices of Barrickman, Allred & Young, 5775
16  Glenridge Drive, Atlanta, Georgia, on Wednesday the
17  27th day of February 2008 commencing at
18  approximately 2:15 p.m EST. and the Law Offices of
19  Ball, Ball, Matthews & Novak, 2000 Interstate
20  Drive, Montgomery, Alabama, on Thursday, the 28th
21  day of February 2008 commencing at approximately
22  5:05 p.m. CST.
23     * * * * * * * * * * * * *

---

**Page 2**

APPEARANCES

FOR THE PLAINTIFF:
ZACHARY T. COLLINS, ESQ.
TONYA D. POWELL, ESQ.
Attorneys at Law
207 Montgomery Street
Suite 215
Montgomery, Alabama

FOR THE DEFENDANT DENITA COLVIN:

W. Christopher Waller, Jr., Esq.
BALL, BALL, MATTHEWS,
  & NOVAK
Attorneys at Law
Suite 204
2000 Interstate Park Drive
Montgomery, Alabama

FOR THE DEFENDANT WILLIE EVA BALDWIN:

David W. Henderson, Esq.
HILL, HILL, CARTER, FRANCO,
  COLE & BLACK
Attorneys at Law
425 South Perry Street
Montgomery, Alabama
FOR THE DEFENDANT ACE AMERICAN INSURANCE COMPANY:
John M. Phillips, Esq.
DORE, LANIER & PHILLIPS
Attorneys at Law
76 South Laura Street
Suite 1701
Jacksonville, FL 32202

---

**Page 3**

APPEARANCES (cont.'d)
ALSO PRESENT: Denita Colvin
         Robert Johnson

* * * * * * * * * * * * *

INDEX

EXAMINATION              PAGE

By Mr. Collins ..................................... 5

By Mr. Collins (cont'd on 2/28) ............... 94

By Mr. Waller .................................. 124

By Mr. Phillips ................................ 164

By Mr. Henderson ............................. 167

By Mr. Collins ................................. 170

By Mr. Waller .................................. 181

EXHIBITS
PX-5 - List of medications ................... 23
PX-6 - Ms. Baldwin's driver's license ......... 35
PX-7 - AAA itinerary ......................... 45
PX-8 - Handwritten itinerary .............. 53
PX-9 - Hertz estimate of charges ............ 54
PX-10 - Hertz rental agreement ................ 60
PX-11 - Accident report (corrected copy) ...... 73

---

**Page 4**

INDEX (cont.'d)
EXHIBITS              PAGE
PX-12 - Department of Police document .......... 92
PX-13 - Ms. Baldwin's statement ................ 93
PX-14 - Responses to Plaintiff's
      Interrogatories ..................... 104

PX-15-59 - Photographs of scene ............... 109

* * * * * * * * * * *

It is hereby stipulated and agreed by and
between counsel representing the parties that the
deposition of WILLIE EVA BALDWIN may be taken
before Tracey H. Rives, Certified Shorthand
Reporter and Commissioner for the State of Alabama
at Large, without the formality of a commission and
all formality with respect to other procedural
requirements is waived; that objections to
questions other than objections as to the form of
the question need not be made at this time but may
be reserved for a ruling at such time as the said
deposition may be offered in evidence or used for
any other purpose by either party as provided for
by the Federal Rules of Civil Procedure.

Page 5

1    It is further stipulated and agreed by
2 and between the parties hereto and the witness that
3 the signature of the witness to this deposition is
4 hereby waived.
5    * * * * * * * * * * * * * *
6    WILLIE EVA BALDWIN
7    The witness, after having first been
8 duly sworn to speak the truth, the whole truth, and
9 nothing but the truth testified as follows:
10    EXAMINATION
11 BY MR. COLLINS:
12 Q. Ms. Baldwin, my name is Zach Collins. We
13    have met. Not just today, but we have met
14    before. And I, too, have been to the house
15    when you were present. I represent your
16    nephew Mr. Johnson.
17    And can you just state for the
18    record, I've never talked to you about this
19    case at any time, have I? You've got to say
20    yes or no. Do you remember me talking to
21    you about this case?
22 A. Yes. Uh-huh (positive response).
23 Q. Are you sure about that?

Page 6

1 A. I think so.
2 Q. Can you tell me when you talked to me about
3    this case?
4 A. Was that yesterday?
5 Q. No, ma'am. I wasn't here yesterday. I
6    believe you may have talked to your attorney
7    about this case, Mr. David Henderson. Do
8    you remember talking to him?
9 A. I think so.
10    MR. COLLINS: Just for the record,
11    I have not talked to her about
12    the case.
13 Q. Ms. Baldwin, if I ask you a question -- Have
14    you ever done a deposition before?
15 A. I don't think so.
16 Q. This is just an opportunity for us to talk
17    about the case that you are involved in.
18    And, again, I represent your nephew,
19    Mr. Johnson. I'm going to ask you some
20    questions, and occasionally I may not
21    understand your answer, so I will probably
22    ask you some follow-up questions just for
23    clarification. When you are prepared to

Page 7

1 answer the question, just make sure you say
2 yes or no or answer it verbally. But don't
3 shake your head side to side or up and down
4 because she has to take it down. Okay?
5 A. Uh-huh (positive response).
6 Q. I have a tendency of talking loud. Please
7    know I'm not screaming at you. I just --
8    They'll tell you, I just kind of talk loud.
9    I think I may be going deaf or something,
10    but I just talk loud.
11 A. I am, too, sort of.
12 Q. Okay. Are you on any medications? Have you
13    taken any medications today, this morning?
14 A. Yes.
15 Q. Can you tell me what medications you've
16    taken?
17    Before you do that, spell your name for
18    us.
19 A. W-i-l-l-i-e.
20 Q. And your middle name is...
21 A. E-v-a.
22 Q. And last name...
23 A. B-a-l-d-w-i-n.

Page 8

1 Q. Thank you. And tell me what medications
2    that you are currently on that you've taken
3    this morning.
4 A. This morning, Fexofendadine.
5 Q. Can you spell that for me?
6 A. F-e-x-o-f-e-n-d-a-d-i-n-e.
7 Q. Do you know what that medication is for?
8 A. It's an antihistamine.
9 Q. Why are you taking it? What illness or
10    ailment do you have that causes you to have
11    to take that particular medicine? Do you
12    know?
13 A. Uh-uh (negative response).
14 Q. Was that a yes or a no?
15 A. No, I don't know.
16 Q. What other medication have you taken this
17    morning?
18 A. This morning K-o-l-o-r-c-o-n (sic) 10
19    P-o-t-a-s-s-i-u-m.
20 Q. Do you know what that's for?
21 A. It goes with the water pill.
22 Q. When you say the water pills, what are you
23    referring to?

Page 9

1   A.  I'm going take another -- oh, another one.
2      The water pill is L-e-s-i-x (sic).
3   Q.  Do you know what that's for?  When you say
4      water pill, what does it help you with?
5   A.  It helps me go to the bathroom too much.
6   Q.  So it slows down your urinary tract system
7      or stops you from using the bathroom all the
8      time?
9   A.  It helps send me.
10  Q.  Oh, it helps send you to the bathroom.  All
11     right.
12  A.  F-u-r-o-s-e-m-i-d-e.
13  Q.  Do you know what that medicine is for?
14  A.  That's -- It's in parentheses after the
15     L-a-s-i-x.
16  Q.  Okay.  So that's part of the Lasix?
17  A.  Yeah.
18  Q.  Now, those three medicines, you've taken
19     those this morning; is that correct?
20  A.  Right.
21  Q.  Now, I believe -- Do you also take eye
22     drops?
23  A.  Yes.

Page 10

1   Q.  What's the name of that medicine?
2   A.  A-l-p-h-a-g-a-n.  It is a solution of zero
3     point one.
4        MR. WALLER:  Do y'all want to do
5        this?  Zach, I don't mean to
6        interrupt.
7        Ma'am, could you give us
8        that and we can put that on the
9        record?  We can attach it, so
10       we can all have it.  Would that
11       help you, Zach?
12  Q.  Ms. Baldwin, all of the medicines that
13     you've taken this morning, do any of those
14     medicines prevent you from being able to
15     testify right now at this deposition?
16  A.  I don't think so.
17  Q.  None of them affect your mental abilities to
18     be able to answer questions that I ask you?
19  A.  I don't think so.
20  Q.  You are not having any side effects from any
21     of those medicines right now, are you?
22  A.  No.
23  Q.  At the appropriate time you can give a list

Page 11

1     to your attorney and I'll get a copy from
2     him.  Okay?
3        MR. WALLER:  Do y'all want to --
4        While we've got it now, Zach,
5        so we can all see it.  Ma'am,
6        do you have another copy of
7        that?
8        MR. COLLINS:  Oh, is she reading
9        from a list?
10       MR. WALLER:  Yes.  Ma'am, is that
11       a copy that we can have?
12       THE WITNESS:  I can copy it.
13       MR. WALLER:  Is that another copy
14       that you are looking at now?
15       THE WITNESS:  Yes.
16       MR. WALLER:  Is that in addition
17       to this other one that
18       Mr. Johnson has?
19       MR. COLLINS:  Help us out, David.
20       THE WITNESS:  I think it's the
21       same thing.
22       MR. HENDERSON:  They are two
23       different ones.  One is

Page 12

1     updated -- this one is dated
2     12/28/2007.  This other one is
3     more recent, February 18th,
4     '08.
5        MR. PHILLIPS:  Let's copy them
6        both, please.
7   Q.  Ms. Baldwin, state your address.  Where do
8     you currently live?
9   A.  My address present now?
10  Q.  Yes, your present address.
11  A.  208 Bella Vista Terrace, McDonough.
12  Q.  Who do you live there with?
13  A.  My nephew, Robert Lavaughn Johnson.
14  Q.  Does his wife live there as well?
15  A.  Yes.
16  Q.  And how long have you lived there?
17  A.  Since July the 27th.
18  Q.  Since the accident that we are here today?
19  A.  Yes.
20  Q.  Where did you live prior to that?
21  A.  1235 North Conestoga Street.  And that's in
22     Philadelphia, Pennsylvania.
23  Q.  Who did you live with?

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 13

1   A. My sister.
2   Q. What is her name?
3   A. Robert's mother.
4   Q. Can you give her name, for the record,
5      please?
6   A. Irena Johnson.
7   Q. And did you own that home on Conestoga in
8      Philadelphia?
9   A. Once upon time. It's been quite a while.
10  Q. And what happened? Did you sell it to
11     Ms. Johnson?
12  A. Yes.
13  Q. And do you remember when you told sold it to
14     her?
15  A. No.
16  Q. Was it ten years ago? Twenty years ago?
17  A. Oh, longer than that.
18  Q. Maybe thirty years ago?
19  A. Possibly.
20  Q. So about thirty years ago you owned that
21     home, correct?
22  A. Right. I think we purchased it in -- it
23     might have been in '42.

Page 14

1   Q. 1942. When you say we purchased it, who are
2      you referring to?
3   A. My husband.
4   Q. And at some point after that you sold it to
5      your sister Irena Johnson?
6   A. Yes.
7   Q. When you said it to her, was the home solely
8      in her name?
9   A. I would think so.
10  Q. And when did you begin living with your
11     sister Irena Johnson?
12  A. It's not clear to me because I lived in
13     Willow Grove for a few years.
14  Q. What's Willow Grove?
15  A. That's a suburb of Philadelphia.
16  Q. Who did you live with in Willow Grove?
17  A. With my husband.
18  Q. And did you move in with your sister Irena
19     Johnson after your husband passed away?
20  A. Yes.
21  Q. Do you remember when your husband passed
22     away?
23  A. No.

Page 15

1   Q. Is it fair to say that you -- Take your time
2      if some of these questions are difficult.
3      You just let me know and we will stop and
4      you can take a break. Okay?
5         But how long did you live with Irena,
6      just you and Irena? Was it ten years?
7      Fifteen years?
8   A. More.
9   Q. About twenty years?
10  A. Yeah.
11  Q. And has it only been you two that just lived
12     together, you and Irena?
13  A. Yes.
14  Q. Now, during the time in which you and Irena
15     lived together, were you working?
16  A. No.
17  Q. Were you retired at that point?
18  A. Yes.
19  Q. When did you retire? Do you remember what
20     year?
21  A. In seventy -- Let's see. It might have been
22     '76. I'm not sure. In the '70s.
23  Q. So in about '76 you retired, and you and

Page 16

1      Irena lived together; is that correct?
2   A. Yes.
3   Q. And is it fair to say since that point,
4      sometime around 1976 you and Irena lived
5      together alone, just you and her?
6   A. Yes.
7   Q. Tell me about the house that y'all lived in.
8      How many bedrooms was it?
9   A. Three.
10  Q. Three bedrooms?
11  A. Yeah.
12  Q. Now, did you have your own room?
13  A. Yes.
14  Q. And she had her own room?
15  A. Yes.
16  Q. Now, the house was solely in Irena's name at
17     that point, correct?
18  A. Yes.
19  Q. Was Irena working at that time?
20  A. Part of the time.
21  Q. Now, when you say part of the time, would
22     you say she worked maybe twenty hours a week
23     or so?

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 17

1    A. Yes.
2    Q. Was this at the laundry facility that she
3       worked at?
4    A. Yes.
5    Q. How did y'all handle the bills in the house?
6       Did y'all put everything together?
7    A. I bought all foods and she prepared.
8    Q. Now, did y'all have the same bank accounts?
9    A. No.
10   Q. Y'all had separate bank accounts?
11   A. Yes.
12   Q. So y'all didn't mix y'all's money together,
13      did you?
14   A. No.
15   Q. Is it safe to say that whatever money she
16      brought in, she had her own way of
17      accounting for her money?
18   A. Right.
19   Q. And she spent that money however she saw
20      fit?
21   A. Right.
22   Q. Would it be safe to say that you did the
23      same? Whatever money you brought into the

Page 18

1       house, you accounted for it and you spent it
2       how you saw fit?
3    A. Yes.
4    Q. Did you have any control over -- and I'm
5       talking about when y'all lived together --
6       did you have any control over where Irena
7       went?
8    A. No.
9    Q. She pretty much had her own schedule?
10   A. Right.
11   Q. And she came and went as she pleased? Would
12      it be safe to say that?
13   A. Right.
14   Q. And you as well, you came and went as you
15      pleased?
16   A. Yes.
17   Q. No one told you when and what time you had
18      to come home, did they?
19   A. No.
20   Q. Would it be safe to say, Ms. Baldwin, that
21      even though y'all lived together under the
22      same roof that y'all essentially had --
23      y'all owned your own individual type

Page 19

1       household that you ran? Would it be safe to
2       say that? That y'all had your own affairs
3       that you ran even though y'all lived under
4       the same roof?
5          MR. PHILLIPS: Object to the form.
6    Q. Do you understand my question?
7    A. No.
8    Q. The fact that y'all lived together under the
9       same roof, that didn't mean that you-all
10      shared each others affairs, did it?
11   A. Sort of.
12   Q. Sort of?
13   A. Yeah. We bowled together three times a
14      week.
15   Q. So y'all did social things together, right?
16   A. Yeah.
17   Q. But in terms of one person ruling the
18      household or having a domination over the
19      household, that wasn't a fact, was it?
20   A. No.
21          MR. PHILLIPS: Object to the form.
22   Q. In terms of either you or Ms. Johnson being
23      the head of the household, would that have

Page 20

1       been either one of y'all?
2    A. No.
3    Q. So it would be safe to say that y'all kind
4       of had your separate households?
5          MR. PHILLIPS: Object to the form.
6    A. We practically just did the same thing.
7    Q. With regard to your social activities?
8    A. Right.
9    Q. That's what you are referring to?
10   A. Right.
11   Q. How old are you, Ms. Baldwin?
12   A. Ninety-one.
13   Q. What is your Social Security number?
14   A. 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 A.
15   Q. Now, before you retired what line of work
16      did you do?
17   A. Teach.
18   Q. Now, did you hold some type of certificate
19      to teach?
20   A. Yes.
21   Q. Were you licensed with a state agency?
22   A. Yes, I was licensed.
23   Q. What state were you licensed in?

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 21

1   A.  Pennsylvania.
2   Q.  And how long did you hold that license?
3   A.  Until I retired.
4   Q.  Until you retired.  Do you remember when you
5       got it?
6   A.  I had it written down someplace.
7   Q.  Maybe you might remember this way.  Do you
8       know how many years you taught before you
9       retired?
10  A.  Not that long because it was under a
11      disability.
12  Q.  When you say it was under disability, is
13      that why you retired?
14  A.  Yes.
15  Q.  And tell me about your disability.  What was
16      the disability that caused you to retire?
17  A.  They thought it was my heart.  And the
18      pacemaker, that didn't help at all.  Later
19      they took it out because they said the
20      pacemaker was the problem.
21  Q.  Do you remember when you got that pacemaker?
22  A.  No.
23  Q.  Do you remember what approximate year that

Page 22

1       was?
2   A.  No, I don't.  In the '70s, though.
3   Q.  When you retired because of your disability,
4       did you get some form of disability income?
5   A.  I guess I collected Social Security.
6   Q.  Are you on Social Security right now?
7   A.  Yes.
8   Q.  Is it SSD?  Is that what you get, Social
9       Security disability?  Or is it SSI?  Do you
10      know?
11  A.  It's the high standard of whatever it is.
12  Q.  And you've been getting that since the '70s?
13  A.  Yes.  I'm about to break them.
14  Q.  While you are looking for that, do you know
15      how much you get in Social Security
16      disability income?
17          While you are looking for that, I'm
18      going to ask you a couple of questions.  If
19      you need me to pause for a second, I will.
20      Okay?
21          Have you ever been to Alabama before?
22  A.  Yes.
23  Q.  Do you know anyone or are you related to

Page 23

1       anyone that lives in Alabama?
2   A.  I don't think so.
3   Q.  As far as you know, you have no relatives in
4       Alabama?
5   A.  I don't think so.
6   Q.  Have you ever been arrested before?
7   A.  No.
8   Q.  Have you ever filed bankruptcy before?
9   A.  No.
10  Q.  Have you ever sued anyone before, been a
11      plaintiff in a case?
12  A.  No.
13  Q.  Have you ever been sued before?
14  A.  No.
15  Q.  And what about being a witness in a case?
16      Have you ever been a witness in any case and
17      had to go to court and testify about it or
18      sit in a deposition like this about it?
19  A.  No.
20  Q.  And that card that you are looking for, you
21      can provide it to your attorney.
22          (Plaintiff's Exhibit Number Five
23              marked for identification.)

Page 24

1   Q.  Let's go back real briefly, Ms. Baldwin, and
2       talk about your medical history.  And I have
3       a -- Let me show you what I'm going to mark
4       as Plaintiff's Exhibit Number Five.  And I
5       believe this is a document that you just
6       provided everybody in the room.  Will you
7       take a look at that?  Is that the document
8       you just gave everyone in the room?
9   A.  Yes.
10  Q.  Why don't you just take a look at it.  Look
11      at that one right there.  Let's talk about
12      the first prescription.  It's called
13      Aricept.
14  A.  Right.
15  Q.  It looks like the purpose is for dementia?
16  A.  Right.
17  Q.  When were you diagnosed with dementia?  Do
18      you remember?
19  A.  It's been a long time.
20  Q.  A long time?
21  A.  Yes.
22  Q.  Were you diagnosed with dementia prior to
23      July 27th of 2007?

Deposition of Willie Eva Baldwin                                                    February 27th and 28th, 2008

Page 25

1    A.  Yes.
2    Q.  Before the accident?
3    A.  Uh-huh (positive response).
4    Q.  And on the date of the accident, were you
5         taking Aricept or any other medicine for
6         dementia?
7    A.  Yes.  N-a-m-e-n-d-a.
8    Q.  That's listed on Plaintiff's Exhibit Number
9         Five as number six; is that correct?
10   A.  Uh-huh (positive response), number six.
11   Q.  Do you take both Aricept and Namenda?
12   A.  Yes.
13   Q.  You take both of them for dementia?
14   A.  Yes.
15   Q.  I believe you take a ten milligram tablet of
16        Aricept and a five milligram tablet of
17        Namenda; is that correct?
18   A.  Yes.
19            MR. HENDERSON:  Let me just
20            clarify this.  Are you talking
21            about now or before or at the
22            time of the accident?
23            MR. COLLINS:  Actually kind of

Page 26

1            both.
2    Q.  Do you take both of them now?
3    A.  Yes.
4    Q.  Prior to July 27, 20007 were you taking both
5         of those at that time?
6    A.  Beg your pardon?
7    Q.  Were you taking both of those medicines at
8         that time?
9    A.  Yes.
10   Q.  Number two Fexofendadine, that's the
11        antihistamine I think you testified earlier.
12        Are you taking that now?
13   A.  Yes.
14   Q.  And on July 27th, the day of the accident,
15        were you taking that medicine was well?
16   A.  Yes.
17   Q.  And let's for speed's sake, all of the
18        medicines that you have listed there, one
19        through eight, are you currently taking all
20        of those medicines right now?
21   A.  Yes.
22   Q.  And you take them on a daily basis?
23   A.  Yes.

Page 27

1    Q.  And if I believe I understand you correctly,
2         you have taken at least some of those today
3         or will take some of those today; is that
4         correct?
5    A.  I've already taken them.
6    Q.  You've taken all of them?
7    A.  Yes.
8    Q.  Now, on July 27th were you taking those
9         eight medications?
10   A.  Yes.
11            (Brief recess.)
12   Q.  With regards to the eight medications that
13        you were taking on the date of the accident,
14        July 27, 2007, I believe you testified that
15        you are still taking those same eight
16        medications today; is that correct?
17   A.  Yes.
18   Q.  Do you have any side effects from any of
19        those medications?  Do they make you dizzy
20        or slow moving or something to that effect?
21   A.  It seems that Aricept makes me have a lot of
22        dreams.  And it may be that I've been
23        looking at television and all of this stuff

Page 28

1         going on.
2    Q.  Is that -- When you say it makes you have
3         dreams, is that in the daytime, sometimes in
4         the daytime?
5    A.  No.
6    Q.  Just at nighttime?
7    A.  Right.
8    Q.  Does the Aricept make you see things
9         sometimes that are really not there in the
10        daytime?
11   A.  No.
12   Q.  But none of them make you dizzy and things
13        of that nature, do they?
14   A.  (Witness shakes head.)
15   Q.  Is that no?
16   A.  I don't think so.
17            MR. HENDERSON:  Ms. Baldwin, you
18            may want to speak up so
19            everybody can hear you.
20            THE WITNESS:  All right.
21   Q.  These eye drops that you take, are you
22        taking three different types of eye drops?
23   A.  Yes.

Page 29

1  Q. And you take those on a daily basis?
2  A. Yes.
3  Q. Are those for glaucoma?
4  A. Well, yes. High blood pressure and for
5     glaucoma.
6  Q. You've got by the second one, the A-z-o-p-t,
7     high pressure and glaucoma. Do you mean
8     that you have high pressure in your eyes?
9  A. Yes.
10 Q. How long have you had glaucoma? Do you
11    remember when you were diagnosed with
12    glaucoma?
13 A. A long, long time ago.
14 Q. A long, time ago?
15 A. Yes.
16 Q. Is it safe to say you've been taking these
17    eye drops or these eye drops for your
18    glaucoma for several years?
19 A. Oh, yes.
20 Q. Do you know approximately how many years?
21 A. Uh-uh (negative response).
22 Q. More than ten?
23 A. More than ten.

Page 30

1  Q. And on July 27, 2007 had you taken those eye
2     drops for your glaucoma?
3  A. Yes.
4  Q. Where do you normally get your prescriptions
5     filled at, Ms. Baldwin, here in Georgia?
6  A. In Georgia?
7  Q. Do you get them filled in Georgia?
8  A. No. My -- I get them mostly in the mail.
9     It's Prescription Solution.
10 Q. And are they prescribed by a doctor, by a
11    physician?
12 A. Yes.
13 Q. What physician prescribed these particular
14    eye drops? Do you know his or her name?
15    Is that something you think you can get
16    to us at a later date?
17 A. Probably.
18 Q. Who is your general doctor? Do you have one
19    here in Georgia?
20 A. Yes. Woods.
21 Q. Dr. Woods?
22 A. Yes.
23 Q. Is Dr. Woods a male or female?

Page 31

1  A. Male.
2  Q. Do you know his first name?
3  A. That's the general.
4  Q. That's your general --
5  A. Yes.
6  Q. -- general practitioner?
7  A. Uh-huh (positive response).
8        MR. COLLINS: Can you get that to
9     me?
10       MR. HENDERSON: Yes, if we can
11    track it down.
12 Q. Ms. Baldwin, I'm going to ask your attorney
13    just to get that to us. I'll send some
14    questions with him and follow up with that.
15    Okay?
16 A. Beg your pardon?
17 Q. I'll ask your attorney to get that from you
18    and he can get that to us, the information
19    for Dr. Woods.
20 A. I have an appointment with him shortly.
21 Q. Okay. Are you looking for the appointment
22    card in your purse?
23 A. Yes. His name is Bruce A. Woods.

Page 32

1  Q. Bruce A. Woods?
2  A. Yes.
3  Q. And he's in McDonough, or is he in Atlanta?
4  A. He's in McDonough.
5  Q. We can get that information.
6  A. Address?
7  Q. Do you want to give it to us? Go ahead.
8  A. 259 Jonesborough Road, McDowell (sic),
9     Georgia.
10 Q. What's that zip code?
11 A. 30253.
12 Q. Thank you, Ms. Baldwin.
13    Are you currently using inhalers as
14    well? Is that correct?
15 A. Part of the time.
16 Q. When you say part of the time, does your
17    prescription say that you have to use them
18    every day?
19 A. No.
20 Q. How often are you to use your inhalers?
21 A. When I'm having trouble.
22 Q. So only when necessary?
23 A. Yes.

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 33

1    Q.  When was the last eye exam you had,
2        Ms. Baldwin?  Do you remember?
3    A.  Yeah.  This week.
4    Q.  This week?
5    A.  (Witness nods head.)
6    Q.  You had one already, or you are about to get
7        one?
8    A.  I just had it.
9    Q.  When was that?  Today is Wednesday.  Was it
10       Monday or Tuesday?
11   A.  Probably it was last week.  Did you say the
12       eye doctor?
13   Q.  Eye doctor, yes.  You say you had an
14       appointment last week, you believe?
15   A.  Yes.  I believe I've taken that out.  One
16       day I had the examination.  And that --
17       Since I've had it, I don't have it with me.
18   Q.  And when you had that eye exam, I assume
19       that you still have glaucoma; is that
20       correct?
21   A.  I guess I have it.
22   Q.  And you are still taking eye drops for that
23       glaucoma?

Page 34

1    A.  Right.
2    Q.  What about your last physical?  Did you have
3        a physical prior to the accident on July
4        27th?
5    A.  No.
6    Q.  You didn't.  Have you had one since then?
7    A.  A total physical?
8    Q.  A total physical, yes, ma'am.
9    A.  I guess I have.
10   Q.  You have?
11   A.  Yes.
12   Q.  Do you remember when?
13   A.  That was with...
14   Q.  That was with Dr. Woods?
15   A.  No.  No.
16       This is the eye physician.  That was
17       last week.  The eye physician is
18       Dr. McDowell.
19   Q.  Dr. McDowell?
20   A.  Yes.
21   Q.  Do you have his address on there?
22   A.  Yes.  His card.  It's in the Peachtree
23       Pavilion, which is 5775 Peachtree Street

Page 35

1        downward road.
2    Q.  We will get that address.  If that's not the
3        right one, we will find it.
4        Ms. Baldwin, let me ask you a couple of
5        other questions.  With regards to your
6        driving history, how long have you held a
7        driver's license?
8    A.  Since early, early '40s.
9    Q.  And is that a Pennsylvania driver's license?
10   A.  It is now.
11   Q.  What was the first state?
12   A.  Georgia.
13   Q.  Georgia.  Okay.  And at some point you moved
14       to Pennsylvania and got a Pennsylvania
15       driver's license?
16   A.  Yes.
17   Q.  And do you still currently have a
18       Pennsylvania driver's license?
19   A.  Good until 2011.
20       (Plaintiff's Exhibit Number Six
21       marked for identification.)
22   Q.  2011.  I'm going to show you what I'm going
23       to mark as Plaintiff's Exhibit Number Six.

Page 36

1        Do you have your driver's license with you
2        right now?  You don't have to pull it out.
3        What I'm going to show you is this document
4        right here and tell me if that looks like a
5        copy of your Pennsylvania driver's license.
6    A.  Yes.
7    Q.  It does?
8    A.  It does.  Yes.  2011.  That's it.
9    Q.  So this is a copy of your actual driver's
10       license; is that correct?
11   A.  Right.
12   Q.  Now, Ms. Baldwin, do you have any type of
13       restrictions on your driver's license that
14       you know of?
15   A.  No.
16   Q.  I notice on the back of your driver's
17       license it says that you are to wear
18       corrective lenses.  Those are the glasses
19       that you have on right now?
20   A.  Right.
21   Q.  And I assume you had those glasses on the
22       day of the accident, right?
23   A.  Yes.

Page 37

1   Q.  Has your driver's license ever been
2       suspended?
3   A.  No.
4   Q.  No revocations of any sort?
5   A.  No.
6   Q.  Has your license ever lapsed for any reason?
7   A.  No.
8   Q.  Have you ever been involved in any accidents
9       whatsoever, automobile accidents?
10  A.  I don't think so.
11  Q.  You don't think so?
12  A.  (Witness shakes head.)
13  Q.  Think just a little bit for me. Let's say
14      within the past ten years have you ever hit
15      someone with your vehicle, caused an
16      accident?
17  A.  No.
18  Q.  Has anyone ever hit you and caused you any
19      injuries in an accident or just caused an
20      accident in general within the past ten
21      years? Has anyone ever...
22  A.  Anyone ever hit me?
23  Q.  Yes.

Page 38

1   A.  Yes.
2   Q.  How long ago has that been?
3   A.  That was about a year ago.
4   Q.  Someone hit you about a year ago?
5   A.  Yes.
6   Q.  Where was that at?
7   A.  In Atlanta.
8   Q.  In Atlanta. Were you driving your vehicle?
9   A.  Yes, mine.
10  Q.  Is that the New Yorker that you were...
11  A.  Fifth Avenue.
12  Q.  Fifth Avenue?
13  A.  Yes, New Yorker.
14  Q.  Was there a police report done on that?
15  A.  Was there...
16  Q.  A police report done on that?
17  A.  Yes.
18  Q.  Now, whose fault was it in that accident?
19              MR. HENDERSON: Object to the
20          form.
21  A.  He came from behind me and hit the left back
22      door and bent it in.
23  Q.  Who all was in that vehicle?

Page 39

1   A.  The same.
2   Q.  The same ladies?
3   A.  Yes.
4   Q.  Was anybody injured?
5   A.  Injured?
6   Q.  Yes, hurt.
7   A.  No.
8   Q.  You said that was about a year ago. Was
9       that before the July 27th accident?
10  A.  It probably was two years ago.
11  Q.  So it was about two years ago when you had
12      come from Pennsylvania to Atlanta?
13  A.  I was coming from Georgia, Cuthbert going to
14      Philadelphia.
15  Q.  You were coming from Cuthbert to
16      Philadelphia. And do you remember where
17      that accident took place, what city that
18      accident took place?
19  A.  Atlanta.
20  Q.  It did happen in Atlanta?
21  A.  Yes.
22  Q.  Did your car have any damage to it?
23  A.  Yes. The back left door was bent in.

Page 40

1   Q.  Did you get it repaired? Did you get your
2       vehicle repaired after that accident?
3   A.  Yes.
4   Q.  Who paid for those repairs? Did you file an
5       insurance claim on that?
6   A.  Well, I had to catch up with the person that
7       was driving this truck that hit the back.
8   Q.  Did he try to leave the scene?
9   A.  He didn't try. He left. But since I was --
10      I followed him, he eventually stopped.
11  Q.  Now, when he stopped, did you-all call the
12      police?
13  A.  Yes.
14  Q.  And did they make a report of that accident?
15  A.  I don't know. They said we could settle it
16      ourselves.
17  Q.  Now, did you ever file a claim with your
18      insurance company to have your vehicle fixed
19      regarding that accident?
20  A.  No.
21  Q.  You didn't?
22  A.  No.
23  Q.  Was your vehicle ever fixed after that

Page 41

1   accident?
2   A.  You know, I think so.  I'm not really sure.
3   Q.  And if you think so, would you have paid for
4       that yourself?
5   A.  Yes, I paid for it.
6   Q.  Who was your insurance company?  Is it
7       Allstate?
8   A.  Allstate.
9   Q.  So you don't know whether or not you
10      actually contacted Allstate and let them
11      know about it?
12  A.  No.
13  Q.  Is it possible that you did, though?
14  A.  No, I didn't.
15  Q.  You didn't.  Okay.
16          Do you remember what part of Atlanta --
17      Atlanta is huge.  There is a lot of suburbs.
18      Do you remember what part of Atlanta that
19      was in?
20  A.  It was the part -- you know, I can
21      describe -- that seemingly you can when you
22      come under this thing up there -- the way I
23      come through Atlanta, I would have to go

Page 42

1   through and keep to my left.
2   Q.  Okay.
3   A.  So I did and kept to my left.  But I was on
4       the right lane and went under this whatever.
5       And that driver seemingly was going to go
6       the same way, but it seemed that he took for
7       granted that I was going to go to that part
8       that was beyond and go on that route.
9   Q.  Do you remember what highway or interstate
10      it was?  Was it I-75?
11  A.  85.  Anyway, it had to be 85 or 75.
12  Q.  So was it through downtown Atlanta --
13  A.  Yes.
14  Q.  -- when downtown splits off 75 and 85 splits
15      off?  Was it through that area?
16  A.  It possibly was.
17  Q.  Do you remember a lot of tall buildings and
18      things of the like in that area,
19      skyscrapers?
20  A.  Yes.
21  Q.  Now, you say that accident may have been two
22      years ago?
23  A.  Yes, it possibly was two years ago.

Page 43

1   Q.  What time of year would that have been?
2       Would that have been around the same time?
3   A.  Yes, in July.
4   Q.  In July.  Have you been in any other
5       accidents?
6   A.  No.
7   Q.  Whether or not you were at fault or someone
8       else was at fault, do you remember any other
9       accidents that you may have been in?
10  A.  No.
11  Q.  Now, I believe you were in the room when
12      your nephew testified that you and your
13      sisters make this trip to Georgia -- from
14      Pennsylvania to Cuthbert every year?
15  A.  Right.
16  Q.  And how long have you been doing that?
17  A.  Ever since probably I'll say the middle '40s
18      maybe.
19  Q.  And is every year the same time?
20  A.  About the same time.
21  Q.  Now, you have another sister Ella Prather;
22      is that correct?
23  A.  Yes.

Page 44

1   Q.  And she lives in Detroit; is that correct?
2   A.  Right.
3   Q.  How does she accompany you-all on that trip?
4   A.  She comes by a bus from Detroit to
5       Philadelphia.
6   Q.  And does she do that every time?
7   A.  Yes.
8   Q.  And then once she arrives in Philadelphia,
9       then you-all travel from Philadelphia to the
10      south; is that correct?
11  A.  Right.
12  Q.  And you-all have always done that by
13      automobile; is that correct?
14  A.  Right.
15  Q.  And the vehicle that you-all traveled in has
16      always been your vehicle?
17  A.  Right.
18  Q.  Have you ever rented a vehicle to make that
19      trip?
20  A.  No.
21  Q.  You always drove your car?
22  A.  Right.
23  Q.  Now, how long a drive is that from

Page 45

1    Philadelphia to, let's say, Atlanta?
2    A.  Philadelphia to....
3    Q.  To Atlanta.  Do you remember?
4    A.  Thirteen hundred miles, I think.  I always
5        got AAA to layout the route.
6    Q.  AAA would always map everything out for you?
7    A.  Right.
8            (Plaintiff's Exhibit Number Seven
9             marked for identification.)
10   Q.  And I'm going to show you what I'm going to
11       mark as Plaintiff's Exhibit Number Seven,
12       what appears to be a copy of a AAA document.
13       It's actually two pages.  Let me staple it
14       together for you.
15           Why don't you take a look at that
16       document for me, Ms. Baldwin, and tell me if
17       you recognize that document.  Does that
18       document look familiar to you?
19   A.  Not yet.
20   Q.  Let me ask you this question.  Is your name
21       on that document, Ms. Baldwin?  Do you see
22       your name on there anywhere?
23   A.  Yes.

Page 46

1    Q.  At the top of that document there is an
2        address, 394 West Lancaster in Haverford,
3        Pennsylvania.  Is that the agent that you
4        used to make your plans for this trip?
5    A.  I guess it is.
6    Q.  When you make those plans, do you go to a
7        physical location and sit down with a AAA
8        agent and they mapped everything out for
9        you?
10   A.  Yes.
11   Q.  Now, there is two other names on that
12       document as well.  Would those names be Ella
13       Prather and Irena Johnson?
14   A.  Right.
15   Q.  Now, who made the plans through AAA?
16   A.  I did.
17   Q.  You made the plans?
18   A.  Yes.
19   Q.  When you made those plans, did you make
20       those plans for your sister Ella and your
21       sister Irena?
22   A.  I just made the plans for the car to go.
23   Q.  Say again.  I didn't understand.

Page 47

1    A.  I just made the plan for the car to go, not
2        who was going to be.  I don't know.
3    Q.  Okay.  That's all right.  So you just made
4        the plans -- Since all of you-all were
5        traveling together, you just made the plans
6        for everybody?
7    A.  Yes.
8    Q.  It's indicated on that document that you-all
9        would be leaving on July 26, that was a
10       Thursday, flying to Atlanta?  Do you see
11       that date on there, July 26?
12   A.  Oh, yes.
13   Q.  Is that the day you-all were scheduled to
14       leave Pennsylvania --
15   A.  Yes.
16   Q.  -- to fly to Atlanta?
17   A.  Yes.
18   Q.  And is it indicated on there anywhere,
19       Ms. Baldwin, that you-all were going to rent
20       a vehicle from Hertz once you got to
21       Atlanta?  Do you see that on there?
22   A.  Yes, I see.
23   Q.  Now, when you made these reservations at

Page 48

1        AAA, did you have to pay for it right then?
2        Did you have to pay for your airline tickets
3        and reserve the rental car at that time?
4    A.  Did I have to pay for the tickets?  It seems
5        that we just went in and paid for the
6        tickets.  And...
7    Q.  When you say -- I don't mean to cut you off.
8        When you say we just went in, did
9        Ms. Johnson go in with you?
10   A.  Yes.
11   Q.  And did she, too, make this same reservation
12       at the same time?
13   A.  I just made the reservation for the car to
14       go.
15   Q.  But when you-all went in to plan this trip,
16       Ms. Johnson physically went in to AAA with
17       you; is that correct?  She went to the
18       location with you?
19   A.  Oh, yes.
20   Q.  Did she, too, tell the agent that you-all
21       spoke with that she, too, wanted to go to
22       Atlanta, Georgia by way of airplane?  Did
23       she say she wanted to make the same trip

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 49

1    that you wanted to make?
2    A.  No.  It just started with the three of us.
3        And they just went with, you know, making it
4        for the three of us.
5    Q.  So this wasn't a trip that you were making
6        by yourself --
7    A.  Uh-uh (negative response).
8    Q.  -- and then you just asked them to tag along
9        with you?  You-all went in to make this same
10       trip together, correct?
11   A.  I'm not sure.
12   Q.  Do you remember how the trip was paid for?
13       Did everybody pay for their own trip?
14   A.  No.
15   Q.  Who paid for it?
16   A.  You mean by the...
17   Q.  To buy the plane tickets.  Who paid for the
18       airline tickets?
19   A.  I think I did.  But Irena paid -- gave me
20       the money, hers.  But I paid for Eloise and
21       mine.  But I paid for all of them as far as
22       they are concerned.
23   Q.  Are you saying you paid for them on your

Page 50

1    credit card, and then they gave you the
2    money back?
3    A.  Who?
4    Q.  Irena.
5    A.  No.  Yeah, she gave it to me before.
6    Q.  Okay.  Before you-all went to AAA to make
7        this reservation, Irena had already given
8        you her money?
9    A.  To make it with AAA -- I'm not sure.
10   Q.  Let me try to see if I can ask the question
11       a little clearer.  Did Irena pay for her own
12       trip?
13   A.  Yes.  By plane, yes.
14   Q.  She paid for her own airline ticket,
15       correct?
16   A.  Uh-huh (positive response).
17   Q.  Did Ella pay for her own airline?
18   A.  No.  I usually paid for hers.
19   Q.  Was there a reason why you usually paid for
20       Ella and not for Irena?
21   A.  Because she had never worked.  She always
22       stayed at home.
23   Q.  So Irena because she had her own income and

Page 51

1    her own checking account and handled her own
2    affairs would pay for her own trip; is that
3    correct?
4    A.  Yes.
5            MR. HENDERSON:  Let's make sure we
6        are talking about the airfare.
7            You said trip.
8    Q.  The airfare; is that correct?
9    A.  Yes.
10   Q.  Let me ask you this.  What was the purpose
11       of the trip?
12   A.  Just a visit to see the other part of the
13       family.
14   Q.  Was that something that Irena wanted to do
15       as well as Ella and as well as you?
16   A.  Sure.
17   Q.  Did you ever tell Irena and Ella that I'm
18       going to Cuthbert, Georgia, will y'all just
19       ride with me?  Or did everybody make the
20       decision that they are all going to
21       Cuthbert, Georgia?
22   A.  I think we just made the decision that the
23       other part of the family is there, and so we

Page 52

1    are all going.
2    Q.  So would it be safe to say that Irena making
3        the trip to Cuthbert benefitted her and also
4        benefitted you?  I mean, you-all were just
5        traveling together?
6    A.  Yeah.
7    Q.  When you got to -- when you got on the
8        plane -- Let's talk about the trip, the day
9        you actually took the trip to Atlanta.  That
10       would be July 26, 2007.  When you got on the
11       plane to Atlanta, was your plane delayed for
12       any reason?
13   A.  Yes.
14   Q.  Can you tell me why?
15   A.  The president was there doing his thing.
16   Q.  What president are you referring to?  George
17       Bush?
18   A.  Yes.
19   Q.  The United States president?
20   A.  Right.
21   Q.  When you say doing his thing, had his plane
22       come into the same airport?
23   A.  Yes, he was there.

Page 53

1   Q.  Did you see him?
2   A.  No, I didn't see him.  We sat on the plane
3       and waited until his business was over.
4   Q.  And how long did President Bush hold y'all
5       up?  Do you know?
6   A.  It was quite a little while.  About an hour,
7       I guess.
8   Q.  So y'all had to sit on the plane for about
9       an hour and wait on President Bush?
10  A.  Right.
11  Q.  So that would explain why your plane was
12      delayed coming into Atlanta; is that
13      correct?
14  A.  Yes.
15  Q.  Let's talk about when you got to Atlanta.
16      Did you rent a vehicle?  Did you go to Hertz
17      rental car and rent a vehicle?
18  A.  I guess I did.
19              (Plaintiff's Exhibit Number Eight
20          marked for identification.)
21  Q.  Before we go there, I'm going to mark this
22      as Plaintiff's Exhibit Number Eight.  I'm
23      going to show you this document.  You may

Page 54

1       not have seen it before.  Do you recognize
2       that document there, Ms. Baldwin?
3   A.  Uh-huh (positive response).
4   Q.  You do recognize that?
5   A.  Uh-huh (positive response).
6   Q.  Whose handwriting is that?
7   A.  Mine.
8   Q.  That is your handwriting?
9   A.  Yes.
10  Q.  So you had the itinerary mapped out for this
11      trip; is that correct?
12  A.  Right.
13  Q.  And that itinerary included Ms. Prather,
14      Ms. Johnson, and Ms. Baldwin, that's you; is
15      that correct?
16  A.  Yes.
17  Q.  And according to this itinerary, you-all had
18      planned to once you get to Atlanta was at
19      some point leave and go to Cuthbert, Georgia
20      and remain there until about August 4th.
21      Does that sound about right?
22  A.  That sounds about right, yes.
23              (Plaintiff's Exhibit Number Nine

Page 55

1               marked for identification.)
2   Q.  I'm going to show you, Ms. Baldwin, what
3       I've marked as Plaintiff's Exhibit Number
4       Nine.  I want you to take a look at those
5       documents and tell me if you can identify
6       those documents?  Have you ever seen that
7       before?
8           And you can take a look at the second
9       page and see if your signature is on there
10      as well.  Have you ever seen that document
11      before?  Do you see a name on it,
12      Ms. Baldwin?
13  A.  Yes.
14  Q.  Is that your signature at the bottom of that
15      page, the second page, Plaintiff's Exhibit
16      Number Nine?
17  A.  Yes.
18  Q.  Is there the name of a rental car company on
19      that document?
20  A.  Yes, Hertz.
21  Q.  Hertz rental car?
22  A.  Yes.
23  Q.  Do those look like a copy of the documents

Page 56

1       that you got when you paid for the rental
2       car?
3   A.  I don't know.
4   Q.  Do you remember signing anything when you
5       got the rental car?
6   A.  Yeah.
7   Q.  Do you remember paying for the rental car?
8   A.  Let's see.  Do they say?
9   Q.  Does it say on there how much you paid for
10      that rental car, Ms. Baldwin?
11  A.  Yes.
12  Q.  How much does it say?
13  A.  Total estimate charge eight hundred ten
14      dollars twenty-seven cents.
15  Q.  I want you to turn to the very first page of
16      that document, and I want you to take a look
17      at it.  There is an area on the document
18      that says optional services.  Do you see
19      that on there?
20  A.  Yes.  That would have been eight hundred ten
21      twenty-seven.
22  Q.  Right where it says optional services in
23      that little block, do you see those three

Page 57

1    lines that says LDW, LIS and PPO?
2    A.  Yes.
3    Q.  Do you remember taking out insurance for
4        this rental car, Ms. Baldwin?
5    A.  Yes.
6    Q.  Did you ask for that insurance to cover the
7        vehicle and cover any losses in the event
8        something happened?
9    A.  Yes.
10   Q.  They told you how much the insurance cost
11       and you agreed to pay that amount for the
12       insurance?
13   A.  Yes.
14   Q.  Where it says LIS accepted, can you tell me
15       how much insurance you paid for under LIS?
16       The little line next to it, what's that
17       amount right next to it?
18   A.  One hundred and sixteen fifty-five.
19   Q.  Now, did you make this payment and accept
20       this insurance at the Atlanta International
21       Airport?
22   A.  Yes, I had accepted insurance there.
23   Q.  Was that in the State of Georgia; Atlanta,

Page 58

1    Georgia?
2    A.  I don't know.
3    Q.  Did you do that in Atlanta, Georgia?
4    A.  I guess so.
5    Q.  Was it in the Atlanta airport?
6    A.  I'm not sure.
7    Q.  Where did you rent the vehicle from?
8    A.  Atlanta, I guess.
9    Q.  And, again, on the second page, that is your
10       signature; is that correct?
11   A.  The second page, yes.
12   Q.  Now, let me ask you...
13   A.  Wait a minute.  The second page.  Yes,
14       that's my signature.
15   Q.  Who paid for rental car, Ms. Baldwin?
16   A.  I did.
17   Q.  Now, you paid for it on your credit card.
18       Did you have to use a credit card or debit
19       card to make that payment?
20   A.  I don't have a debit card.
21   Q.  What about a credit card?
22   A.  Possibly with a credit card.
23   Q.  Did you use that to rent the vehicle, or did

Page 59

1    you use cash?
2    A.  No.  I didn't use cash.
3    Q.  So you used some form of plastic; is that
4        correct?
5    A.  Yes.
6    Q.  Now, did anyone else help you pay for that
7        rental car?
8    A.  No.
9    Q.  You paid for it by yourself?
10   A.  Yes.
11   Q.  Did anybody reimburse you?  Did Ms. Johnson
12       give you some of the money to help you take
13       care of eight hundred and ten dollars?
14   A.  I'm quite sure she did.
15   Q.  But Ms. Prather, she wouldn't have given you
16       any money; is that correct?
17   A.  No.
18   Q.  Now, you-all were going to Cuthbert, Georgia
19       together as a family, correct?
20   A.  Right.
21   Q.  Three sisters, correct?
22   A.  Right.
23   Q.  Why didn't you-all rent separate cars?

Page 60

1    A.  We would have needed three drivers.
2    Q.  I didn't hear you.  What did you say?
3    A.  If we had rented three cars, we would have
4        needed three drivers.
5    Q.  Okay.  So are you saying it was beneficial
6        for you-all to just rent one car?
7    A.  Yes, rent one car and three of us get in it.
8    Q.  So it kind of helped everybody out in the
9        situation, right?
10   A.  Right.
11   Q.  Ms. Johnson, it helped her out a little bit;
12       is that correct?
13   A.  Uh-huh (positive response).
14   Q.  It helped you out a little bit as well,
15       correct?
16   A.  Right.
17   Q.  And it also helped Ms. Prather out because
18       y'all didn't have to rent separate cars; is
19       that right?
20   A.  Right.
21          (Plaintiff's Exhibit Number Ten
22           marked for identification.)
23   Q.  Now, once you rented the vehicle from

Page 61

1   Hertz -- I'm done with that document. Thank
2   you. Let me show you another document
3   before I move forward. Here is another
4   document that I believe you may have
5   received. I'm going to ask you if you
6   remember receiving this document. This is a
7   copy of it. It may have come in a
8   folder-like form. Would you take a look at
9   that and see if you remember seeing a
10  document similar to that that was in some
11  folder-like form?
12       You don't have to read all the way
13  through it, but just kind of flip through
14  the pages and see if you ever remember
15  seeing anything like that.
16       Ms. Baldwin, I'm going to represent to
17  you that that document is a copy of this
18  document. Do you remember receiving any
19  type of document like this from Hertz that
20  was in this little folder exactly like this?
21  Just take a look at it. And they may have
22  stuck these little tickets here inside that
23  folder. Do you remember receiving those

Page 62

1   tickets and then that little jacket as well?
2   A.  No.
3   Q.  You don't remember receiving that? Okay.
4       That's quite all right.
5   A.  This must be charged to VISA.
6   Q.  That's correct. Okay.
7       You already talked about the little
8       cards. But I just wanted to know if you
9       remembered receiving a folder equivalent to
10      the one that I've just given to you.
11  A.  No, I don't remember.
12  Q.  Okay. That's quite all right. Thank you.
13      So looking at that document you can't
14      say you remember seeing any document like
15      that?
16  A.  (Witness shakes head.)
17  Q.  Ms. Baldwin, we can move on. You can stick
18      that down here.
19  A.  Okay.
20  Q.  Do you remember what kind of vehicle you
21      rented, what kind of car it was?
22  A.  (Witness shakes head.)
23  Q.  You don't remember the type? Do you

Page 63

1   remember what color it was?
2   A.  Wine, I guess you could say.
3   Q.  You say it was wine colored?
4   A.  Yes. Sort of reddish.
5   Q.  In the reddish...
6   A.  Yeah.
7   Q.  I'm going to show you this document just to
8       kind of -- maybe we can refresh your memory
9       a little bit. Does that photograph -- Does
10      that photograph look like the type of car
11      that you rented? Is that the vehicle that
12      you rented that day, the green car there?
13  A.  (Witness indicates.)
14  Q.  Yes.
15  A.  I guess it does.
16  Q.  Do you remember renting a vehicle like that?
17  A.  Oh, that's a...
18  Q.  Is that a reddish or a greenish car?
19  A.  It was reddish.
20  Q.  The one that you rented?
21  A.  Right.
22  Q.  Who owned that vehicle? Do you know who
23      owned the vehicle that you rented? Was it

Page 64

1   owned by Hertz?
2   A.  I would think so.
3   Q.  Do you remember the license plate that was
4       on it?
5   A.  No.
6   Q.  When you rented the vehicle, the vehicle
7       that you remember renting, did you check it
8       to make sure everything worked fine on it,
9       the headlights --
10  A.  Uh-huh (positive response).
11  Q.  -- the turn signals, the brake lights --
12  A.  Uh-huh (positive response).
13  Q.  -- the brakes? Did you check and make sure
14      the car was in good repair?
15  A.  Yes.
16  Q.  Tell me how you did that.
17  A.  Until I got to where I was going to get off,
18      I could check it -- you know, until it was
19      time that I didn't want to go any further in
20      Alabama, then I could check it on the
21      highway if I needed those things. But...
22  Q.  But before you -- I'm sorry. Go ahead.
23  A.  But once I decided, turn around, don't go

Page 65

1    any further in Alabama, then this little
2    chute that -- you know, that you could turn
3    around in, it was just -- just one --
4    couldn't but one car go through that -- that
5    door up there at the end of -- that you
6    would make your left to turn around.
7  Q.  We are going to talk about the accident in
8    just a moment.  Okay?  What I'm referring to
9    is, when you rented the vehicle when you
10   were in Atlanta at the airport, before you
11   had gotten into the car, did you check it
12   and make sure everything worked properly?
13 A.  Yes.
14 Q.  And did everything work properly on it?
15 A.  Yes.
16 Q.  The lights and turn signals and brake lights
17   and everything was working properly?
18 A.  (Witness nods head.)
19 Q.  As you were driving the vehicle, was it
20   driving just fine?
21 A.  Yes.
22 Q.  You didn't have any mechanical problems or
23   no other types of problems with the vehicle?

Page 66

1  A.  No.
2  Q.  Once you left the Atlanta airport, where did
3    you go when you left Atlanta?  When you,
4    Irena, and Ella got in the vehicle to leave
5    Atlanta, where did y'all go?
6  A.  It seemed that it was -- it was sort of to
7    the right, and the car was over to a little
8    section to the right.
9  Q.  I'm not talking about the day of the
10   accident.  I'm talking about the first day
11   you rented the car on July 26 when your
12   plane got to Atlanta and you went and rented
13   the car, as soon as you left the airport --
14   before you got to Montgomery, as soon as you
15   left the airport, where did y'all go, you
16   and Ella and Irena?  Do you remember?
17 A.  (Witness shakes head.)  Just to try to pick
18   up the luggage.
19 Q.  I'm talking about once you got the luggage
20   and actually got into the vehicle.
21 A.  Well, we hadn't gotten the luggage until
22   yet.
23 Q.  Did you have to get the vehicle to go get

Page 67

1    your luggage?
2  A.  No.  It was this, you know, table that it
3    would be on.  But all was on except one
4    piece, which we haven't found yet.
5  Q.  Once you did get most of the luggage...
6  A.  But...
7  Q.  I'm sorry.  Go ahead.
8  A.  But that was found.  It was really crushed
9    up.  But it seemed that maybe everything was
10   in there.  Anyway, they finished tearing
11   that up.
12 Q.  And once you got the luggage and loaded it
13   into the vehicle, the rental car, the Hertz
14   rental car, where did you-all go when you
15   left the airport?
16 A.  When we got the luggage?
17 Q.  Yes, after you got the luggage.  You don't
18   remember?
19     When you left Atlanta, did y'all get
20   lost?
21 A.  I guess we were lost because we were going
22   on to Alabama.
23 Q.  Before you had gotten to Alabama, did you

Page 68

1    ever go to Florida?
2  A.  Yes, we went to Florida.
3  Q.  What part of Florida did you go to?
4  A.  I don't know where.
5  Q.  Do you know how you got to Florida?
6  A.  Yeah.
7  Q.  How?
8  A.  Drove there.  And once we were in Florida,
9    we knew we didn't want to be in Florida.
10 Q.  Were you driving at the time?
11 A.  Yes.
12 Q.  Did you drive the entire time?
13 A.  Yes.
14 Q.  Now, do you remember what part of Florida
15   you had gotten to?
16 A.  No.
17 Q.  Do you remember what highway or interstate
18   you were on?
19 A.  I thought it was 85, I thought.
20 Q.  So when you got to Florida, did you-all turn
21   around and come back?
22 A.  Right.
23 Q.  That same day?

Page 69

1  A.  That same day.
2  Q.  How long will y'all been driving?  Do you
3      know?
4  A.  Since that morning, I guess.
5  Q.  Since that morning.  Okay.  So your plane --
6      Strike that.
7          After you left Florida when you turned
8      around in Florida, did you end back up in
9      Georgia?
10  A.  Right.
11  Q.  Do you remember what part of Georgia you
12      ended back up in?
13  A.  No.
14  Q.  Does the name Newnan sound familiar?
15      Newnan, Georgia, does it sound familiar?
16  A.  Not connecting this.
17  Q.  Did you-all stay the night in a hotel
18      somewhere?
19  A.  It didn't seem that we did.
20  Q.  So after you got back from Florida, y'all
21      didn't spend the night in a hotel?  Do you
22      remember?
23  A.  Uh-uh (negative response).

Page 70

1  Q.  Do you remember ever staying in a hotel
2      during this trip?  When you came down last
3      year from Pennsylvania to Atlanta, do you
4      remember staying in a hotel at any time
5      during that trip?
6  A.  No, I don't think so.
7  Q.  So when did you-all end up in Alabama?
8  A.  On the 27th.
9  Q.  On the 27th.  So you came in -- As your
10      airline tickets indicate, you flew in on the
11      26th, correct?  The morning of July 26th,
12      correct, you flew into Atlanta?  Does that
13      sound about right?
14  A.  Yes.
15  Q.  Then you rented a vehicle from Hertz at the
16      airport, correct?
17  A.  Atlanta airport.
18  Q.  Atlanta airport, correct?
19  A.  Uh-huh (positive response).
20  Q.  You left the Atlanta airport and you
21      traveled and you got lost in Florida.  Does
22      that sound about right?
23  A.  Uh-huh (positive response).

Page 71

1  Q.  And then you ended up back in Georgia?
2  A.  Back.
3  Q.  And then back in Alabama.  Did y'all ever
4      stop and take a rest anywhere?
5  A.  Uh-uh (negative response).  I don't think
6      so.
7  Q.  You drove the entire time from the morning
8      of July 26 until the evening hours of July
9      27th?  Y'all never stopped at all?
10  A.  I don't remember stopping.  But...
11  Q.  Is it possible that you could have?
12  A.  It's possible that we could have.
13  Q.  So it's possible that y'all may have spent
14      the night in Newnan, Georgia; is that
15      correct?  Y'all may have done that?
16          If I represent to you that your sister
17      Ella said that you-all spent the night in
18      Newnan, Georgia, would she be correct?
19  A.  I don't know.
20  Q.  So you don't remember anything about
21      spending the night anywhere, do you?
22  A.  (Witness shakes head.)
23  Q.  That's okay.  Let's talk about the accident

Page 72

1      that happened on July 27th.  Ms. Baldwin,
2      when I used the word hotel, sometimes I
3      assume that's motel, too.  Did y'all stay at
4      a motel?  Do you remember a motel or
5      anything like a Motel 6 or any type of
6      lodging facility that you stayed at?
7  A.  I'm not sure.
8  Q.  On July 27, 2007 at about seven o five do
9      you remember being involved in an automobile
10      accident?
11  A.  Yes.
12  Q.  Now, I want you to tell me in your own words
13      what happened.
14  A.  Well, to get off of 85 and turn around, you
15      had to go up this little path, and only one
16      car could go through.  And as I was going
17      up, a car came from behind and just
18      spattered the car.
19  Q.  Okay.  So as you were going up the little
20      ramp area, the area that you are referring
21      to, you were hit from behind?
22  A.  Right.
23  Q.  Do you know who it was that hit you from

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 73

1    behind?
2    A.  No, I didn't know them.
3    Q.  You didn't know at that time?
4    A.  No.
5    Q.  Did you later learn who it was that hit you
6        from behind?
7    A.  Just in reading who it was.
8    Q.  Do you remember what you read that let you
9        know who it was that hit you from behind?
10   A.  Some of your writings.
11   Q.  Were those things that you presented to your
12       attorney?  I don't want you to tell me what
13       your attorney told you.  Were those some of
14       the documents that I presented to your
15       attorney is what you looked at?
16   A.  I guess so.
17   Q.  Did you ever see the police report?
18   A.  No.
19            (Plaintiff's Exhibit Number 11
20             marked for identification.)
21   Q.  Let me show you what I've marked as
22       Plaintiff's Exhibit Number Eleven.  I want
23       you to take a look at that document.  I

Page 74

1    represent to you that this is the corrected
2    copy of the accident report.  Have you ever
3    seen that accident report before?
4    A.  Not that I remember.
5    Q.  Did you ever talk to anyone regarding the
6        accident?
7    A.  No.
8    Q.  Do you remember talking to a Montgomery
9        police officer about the accident?
10   A.  It seemed that we might have eventually got
11       off there, and this is the lady that hit me
12       from behind.
13   Q.  Do you see her name on that report?
14   A.  Denita R. Colvin.
15   Q.  Do you remember what kind of vehicle
16       Ms. Colvin was driving when she hit you from
17       behind?
18   A.  It seemed that it was -- it was a dark
19       color.
20   Q.  When you say dark, was it black?
21   A.  It was black.
22   Q.  Do you remember what kind of vehicle it was?
23   A.  No.  It was sort of an older vehicle because

Page 75

1    it just splattered up -- the Hertz vehicle
2    just splattered up like it was glass.
3    Q.  Ms. Baldwin, I want you to take a look at
4        that police report, that accident report.
5        And if you look at the area where it says
6        unit number one --
7    A.  Yes.
8    Q.  -- over to your left-hand side, I believe
9        your attorney can show you.  Do you see your
10       name on that report?
11   A.  Yes.
12   Q.  And that unit number one would identify that
13       you were driving in vehicle number one
14       according to the police report.  Does that
15       sound about right?
16   A.  Yes.
17   Q.  Now, below that you'll see where by
18       Ms. Colvin's name it will say unit number
19       two.
20   A.  Uh-huh (positive response).
21   Q.  Do you see anywhere on that report that
22       shows that Ms. Colvin was driving in unit
23       number two?

Page 76

1    A.  Yes.
2    Q.  Now, do you know whether or not there were
3        any witnesses to this accident?
4    A.  I wouldn't say it was no more than who was
5        in the car.
6    Q.  Now which car are you referring to?
7    A.  The one that hit.
8    Q.  Now, let me ask you this question.  When you
9        were driving on 85 getting ready to turn
10       around, did you notice any other vehicles on
11       the interstate, any other cars that were
12       driving alongside you, ahead of you?
13   A.  They couldn't drive beside me because I was
14       going up this ramp to where one car could
15       only go through.  And as I was going up that
16       ramp to go through that one door, a car
17       behind came and hit me.
18   Q.  When you say go through that door, what are
19       you referring to?  What door are you
20       referring to?
21   A.  Where you could only go up the ramp, and the
22       door I'm talking about is a door for just
23       one car to go through.

Page 77

1  Q.  Were there any other vehicles on the
2      interstate that you were driving on?
3  A.  I wasn't on the interstate.  I was before.
4      Yeah, it was a lot of cars.
5  Q.  Do you know about how many cars may have
6      been on the road?
7  A.  No.
8  Q.  How fast were you driving?  Do you remember?
9  A.  Probably thirty or forty miles an hour.
10 Q.  Thirty or forty miles an hour?
11 A.  Yeah, looking for some place to get off.
12 Q.  Do you know what the speed limit is on that
13     road?
14 A.  No.
15 Q.  Did you see any signs that indicate what the
16     speed -- the posted speed limit was?
17 A.  I'm quite sure I did, but I don't remember
18     what it would be.
19 Q.  Did you see any signs that would indicate
20     what the minimum speed that you would have
21     to drive?
22 A.  No.  I'm probably sure I did, but I don't
23     remember.

Page 78

1  Q.  And you believe you were driving about
2      thirty or forty miles an hour?
3  A.  Yes.
4  Q.  Why would you have been going that slow?
5  A.  Looking for some place to get off.
6  Q.  You say you were looking for a place to get
7      off?
8  A.  Yes.
9  Q.  Now, when you were looking for this place to
10     get off, did you somehow stop so that you
11     can kind of make a turn?  Did you stop in
12     the road?
13 A.  No.  Probably a little slower to get on this
14     ramp that was going up to that door for
15     turning around.
16 Q.  Did you...
17 A.  I assume, you know, you go up and turn to
18     your left, that that was going to put you
19     somewhere to turn around.
20 Q.  So is it your testimony that you never, ever
21     stopped your vehicle on the road?
22 A.  I never stopped.
23 Q.  Now, I want you to look at page two of that

Page 79

1      accident report, Ms. Baldwin.
2  A.  Page two.
3  Q.  And towards the bottom of the page there is
4      a paragraph that says describe what
5      happened, refer to vehicles by number.  Can
6      you read that for me, Ms. Baldwin?
7  A.  Witness advised that vehicle one was
8      traveling west on -- that's 1085 South in
9      the right lane when suddenly vehicle one
10     started backing up on 1085 in the lane of
11     traffic.  Witness further advised that
12     vehicle two took evasive action, however was
13     unable to avoid the collision.
14         We weren't down on that highway then.
15     The driver of vehicle one advised that she
16     was traveling on 1085 south and vehicle two
17     collided with her vehicle in the rear.
18     Driver of vehicle one advised that she never
19     put her vehicle in reverse.  Driver of
20     vehicle two advised that when she noticed
21     vehicle one, it was backing on the
22     interstate.
23         We weren't down on the interstate.

Page 80

1  Q.  Okay.  Continue.
2  A.  Driver of vehicle two further advised she
3      attempted to avoid the collision by swerving
4      to the right.
5  Q.  Okay.
6  A.  But we weren't on the highway then.  We were
7      on that ramp.
8  Q.  Now, you saw where it said witnesses advised
9      that you were backing up on interstate.
10     Would that be incorrect?
11 A.  That's incorrect.  We went -- well, a long
12     time before that since it seemed that all I
13     saw was going further into Alabama.  But
14     there was that ramp I saw, so I did back up
15     on, you know, the regular highway until I
16     could make the -- it would be a left-hand
17     turn to get on this ramp to go up and go
18     through that little door.
19 Q.  So at some point you did back up on the
20     highway to try to catch the ramp.  Is that
21     what you are testifying to?
22 A.  Yes.
23 Q.  And that was because you -- Was that because

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 81

1    you were too far in Alabama, and you didn't
2    want to go that far?
3    A.  Right.  Had been to Florida.  Didn't want to
4    get further into Alabama.
5    Q.  You were the only person that was driving;
6    is that correct?
7    A.  Right.  See, on the -- That's the way it
8    looked.  And the highway is down here.  But
9    when you go up this ramp there, only one car
10   can go through there at a time.
11   Q.  And let me see that exhibit.  We are going
12   to talk about that for a second.  Just for
13   the record, I believe, Ms. Baldwin, you are
14   referring to page number four on Plaintiff's
15   Exhibit Number Eleven.  Is this the diagram
16   that you were just talking about?
17   A.  Yes.
18   Q.  Now, hang on one second.  Let me allow you
19   to use this ink pen here.  Ms. Baldwin, I'm
20   going to refer to page number four --
21   actually page number five.  It is the same
22   drawing, but it's a little bit bigger and it
23   might help you identify it a little better.

Page 82

1    All right?
2    A.  Okay.
3    Q.  What I want you to do, Ms. Baldwin, I think
4    you testified that you were traveling in the
5    one lane right there, correct?  I want you
6    to take one of these green stars, if you
7    can, and just put it in the area that you
8    were just so we can show that that was your
9    vehicle in that approximate area.  Okay?
10        MR. HENDERSON:  At what time?
11   Q.  At approximately seven o two, seven o three,
12   right before the accident where you believe
13   your vehicle was.
14        MR. HENDERSON:  When you say right
15   before the accident, there is a
16   lot of time there.
17   Q.  Immediately preceding the accident at seven
18   o two or seven or three -- during the time
19   frame when you tried to take the one little
20   road.
21        MR. WALLER:  Can I interject
22   something?
23        Ms. Baldwin, do you need

Page 83

1    orientation on that map from
2    Mr. Henderson, your attorney?
3    Q.  Take a look at that.  Do you understand what
4    all of that means on this particular map?
5    A.  Uh-huh (positive response).  I hadn't been
6    on this little space long to go up and go
7    through that exit and turn to my left.
8    Q.  Now, where you placed the X at on this
9    particular diagram on Plaintiff's Exhibit
10   Number Eleven...
11        MR. HENDERSON:  I'm sorry.  That's
12   a star.
13   Q.  Excuse me.  The star.  Is that where you
14   contend your vehicle was?
15   A.  I would say that I hadn't been going up very
16   long.
17   Q.  Where did you back up at and try to...
18   A.  Down in the highway.
19   Q.  You were in the highway when you backed up?
20   A.  Yeah.
21   Q.  And did you actually put your vehicle in
22   reverse and start backing up to try to catch
23   that exit?

Page 84

1    A.  Yes.  I stood there until it was safe for me
2    to back up, you know, and go to my right to
3    get to that.
4    Q.  And that was in the highway that you did
5    that, that you backed up?
6    A.  Right.
7    Q.  Do you remember -- Let me ask you this.
8    Once Ms. Colvin's car hit you from behind,
9    do you remember the car going up in the air?
10   A.  It didn't seem to go up in the air.  It just
11   seemed to sort of turn around as if it was
12   going to go back to the left.
13   Q.  And were you injured in the accident?
14   A.  Injured?
15   Q.  Yes, ma'am.  Were you hurt?
16   A.  (Witness shakes head.)
17   Q.  You weren't hurt?
18   A.  (Witness shakes head.)
19   Q.  How did you get out of the vehicle?
20   A.  I just got out.
21   Q.  You just got out?
22   A.  Yes.
23   Q.  When you got out, what's the first thing you

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 85

1    did?

2    A.  Well, I looked back at my sister, the one
3         that was killed.  And she was, you know,
4         laying over -- from the right side she was
5         laying over to the left side.  And when the
6         car hit, she said, oh.  And it was a lot of
7         blood coming from -- so much so that the
8         jacket that she had on the seat beside her
9         was so full of blood and the seat of the car
10        that we just left that as it was.  And the
11        ambulance picked her up.

12   Q.   Did you see anybody else come in and try to
13        help out with the accident?

14   A.   No.

15   Q.   You don't remember any guys coming in and
16        trying to get you out of the car?

17   A.   No.

18   Q.   Did anybody try to get Ms. Prather out of
19        the car?

20   A.   Only the people of the ambulance that was
21        going to take us -- you know, that helped
22        her out.

23   Q.   Prior to them arriving, did anyone...

Page 86

1    A.   Nobody, no.  Nobody.  We were just the two
2         cars up there.

3    Q.   There were no other cars around?

4    A.   No.

5    Q.   Did anybody try to -- Did you try to help
6         your sister Ms. Johnson get up?

7    A.   No, because the people in the ambulance was
8         helping her.

9    Q.   Okay.  That's fair enough.  After you had
10        gotten out and you-all waited for the
11        paramedics to come, did you say anything to
12        Ms. Prather about what happened?

13   A.   No, I don't think so.

14   Q.   Did you go to the hospital?

15   A.   They took us to the hospital.

16   Q.   The ambulance took you to the hospital as
17        well?

18   A.   Right.

19   Q.   Was your sister injured -- Ms. Prather, was
20        she hurt?

21   A.   It doesn't seem so.  But she doesn't
22        remember it.  I guess it just, you know,
23        dulled the brains.

Page 87

1    Q.   Let me ask you this question.  In your
2         interrogatories I asked you -- the questions
3         I had asked you, and you were to answer and
4         give them back to us.  I had asked you is it
5         customary for you to stop or back up on the
6         roadway.  And I believe your answer was very
7         seldom.

8    A.   Very seldom.

9    Q.   Have you ever done that before where you
10        just stopped in the middle of the highway
11        and backed up?

12   A.   I wasn't on the middle of...

13   Q.   Or in the highway?

14   A.   In the highway.

15   Q.   Have you ever done that before?

16   A.   Yes.

17   Q.   You have?

18   A.   Uh-huh (positive response).  Pulled to the
19        side -- to, you know, the extreme right.

20   Q.   But when you stopped and backed up, were you
21        in the highway when you did that and then
22        you pulled to the side?

23   A.   Right.

Page 88

1    Q.   Let me ask you this question.  Was anybody
2         injured or was there an accident behind that
3         conduct before when you did that?  Did
4         anybody ever get hurt?

5    A.   No.

6    Q.   Do you think it's safe to stop in the
7         highway and back up?

8    A.   Yes.

9    Q.   You think it is safe to do that?

10   A.   If you don't see anyplace of pulling off to
11        your right.

12   Q.   Assuming that it's -- Let me ask you this
13        question.  If there are other cars coming
14        behind you, would it be safe -- in your
15        opinion would it be safe, then, to stop in
16        the highway?

17   A.   Extremely at the right, but not in the
18        highway.  You know, but that space that's
19        not part of the highway where if you broke
20        down you would stop anyway.

21   Q.   That's fine.  But if you were in the highway
22        and you -- not in that space you are talking
23        about, but if you were in the highway?

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 89

1    A.  Oh, no.  Never back up there.
2    Q.  Is that dangerous?
3    A.  Sure.
4    Q.  What do you think would happen if you did
5        that?
6    A.  They would kill everybody in that front car.
7    Q.  When you backed up -- you say you were in
8        the highway when you backed up -- did you
9        think about whether or not someone....
10   A.  But I wasn't, you know, out in the traveling
11       lane.  I was beside -- that space that if
12       you had car trouble that you would pull over
13       there.
14   Q.  Is it possible that you may have thought
15       that you were in that space and you were in
16       the highway?
17   A.  No.
18   Q.  I think you testified earlier that you were
19       in the highway when you backed up.  Were you
20       in the highway when you backed up?
21   A.  Possibly.  But you are calling the
22       highway -- it's those lanes that tell you,
23       you know, that you are in one, two, three

Page 90

1        lane, that's the highway.  But not that lane
2        that you don't drive on, the one that's on
3        the right.
4    Q.  So would it be safe to say that if you were
5        in the highway, the lane that you do drive
6        on and you back up, that would be dangerous?
7    A.  Worse than dangerous.
8    Q.  And would it be safe to say if someone
9        backed up in that lane that you drive in
10       with oncoming traffic, that injury or death
11       might very well happen?
12   A.  It sure would.
13           MR. HENDERSON:  Object to the
14           form.
15   Q.  When the accident happened, did you get
16       out -- did you see any debris in the road?
17       From where the vehicles were tore up, did
18       you see anything in the road?
19   A.  No.  It was clear, that little ramp.
20   Q.  What I'm referring to, once the collision
21       happened, once the accident happened, did
22       you see any parts of either Ms. Colvin's car
23       or the Hyundai that you rented...

Page 91

1    A.  No.  It didn't seem that it bothered that
2        car that hit me.  It just splattered it.
3    Q.  It just splattered which one?
4    A.  The one that I was driving.  And it didn't
5        seem that they were hurt.  It seemed that
6        they just sat there.
7    Q.  Who did?
8    A.  The other car.  It did -- When it hit, it --
9        on the other little space there, it had
10       turned to come across that little ramp that
11       we were going up.
12   Q.  At some point, Ms. Baldwin, when you had
13       gone to the hospital and Ms. Prather had
14       gone to the hospital, at some point did you
15       go down to the Montgomery Police Station?
16   A.  It seemed that at some point we did, because
17       it seemed that they didn't -- couldn't keep
18       up with the license.  And it was some
19       walking around down there.
20   Q.  Do you remember giving a statement about
21       your version of the events that took place
22       on July 27, 2007?  Did you give a statement
23       to the police about what happened?

Page 92

1    A.  I would think I did.
2           (Plaintiff's Exhibit Number 12
3           marked for identification.)
4    Q.  Let me show you what I'm going to mark as
5        Plaintiff's Exhibit Number Twelve and ask
6        you if you remember receiving that document,
7        reading it and signing it.  And I'll
8        represent to you that that's a copy of the
9        document.  Is that your signature on there?
10   A.  Yes.
11   Q.  I want you to read for the record the
12       portion of that document that's highlighted
13       in yellow for me.  Tell me if you remember
14       that.
15   A.  I fully understand the foregoing statement
16       and do willingly agree to answer questions.
17       I understand and know what I'm doing.  No
18       promises or threats have been made to me by
19       anyone and no pressure of any kind has been
20       made against me by anyone.
21   Q.  Okay.  So you were asked to make a
22       statement, and you made it on your own free
23       will?

Page 93

1   A.  Yes.
2   Q.  Now, do you remember if they recorded that
3       statement; in other words, if they had a
4       little tape recorder device similar to what
5       we have here today when they recorded your
6       statement or not?
7   A.  You mean this is the police --
8   Q.  Yes.
9   A.  -- in Montgomery?
10  Q.  In Montgomery, yes, ma'am.
11  A.  No, I don't.
12          (Plaintiff's Exhibit Number 13
13           marked for identification.)
14  Q.  I'm going to show you what I've marked as
15      Plaintiff's Exhibit Thirteen.  I want you to
16      take a look at that document.  It's about
17      twelve pages long, and I represent to you
18      that it constitutes the statement that you
19      gave to Corporal Caffey following the
20      accident.  I want you to take a few minutes
21      to look at it if you haven't already.  Take
22      a look at that and see if that statement is
23      the statement that you gave on that date

Page 94

1       July 28th, 2007.
2           MR. COLLINS:  For the record,
3           Ms. Baldwin is still under
4           oath.  She is reviewing
5           Plaintiff's Exhibit Number
6           Thirteen.  However, due to
7           scheduling we are going to
8           break for the evening,
9           reconvene tomorrow in
10          Montgomery beginning at about
11          four o'clock.
12              Anything else anybody needs
13          on the record?
14          MR. HENDERSON:  I don't think so.
15          (Deposition adjourned.)
16          (Deposition reconvened on
17              Thursday, the 28th day of
18              February 2008 at approximately
19              5:05 p.m. CST)
20          EXAMINATION (cont.'d)
21  BY MR. COLLINS:
22  Q.  Ms. Baldwin, how are you doing?
23  A.  Struggling.

Page 95

1   Q.  Are you struggling?  We are going to try to
2       make this as painless as possible.  Okay?
3   A.  Thank you.
4   Q.  We are back on the record, and you remember
5       you are still under oath from yesterday.
6       Okay?
7   A.  Yes.
8   Q.  I'm going to finish asking you some
9       questions that I didn't get a chance to talk
10      to you about yesterday.
11          Do you remember I showed you
12      Plaintiff's Exhibit Number Thirteen.  That
13      was a statement that you had given to the
14      Montgomery Police Department and we had
15      asked you to take a copy of it home and read
16      it.  Did you get a chance to do that?
17  A.  No.
18  Q.  Do you remember your attorney giving you a
19      copy yesterday before we left the
20      deposition?  Did you get a chance to look at
21      that document and review it last night?
22  A.  No.
23  Q.  Now, I represent to you that that document

Page 96

1       is the statement that you gave Corporal
2       Caffey, I believe, on July 28th, which is
3       the date after the accident.  Do you
4       remember giving a statement to the police
5       about the accident?  Do you remember talking
6       to the police about the accident?
7   A.  No.
8   Q.  Yesterday we had showed you a document and
9       you said you did remember.
10  A.  Yes, I did, because today seemed to -- it
11      was here, there, and everywhere.
12  Q.  Okay.  Now, does that -- do you need a
13      couple of minutes to read that statement, or
14      are you comfortable testifying to what you
15      believe you said the day of the accident?
16      If you need some time to read it.
17  A.  Yes, sir, I do.
18  Q.  Okay.  Just let us know when you are done.
19      Okay?
20  A.  Uh-huh (positive response).
21  Q.  Ms. Baldwin, do you remember yesterday I
22      showed you what has been marked as
23      Plaintiff's Exhibit Number Twelve.  And it

Page 97

1  was a document that contained your statement
2  indicating that you fully understand the
3  statement that you were giving and you were
4  giving that statement voluntarily. Do you
5  remember seeing this document yesterday?
6  A.  Yes.
7  Q.  Is that your signature on the bottom of
8  Plaintiff's Exhibit Number Twelve?
9  A.  Yes, to the right.
10  Q.  Okay.
11       MR. COLLINS:  And, for the record,
12          with agreement of the parties
13          we stipulate that the statement
14          constituted in Plaintiff's
15          Exhibit Number Thirteen is the
16          statement that Ms. Baldwin had
17          given on July 28th, 2007
18          regarding the accident that
19          makes the basis of this case.
20  Q.  Ms. Baldwin, I'm just going to ask you a
21  couple of questions based on your statement
22  and see if you can just help me out a little
23  bit.  Okay?

Page 98

1       Now, I asked you yesterday,
2  Ms. Baldwin, if you remember spending the
3  night somewhere in Newnan, Georgia. And I
4  believe you told me no, you didn't remember
5  spending the night.
6  A.  I don't.
7  Q.  If you would, turn to page number eight.
8  And if you look at the bottom you'll see the
9  page designations at the bottom of your
10  document. But turn to the eighth page of
11  that document, and let me know when you get
12  there.
13  A.  Okay.
14  Q.  And I'll read to you, Ms. Baldwin, from the
15  statement about a quarter of the page down
16  it says, question:  Okay. So y'all go back
17  to Atlanta and this is Thursday evening, and
18  then you get on 85 and you-all stop in
19  Newnan, Georgia to spend the night. Is that
20  where y'all spent the night? And your
21  answer is:  I...
22       And then the question again is:  Do you
23  remember spending the night? And your

Page 99

1  answer was:  Yes. Do you remember saying
2  that on July 28th, 2007?
3  A.  Spending the night?
4  Q.  Does that help you remember whether or not
5  you spent the night in Newnan, Georgia?
6  A.  Spending the night, was that at a motel or
7  the hospital?
8  Q.  At a motel -- a motel or hotel. And I
9  believe you said that you spent the night at
10  Holiday Inn, I think. Is that -- If you
11  look down, is that what you told....
12  A.  I don't know.
13  Q.  Do you remember telling Corporal Caffey that
14  you spent the night at the Holiday Inn?
15  A.  No, I don't remember it now.
16  Q.  Okay. Let's talk about when you got to
17  Alabama. I believe you testified yesterday
18  that you -- when you left Georgia, you came
19  straight on to Alabama and then you realized
20  that you were too far into Alabama and you
21  wanted to turn around.
22  A.  Right.
23  Q.  Do you remember going to Ramer, Alabama?

Page 100

1  A.  Ramer?
2  Q.  Yes.
3  A.  (Witness shakes head.)
4  Q.  You don't remember? Do you know where
5  Ramer, Alabama is?
6  A.  No.
7  Q.  Do you remember stopping and purchasing gas
8  in Ramer, Alabama?
9  A.  No.
10  Q.  Do you remember where you stopped and got
11  gas on your way from Georgia to Alabama?
12  A.  No.
13  Q.  You don't really remember?
14  A.  (Witness shakes head.)
15  Q.  When you got into Alabama, did you drive
16  just on Interstate 85 or did you ride all
17  around different portions of Montgomery,
18  Alabama?
19  A.  No.
20  Q.  You were just on the interstate?
21  A.  Right, 85.
22  Q.  85. You never got off at all and went to
23  another part of --

Deposition of Willie Eva Baldwin                                        February 27th and 28th, 2008

Page 101

1   A.  No.
2   Q.  -- this area in Montgomery, Alabama?
3   A.  No.
4   Q.  That's enough with this document here.  We
5       are pretty much done with that.
6           Let's talk about Cuthbert, Georgia.
7       Tell me again, Ms. Baldwin, who were you,
8       Irena, and Ella -- who were you-all going to
9       visit in Cuthbert, Georgia?
10  A.  Family.
11  Q.  Can you give me the names of family?
12  A.  Lois Brown.
13  Q.  And how was she related to you?
14  A.  Niece.
15  Q.  And do you know her telephone number?
16      Ms. Baldwin, you don't have to get it out
17      right now.  But if you can get it to your
18      attorney, he can give it to me later.  Okay?
19          And who else were y'all going to see?
20  A.  Ann Johnson.
21  Q.  And how are you related to Ann Johnson?
22  A.  I'm her aunt.
23  Q.  Now, Ann Johnson, is she related to -- how

Page 102

1       was she related to Irena Johnson?
2   A.  She's Irena's niece.
3   Q.  And Lois Brown is also Irena's niece; is
4       that correct?
5   A.  Right.
6   Q.  Now, does Lois Brown and Ann Johnson live
7       together or do they live separately?  Do
8       they live in different houses, or do they
9       live together?
10  A.  Different houses.
11  Q.  Was there anyone else you-all were going to
12      see in Cuthbert?
13  A.  A sister-in-law.
14  Q.  Your sister-in-law?
15  A.  Yeah.
16  Q.  What's her name?
17  A.  Lucille Johnson.
18  Q.  Now, how was she your sister-in-law?
19  A.  She was once married to my brother, oldest
20      brother.
21  Q.  Now, was there anyone else you-all were
22      going to see in Cuthbert, Georgia?
23  A.  Just whoever was in the house with Lucille.

Page 103

1   Q.  Now, when you had planned to get to
2       Cuthbert, did you-all have some type of
3       activity planned like a family dinner or
4       reunion of sorts that you-all had planned?
5   A.  No.
6   Q.  What usually happens when you-all go to
7       Cuthbert and what kind of activities do
8       you-all usually partake in?
9   A.  Just go from house to house, and Lois
10      usually fixes dinner.
11  Q.  And, again, I think you testified
12      yesterday...
13  A.  We may go out to dinner.
14  Q.  Okay.
15  A.  I can't tell you where that is.
16  Q.  I think you testified yesterday that this is
17      something you-all do every single year,
18      correct?
19  A.  Yes.
20  Q.  And it's kind of like a reunion?
21  A.  Well, we don't call it a reunion, not then.
22      But sometime ago it was a reunion.
23  Q.  But now it's just all of the sisters come

Page 104

1       down and everybody just goes to visit
2       everybody?
3   A.  Right.
4   Q.  And that's something that Irena wanted to
5       do; is that correct?
6   A.  Right.
7   Q.  Something that you wanted to do?
8   A.  Uh-huh (positive response).
9   Q.  And something that Ella wanted to do; is
10      that correct?
11  A.  Right.
12          (Plaintiff's Exhibit Number 14
13           marked for identification.)
14  Q.  Ms. Baldwin, I'm going to show you what I've
15      marked as Plaintiff's Exhibit Number
16      Fourteen.  And I'm going to ask you if you
17      can take a look at that document and see if
18      you've seen that document before.  And on
19      the very last page or next to the last page,
20      I believe your signature may be on there,
21      and tell me if you signed that document.
22      And you can flip the pages if you need to,
23      Ms. Baldwin.

Page 105

1        Ms. Baldwin, all I want you to do is
2    take a look at that document. You don't
3    have to read it. Just take a look at the
4    document and see if you've seen it before
5    and if you in fact signed that document on
6    the last page.
7        Is that last page, Ms. Baldwin? Does
8    that appear to be your signature somewhere
9    on that page?
10   A.  Yes.
11   Q.  It looks like you read those
12   interrogatories. I'm just going to ask you
13   a couple of questions with regard to those
14   interrogatories and the other attorneys may
15   ask you some questions about those as well.
16       Ms. Baldwin, was Irena and Ella, were
17   they passengers in the vehicle?
18   A.  Yes.
19   Q.  Now, do you know what a guest is?
20   A.  A guest?
21   Q.  Yes.
22   A.  Yes. Somebody that really doesn't live with
23   you.

Page 106

1        MR. HENDERSON:  Object to the
2        form.
3    Q.  Would you characterize Irena as a guest in
4    the automobile with you?
5        MR. HENDERSON:  Object to the
6        form.
7    Q.  Or would you characterize her as a
8    passenger?
9        MR. HENDERSON:  Object to the
10       form. You are asking about a
11       legal conclusion.
12       MR. COLLINS:  I understand the
13       objection.
14       MR. HENDERSON:  And she obviously
15       doesn't understand the legal
16       definition of a guest or a
17       passenger. But under the facts
18       that she presented, it would
19       appear that she's a passenger.
20   Q.  With regards to interrogatory number
21   thirteen, you indicated that you also had
22   insurance with Allstate. Did you file a
23   claim with Allstate for this particular

Page 107

1    case? Did you let Allstate know -- your
2    insurance company know about this particular
3    accident?
4    A.  I don't remember.
5    Q.  You don't remember. You may have? You just
6    don't remember?
7    A.  No, I don't remember.
8    Q.  And interrogatory number twenty-two asks is
9    it customary in your driving experience that
10   you stop on the roadways including
11   interstate, highways, and expressways that
12   are traveled by other drivers -- if you look
13   at number twenty-four in that document. And
14   your answer was very seldom. And I believe
15   yesterday you testified that...
16   A.  Twenty-two?
17   Q.  Yes, ma'am.
18       MR. COLLINS:  Do you want to help
19       her out, David?
20   A.  Very, very seldom.
21   Q.  Very, very seldom. And I believe yesterday
22   you said that you have done it before; is
23   that correct?

Page 108

1        MR. HENDERSON:  Let me object to
2        the form. I don't think that
3        she said that she stopped in a
4        lane of highway, but she
5        stopped off to the side of the
6        road because obviously she
7        testified yesterday that it
8        would be dangerous to stop in
9        the lane of a highway.
10       MR. COLLINS:  Actually I think she
11       testified that she stopped in
12       the highway before.
13       THE WITNESS:  No, not in the
14       highway.
15       MR. COLLINS:  There was another
16       question I think she -- when I
17       asked her is it customary that
18       she stop on the roadway, I
19       believe she -- we can address
20       that at a later date. I'll
21       withdraw the question for right
22       now.
23   Q.  Just a couple of more things, Ms. Baldwin.

Page 109

1    We are done with that document there. Let
2    me ask you one more question about Cuthbert.
3    Are there any other relatives in Cuthbert
4    that may be sick or sometimes ill when
5    you-all travel to see them?
6  A.  Well, my sister-in-law is ill.  But she's in
7    bed at all times.
8  Q.  Is that Lucille Johnson?
9  A.  Right.
10 Q.  Is that one of the reasons why you-all
11   travel to see her because she's...
12 A.  No.
13 Q.  But when you make it to Cuthbert, you do go
14   and see her?
15 A.  Definitely.
16 Q.  Anybody else that may be ill or anything to
17   that effect?
18 A.  No.  That's the only ill one there.
19       (Plaintiff's Exhibit Numbers 15
20        through 59 marked for
21        identification.)
22 Q.  The last thing I want to do, Ms. Baldwin --
23   and I'll give the other attorneys an

Page 110

1    opportunity to ask you some questions -- I'm
2    going to show you about forty-six
3    photographs that were taken of the accident.
4    Okay?  I want you to just kind of flip
5    through them and look at them and tell me if
6    the scene looks familiar to you.  When you
7    got out of the car after the accident, if
8    you remember seeing Ms. Colvin's vehicle and
9    your vehicle that you had rented in that
10   same or similar condition.
11       Just take a look at those photographs.
12   Just flip through them and tell me if you
13   remember that scene -- if those photographs
14   accurately depict the scene as you saw it
15   that day.  And if you could kind of keep
16   them in order.
17       Ms. Baldwin, you had an opportunity to
18   look at those photographs, correct?
19 A.  Yes.
20 Q.  Do the images in those photographs look
21   familiar to you?  The vehicles and the
22   scenery, does all of that look familiar to
23   you?

Page 111

1  A.  This is the closest one to it.
2  Q.  Does that appear to be the car that you had
3    rented from Hertz?
4  A.  This car seems to be blue.
5  Q.  Okay.  What color was the Hertz car?
6  A.  It looks like it was a rust color or wine or
7    reddish looking.
8  Q.  But take a look at the entire scene and the
9    car.  You said there was a black car that
10   hit you as well; is that correct?  The black
11   car is the car that hit you from behind?
12       MR. WALLER:  Object to the form.
13 Q.  What color was the car that hit you from
14   behind?
15       MR. WALLER:  Object to the form.
16 A.  It seems to have been black.  But you don't
17   show that car -- you don't show another car
18   on this little strip going up.
19 Q.  Can you take a look at the picture where
20   your hand is right here, this picture right
21   here, there on the top.  And I believe
22   that's Plaintiff's Exhibit Number -- What's
23   the number at the bottom there?

Page 112

1  A.  Fifteen.
2  Q.  Fifteen.  What color is the vehicle in that
3    photograph?
4  A.  It's sitting over here, but it's dark.
5  Q.  Does it appear to be black or blue?
6  A.  It appears to be black.
7  Q.  Do you remember that vehicle being the
8    vehicle that was involved in the accident
9    that you were in?
10 A.  It seemingly might have been.
11 Q.  What about the vehicle right here, does that
12   kind of look like the vehicle that you may
13   have been in that you were driving?
14 A.  That is a hit from possibly the right side.
15 Q.  And where was the car that you were driving
16   hit from?
17 A.  Mostly on the right, I guess, that my sister
18   said, oh, and, you know, fell over to the
19   left.  And it was all of this blood over
20   there.
21 Q.  If I represent to you that that is the
22   vehicle that you rented from Hertz --
23 A.  This is?

Page 113

1  Q.  Yes.
2      -- would that sound about right?  Could
3  it possibly have been the vehicle that you
4  rented from Hertz?
5      MR. PHILLIPS:  Object to the form.
6  A.  It could have, but not been a blue one.
7  Q.  Do any of those pictures look familiar to
8  you, Ms. Baldwin?
9  A.  Not too much.
10  Q.  Now, when you got out of the vehicle after
11  the accident, did you take a look at the
12  scene?  Did you look and see what was going
13  on?
14  A.  No, because it was -- Yeah.  Because it
15  wasn't anybody there but the people that
16  were in the car that hit me.  They didn't
17  seem to be getting out doing anything.  Just
18  sitting in the car.
19  Q.  And when you got out -- You testified
20  yesterday that you had got out of the car;
21  is that correct?
22  A.  Yes.
23  Q.  And that you checked on your sisters and

Page 114

1  then you waited for help; is that correct?
2  A.  Right.
3  Q.  While you were waiting, did you look around
4  to see what vehicles...
5  A.  It seems that nobody was around.
6  Q.  Did you see any cars that looked like they
7  had been in a collision?
8  A.  No, no.
9  Q.  Did you see a black car?
10  A.  That was standing facing me.  Not facing me,
11  facing the right side of the Hertz car that
12  I was driving.
13  Q.  Is that the Hertz car that you were driving?
14  A.  This one?
15  Q.  Yes.
16  A.  The color is wrong.
17  Q.  Is that the only thing wrong?  Does that
18  look like the type of vehicle you had
19  rented, though?  Is that the only thing you
20  represent as being wrong is the color?
21  A.  I'm not sure.  And I guess that one
22  that's -- with its face torn -- that's going
23  to come back across seemingly.  But after it

Page 115

1  hit, it just parked over there.
2  Q.  If you would, Ms. Baldwin, slide the
3  photographs over to me and I'm going to go
4  through some of them.
5  A.  Okay.  This is six.
6  Q.  And I'll put them back in order.  Don't
7  worry about that.  Okay?
8  A.  Okay.
9  Q.  Ms. Baldwin, I'm going to show you what is
10  Plaintiff's Exhibit Number Twenty-nine.
11  Does that photograph look like the vehicle
12  that you rented from Hertz?
13  A.  I'm not sure.
14  Q.  Is it similar in type, just the color is
15  different?
16      MR. PHILLIPS:  Object.  It's been
17      asked and answered.  She
18      doesn't seem to recall.
19  A.  At this point I'm not sure.
20  Q.  Okay.  You just can't remember?
21  A.  (Witness shakes head.)
22  Q.  And you say there was a black car over to
23  the right-hand side.  I'm going to show you

Page 116

1  what's been marked as Plaintiff's Exhibit
2  Number Thirty.  Does that appear to be the
3  black car that you remember seeing?
4  A.  You mean this one?
5  Q.  The one in the middle of the page.
6  A.  Going in the wrong direction.  And it isn't
7  going up that little strip behind me.
8  Q.  Okay.  Just one second, Ms. Baldwin.  Take a
9  look at Plaintiff's Exhibit Number
10  Forty-nine.  Does that appear to be the area
11  that you were traveling in Montgomery on
12  July 27th?
13  A.  Yes.
14  Q.  So that...
15  A.  That's that -- yes, the strip that's going
16  up.
17  Q.  Okay.
18  A.  It's only one door up there to go through.
19  Q.  Okay.  Now, when you say -- Strike that.
20  Let me ask you this question.  So you do
21  recognize the images in Plaintiff's Exhibit
22  Number Forty-nine.  You see the signs up
23  there?  Do you recognize those?

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 117

1   A.  Maybe.
2   Q.  Okay.  I think you just said you did.  Do
3       you remember whether or not you were
4       traveling on that road on July 27th of 2007?
5   A.  Yes.
6   Q.  You were?
7   A.  Yes.
8   Q.  So does that picture fairly and accurately
9       depict the scene as you remember on July 27,
10      2007?
11  A.  Yes.  See, you drive up here.  And to turn
12      around, only one could go through there to
13      turn around.
14          MR. HENDERSON:  Ms. Baldwin, just
15          so I'm clear.  When you point
16          up there, do you mean there was
17          just one lane that you could go
18          through?
19      THE WITNESS:  Just one -- it was
20          just one lane.
21      MR. HENDERSON:  And that's what
22          you mean when you say door, it
23          was just -- the lane was the

Page 118

1       door, right?
2       THE WITNESS:  No.
3       MR. COLLINS:  Object to the form.
4       MR. WALLER:  Object to the form.
5   Q.  Ms. Baldwin, do this for us.  Take this ink
6       pen and draw an X in the lane in which you
7       say you were traveling that you were going
8       through to...
9   A.  Well, it wasn't but one lane.
10  Q.  Can you put an X in the lane looking at that
11      picture where you were traveling?
12  A.  Well, I guess it could be this one.
13      MR. HENDERSON:  Ms. Baldwin,
14          that's only if you know.  Don't
15          put it down if you don't know.
16  A.  No.  And this is all wrong.  Nobody was over
17      here.  It's just that you could go up this
18      lane to go through this one door to your
19      left to turn around.
20  Q.  And, if you could for us, Ms. Baldwin, I
21      notice you have the pen there.  Could you
22      indicate, if you remember, which lane you
23      were traveling in when you got ready to turn

Page 119

1       around?  Just put a nice big X right there.
2       It doesn't have to be too big.
3   A.  To turn around?
4   Q.  Yes.
5   A.  I wasn't going to turn around in this lane.
6       I didn't want to go on over into Alabama any
7       further.  So I was going to get on this
8       thing.  Well, you had called -- what -- 85
9       is down here.  And going up this lane, just
10      one car could go up and through.
11  Q.  This probably would show up a little bit
12      better than that, Ms. Baldwin, if you can
13      get the top off.  Just use that end right
14      there and make a marking where you were
15      indicating you were traveling.
16          MR. HENDERSON:  If you know.
17  Q.  If you know.
18  A.  This lane.
19  Q.  And I represent to you that Ms. Baldwin just
20      drew a red line with a red Sharpie marker
21      indicating the lane that she was driving.
22          And I indicate that Ms. Baldwin just
23      drew a second red line.  What's the purpose

Page 120

1       of the second red line?
2   A.  This is where I was traveling.
3   Q.  Okay.  Now, Ms. Baldwin, is that in the
4       middle of the interstate or the highway?
5   A.  That's not the highway.
6   Q.  Is it in the middle of the road?
7   A.  When you say road...
8   Q.  Yes, ma'am.  Tell me...
9   A.  That's that place that I had gotten off of
10      85 down here.
11  Q.  Okay.
12  A.  And I was going forward here.
13  Q.  Ms. Baldwin, tell me how many lanes are
14      indicated in that photograph?  Do you see
15      how many different lanes?  Can you count
16      them?
17  A.  Just one.  Is that it?
18  Q.  Okay.  And which one were you traveling in?
19      The one where you drew the red lines?
20  A.  Yeah, between this -- just going straight up
21      to go through this one door which only one
22      car could go through.
23  Q.  Okay.  Do you see that door on that

30 (Pages 117 to 120)

Page 121

1    photograph right now, Ms. Baldwin?
2    A.   No.
3             MR. HENDERSON:  Let me represent
4             that I don't see it on there
5             either because you can't see
6             past the car.
7             THE WITNESS:  Right.
8    A.   But this is...
9    Q.   Ms. Baldwin, you can hang on to that marker.
10   I'm going to show you a couple of more
11   photographs and then we will be done.  Okay?
12   We will straighten these out here
13   afterwards.
14        I'm going to show you what's been
15   marked as Plaintiff's Exhibit Number Fifty.
16   And it's similar to this photograph on
17   Forty-nine.  And can you look up now and
18   tell me if you see the door?  Can you tell
19   me if you see the door that you are
20   referring to?
21   A.   Why did you get this person standing there
22   because nobody was standing in that little
23   ramp.

Page 122

1    Q.   And I'll represent to you, Ms. Baldwin, that
2    those photographs were taken after the
3    accident.  And so you may see people inside
4    the photographs that may have not been there
5    at the time of the accident.
6    A.   Let's see.
7    Q.   Do you see the door that you were referring
8    to?
9    A.   It should be up here.
10   Q.   If you see it, why don't you circle it for
11   me with the red marker if you see the door
12   that you are referring to.
13   A.   No, these arrows are all wrong.
14   Q.   Can you tell me how?
15   A.   They seem to be pointing go on through.
16   Q.   Okay.
17   A.   And not a left turn.
18            MR. HENDERSON:  Let's wait one
19            second for his question,
20            Ms. Baldwin.
21   Q.   On that document it appears you drew a door;
22   is that correct?
23   A.   Right.

Page 123

1    Q.   Where you say the door should be?
2    A.   Yes.
3    Q.   Are you saying, Ms. Baldwin, the lane that
4    you just drew on this photograph, is that
5    the lane that you were driving in?
6    A.   Yes.
7    Q.   And you drew that in red?
8    A.   There is only one lane.
9    Q.   In red marker, right?
10   A.   Right.
11   Q.   Let me show you this document I'm going to
12   represent to you as Plaintiff's Exhibit
13   Number Fifty-five.  Can you look on that
14   document and tell me if you see any letters
15   written in the straight -- in the roadway.
16   A.   No.
17   Q.   Why don't you take a look at it again, look
18   down on the road and see if you see any
19   letters that are written in what looks like
20   paint, orange paint just in that photograph.
21   A.   It wasn't anybody up there.
22   Q.   What I'm looking for is for you to look at
23   that image right there and see if you see

Page 124

1    where somebody wrote three letters POI in
2    the road.  Do you see it?
3    A.   Yes, I see that.
4    Q.   Can you circle that for me with that red
5    marker?
6    A.   Okay.
7    Q.   And I'm going to represent to you,
8    Ms. Baldwin, that POI means point of impact.
9    Is it possible that you were driving in that
10   lane when the collision occurred?
11   A.   I guess so.  It wasn't but one lane there.
12   Q.   All right, Ms. Baldwin.  I don't think I
13   have anything further at this point.  I'm
14   going to turn you over to Mr. Waller.  He
15   may have some questions for you.
16   Mr. Phillips, who is on the telephone, he
17   may have some questions for you.  And then
18   your attorney, I'm sure he's going to have
19   some questions for you as well.
20            EXAMINATION
21   BY MR. WALLER:
22   Q.   Ms. Baldwin, are you doing okay?  Do you
23   need to take a break?

Page 125

1  A. I'm doing okay.
2  Q. I'm going to try to be as fast as I can.
3     Okay?
4  A. Okay.
5  Q. Ms. Baldwin, we met yesterday for the first
6     time. And, as you know, I'm one of the
7     attorneys representing Ms. Colvin. And I'll
8     represent to you Ms. Colvin was the driver
9     of the black vehicle involved in the
10    collision. Do you remember Ms. Colvin from
11    yesterday? I represent to you that I'm
12    representing Ms. Colvin who was the driver
13    of that black vehicle. Okay?
14 A. Yes.
15 Q. If at any time I ask you a question and you
16    don't understand it, please stop me and I'll
17    restate it. Okay?
18 A. Yes.
19 Q. Mr. Collins was showing you Plaintiff's
20    Exhibit Fifty. This is the one that you
21    wrote on. Do you mind if I come over there
22    right next to you?
23 A. Sure. Come on.

Page 126

1  Q. Ms. Baldwin, let me ask you this. Does this
2     diagram in the scene that's depicted right
3     here, does that accurately depict the
4     roadway immediately after the accident?
5        MR. HENDERSON: If you know,
6        Ms. Baldwin.
7  A. If I can discard all of that.
8  Q. So by all of that, you are saying discard
9     the individual who is right here on the
10    right of the picture? Is that what you are
11    talking about?
12 A. Unless that person got -- No, nobody got out
13    of the car that hit me.
14 Q. Let me do this, Ms. Baldwin. I'll represent
15    to you that this is a police officer. And
16    this picture was taken after the accident.
17    Okay?
18 A. Okay.
19 Q. Here is my question based on that. Okay.
20    Does this picture -- this scene identified
21    in Plaintiff's Exhibit Fifty with the
22    exception of the police officer and the
23    cars, does this scene of the roadway, does

Page 127

1     that accurately depict the roadway as you
2     remember it --
3  A. Yes.
4  Q. -- at the time of the accident?
5  A. Yes.
6  Q. Mr. Collins had asked to you identify how
7     many lanes are depicted on this roadway. It
8     is my understanding you testified there was
9     one lane?
10 A. Right.
11 Q. In looking on this picture, you don't have
12    any reason to disagree with that, do you?
13 A. No.
14 Q. This individual right here to the right,
15    Ms. Baldwin -- do you see this individual on
16    Plaintiff's Exhibit Fifty?
17 A. Uh-huh (positive response).
18 Q. Where do you believe he is standing? Is he
19    standing in the roadway or on the shoulder?
20 A. It should be -- well, he was on -- It wasn't
21    any shoulder. It was just a scoop up.
22 Q. But based on this picture right here and --
23    and I'm asking you about this picture --

Page 128

1     where do you think this gentleman is
2     standing? In the lane still?
3  A. No. He wouldn't be in the lane. Oh, from
4     looking at this picture, it looks like he's
5     in the lane because it looks like you have
6     all of this as the lane.
7  Q. Ms. Baldwin, you'll recall yesterday that
8     you testified that at some time prior to the
9     collision or prior to the accident that you
10    had backed your car up; is that correct?
11 A. Not on this, not on that ramp.
12 Q. Where did you back your car up, Ms. Baldwin,
13    in relation to the ramp which is Plaintiff's
14    Exhibit Fifty?
15 A. It was beside the ramp where, you know, you
16    can stop. It's no traveling down there.
17 Q. Let me do this real quick. I'm going to see
18    if I can have a picture that shows that area
19    so you can tell us about it. Okay?
20 A. Okay.
21 Q. Ms. Baldwin, can you tell us how many
22    seconds went by from the time that you
23    backed the vehicle up until the time that

Page 129

1    the accident happened? .
2       MR. HENDERSON: Object to the
3       form. Only if you know.
4   A.   No, I couldn't tell you.
5   Q.   Would minutes be a better description, if
6    you know?
7   A.   Yeah. And I wouldn't know those.
8   Q.   Was it less than an hour from the time...
9   A.   Oh, yes.
10   Q.   Was it less than five minutes from the time
11    that you backed up until the accident?
12   A.   I didn't back up to the accident.
13   Q.   Right. And that was the way I phrased, and
14    I'll rephrase it. I'm glad you told me. I
15    want to be sure we both understand. Okay?
16       Was the period of time less than five
17    minutes from the time that you backed up
18    until the time of the accident?
19       MR. HENDERSON: If you know.
20   Q.   You can answer, if you know.
21   A.   No, I don't know.
22   Q.   I'm asking your opinion. You don't know
23    whether or not it was less than five

Page 130

1    minutes?
2   A.   No, I'm not sure.
3   Q.   Ms. Baldwin, isn't it true that you don't
4    know for a fact, do you, that at the time of
5    your backing up the accident happened
6    immediately thereafter?
7   A.   Well, as I pulled to my right and got on
8    that ramp going up, it was no time.
9   Q.   When you say no time, you mean pretty
10    instantaneous after that?
11   A.   Right.
12   Q.   And to get on the ramp, would you have had
13    to back up to get on that ramp?
14   A.   Yes, I would.
15   Q.   Yesterday you had mentioned at some point
16    you were going to turn left. Do you
17    remember saying that?
18   A.   Right.
19   Q.   Will you show us -- Scratch that. Did you
20    have a chance to turn left before the
21    accident?
22   A.   I might have. But it looked like all I
23    could see was that 85 is just going on and

Page 131

1    on. So that was the only place I saw that I
2    could turn around.
3   Q.   Were you tired by that time?
4       MR. HENDERSON: Object to the
5       form.
6   Q.   Ma'am, you can answer.
7   A.   No. I wasn't tired.
8   Q.   You weren't tired?
9   A.   No.
10   Q.   That particular day, Ms. Baldwin, do you
11    recall traveling south of Montgomery?
12   A.   South of -- No, not south of Montgomery. It
13    seemed that if I had kept going 85, I would
14    have gone on into Montgomery.
15   Q.   Let me show you Plaintiff's Exhibit
16    Fifty-five that Mr. Collins just showed you.
17    He represented those letters POI. Would you
18    have any reason to disagree with the police
19    officer's opinion that the point of impact
20    between the vehicles was depicted as shown
21    in Plaintiff's Exhibit Fifty-five?
22   A.   No.
23   Q.   I'll even rephrase it even though you

Page 132

1    answered. Assuming a police officer or the
2    facts established that the point of impact
3    is located on Plaintiff's Exhibit Fifty-five
4    as you are looking at here, would you have
5    any reason whatsoever to disagree with that?
6   A.   No.
7   Q.   Ma'am?
8   A.   No. It's too much in that picture. That --
9    just disregard all of this stuff.
10   Q.   When you say stuff, you mean the cars that
11    are in the picture?
12   A.   Yes, these.
13   Q.   But the scene of the accident, that's a fair
14    depiction, would you agree, with the
15    exception of the cars? Is that right?
16   A.   Well, I don't know because I wouldn't know
17    if any cars were down there.
18   Q.   Ms. Baldwin, I'm going to turn your
19    attention real quick and go over some
20    questions that I had written down when
21    Mr. Collins was asking you questions. I'm
22    going to try to do my best not to repeat
23    what he asked you yesterday. I just have a

Deposition of Willie Eva Baldwin                                      February 27th and 28th, 2008

Page 133

```
1       few.
2           Do you have any children?
3    A.  No.
4    Q.  Have you ever been married?
5    A.  Yes.
6    Q.  Who were you married to?
7    A.  Renzie L. Baldwin.
8    Q.  Was that your only marriage?
9    A.  Yes.
10   Q.  Have you ever served in the military?
11   A.  No.
12   Q.  Mr. Collins talked about your medical
13       conditions yesterday, and you provided us
14       with an exhibit showing your medications.
15       Do you remember that?
16   A.  Yes.
17   Q.  I want to ask you something about the drug
18       Namenda.
19   A.  Namenda?
20   Q.  Yes, ma'am.
21   A.  N-a-m-e-n-d-a.
22   Q.  Correct.  Do you take that?
23   A.  Yes.
```

Page 134

```
1    Q.  And based on your response yesterday, you
2        indicated that you had been diagnosed with
3        dementia; is that correct?
4    A.  Dementia.
5           MR. HENDERSON:  I don't know if
6              she said she was diagnosed with
7              dementia.  She said she took it
8              for dementia.
9           MR. WALLER:  I'll rephrase it.
10   Q.  Do you take the Namenda for dementia?
11   A.  Yes.
12   Q.  And how long have you been taking any
13       medication for dementia?
14   A.  I don't know.
15   Q.  Is it years?
16   A.  Maybe.
17   Q.  Well, were you taking medication for
18       dementia before July of 2007?
19   A.  Yes.
20   Q.  Am I correct to assume that there are some
21       periods of time where you mistakenly failed
22       to take some medication?
23           MR. HENDERSON:  Object to the
```

Page 135

```
1        form.
2    Q.  You can answer.
3    A.  Has it ever been a time that I failed to
4        take...
5    Q.  Some medication, whatever it be?
6    A.  I would say no.  Sometime during the day I
7        take it.  It might not be at the same time.
8    Q.  What types of symptoms were you experiencing
9        that made you get these medications for
10       dementia?
11   A.  I guess it was dizziness.
12   Q.  Forgetfulness?
13   A.  No.  Just dizzy.
14   Q.  Confusion?
15   A.  No.  I wasn't confused.  I was just -- you
16       know, I possibly couldn't walk straight.
17   Q.  Have you ever been diagnosed with
18       Alzheimer's?
19           MR. HENDERSON:  Object to the
20              form.
21   Q.  Have you ever heard any doctor tell you that
22       you had Alzheimer's?
23   A.  No.
```

Page 136

```
1           MR. HENDERSON:  Object to the
2              form.
3    Q.  You haven't?
4    A.  (Witness shakes head.)
5    Q.  Ma'am, is that right?  Do you want me to
6        repeat my question?  Are you still thinking?
7    A.  No.  You can repeat it.  Has anybody ever
8        diagnosed me with Alzheimer's?
9    Q.  Yes.
10   A.  No.
11   Q.  Has any doctor told you that the Namenda
12       medication, one of the side effects could be
13       confusion?
14   A.  No.
15   Q.  Your last doctor that you saw in Georgia --
16       and we talked about it yesterday -- do you
17       recall seeing a doctor in Georgia?
18   A.  Yes.
19   Q.  Who helps you set up appointments?  Is it
20       Mr. Johnson's wife?
21   A.  Right.
22   Q.  Would she be the person most knowledgeable
23       about your medical conditions?
```

Page 137

1    A.  Yes.
2    Q.  And, in fact, does she make sure that you
3        stay up to date and you take the medication
4        as depicted on Plaintiff's...
5    A.  Yes.
6            MR. COLLINS:  Object to the form.
7            We are referring to since the
8            accident, correct?
9            MR. WALLER:  Yes.
10   Q.  You've only lived with them since the
11       accident; is that right?
12   A.  Yes.
13   Q.  Plaintiff's Exhibit Five, is Ms. Johnson --
14       she's the one that helps you out and makes
15       sure you take these medications currently,
16       right?
17   A.  Yes.  She helps me.
18   Q.  Did Ms. Irena Johnson know that you were
19       taking medication for dementia prior to her
20       death?
21           MR. COLLINS:  Object to the form.
22           MR. HENDERSON:  Object to the
23           form.

Page 138

1    Q.  Would you like me to repeat it?
2    A.  Yes.
3    Q.  Did Ms. Irena Johnson know that you took
4        medication for dementia before the accident?
5            MR. COLLINS:  Same objection.
6            MR. HENDERSON:  Object to the
7            form.
8    Q.  They are making a legal objection.  You can
9        answer if you know.
10   A.  No.
11   Q.  Y'all lived together for over forty years;
12       is that right?
13   A.  Right.
14   Q.  And y'all did everything together pretty
15       much; is that right?
16   A.  Right.
17   Q.  And you took this medication every day; is
18       that right?
19   A.  Yes.
20   Q.  And you are telling us that Ms. Johnson --
21       you are not sure whether Ms. Johnson knew
22       that you took this medication for dementia?
23           MR. COLLINS:  Object to the form.

Page 139

1            MR. HENDERSON:  Object to the
2            form.
3    Q.  You can answer.  Would you like me to repeat
4        it?
5    A.  She wouldn't know what it was for.
6    Q.  Had you ever complained to her about any
7        symptoms associated with dementia?
8    A.  No.
9    Q.  What about Mr. Johnson here, did Mr. Johnson
10       know that you took medication for dementia
11       before the accident?
12           MR. COLLINS:  Object to the form.
13           MR. HENDERSON:  Object to the
14           form.
15   Q.  Ma'am?  Would you like me to repeat it?
16   A.  Would he know...
17   Q.  Did he know?
18           MR. COLLINS:  Are we talking about
19           before the accident or after?
20           MR. WALLER:  Before the accident.
21   Q.  I'll repeat the question.  Okay,
22       Ms. Baldwin?  Do you want me to repeat it?
23   A.  He doesn't know what all of those medicines

Page 140

1        are for.
2    Q.  I'm looking on Plaintiff's Exhibit Five, and
3        I can read under the purpose it says
4        dementia.  Is that right?  Is that what's
5        listed on Plaintiff's Exhibit Five?  It has
6        dementia right under the purpose.
7            MR. HENDERSON:  These aren't
8            marked.  Which one are you
9            talking about?
10   Q.  Right here.  I'm showing you Plaintiff's
11       Exhibit Five.  I'm talking about number six,
12       Namenda.  Do you see that, Ms. Baldwin,
13       right here?
14   A.  Uh-huh (positive response).
15   Q.  Do you see the second column it says
16       purpose?
17   A.  Uh-huh (positive response).
18   Q.  Under that it says dementia.  Do you see
19       that?
20   A.  Uh-huh (positive response).
21   Q.  Who prepared this for you, Plaintiff's
22       Exhibit Five?
23   A.  Well, my niece.

Page 141

1   Q.  Who is that?
2   A.  Sandra.
3   Q.  Mr. Johnson's wife?
4   A.  Right.
5   Q.  And you are telling me that up until today
6       Mr. Johnson didn't know that you suffer from
7       dementia?
8           MR. COLLINS:  Object to the form.
9               Asked and answered.
10  Q.  Do you need me to repeat it?  Would you like
11      me to repeat it?
12  A.  Go on.
13  Q.  Are you telling us that until today that
14      Mr. Johnson didn't know that you suffered
15      from dementia?
16  A.  I don't think he would.
17  Q.  Did you tell this doctor in Georgia that you
18      took all of these medications in Plaintiff's
19      Exhibit Five?
20  A.  Did I tell a doctor?
21  Q.  This last doctor in Georgia that you
22      visited, do you remember telling us about
23      that yesterday once you started living with

Page 142

1       Mr. Johnson?
2   A.  Uh-huh (positive response).
3   Q.  Do you remember telling us that?
4           MR. HENDERSON:  Which doctor are
5               you talking about?  What's his
6               name?
7           MR. WALLER:  Let's ask her.
8   Q.  What is the doctor's name in Georgia that
9       you saw, Ms. Baldwin?
10  A.  The physical doctor is Woods.
11  Q.  Dr. Woods?
12  A.  Yes.
13  Q.  Did you tell Dr. Woods when you saw him that
14      you were taking all of this medication that
15      you listed on Plaintiff's Exhibit Five?
16  A.  Yes.
17  Q.  You did?
18  A.  Yes.
19  Q.  Did he ever discuss with you...
20  A.  Well, I -- I might have told him about the
21      eye medicine.
22  Q.  Would this document, Plaintiff's Exhibit
23      Five, have been something that you presented

Page 143

1       to Dr. Woods or not?
2   A.  Did I -- I just told him what I was taking.
3   Q.  So you told him that you were taking every
4       medication that you have listed on
5       Plaintiff's Exhibit Five here?
6   A.  Yes.
7   Q.  Did he discuss with you any potential
8       negative effects or adverse reactions when
9       taking all of these medications together?
10          MR. HENDERSON:  Object to the
11              form.
12  Q.  Ma'am?  Did he discuss that with you?  He
13      just objected to the form.
14  A.  No.
15  Q.  He didn't discuss any of that?
16  A.  No.
17  Q.  Ma'am, if you can look on Plaintiff's
18      Exhibit Five right there that you are
19      looking at -- I'll show you this.  You've
20      got number four down on the bottom.  It says
21      over-the-counter drugs.  Do you want to look
22      at this so we can be on the same page?  You
23      have it on yours.  I guess that's an exact

Page 144

1       copy.  It has Ecotrin.  Do you see that?
2   A.  Ecotrin, over the counter, uh-huh (positive
3       response).
4   Q.  What is that for?
5   A.  Oh, that's a coated aspirin.
6   Q.  Is that pain medication?
7   A.  Yes.
8   Q.  How often do you take that?
9   A.  Once a day.
10  Q.  Did you take it?
11  A.  Today.
12  Q.  You took it today.  Did you take it the day
13      of July 27 of '07, the day of the accident?
14  A.  Yes, I think I did.
15  Q.  Do you know whether or not you took that?  I
16      know it's been a long time.  That's the
17      reason I'm asking.
18  A.  Yes.
19  Q.  You don't know?
20  A.  I would think I take them all.
21  Q.  Ms. Baldwin, is there a reason that you and
22      your sisters chose to fly into Atlanta as
23      opposed to driving to Atlanta?

Deposition of Willie Eva Baldwin                                          February 27th and 28th, 2008

Page 145

1　A.　She didn't think that -- Oh, to drive.
2　　　Well, from -- we were saying thinking that
3　　　my car was so old, an '87, that probably it
4　　　was time that it might not make it.
5　Q.　Was there any other reason that you and your
6　　　sisters chose to fly into Atlanta as opposed
7　　　to drive into Atlanta?
8　A.　That's the reason.
9　Q.　Did you feel comfortable driving a
10　　vehicle --
11　A.　Yes.
12　Q.　-- at that time?
13　A.　Very comfortable.
14　Q.　Do you still drive vehicles?
15　A.　No.
16　Q.　Why is that?
17　A.　Because too much happened.
18　Q.　What you mean by that?
19　A.　That the one that I rented was chipped up.
20　　So...
21　Q.　Chipped up, you mean after the accident?
22　A.　No, no.
23　Q.　Explain that for me.

Page 146

1　A.　The one that I was driving was the rental
2　　　car, and it was chipped up like it was just
3　　　a glass car.
4　Q.　Prior to the day of the accident, which is
5　　　July 27, 2007, prior to that day had any
6　　　family member told you not to drive a
7　　　vehicle?
8　　　　　MR. HENDERSON:  Object to the
9　　　　　form.
10　　　　　MR. COLLINS:  Object to the form.
11　Q.　You can answer.
12　A.　It seemed that you had asked that before.
13　Q.　Ma'am?
14　A.　It seemed that you asked that before.
15　Q.　No, ma'am, I don't think I did.
16　A.　Just Irena, the one that was killed, thought
17　　　that to rent a car because my car being an
18　　　'87 just might not make this trip.
19　Q.　Right.  And I understand your answer.  And I
20　　　guess we are a little confused.  My question
21　　　is, though, Ms. Baldwin, prior to the day of
22　　　the accident in our case had any family
23　　　member...

Page 147

1　A.　No.
2　Q.　Let me get through with my question, please,
3　　　ma'am.
4　　　　Prior to July 27 of '07 had any family
5　　　member whatsoever told you not to drive a
6　　　vehicle?
7　A.　No.
8　Q.　Prior to July 27 of '07 had any family
9　　　member told you they were concerned with
10　　your driving ability?
11　A.　No.
12　Q.　Prior to July 27 of '07 had any family
13　　member told you they were concerned with the
14　　amount of medication you were taking while
15　　driving?
16　A.　No.
17　Q.　Did that ever concern you?
18　　　　　MR. HENDERSON:  Object to the
19　　　　　form.
20　A.　No.
21　Q.　Do you still feel like you are capable of
22　　driving a vehicle today?
23　A.　I don't want to.

Page 148

1　Q.　Why is that?
2　A.　Because of the accident.
3　Q.　Because you are scared of getting in another
4　　　accident?
5　　　　　MR. HENDERSON:  Object to the
6　　　　　form.
7　Q.　Why, because of the accident?
8　A.　Why, because of the accident?
9　Q.　Yes, ma'am.  You said you were not going to
10　　drive another vehicle because of the
11　　accident.  My question is why?
12　A.　I don't want to be involved in -- I might
13　　be.  And it doesn't have to be my fault as
14　　it wasn't my fault then.
15　Q.　Do you believe that any actions or inactions
16　　taken by you on July 27 of 2007 contributed
17　　to the death of your sister?
18　　　　　MR. HENDERSON:  Object to the
19　　　　　form.
20　A.　Any action, no.
21　Q.　You don't feel like any actions -- Is that
22　　what you said, no?
23　A.　Yes.

37 (Pages 145 to 148)

Page 149

1  Q.  When you go to the doctor, who is listed as
2      your next of kin or your immediate contact?
3  A.  Well, when I go here, it's my niece or my
4      nephew.
5  Q.  Your nephew Plaintiff Robert Johnson?
6  A.  Yes.
7  Q.  If you didn't take the drops for the
8      glaucoma daily, would you tell the members
9      of the jury what would happen?  How would
10     your eyes be?
11         MR. HENDERSON:  Object to the
12     form.
13 Q.  Do you need me to repeat the question?
14 A.  You can.
15 Q.  Ma'am?
16 A.  Go on.
17 Q.  Would it help you if I did?
18 A.  No.
19 Q.  No?
20 A.  Because the doctor, you know, see about my
21     eyes.
22 Q.  Right.  What symptoms would you get that
23     caused you to go to the doctor to get the

Page 150

1      glaucoma medicine?
2  A.  I don't have any symptoms, I don't suppose.
3      I have dry eyes.  They just need some...
4  Q.  Were you wearing your glasses at the time of
5      the accident on July 27 of '07?
6  A.  Yes.
7  Q.  Did you have any sunglasses on?
8  A.  No.
9  Q.  Was there light still out at that time?
10 A.  It looked like it was day to me.
11 Q.  It looked like it was complete daylight?
12 A.  Uh-huh (positive response).
13 Q.  Is that a yes?
14 A.  (Witness nods head.)
15 Q.  Just say yes so she can get it on the
16     record?
17 A.  Yes.
18 Q.  I want to skip around a little bit.  Do you
19     recall driving to Florida?  When I say this,
20     I'm talking about the week of July 27 of
21     '07.  Okay?
22 A.  Uh-huh (positive response).
23 Q.  Do you recall driving to Florida on more

Page 151

1      than one occasion?
2  A.  Uh-huh (positive response).
3  Q.  You do?
4  A.  Uh-huh (positive response).
5  Q.  Is that a yes?
6  A.  Yes.
7  Q.  How many times did you drive to Florida?
8  A.  Just that once.
9  Q.  You drove to Florida and then you drove back
10     up to Atlanta?
11 A.  Back up to get on 85.
12 Q.  Have you ever spoken with the driver of that
13     black vehicle who was also involved in the
14     collision, Ms. Denita Colvin?
15 A.  Not that I know of.
16 Q.  Have you ever spoken to any witnesses who
17     claim they witnessed the accident?
18 A.  No.  They couldn't witness the accident when
19     it's just the car that hit me and me going
20     up that ramp.  There couldn't be any
21     witnesses.
22 Q.  Did you ever see the driver of the black car
23     after the accident?

Page 152

1  A.  No.  Just -- No, I didn't go over to the car
2      because after it turned, it seemed it was
3      going to come across the driveway.
4  Q.  What do you feel the driver of the black car
5      did wrong, if anything?
6  A.  Hit me at the back.
7  Q.  At the time that the black car impacted or
8      hit your vehicle, was your vehicle stalled,
9      stopped?
10 A.  No.
11 Q.  Was your vehicle moving forward?
12 A.  Moving forward.
13 Q.  How fast was your vehicle moving forward, if
14     you can estimate?
15 A.  I guess about -- I really don't know.  But
16     not that fast.  Possibly thirty or forty
17     miles an hour.
18 Q.  Did you ever go back to the scene of the
19     accident after you left and went to the
20     hospital?
21 A.  No.
22 Q.  You never took any measurements?
23 A.  Measurements?

Page 153

1   Q.  Yes, ma'am.  You never went out and measured
2       the scene, did you?
3   A.  Oh, no.
4   Q.  Did you ever take any photos of the scene?
5   A.  No.
6   Q.  Did you ever take any photos of any of the
7       cars involved in the accident?
8   A.  No. It wasn't but one car involved.
9   Q.  One car involved in the accident?
10  A.  Right.
11  Q.  Was that your car?
12  A.  The one that hit me from behind.
13  Q.  Did you ever see the black vehicle before
14      the impact?
15  A.  No.
16  Q.  What were you doing at the time of the
17      impact?
18  A.  Just going up -- driving up to go through
19      that one little door and make a left turn to
20      turn around.
21  Q.  I'm confused because you told us earlier
22      that you had gone backwards in reverse; is
23      that right, at some time prior to the

Page 154

1       accident?  Is that what you told us earlier?
2   A.  No, I didn't.  Not on that ramp.
3   Q.  Right.
4   A.  All on that ramp was going forward.
5   Q.  What was the purpose of backing up at some
6       point in time before you say you got on the
7       ramp?
8   A.  Because it seemed that I was just going to
9       go on and go on to Alabama.
10  Q.  When you backed up, did you turn right or
11      left to get where you wanted to go?
12  A.  No.
13  Q.  What...
14  A.  No turning.
15  Q.  Okay.  When you backed...
16  A.  It was on the -- like the highway is here.
17      And I'm driving on the right side because I
18      know I want to pull off, you know, when it's
19      a place that I could pull off to turn
20      around.  But just going and going, it seemed
21      that, you know, the big highway was just
22      going to continue.  So I saw this ramp going
23      up.

Page 155

1   Q.  Is that depicted in Forty-nine there, the
2       ramp that you saw going up?
3   A.  Well, I made the ramp.
4   Q.  You made the ramp?  Is that what you said?
5   A.  Yes.  You can call this that you made the
6       ramp if that's the car that's struck me from
7       behind.  But it seemed no one ever got out
8       of the car that was -- that hit me.
9   Q.  You don't know if they were injured or not,
10      do you?
11  A.  No, I don't.
12  Q.  Do you even know if their car door was
13      operable where they could get out?
14  A.  No, I don't know.  It seemed that they never
15      attempted to get out.  They just -- when it
16      sort of turned to come across that ramp, it
17      seemed that they just -- they were still in
18      the car.
19  Q.  Are you aware of any witnesses saying that
20      you were backing up into oncoming traffic at
21      the time of the impact?
22  A.  Well, they weren't telling the truth.
23  Q.  My question was, are you aware of witnesses?

Page 156

1   A.  No, I'm...
2   Q.  You are not aware of anyone saying that?
3   A.  No.
4   Q.  Assuming witnesses put you backing up at the
5       time of the accident, would you disagree
6       with that statement?
7   A.  Definitely.
8   Q.  Assuming witnesses testify that you were
9       backing up into oncoming traffic at the time
10      of the accident, would you say that they are
11      fabricating their testimony?
12  A.  Right.  It's not the truth.
13          MR. COLLINS:  Object to the form.
14  Q.  Are you aware of my client, Ms. Colvin, the
15      driver of that black vehicle making a claim
16      against you for her injuries?
17  A.  She was injured?
18  Q.  Are you aware of Ms. Colvin making a claim?
19  A.  No.
20  Q.  You are not?
21  A.  No.
22  Q.  You know that Mr. Johnson here filed this
23      lawsuit against you and other people?  Is

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 157

1       that your understanding?
2    A.  Uh-huh (positive response).
3    Q.  Is that a yes?
4    A.  Yes.
5    Q.  Do you know what the allegations are against
6       you?
7    A.  What?
8    Q.  I'm asking you, do you know what they are
9       saying that you did?
10   A.  What I did do?
11   Q.  I'm asking you.  There is no right or wrong
12      answer.
13   A.  No.
14   Q.  You are not aware?
15   A.  No.
16   Q.  We talked about this yesterday.  Will you
17      make sure that Mr. Henderson gets a list of
18      all doctors that you saw while you were in
19      Georgia?  Will you make sure he gets that?
20   A.  Of all of the doctors.
21   Q.  Yes, ma'am.  We can get that later, but will
22      you make sure Mr. Henderson gets that for
23      us.

Page 158

1    A.  Okay.
2        THE WITNESS:  How will you get it,
3        Mr. Henderson?
4        MR. HENDERSON:  I'll call you
5        about it.
6        THE WITNESS:  Okay.
7    Q.  I've just got a couple more.  Bear with me,
8       Ms. Baldwin.  You are doing great.
9        You had mentioned yesterday,
10      Ms. Baldwin, about missing a piece of
11      luggage at the airport; is that right?
12   A.  Right.
13   Q.  Isn't it true that that luggage contained
14      your medicine?
15   A.  No.
16   Q.  Whose luggage was that?
17   A.  Mine.
18   Q.  What did that luggage contain?
19   A.  Clothing.
20   Q.  Where was your medicine stored?
21   A.  In my carry-on bag.
22   Q.  Did you have your carry-on bag with you --
23   A.  Yes.

Page 159

1    Q.  -- the day of the accident?
2    A.  Yes.
3    Q.  When did you get that luggage bag back?
4    A.  I haven't gotten it back yet.
5    Q.  You never got it back?
6    A.  No.
7    Q.  Was there any medication whatsoever that was
8       stored in that luggage bag?
9    A.  No.
10   Q.  Do you know who would have watched you take
11      the medication -- your medication that's
12      listed on Plaintiff's Exhibit Five the day
13      of the accident?
14   A.  Who would have watched me?  Possibly nobody.
15   Q.  Do you have a distinct recollection of
16      taking every medicine you have listed on
17      Plaintiff's Exhibit Five the day of the
18      accident, July 27 of '07?
19          MR. COLLINS:  Object to the form.
20          Asked and answered.
21   Q.  Do you need some more time, ma'am?  Do you
22      need some more time to answer my question?
23   A.  Oh.

Page 160

1    Q.  That's okay.  Do you have a distinct
2       recollection that you took each one of these
3       medicines on July 27 of '07?
4    A.  Yes.
5    Q.  You do?
6    A.  Yes.
7    Q.  Would anybody have seen you take that?
8    A.  I'm not really sure.
9    Q.  Earlier you told Mr. Collins that you were
10      involved in a prior accident about two years
11      ago.  Do you remember talking about that in
12      Atlanta?
13   A.  Uh-huh (positive response).
14   Q.  Do you remember that?
15   A.  Uh-huh (positive response).
16   Q.  Is that a yes?
17   A.  Yes.
18   Q.  You had mentioned that the ladies -- Am I
19      correct to assume that your two sisters were
20      with you then, too?
21   A.  Yes.
22   Q.  Was anybody injured in that accident?
23   A.  No.

Page 161

1  Q.  Do you accept any fault whatsoever from that
2      particular accident?
3          MR. HENDERSON:  Object to the
4      form.
5  A.  No.
6  Q.  Were you trying to turn left in that
7      accident, too?
8  A.  No.
9          MR. COLLINS:  Object to the form.
10         MR. WALLER:  What's your
11     objection?
12         MR. COLLINS:  I just object to the
13     form, too.
14         MR. HENDERSON:  Not relevant.
15 Q.  Ma'am, they are objecting to the form.  You
16     can answer, if you know.
17 A.  No.  I wasn't trying to turn left.
18 Q.  When you woke up the morning of July 27,
19     '07, when you woke up that morning, what
20     time did you and your sisters leave to head
21     to Cuthbert, Georgia?
22 A.  I don't know.
23 Q.  Do you have a recollection leaving that

Page 162

1      morning?
2  A.  Yes.
3  Q.  Do you know where all you went that day?
4      And let me rephrase.
5  A.  No place.
6  Q.  I represent to you -- I'm sorry.  I'll
7      represent to you the accident in Montgomery
8      happened around seven p.m. that night.  Do
9      you know what you did that day?  If the
10     accident occurred in Montgomery at seven
11     p.m. that night, do you recall where all you
12     had been that particular day?
13 A.  On the highway.
14 Q.  You had been on the highway the whole time?
15 A.  I don't know.
16 Q.  Is it fair to say you just don't recall some
17     of the details of the accident?
18 A.  Details of the accident?
19 Q.  Yes, ma'am.
20         MR. HENDERSON:  Object to the
21     form.
22 Q.  Ma'am, you just told me you don't remember
23     what you did that day; is that right?

Page 163

1          MR. HENDERSON:  Object to the
2      form.
3  Q.  Is that right, Ms. Baldwin?
4  A.  Nothing but drive.
5  Q.  It is your recollection that you drove --
6      you were driving from the time you left that
7      morning until the time of the accident at
8      approximately seven p.m. in Montgomery; is
9      that right?
10 A.  What was your question?
11 Q.  I'm just trying to establish, Ms. Baldwin,
12     if you know what you did the day of July 27,
13     2007 from the time you left Atlanta until
14     the time of the accident in Montgomery.
15 A.  Left Atlanta.  I don't remember doing
16     anything.
17 Q.  That's okay.  Was this the first time you
18     had been on a plane in July of 2007?
19 A.  No.
20 Q.  You had been on one before?
21 A.  Yes.
22 Q.  I'm trying to get through, Ms. Baldwin.
23     Bear with me.

Page 164

1          Do you recall telling the police
2      officer that you had only been driving about
3      thirty minutes prior to the accident that
4      night?
5  A.  Thirty minutes?
6  Q.  Uh-huh (positive response).
7  A.  Uh-uh (negative response).
8  Q.  You don't recall telling the officer that?
9  A.  No.
10         MR. WALLER:  Ms. Baldwin, I think
11     that's all I have for you.
12         EXAMINATION
13 BY MR. PHILLIPS:
14 Q.  Ms. Baldwin, did your sister Irena suffer
15     from the glaucoma that you know of?
16 A.  Did she what?
17 Q.  Did she have glaucoma?
18 A.  Car cover?
19 Q.  Glaucoma.
20         MR. HENDERSON:  Glaucoma.
21         MR. PHILLIPS:  Yes.  Thank you.
22         MR. HENDERSON:  Do you know if she
23     suffered from glaucoma?

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 165

1  THE WITNESS: She didn't suffer
2  from it.
3  MR. HENDERSON: Do you know if she
4  had glaucoma?
5  THE WITNESS: No, I don't know.
6  MR. HENDERSON: She doesn't know,
7  John.
8  MR. PHILLIPS: Okay. Thank you.
9  Q. Do you know if she suffered from dementia?
10 A. No.
11 Q. How long did you and Irena live together?
12 A. Live together?
13 Q. Yes, ma'am.
14 A. Probably forty years.
15 Q. And let's just think about the last five
16 years y'all lived together. Who paid for
17 the power bill?
18 A. Who paid for the...
19 MR. HENDERSON: Power bill.
20 MR. COLLINS: Electricity.
21 A. Together.
22 Q. There was one bill that came to the house
23 and y'all split it?

Page 166

1  A. Yes.
2  Q. So the same for the phone bill?
3  A. The phone bill?
4  Q. Yes, ma'am.
5  A. Yes.
6  Q. It's kind of a strange question, but did you
7  and Irena have the same key that opened the
8  front door -- not shared the key, but it was
9  the same key that worked the front door?
10 A. We had our own keys.
11 Q. But that key was...
12 A. The same.
13 Q. If you traded keys with her, it would open
14 the same door, correct? In other words,
15 your key didn't open a separate door than
16 Ms. Irena's key, right?
17 A. No, no.
18 Q. Ms. Baldwin, have you had a conversation
19 with Mr. Johnson about the damages that he's
20 suing you for?
21 A. No.
22 Q. Have you asked him why he's suing you?
23 A. No.

Page 167

1  MR. PHILLIPS: That's all I have.
2  Thank you.
3  MR. HENDERSON: Can we take a
4  quick break?
5  (Brief recess.)
6  EXAMINATION
7  BY MR. HENDERSON:
8  Q. Ms. Baldwin, I'm just going to ask you a few
9  questions, and I want to try to clear up a
10 few things that may have come across as
11 being confusing -- may have confused a few
12 of us in the deposition.
13 One thing is earlier you were talking
14 about going toward a door on the interstate.
15 Do you remember that, that you were going
16 toward a door?
17 A. Not on the interstate. On that ramp.
18 Q. On the ramp. Okay. I'm going to show you a
19 picture, Plaintiff's Exhibit Number
20 Twenty-six. Okay. Do you see the door that
21 you've been referring to about going towards
22 on that ramp?
23 A. No. I don't see the door. But it's up on

Page 168

1  the ramp. It's just one exit up there.
2  Q. Okay. So you don't...
3  A. It's to the left.
4  Q. So you don't see it on this picture?
5  A. No. I don't see a door.
6  Q. Let me ask you a few more. But the door was
7  a place where you could go and turn around
8  off the interstate; is that right?
9  A. I assumed it would be that I could turn
10 around some place.
11 Q. Now, these lawyers have been talking to you
12 about stopping on the interstate or the
13 highway and backing up. Do you remember
14 stopping in the middle of the interstate?
15 A. No, I didn't.
16 Q. Do you remember backing up in the middle of
17 the interstate?
18 A. No.
19 Q. Where you backed up, was that on the side of
20 the interstate?
21 A. Right. On the right side.
22 Q. Would that have been in an area where cars
23 did not travel?

Page 169

1   A.   Right.
2   Q.   Kind of on the edge of the highway?
3          MR. WALLER:  Object to the form.
4   Q.   Would that be on the edge of the highway?
5          MR. WALLER:  Object to the form.
6   A.   Yeah.
7   Q.   Ms. Baldwin, do you remember if your sister
8        Irena gave you any money for the hotel room?
9   A.   No.
10  Q.   Do you remember if she gave you any money
11       for the rental car?
12  A.   No.
13  Q.   Did you ask Irena to give you any money for
14       the hotel room?
15  A.   No.
16  Q.   Did you ask Irena to give you any money for
17       the rental car?
18  A.   No.
19  Q.   Would that have been something that she
20       would have done on her own?
21  A.   She would have done it on her own.
22  Q.   Did you require that Irena give you any
23       money for expenses?

Page 170

1   A.   No.
2   Q.   Would you have taken Irena on this trip
3        anyway if she hadn't given you any money for
4        expenses?
5   A.   Right.
6   Q.   And your other sister that went,
7        Ms. Prather, on the trip with you, she
8        didn't give you any money, did she?
9   A.   No.
10  Q.   And she didn't give you any money for
11       expenses, did she?
12  A.   No.
13         MR. HENDERSON:  That's all of the
14       questions I've got.
15         EXAMINATION
16  BY MR. COLLINS:
17  Q.   Ms. Baldwin, when you say you would have
18       taken Irena on the trip with you, isn't it a
19       fact that you didn't take her with you, that
20       y'all all went together?  I mean, y'all all
21       agreed to go on the trip together, right?
22  A.   Yes.
23  Q.   You weren't in charge of the trip, were you?

Page 171

1          MR. HENDERSON:  Object to the
2        form.
3   A.   No.
4   Q.   Were you in charge of the trip?
5   A.   No, no.
6   Q.   There was an agreement by all of y'all to go
7        on the same trip?
8   A.   Right.
9   Q.   And that purpose was to go visit family,
10       correct?
11  A.   Right.
12  Q.   And all of you made the decision to go visit
13       family, correct?
14  A.   Yes.
15  Q.   So it wasn't a trip that you spearheaded, so
16       to speak?
17  A.   No, no.
18  Q.   So when you said you would have taken Irena
19       on the trip with you, that's not accurate,
20       is it?  I mean, she was going anyway --
21         MR. HENDERSON:  Object to the
22       form.
23  Q.   -- correct?

Page 172

1   A.   Right.
2   Q.   Now, you said that you don't remember if she
3        gave you any money, right, for the rental
4        car?
5   A.   Oh, I know she didn't.
6   Q.   You know she didn't?
7   A.   Right.
8   Q.   Now, yesterday you said that she probably
9        did.  Which one is correct?
10  A.   She probably would have, but not at that
11       point.  I would think it was all on my
12       Discovery Card.
13  Q.   So it would have been paid for on your
14       Discovery Card, correct?
15  A.   Right.
16  Q.   Now, yesterday you testified that Irena
17       helped pay for the rental car?  She gave you
18       some money cash?
19  A.   Beg your pardon?
20  Q.   Yesterday I believe you testified that Irena
21       probably helped you pay for the rental car;
22       is that correct?
23         MR. HENDERSON:  Object to the

Deposition of Willie Eva Baldwin

February 27th and 28th, 2008

Page 173

1          form.
2      A.  I'm not sure.
3      Q.  The fact is, you don't really know whether
4          or not she helped you or not, do you?  You
5          don't really know, do you?
6              MR. HENDERSON:  Object to the
7          form.
8      Q.  I'm asking your opinion.  Do you know one
9          way or the other whether she really helped
10         you or not?
11     A.  To put it on my Discovery Card, then I would
12         pay Discovery.
13     Q.  Is it possible that Irena paid you a portion
14         of the rental cost --
15     A.  No.
16     Q.  -- in cash?
17     A.  No.
18     Q.  Yesterday you said she probably did.  Do you
19         remember saying that yesterday?
20     A.  Probably I did.
21     Q.  So which one would be more accurate, that
22         she probably did or that she didn't?
23     A.  She would have, I would think, you know, if

Page 174

1          she hadn't have been killed in the accident.
2      Q.  So are you saying that she had probably
3          would have paid you sometime later?
4      A.  Yes.
5      Q.  Was there an agreement that...
6      A.  No.
7      Q.  Let me finish.  Was there an agreement that
8          you would pay for the rental car on your
9          card and that she would pay you back later?
10     A.  I don't know if we agreed to that.  But I
11         just, you know, usually paid for the trip on
12         Discovery.
13     Q.  And when you usually paid for the trip, did
14         she usually reimburse you or pay you back?
15     A.  I'm not sure.
16     Q.  So are you saying that it's possible that
17         she might have paid you back?
18             MR. HENDERSON:  Object to the
19         form.
20     A.  Yes.
21     Q.  With regards to your living arrangements, I
22         believe you testified that you-all split the
23         electricity bill, correct?

Page 175

1      A.  Sort of.
2      Q.  Can you explain that?
3      A.  It was all in her name.  But we would go
4          down and pay the bill, and I would give her
5          something.
6      Q.  So you would pay her some money for the
7          electricity bill?
8      A.  Yes.
9      Q.  Now, the house was in her name; is that
10         correct?
11     A.  Right.
12     Q.  Was the house paid off?
13     A.  Yes.
14     Q.  Did you pay her any rent to live there?
15     A.  No.
16     Q.  Now, yesterday you testified that you-all
17         handled your own affairs.  She handled her
18         affairs and you handled your own affairs,
19         correct?
20     A.  Right.
21     Q.  And I believe you testified that you-all had
22         your own checking accounts, your own bank
23         accounts?

Page 176

1      A.  Yes.
2      Q.  You were getting disability at the time,
3          correct?
4      A.  Right.
5      Q.  Where was your checking deposited to?
6      A.  At PNC.
7      Q.  PNC?  What does that PNC stand for?
8      A.  Pennsylvania National Bank.
9      Q.  Is that in Philadelphia?
10     A.  Philadelphia.
11     Q.  Was that account solely your account?
12     A.  Yes.
13     Q.  You were the only person on it?
14     A.  Right.
15     Q.  Did Ms. Johnson receive -- to your knowledge
16         receive her own retirement or disability
17         check?
18     A.  Yes.
19     Q.  Does she have a separate account that her
20         money was going into to your knowledge?
21     A.  Yes.  She had a separate account.
22     Q.  Did y'all ever mix accounts?
23     A.  No.

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 177

1   Q.  So the money that came into the household
2       was never commingled together, was it?  It
3       was never put together in one big pot, was
4       it?
5   A.  No.
6   Q.  She had her funds and you had your funds,
7       correct?
8   A.  Right.
9   Q.  Do you -- When was the last time you filed
10      an income tax return?  Do you remember?
11  A.  Last year.
12  Q.  You did file one last year?
13  A.  Yes.
14  Q.  And when you filed that income tax return,
15      did you list Irena Johnson on your income
16      tax return as a dependent?
17  A.  No.
18  Q.  Did you file an income tax return the year
19      before that?
20  A.  Yes.
21  Q.  Did you list Irena Johnson on there as a
22      dependent?
23  A.  No.

Page 178

1   Q.  Have you ever listed Irena Johnson on your
2       income tax return as a dependent?
3   A.  No.
4   Q.  When you filed your income tax return, did
5       you file as a single?
6   A.  Single.
7   Q.  Has Irena -- To the best of your knowledge,
8       has Irena ever listed you on her income tax
9       as a dependent?
10  A.  No.
11  Q.  Do you know whether or not she filed single
12      or head of household?
13  A.  No.
14  Q.  You don't know?
15  A.  No.
16  Q.  So Irena didn't take care of you and you
17      didn't take care of her, correct?
18  A.  Correct.
19          MR. PHILLIPS:  Object to the form.
20  Q.  In your opinion did you take care of Irena?
21  A.  No.
22          MR. PHILLIPS:  Object to the form.
23  Q.  Did you consider yourself being taken care

Page 179

1       of by Irena?
2           MR. PHILLIPS:  Object to the form.
3   Q.  You can go ahead and answer.
4   A.  No.
5   Q.  What about mail?  Did y'all have separate
6       pieces of mail coming to the house?
7   A.  Yes.
8   Q.  Did you ever open her mail?
9   A.  No.
10  Q.  Did she ever open your mail to your
11      knowledge?
12  A.  No.
13  Q.  Let me ask you about Hertz when you went to
14      go rent the car.  Did Hertz ever ask you
15      whether or not they felt that you were
16      capable of driving this vehicle?  Did they
17      ever indicate anything to you like that?
18  A.  No.
19  Q.  Did they ever ask you what kind of
20      medications you were on?
21          MR. PHILLIPS:  I'm going to have
22          to object to that just because
23          of leading on cross

Page 180

1       examination, just to preserve
2       it.  But, otherwise, go ahead,
3       Ms. Baldwin.
4   Q.  You can go ahead and answer the question.
5       Did Hertz ever ask you what medications
6       you were on?
7   A.  No.
8   Q.  Did they ever ask you have you been in any
9       accidents or anything in the past?
10  A.  I don't think so.
11  Q.  Did anybody at Hertz appear to be concerned
12      about whether or not you could drive their
13      vehicle?
14  A.  No.
15          MR. PHILLIPS:  Object to the form.
16  Q.  Did you ever tell Hertz that you were taking
17      all of these different medications?
18  A.  No.
19          MR. COLLINS:  I don't think I have
20          anything further at this point.
21      EXAMINATION
22  BY MR. WALLER:
23  Q.  Just a couple, Ms. Baldwin.  Your attorney

Page 181

1    just talked to you and you replied to him
2    that at the time you were backing up you
3    thought it was safe to do so on the edge of
4    the roadway, I think is what you said. Is
5    that right?
6    A.  Uh-huh (positive response).
7    Q.  Is that right?
8    A.  Uh-huh (positive response).
9    Q.  Say yes for...
10   A.  Yes.
11   Q.  I'm going to show you Plaintiff's Exhibit
12      Forty-nine and Plaintiff's Exhibit Fifty,
13      these two pictures. In either one of these
14      pictures does it depict the area where you
15      backed up?
16   A.  Yeah.
17   Q.  Will you put a red X on that area where you
18      backed up -- where you thought it was the
19      edge of the roadway?
20   A.  This is not the highway.
21   Q.  And my question is, will you put an X where
22      you backed up in these pictures, whatever
23      they depict?

Page 182

1    A.  I can't put an X there where I backed up
2       because that's not 85.
3           MR. HENDERSON: I think it's clear
4              that she doesn't recognize
5              these pictures. And to get her
6              to put an X or draw on the
7              photographs wouldn't do us any
8              good since she doesn't
9              recognize these pictures as
10             being the...
11          THE WITNESS: Because the highway
12             would be down.
13          MR. COLLINS: I think she
14             recognized them enough to draw
15             the lane she was traveling in.
16             So...
17          MR. WALLER: My response is this.
18             The pictures depict what they
19             depict. And, David, if she
20             doesn't, she can say she
21             doesn't know.
22   Q.  But just based on what you are looking at
23      here, do you know, Ms. Baldwin, if the area

Page 183

1    where you backed up is depicted in either
2    one of these two pictures?
3    A.  No.
4    Q.  You don't know?
5    A.  It's not.
6    Q.  Okay. That's fine. I thought you said it
7    did.
8           MR. WALLER: That's all I have.
9           MR. HENDERSON: Anything else,
10             John?
11          MR. COLLINS: Just for the record,
12             Plaintiff's Exhibit Fifteen
13             through Sixty indicates that we
14             had two Plaintiff's Exhibits
15             Twenty-one. We are going to
16             change one of those exhibits to
17             reflect Plaintiff's Exhibit
18             Twenty-one A with, I assume, no
19             objections.
20          MR. HENDERSON: That's fine.
21    * * * * * * * * * * * * *
22    FURTHER DEPONENT SAITH NOT
23    * * * * * * * * * * * * *

Page 184

1           REPORTER'S CERTIFICATE
2    STATE OF ALABAMA:
3    MONTGOMERY COUNTY:
4        I, Tracey H. Rives, Certified Shorthand
5    Reporter and Commissioner for the State of Alabama
6    at Large, do hereby certify that I reported the
7    deposition of:
8           WILLIE EVA BALDWIN
9    who was first duly sworn by me to speak the truth,
10   the whole truth and nothing but the truth, in the
11   matter of:
12          ROBERT JOHNSON, as Personal
13          Representative of THE ESTATE OF
14          IRENA JOHNSON, Deceased,
15          Plaintiff,
16          Vs.
17          DENITA COLVIN and
18          WILLIE EVA BALDWIN, et al.,
19          Defendants.
20          Civil Action Number
21          2:07CV1068-MHT
22          In the U.S. District Court
23          for the Middle District of Alabama

Deposition of Willie Eva Baldwin                                    February 27th and 28th, 2008

Page 185

1   On February 27, 2008.
2        The foregoing 184 computer printed pages
3   contain a true and correct transcript of the
4   examination of said witness by counsel for the
5   parties set out herein.  The reading and signing of
6   same is hereby waived.
7        I further certify that I am neither of
8   kin nor of counsel to the parties to said cause,
9   nor in any manner interested in the results
10  thereof.
11       This 21st day of March 2008.
12
13       _____
         Tracey H. Rives, Certified
14       Shorthand Reporter and
         Commissioner for the
15       State of Alabama at Large,
         ACCR#: 400, Expiration Date:
16       9/30/08
17
18
19
20
21
22
23